**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IYS Ventures, LLC, | ) | Case No. 23-06782 |
| | ) | |
| Debtor. | ) | Hon. David D. Cleary |
| | ) | |

**CROSSAMERICA PARTNERS LP'S
RESPONSE TO DEBTOR'S AMENDED MOTION FOR ENTRY
OF AN ORDER (I) ENFORCING THE AUTOMATIC STAY AGAINST
CROSSAMERICA PARTNERS, LP, CAP OPERATIONS, INC., LEHIGH GAS
WHOLESALE, LLC, LGP REALTY HOLDINGS, LP, LEHIGH GAS WHOLESALE
SERVICES, INC., AND ERICKSON OIL PRODUCTS, INC., AND (II) FOR
DAMAGES AND SANCTIONS PURSUANT TO 11 U.S.C. § 105 AND 11 U.S.C. § 362**

CrossAmerica Partners LP and certain of its affiliates[1] ("CAP"), by and through their attorneys, respectfully state as follows in response to *Debtor's Amended Motion for Entry of an Order (I) Enforcing the Automatic Stay Against CrossAmerica Partners, LP, CAP Operations, Inc., Lehigh Gas Wholesale, LLC, LGP Realty Holdings, LP, Lehigh Gas Wholesale Services, Inc., and Erickson Oil Products, Inc., and (II) for Damages and Sanctions Pursuant to 11 U.S.C. § 105 and 11 U.S.C. § 362* [Docket No. 179] (the "Motion"), filed by the above-captioned debtor (the "Debtor").

**PRELIMINARY STATEMENT**

1. The Motion should be denied on procedural grounds because claims for injunctive relief and monetary damages require an adversary proceeding. Even if the Court could entertain

---

[1] CAP affiliate Lehigh Gas Wholesale LLC is the fuel supplier under the Fuel Supply Agreements with the Debtor. The Debtor leases certain of its locations from the following CAP-affiliated landlord entities: LGP Realty Holdings LP, Erikson Oil Products, Inc., CAP Operations, Inc., Lehigh Gas Wholesale Services, Inc. and Lehigh Gas Wholesale LLC.

1

149178469.5

the Debtor's request on a motion, the Debtor has not carried its burden by presenting actual evidence and misrepresents CAP's conduct, which is entirely consistent with the parties' contractual relationship. There is no evidence of any violation of the automatic stay.

2. The Debtor alleges, largely with no evidence, that: (1) CAP has not complied with the parties' credit terms, which is untrue; (2) CAP has "stuffed tanks" and delivered disproportionate amounts of higher-priced fuel, which is not only untrue but largely outside of CAP's control; (3) CAP has caused its employees to improperly conduct inspections of the Debtor's stations, when in fact such inspections were conducted in accordance with the Agreements (as defined below) and in the ordinary course of business; (4) CAP improperly withheld funds from the Debtor at the end of August, when in fact the payment mechanics were discussed with and approved by the Debtor; (5) CAP has interfered with the Debtor's business operations by posting the Rejection Motion (as defined below) at stations in Louisiana, which is untrue and ignores the fact that the Debtor's unauthorized subtenants in Louisiana are listed as interested parties in this bankruptcy and therefore received a copy of the Rejection Motion via U. S. Mail; and (6) CAP has improperly communicated with licensing bodies and the creditors in this case, which misstates the nature of CAP's communications with the town of Neillsville, Wisconsin and ignores CAP's right to communicate with creditors about the direction of this bankruptcy proceeding.

3. CAP takes seriously the Debtor's allegation that the stay has been violated. CAP has reviewed its records regarding sweeps and withdrawals into and from the Debtor's account; CAP has reviewed its records regarding deliveries of fuel to the Debtor; and CAP has questioned its employees regarding station inspections and communications with licensing authorities. As explained below, CAP found no evidence to substantiate the Debtor's allegations of stay

violations—which CAP perceives as an attempt to distract attention from the Debtor's uncured breach of the Agreements.

4. What's more, many of the Debtor's allegations lack specificity or evidentiary support, limiting CAP's ability to respond. For example, the Debtor alleges that CAP has "stuffed" tanks, but the Debtor does not identify which tanks or when they were allegedly "stuffed." The Debtor alleges that CAP has delivered disproportionate amounts of higher-octane fuel, but the Debtor has not identified the alleged deliveries in question. CAP sought clarification from the Debtor and the Debtor refused to provide it, suggesting that it is CAP's burden to disprove the allegations.

5. For these reasons, as further discussed below, the Motion should be denied.

## BACKGROUND

6. On August 23, 2023, the Debtor filed the *Debtor's Motion for Entry of an Order (I) Enforcing the Automatic Stay Against CrossAmerica Partners, LP, CAP Operations, Inc., Lehigh Gas Wholesale, LLC, LGP Realty Holdings, LP, Lehigh Gas Wholesale Services, Inc., and Erickson Oil Products, Inc., and (II) for Damages and Sanctions Pursuant to 11 U.S.C. § 105 and 11 U.S.C. § 362* [Docket No. 130] (the "Original Motion") in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Court"), alleging that CAP violated section 362 of Title 11 of the United States Code (the "Bankruptcy Code").

7. The Court addressed the Original Motion on August 30, 2023 and CAP argued that the Original Motion lacked sufficient specificity. The Court directed the Debtor to file an amended motion, but the Debtor's allegations in the Motion still lack sufficient specificity for the most part.

8. On September 5, 2023, the Debtor filed the Motion. On September 6, 2023, the Court ordered CAP to respond to the Motion by September 11, 2023, and continued the Motion for a status hearing on September 12, 2023.

3

**ARGUMENT**

**I.   The Debtor's Claims for Monetary and Injunctive Relief in the Motion Require an Adversary Proceeding and Should Be Denied.**

9.   The Motion requests recovery of money and injunctive relief, which may only be sought through an adversary proceeding. Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides, "[t]he following are adversary proceedings: . . . (1) a proceeding to recover money or property, other than a proceeding to compel the debtor to deliver property to the trustee, or a proceeding under § 554(b) or § 725 of the Code, Rule 2017, or Rule 6002 [and] (7) a proceeding to obtain an injunction or other equitable relief, except when a . . . plan provides for the relief." FED. R. BANKR. P. 7001.

10.   This Court and others have held that such requests require an adversary proceeding. *See In re 1600 Hicks Rd. LLC*, 649 B.R. 172, 176 (Bankr. N.D. Ill. 2023) ("Fed. R. Bankr. P. 7001(7) requires proceedings to obtain an injunction or other equitable relief to be brought by adversary proceeding")[2]; *In re Collum*, 649 B.R. 186, 196 (Bankr. N.D. Ill. 2023) ("the Complaint seeks injunctive relief as well as damages. Such a request must be brought by way of an adversary proceeding."); *Matter of Rimsat, Ltd.*, 208 B.R. 910, 913 (Bankr. N.D. Ind. 1997) ("The complaining party seeks an order compelling restoration of the pre-violation status quo and requiring future compliance with § 362(a), as well as compensatory damages as a result of the violation, attorney fees, and often punitive damages as well. This makes the proceeding one to

---

[2] The Debtor cites *In re 1600 Hicks Rd. LLC* for the principle that the Court may issue an injunction any time (1) there is likelihood of a successful reorganization and (2) such injunction would serve the public interest. Motion ¶ 33. *In re 1600 Hicks*, however, involved enjoining third-party litigation, which is not the case here. 649 B.R. at 179–80. Further, the operative facts in that case appeared undisputed. Here, CAP fervently disputes that it has taken any action that violates the automatic stay. Before the Court may grant the injunctive relief requested in the Motion, the Debtor must first show, by a preponderance of evidence, that CAP has violated the automatic stay. *See In re Standfield*, 152 B.R. 528, 534 (Bankr. N.D. Ill. 1993) (holding that the debtor had the burden of proving, by a preponderance of the evidence, that a party had violated the automatic stay). The Debtor has not proven a stay violation and so there are no grounds for injunctive relief.

recover money or property or to obtain injunctive relief. As such, an adversary proceeding is required.").

11. At the September 6 hearing, the Court appropriately questioned the need for an adversary proceeding in light of the injunctive relief requested by the Debtor. Indeed, the Court cannot grant any of the relief requested without an adversary proceeding, and the Motion should be denied for that reason alone.

## II. The Factual Bases Listed in the Motion Are Wrong or Mischaracterized.

12. <u>Credit Terms.</u> Paragraphs 21.A and 21.E of the Motion allege that CAP violated the Fuel Supply Agreement by shortening the Debtor's credit terms for fuel purchases. As evidenced by the Declaration of Robert Brecker, attached hereto as **Exhibit A** (the "<u>Brecker Declaration</u>"), CAP reviewed its records of ETF withdrawals from the Debtor's accounts (an example of which is attached to the Brecker Declaration as <u>Exhibit 1</u>) and determined that, since the commencement of this chapter 11 case, CAP has complied with the credit terms set forth in the Fuel Supply Agreement. See Brecker Declaration ¶ 9. The Debtor asserts that CAP has violated the Fuel Supply Agreement by applying less than four-day credit terms; however, the Debtor has ignored the terms of the agreement, which provides for three-day terms for certain stations and four-day terms for others. Aside from the bald assertion that CAP has "[u]nilaterally chang[ed] credit terms in contravention of the Agreements," the Debtor has provided no other information to support its allegation, despite CAP's request for additional specifics. Instead of providing any specifics or even identifying the transaction(s) in question, the Debtor has suggested that it is CAP's burden to prove the absence of a violation. *See* Email from Gregory Stern to Peter Buckley (Sept. 6, 2023),[3] attached hereto as **Exhibit B** ("Regarding the credit terms and allegations

---

[3] Following the hearing before the Court on September 6, 2023, CAP's counsel emailed Debtor's counsel requesting to meet and confer regarding the allegations in the Motion, requesting that the Debtor provide more detailed

5

of fuel and rent billing and drafting of funds if you could provide documentation relating to all fuel shipments from lets say June 20, 2023 through the current date including but not limited to when shipments were received, billed and drafted [Matthew Brash's] people could examine them to determine if their understanding of what has happened is correct or not."). CAP has complied with the terms of the Fuel Supply Agreements. There is no basis to find a stay violation.

13. <u>Tank "Stuffing."</u> Paragraphs 21.B and 21.E of the Motion allege that CAP intentionally delivered more fuel than the Debtor could sell in a reasonable amount of time. Again, despite demand, the Debtor has not provided any specifics, refusing to identify the alleged deliveries that support its bald allegation. The Debtor and CAP utilize two fuel delivery processes to supply the Debtor's 49 stations, one is automated by tank monitoring equipment and software and the other is managed directly by the Debtor—in either scenario, CAP does not actively participate in the routine ordering of fuel for any of the Debtor's locations. *See* Brecker Declaration ¶¶ 10–11. During this Chapter 11 case, just as before in the ordinary course of business, CAP has not actively controlled when or how much fuel has been delivered to any of the Debtor's stations. *See* Brecker Declaration ¶¶ 10–15. Indeed, CAP's records show that less fuel

---

information about certain vague allegations. In response, Debtor's counsel refused to provide the requested information and unilaterally asserted that such refusal was "for settlement purposes only." However, the communications related only to the Debtor's refusal to provide information for purposes of responding to the Motion and not to any proposed compromise.

"Rule 408 excludes evidence of conduct or statements made in compromise negotiations. Conduct or statements not a part of compromise discussions are not subject to Rule 408." *Sunstar, Inc. v. Alberto-Culver Co.*, No. 01 C 0736, 2004 WL 1899927, at *22 (N.D. Ill. Aug. 23, 2004). For Rule 408 to apply, the Debtor must make a "substantial showing" that the email was, in fact, part of a settlement discussion. *Raybestos Prod. Co. v. Younger*, 54 F.3d 1234, 1241 (7th Cir. 1995). The unilateral statement that a communication is part of settlement negotiations does not make such communication subject to Rule 408. *See Calise v. Casa Redimix Concrete Corp.*, No. 20 CIV. 7164 (PAE), 2022 WL 355665, at *4 (S.D.N.Y. Feb. 4, 2022) (Holding that the presence of a header on a letter to the effect that the letter was subject to Rule 408 was not determinative.). CAP asked for additional facts to support the pending Motion and so that it could investigate and respond to the Motion; the Debtor refused. That discussion is relevant here and not subject to Rule 408.

Out of an abundance of caution, any information in the September 6 email that could remotely be considered related to settlement has been redacted.

149178469.5

was delivered to the Debtor in June 2023 and July 2023 than in June 2022 and July 2022. *See* Brecker Declaration, Ex. 2. The Debtor has provided no information to support this unfounded allegation and instead has asked CAP to prove that CAP has not intentionally engaged in tank stuffing. *See* Email from Gregory Stern to Peter Buckley (Sept. 6, 2023) ("Regarding the . . . allegations of fuel[,] . . . if you could provide documentation relating to all fuel shipments from lets say June 20, 2023 through the current date including but not limited to when shipments were received, billed and drafted [Matthew Brash's] people could examine them to determine if their understanding of what has happened is correct or not."). It is the Debtor's burden to support its Motion with evidence and to identify the facts supporting its bald allegations of "tank stuffing." The Debtor has not carried its burden and the Motion should be denied.

14. Paragraph 21.C of the Motion alleges that CAP intentionally supplied the Debtor with disproportionate amounts of high-priced fuel that the Debtor would not be able to sell in a timely manner. As explained above, and in the Brecker Declaration, CAP does not actively manage the timing or volume of fuel deliveries to the Debtor's stations and a review of CAP's records shows that proportions of fuel grades delivered in June 2023 and July 2023 were similar to the proportions delivered in June 2022 and July 2022. *See* Brecker Declaration, Ex. 2. There is no evidence to support the Debtor's irresponsible speculation. CAP has asked the Debtor to identify the deliveries that support its allegation and the Debtor has not responded.

15. Paragraph 21.D of the Motion alleges that CAP timed deliveries such that tank "stuffing" would occur immediately before expected drops in fuel prices. As explained above, CAP does not actively manage fuel deliveries, therefore CAP could not deliberately time deliveries to coincide with certain market conditions. *See* Brecker Declaration ¶¶ 10–15. Once again, CAP

7

149178469.5

asked the Debtor to identify a specific delivery to support its allegation and the Debtor has refused to provide any specifics.

16. <u>Inspections.</u>  Paragraphs 21.F, 21.G, 21.H, and 21.O of the Motion allege that CAP employees have conducted station inspections on an unreasonably frequent basis.  The Motion further alleges that, during such inspections, CAP's employees have inappropriately questioned the Debtor's employees about business operations, sales volume, inventory costs, store margins, profits and credit terms with vendors.

17. Inspections of property do not violate the automatic stay so long as they are not conducted to harass the debtor into paying a debt.  *See In re Nyamusevya*, 644 B.R. 375, 384 (Bankr. S.D. Ohio 2022) ("But property inspections in and of themselves do not violate the stay. Instead, a stay violation occurs only if the inspections are conducted to harass the debtor or coerce him into paying the mortgage debt."); *In re Rodriguez*, No. 11-BK-18847-RGM, 2015 WL 403968, at *6 (E.D. Va. Jan. 29, 2015) (finding that lender did not violate the automatic stay by conducting an inspection of property where "no employee or agent of Wells Fargo took any act to collect a debt, made any attempt to take possession of the Property, or made any threatening or intimidating act during any of the Property inspections").

18. CAP's inspections do not violate the automatic stay and CAP is entitled—indeed, authorized—to conduct inspections of the stations pursuant to the Agreements.  Nonetheless, CAP has investigated the Debtor's allegations of impropriety, including questioning the employees named in the Motion regarding inspections.  CAP Employees' responses to the Debtor's allegations—only some of which were even signed by the Debtor's employees—are attached hereto as **<u>Exhibit C</u>** through **<u>Exhibit G</u>** (the "<u>Employee Responses</u>").  CAP's investigation produced no evidence that CAP's employees have inappropriately questioned the Debtor's

8

149178469.5

employees. As shown in the Employee Responses, CAP's employees properly inspected the stations and appropriately informed and questioned the Debtor's employees of any issues they found in the stations' operation and maintenance. Such inspections do not harm the estate. Indeed, such inspections benefit the estate by ensuring that the Debtor's stations are maintaining industry standards and that any issues, such as pumps out of order or dirty bathrooms, are rectified promptly. Unkempt or out of service stations drive customers away, harming the Debtor's estate and CAP. CAP is appropriately exercising its oversight role under the Agreements.

19. In the Motion, the Debtor requests injunctive relief in the form of a Court-prescribed inspection protocol. Such relief not only re-writes the Agreements but it is also impractical, essentially asking the Court to micromanage ordinary course inspections conducted in the convenience store industry all the time.

20. <u>Fuel Prices.</u> Paragraph 21.I of the Motion alleges that CAP has improperly pressured the Debtor's employees to reduce fuel prices. Such actions would be against CAP's company policies and CAP's employees are trained to not pressure retailers with respect to fuel prices. *See* Brecker Declaration ¶ 17. CAP investigated this allegation and found no evidence of any improper pressure. *See* Brecker Declaration ¶ 17. As explained in the Employee Responses, CAP employees routinely assess whether station prices are consistent with local markets and share that market data with the station operator. However, CAP employees have not pressured station employees to alter the price as that decision is ultimately left to the Debtor. Consistent with the recurring theme, CAP asked the Debtor to provide specifics to support this allegation and the Debtor refused.

21. <u>Licensing Conversations.</u> Paragraph 21.J of the Motion alleges that CAP has improperly communicated with the town of Neillsville, Wisconsin regarding the Debtor's licenses

and that CAP "slander[ed] IYS's credit by predicting imminent demise and improperly communicated with suppliers, competitors, and governmental agencies." Motion ¶ 21.J. Other than the allegations regarding Neillsville, the Debtor has not provided any specifics. As discussed in the Declaration of Amy Shupp attached hereto as **Exhibit H**, CAP employees sought general guidance about the licensing process in Neillsville in case the Debtor ceases operations there—which is more than a remote possibility in view of the Debtor's bankruptcy. There is nothing improper about understanding the licensing process and, indeed, there is no evidence that Neillsville, Wisconsin has extended the Debtor any credit or that the Debtor suffered any consequence from CAP's innocuous conversations with licensing personnel—which do not support any finding that the stay has been violated.

22.     <u>Corporate Strategy/Rejection Motion.</u>  The Debtor has suggested, in Paragraph 21.K, that CAP has violated the automatic stay by adopting a corporate strategy to increase the number of company operated stores. At the threshold, as it concerns other operators, CAP's corporate strategy is irrelevant to this bankruptcy. With regard to the Debtor, CAP has already asked the Court to compel rejection of the Agreements for the Leased Stations in the Rejection Motion—and the reasons for that request are specified in the Rejection Motion. Indeed, in Paragraph 21.L, the Debtor alleges that CAP violated the automatic stay by filing the Rejection Motion and, in Paragraph 21.M, the Debtor argues that CAP violated the automatic stay by seeking support for the Rejection Motion from the creditors in this bankruptcy. It is not a violation of the automatic stay to seek redress in Court or to discuss the Rejection Motion with the Debtor's creditors. The Debtor's Motion has no merit.

23.     <u>Labor Day Sweep.</u>  Paragraph 21.N of the Motion alleges that, on August 30, 2023, CAP withheld funds from the Debtor in violation of the automatic stay. As explained in the

149178469.5

Brecker Declaration, CAP discussed the relevant transactions with the Debtor and obtained consent. In short, the Debtor was not expected to have sufficient credit card proceeds on account when its September 1 rent payment was due and so, instead of debiting the Debtor's bank account for $262,000 on Friday, September 1, CAP applied ~$80,000 of credit card proceeds on August 30 and waited until September 5 (*i.e.*, after the Debtor had accumulated additional credit card proceeds over the holiday weekend, as the Debtor requested) to charge the Debtor the remaining balance of the rent that was rightfully due to CAP on September 1. *See* Brecker Declaration ¶¶ 21–23. The Debtor was consulted and agreed to this arrangement, which did not violate the automatic stay.

24.   <u>Posting of the Rejection Motion.</u>  Paragraph 21.P of the Motion alleges that CAP posted *CrossAmerica Partners, LP's Motion for Entry of an Order Compelling Rejection of Agreements for Leased Stations Or, Alternatively, Granting Relief from the Automatic Stay* [Docket No. 74] (the "<u>Rejection Motion</u>") on the doors of the Debtor's stations, including stations in Louisiana. CAP investigated this allegation and found no evidence that any CAP employees or personnel posted the Rejection Motion at any stations. *See* Brecker Declaration ¶ 17. The Debtor has provided no evidence that CAP posted the Rejection Motion at any stations and instead asks CAP to prove that CAP did not post the Rejection Motion. *See* Email from Gregory Stern to Peter Buckley (Sept. 6, 2023) ("In regards to the motion to compel rejection taped to the doors of the LA stores it is not incumbent upon me to provide you with evidence of which CAP employee or agent taped the motion to the stations door. Who else would do such a thing? Are you suggesting the US Postal Service? How about you provide me proof that CAP did not do it? Provide all communications in these regards as requested."). There is no merit to the Debtor's unfounded speculation and, indeed, the Debtor overlooks the fact that the unauthorized subtenants that are

running the Louisiana stations (7 Mart, Inc., M&A Stop Market LLC, and M&A 200, Inc.) are listed on the label matrix for local noticing by virtue of the Debtor having identified them as interested parties. As the Court may recall, the Debtor insisted that CAP serve the Rejection Motion on all such parties.

25. Taken in its totality, the Debtor's Motion is devoid of any factual substance or legal merit. It is nothing more than an attempt to distract from the Debtor's uncured breaches of the Agreements and to muddy the waters of this bankruptcy. The Debtor's allegations are either false, recklessly made, or mischaracterizing innocuous conduct on the part of CAP. CAP has not violated the automatic stay and the Debtor's attempt to insert the Court in the middle of the daily interactions necessary to operate 49 stations across multiple states should be denied.

### III. Station Inspections Do Not Violate the Automatic Stay and Are Authorized Under the Agreements Between CAP and the Debtor

26. The Fuel Supply Agreement, attached to the Motion as <u>Exhibit B</u>, provides that the Debtor "shall permit [CAP] . . . to enter and inspect the Marketing Premises, including any and all records relating to the Business or required to be maintained under this agreement, to determine compliance with this Agreement and Law. [Debtor] shall cooperate fully with [CAP] . . . in conducting any inspection and shall render assistance as may be reasonably requested." Fuel Supply Agreement, Section 5.13. The Lease Agreement, attached to the Motion as <u>Exhibit A</u>, provides that "[CAP] has the unrestricted right to enter upon the Property at any time to inspect or to remove any and all of its property including the Equipment." Lease Agreement, Section 2.9.

27. As stated above, courts have found that inspections of property do not violate the automatic stay so long as they are not conducted to harass the debtor into paying a debt. CAP investigated the allegations set forth in the Motion and found no evidence that inspections took

place to coerce payment or that CAP's employees performed their duties in a way that violated the automatic stay.  *See* Employee Responses.

28.     The Debtor relies on Section 362(a)(3)'s prohibition against "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" and complains that CAP is interfering with the Debtor's reorganization effort.  However, there is no evidence to even suggest that CAP is engaged in activity that rises to the level of a stay violation.  To the contrary, CAP is merely seeking to hold the Debtor to its contractual obligations while separately seeking relief from the Court by way of a motion to compel rejection or relief from the automatic stay to enforce the Debtor's ongoing contractual breaches.  The Debtor is improperly trying to shift the blame for its own conduct and uncured contractual breaches.  The Court should not entertain the Debtor's unfounded allegations and should deny the Motion outright unless the Debtor can come forward with evidence that justifies conducting further proceedings on the Motion.

## NOTICE

29.     Notice of this response has been provided to the Debtor and its counsel, the United States Trustee, and parties who have requested notice in this case.  CAP requests that the Court waive any further notice.

 

Respectfully submitted,
CrossAmerica Partners, LP

Dated: September 11, 2023            By: */s/ Gordon E. Gouveia*
            One of its attorneys

149178469.5

Gordon E. Gouveia (#6282986)
FOX ROTHSCHILD LLP
321 North Clark Street, Suite 1600
Chicago, IL 60654
Tel: (312) 517-9200
ggouveia@foxrothschild.com

149178469.5

# CERTIFICATE OF SERVICE

I, Gordon E. Gouveia, certify that I caused a copy of the foregoing to be served on all persons set forth on the attached Service List identified as Registrants through the Court's Electronic Notice for Registrants and, as to all other persons on the attached Service List, by mailing a copy of same in an envelope properly addressed and with postage fully prepaid and by depositing same in the U.S. Mail, on September 11, 2023.

By: /s/ *Gordon E. Gouveia*

## SERVICE LIST

**Registrants Served Through the Court's Electronic Notice for Registrants**

Patrick Layng, United States Trustee
219 South Dearborn Street, Suite 873
Chicago, Illinois 60604

Gregory K. Stern
Gregory K. Stern, P.C.
53 West Jackson Blvd.
Suite 1442
Chicago, IL 60604

William J. Serritella
Yeoeun C. Yoon
111 East Wacker Drive, #2600
Chicago, Illinois 60601

Daniel Scheeringa
4711 Golf Road, #200
Skokie, Illinois 60076

William K. Kane
321 North Clark Street
32nd Floor
Chicago, Illinois 60654

Ariel Weissberg, Counsel for:
Ameer Investment, Inc.;
Areej Investment, Inc.;
Kareem, Inc.;
Kenan Ventures, Inc.;
Leanne Investments, Inc.;
Leanne Ventures, Inc.; and
Marks Supermarket NC, Inc.

149178469.5

Weissberg and Associates, Ltd.
125 South Wacker Drive
Suite 300
Chicago, IL 60606

John Reding, Counsel for Illinois Lottery
Illinois Attorney General's Office
100 W. Randolph St., 13th Floor
Chicago, IL 60601

Miriam Stein Granek, Counsel for Itria Ventures, LLC
Gutnicki LLP
4711 Golf Road
Suite 200
Skokie, IL 60076

Kimberly Ross Clayson, Counsel for The Huntington National Bank
Taft Stettinius & Hollister LLP
27777 Franklin Rd. Suite 2500
Southfield, MI 48034

**Parties Served Via United States Mail**

IYS Ventures, LLC
15416 South 70th Court
Orland Park, Illinois 60462

Aramark Uniform Services
2334 South Michigan Avenue
Chicago, IL 60616

BMW Bank of North America, c/o AIS Portfolio Services, LLC
4515 N Santa Fe Ave. Dept. APS
Oklahoma City, OK 73118

BMW Financial Services
Customer Service Center
PO Box 3608
Dublin, OH 43016-0306

Byzfunder NY, LLC
530 7th Avenue
Suite 505
New York, New York 10018

149178469.5

Coca-Cola Bottling Company
PO Box 105637
Atlanta, GA 30348

Fox Capital Group, Inc.
803 South 21st Avenue
Hollywood, FL 33020

Frito-Lay, Inc.
7700 Bulldog Drive
Summit Argo, IL 60501

Home State Security
250 East 5th Street
15 Floor
Cincinnati, OH 45202

M&M Service
315 East 15th Street
Covington, Kentucky 41011

Manistique Oil Company
216 Deer Street
Manistique, MI 49854

Marks Supermarket NC, Inc.
317 U.S. Highway 64 West
Creswell, North Carolina 27928

Mercedes Benz Financial Services
PO Box 5209
Carol Stream, IL 60197-5209

Nissan Motor Acceptance Corporation
Bankruptcy Department
P.O. Box 660577
Dallas, Texas 75266-0577

Pepsi Beverages Co.
2541 West 20th Avenue
Oshkosh, WI 54904

Red Bull Distribution Company
PO Box 204750
Dallas, TX 75320

149178469.5

Samson Funding
17 State Street
Suite 630
New York, New York 10004

U.S. Small Business Administration
409 3rd Street SW
Washington, DC 20416

We Energies
PO Box 2046
Milwaukee, WI 53201-2046

Wisconsin Department of Revenue
2135 Rimrock Road
Madison, WI 53713

Xcel Energy
PO Box 9477
Minneapolis, MN 55484-9477

149178469.5