**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| IYS Ventures, LLC, | ) | Case No. 23-06782 |
| | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |
| | ) | Hon. David D. Cleary |

**CROSSAMERICA PARTNERS' POST-TRIAL BRIEF**
**IN SUPPORT OF ITS REJECTION MOTION AND**
**IN OPPOSITION TO DEBTOR'S ASSUMPTION MOTION**

CrossAmerica Partners LP and certain of its affiliates[1] ("CAP"), by their attorneys, submit this post-trial brief in support of *CrossAmerica Partners LP's Motion for Entry of an Order Compelling Rejection of Agreements for Leased Stations or, Alternatively, Granting Relief from the Automatic Stay* [Docket No. 74] (the "Rejection Motion") and in opposition to the *Debtor's Motion to Approve Assumption of CrossAmerica Partners LP, CAP Operations, Inc., Lehigh Gas Wholesale, LLC, LGP Realty Holdings, LP, Lehigh Gas Wholesale Services, Inc., and Erickson Oil Products, Inc. Agreements* [Docket No. 206] (the "Assumption Motion"). For the reasons set forth below and more fully articulated during the hearings on November 15-17, 2023, the Court should compel the Debtor to reject the Debtor's CAP Leases and deny the Debtor's request to assume the Debtor's Fuel Supply Agreements, Leases, Proprietary Marks Agreements and other agreements with CAP.

---

[1] The CrossAmerica Partners LP's affiliates are LGP Realty Holdings LP, Erikson Oil Products, Inc., CAP Operations, Inc., Lehigh Gas Wholesale Services, Inc. and Lehigh Gas Wholesale LLC.

## INTRODUCTION

1.      IYS Ventures, LLC (the "Debtor") entered into the Management Agreements[2] in direct violation of its contractual promises to CAP and for the purpose of evading its creditors. The Debtor concealed the Management Agreements from CAP for six months and only revealed its complete outsourcing of operations to the Management Companies post-petition when it proposed that CAP approve an assignment of their franchise relationship to the Management Companies that would benefit the Debtor's principal but, in the words of Debtor's counsel, require the Debtor's creditors to "take it on the chin." CrossAmerica rejected the Debtor's attempted end-run around its obligations—both under the relevant contracts and pursuant to the Bankruptcy Code—and the Court should do the same. The Debtor has not cured its breaches of the CAP Agreements and cannot regain CAP's trust in view of its misconduct, nor has the Debtor provided adequate assurance of future performance under the contracts. These circumstances prevent the Debtor from assuming the contracts and, instead, compel the Debtor to reject them.

2.      The Management Agreements effect a complete outsourcing of the Debtor's operations and responsibilities under the Fuel Supply Agreements, Leases and Proprietary Marks Agreements. Although CAP owns the Leased Locations and the Debtor's right to occupy them, sell CAP's fuel and use the branded supplier's proprietary marks derives only from contracts that prohibit assignment, the Debtor unilaterally and without notice handed the Leased Locations over to the Management Companies. Most of the Management Companies are owned and controlled by Munadel Rizek—an individual who CAP has never met, who has no contractual relationship with CAP and who has never appeared in this action despite his central role. The Louisiana Management Companies sell convenience store products outside of CAP's closed financial system

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Joint Pretrial Statement* [Docket No. 321] (the "Joint Pretrial Statement").

in violation of the contracts and of the Bankruptcy Code. CAP owns the Leased Locations and has the right to have a contractual relationship with the persons occupying its property, including to ensure that they hold the licenses, permits and insurance necessary to conduct operations in accordance with the law and CAP's contractual expectations. The Debtor upended the contractually agreed-upon framework to serve its own interests and now asks the Court to bless the mess it created. Meanwhile, the Debtor has done nothing to eliminate the Management Companies and continues to subsist on convenience store inventory gratituously purchased by the Management Companies for nothing in return. Hoping that Munadel Rizek will continue to risk his credit for the Debtor's benefit is not a plan of reorganization and it does not adequately assure the Debtor's future performance. If Munadel Rizek says "No" tomorrow, the Debtor's business will not survive. As it is, the Debtor's business is showing signs of strain. CAP should not be forced to accept the risks attendant to these uncured breaches—especially in view of the environmental, public safety and business risks associated with operating gas stations and convenience stores.

3.      By lying to CAP and violating the law, the Debtor's principal Muwufak Rizek has exacerbated these breaches and lost CAP's trust. Despite having executed written agreements with numerous Management Companies, Mr. Rizek tried to sneak his complete sourcing past CAP by falsifying an ACH form for the sweep account and by asking—more than six months after involving a long list of Management Companies—if the Debtor could "assign all IYS ventures sites into Kareem INC." Mr. Rizek closed the purchase of one location from CAP post-petition without even disclosing the existence of this bankruptcy. He was indicted in Minnesota for selling untaxed vape products and acknowleged his culpability by paying the taxes as part of his plea deal. The State of Ohio has alleged that he is complicit in a drug trafficking operation at one CAP

location and accused the Debtor of evading sales taxes—by selling products through the Management Companies instead of in its own name. Trust is a vital element of any relationship of this sort and the Court should not force CAP to continue doing business with someone who has broken that all-important bond and offloaded his entire business to someone against whom CAP has no recourse.

4. The relevant evidence is unrebutted. The Debtor completely outsourced its operations and responsibilities in violation of its contractual promises and has made no attempt to remedy its breach. The Debtor's principal has violated the law and CAP's trust. The Debtor hired a Chief Restructuring Officer to guide its proposed reorganization, but Mr. Brash did not even testify at the hearing. Instead, the Debtor focused on miscelleanous relationship grievances and a witchunt for withheld inspection records that its own witness (Mark Yeary) testified did not exist. Munadel Rizek never appeared and no one denied that the Debtor sought to use the Management Companies so that its creditors would "take it on the chin."

5. The Court must decide whether to condone the Debtor's conduct and force CAP to accept breached agreements or instead return the Leased Locations to the control of their rightful owner. The Debtor has not established the prerequisites to assume the contracts and CAP has presented compelling evidence that the Debtor has not and cannot cure its material breaches. Indeed, the Debtor has had six months to extract the Management Companies from its operations and, despite ample opportunity, the Debtor has not even tried. The Court should deny the Debtor's motion and compel rejection.

## STATEMENT OF FACTS

6. On November 15, 16, and 17, 2023, the Court held an evidentiary hearing regarding CAP's Rejection Motion and the Debtor's Assumption Motion. A transcript of the hearing is

attached hereto as **Exhibit A** (the "Evidentiary Hearing Tr."). CAP's witnesses testified and the Debtor took the stand, but the Debtor did not present any testimony from Matthew Brash (the Debtor's Chief Restructuring Officer) or from Munadel Rizek, whom the Debtor has sought to make CAP's new business partner by assigning all of CAP's contracts to the Management Companies.

7.      The evidence established that the Debtor wrongfully outsourced all of its operations and responsibilities to the Management Companies in violation of CAP's contracts and to evade its creditors, that the Debtor's principal Muwufak Rizek concealed the existence of the Management Companies and committed other acts of misconduct, and that the Debtor's unilateral actions have created risk and uncertainty that CAP bargained to avoid in its agreements. The Debtor did not present any plan to remedy its breaches and acknowledged that its business model relies upon Munadel Rizek's willingness to extend his credit to purchase the Debtor's inventory for nothing in return. The Debtor wants to play by its own rules, but the contracts and the bankruptcy code do not permit it. The Court should grant CAP's Rejection Motion and deny the Debtor's Assumption Motion.

**A. The Debtor And CAP Establish A Unitary Franchise Relationship Through Agreements That Broadly Prohibit Transfer Or Assignment, Require Compliance With Applicable Law And Demand Insurance, Indemnity And A Closed Financial System As Security.**

8.      In February and March of 2021, the Debtor and CAP entered into the Fuel Supply Agreements, the Leases and the Proprietary Marks Agreements; there are two sets of unitary agreements that group the Debtor's locations together in two packages. *See* CAP Exs. 1–6.

9.      Through the Fuel Supply Agreements, CAP supplies fuel to gas stations operated by the Debtor; through the Leases, the Debtor leases most but not all of its locations from CAP; and, through the Proprietary Marks Agreements, CAP sublicenses to the Debtor its license to use

151688169.4

certain proprietary marks associated with the branded fuel suppliers. *See id.*

10. On April 21, 2021, the Debtor and CAP executed the Cross Default Agreement, binding all of the agreements together in one "unitary agreement in all respects." *See* CAP Ex. 7, Section II; *see also* Evidentiary Hearing Tr. at 579:11–20 ("[Mr. Faust]: So we started talking about the unitary lease concept, which puts [the stations] all together, under one umbrella. . . . Q [Mr. Buckley]: And were those – was that unitary relationship ultimately formed? A: Yes, it was."). In the Cross Default Agreement, the Debtor "acknowledge[d] that the treatment of all of the Related Agreements as a unitary agreement was and is of primary importance to [CAP], and [that CAP] would not have entered into the Related Agreements without simultaneously entering into [the Cross Default Agreement] and [the Debtor] agreeing to the treatment of all of the Related Agreements as a unitary agreement." *Id.* The Debtor has acknowledged the unitary nature of the parties' relationship. *See* Joint Pretrial Statement, ¶ 76, Debtor's Statement of Disputed Facts ("Each Lease was intended to 'constitute a single, unitary, indivisible, non-severable' lease of the Stations."); *see also* Evidentiary hearing Tr. at 408 ("[Mr. Morgan] Q: And have the stations been operating? A [Mr. Rizek]: I mean, we can't close it, because if you close it, you default everything else, so you're kind of in a bind, because you're in a unitary lease, per se.").

11. The Fuel Supply Agreements, Leases and Proprietary Marks Agreements broadly prohibit "direct[] or indirect[]" transfer or assignment of the Debtor's rights and obligations without CAP's prior written consent, which is entrusted to CAP's "sole discretion." *See* Fuel Supply Agreements, §8.1; Leases, §9.1; Proprietary Marks Agreements, §6.2(a). The agreements all contain strict compliance and anti-waiver provisions. *See* Fuel Supply Agreements, §§15.2, 15.3; Leases, §16.1(e)(i) and (ii); Proprietary Marks Agreements, §§11.2, 11.3. Any transfer of the Debtor's interests under the Fuel Supply Agreements or the Leases is subject to broad rights

of first refusal in favor of CAP.  *See* Fuel Supply Agreements, §8.3; Leases, §8.3.

12. The Fuel Supply Agreements identify the convenience stores as "related businesses" that are "made part" of the Franchise Relationship and the Leases recognize that adequate assurance in the context of bankruptcy requires "keep[ing] all of the Property stocked with merchandise and properly staffed with sufficient employees to conduct a fully-operational, actively promoted business on all of the Property." *See* Fuel Supply Agreements, §5.3 and Exhibit 5.2; Leases, §13.1(b)(ii).  Proper maintenance of the convenience stores is an important aspect of CAP's relationship with the Debtor.  *See* Evidentiary Hearing Tr. at 107:25–108:5 (Mr. Brecker: "Maintenance issues, dispensers were down, air conditioners were down, price signs were broken, price signs were not turned on, store stock was starting to dwindle.  ***And those are the signs that things aren't going well***.") (emphasis added).

13. The agreements require compliance with applicable laws, including environmental laws and the regulations that apply to the sale of alcohol and tobacco.  *See* Fuel Supply Agreements, §5.8; Leases, §16.1(e)(i) and (ii); Proprietary Marks Agreements, §§11.2, 11.3.  The Fuel Supply Agreements require the Debtor to "timely obtain and comply with all permits, certificates, or licenses necessary for the full and proper conduct of the Businesses" and allow CAP to terminate the relationship if the Debtor "engages in fraud or criminal misconduct relevant to the operation of the Businesses" or "[u]pon assignment . . . by Franchise Dealer contrary to the terms of [the] Agreement."  *See* Fuel Supply Agreements, §§9.1 (vii), (xi), 11.3.  The Leases prohibit the Debtor from "knowingly permit[ting] the transfer of any interest . . . to any person or entity . . . who is listed on the Designated Nationals and Blocked Persons list maintained by the Office of Foreign Asset Control."  *See* Leases, Article XIV.

14. All of the agreements require the Debtor to maintain proper insurance and to

indemnify CAP against a broad spectrum of potential losses. *See* Fuel Supply Agreements, §§7.1, 13.2; Leases, §§6.2, 6.9; Proprietary Marks Agreements, §§6.1, 9.2.

15.     Under the Fuel Supply Agreements, the Debtor is required to use a point of sale system and credit card processing equipment provided by CAP (the "<u>POS System</u>"); when using the designated POS System, the proceeds from customer credit card sales are remitted to CAP as security and, later, CAP periodically "sweeps" via ACH the Debtor's portion of the credit card proceeds into the Debtor's account. *See* Fuel Supply Agreements, §5.11.

16.     The Fuel Supply Agreements afford CAP the right to "enter and inspect the Marketing Premises" and the Leases give CAP "the unrestricted right of entry to enter upon the Property at any time to inspect or to remove any of its property." *See* Fuel Supply Agreements, §5.13; Leases, §2.9.

**B.   <u>Without CAP's Knowledge Or Consent, The Debtor Outsources Its Operations And Responsibilities To The Management Companies In An Attempt To Evade Creditors, Rendering CAP's Counterparty (The Debtor) An Empty Shell.</u>**

17.     Between November 1, 2022 and March 1, 2023, the Debtor entered into the Management Agreements, completely outsourcing its obligations under the Fuel Supply Agreements and Leases. *See* CAP Exs. 24–32; s*ee also, e.g.*, Evidentiary Hearing Tr. at 267:11–24 ("Q [Peter Buckley]:  The management companies pay for the payroll?  A [Mr. Rizek]:  Yes. Q:  They bring in their own inventory, right?  A:  Yes.  Q:  And they pay for the inventory, right? A:  Yes."); Evidentiary Hearing Tr. at 318:12–19 ("Q:  Exhibit 25 is a November 1, 2022 management agreement between IYS Ventures, LLC, and Ameer Investment, Incorporated, correct?  A:  Yes.  Q:  And this was for Ameer Investment, Incorporated, to manage and operate one Wisconsin and two Indiana locations, correct?  A:  Yes."); Evidentiary Hearing Tr. at 318:25–319:4 ("Q:  IYS Exhibit 13 is a December 1ˢᵗ, 2022 management agreement with Ameer

Investment Incorporated, to manage and operate seven other locations in Wisconsin, correct?  A: Yes."); Evidentiary Hearing Tr. at 332:25–333:3 ("Q:  And after they signed the contract, Leanne Investment, LLC, managed and operated the eight locations in Ohio, right?  A:  Yes."); (Q:  My question is, is IYS Ventures, LLC, no longer operating their locations in Ohio where it holds liquor licenses?  A:  Yes, the management company is."); 341 Meeting Tr. at 36:4–5 ("And it's due to outsourcing, you know, everything to the management company").

18.    The Debtor's outsourcing coincided with legal challenges presented by lawsuits filed by Huntington Bank and EBY Brown, two of the Debtor's primary creditors.  *See* 341 Meeting Tr. at 86:2–3 ("We started outsourcing this when we have the issue with Huntington"); 341 Meeting Tr. at Evidentiary Hearing Tr. at 295:21–25 ("Q [Mr. Buckley]:  Did the use of the management companies beginning in the fourth quarter of 2022 have anything to do with the litigation with Eby-Brown?  A [Mr. Rizek]:  I mean, the use of the management companies has everything to do with all issues across the board").

19.    At the time that the Debtor entered into the Management Agreements, the Management Companies had not yet been formed as companies under the relevant state procedures.  *See* CAP Exs. 42–43.  As such, none of the Management Companies held any of the licenses or permits needed to operate the Debtor's stations.

20.    The Debtor entered into the Management Agreements without CAP's knowledge or consent.  Evidentiary Hearing Tr. at 334:21–335:2 ("Mr. Buckley:  And we're looking for a stipulation that prior to the bankruptcy, the debtor never shared any of the management agreements with CrossAmerica Partners.  Mr. Stern:  Stipulated.  Mr. Buckley:  And we're looking for a stipulation that prior to the bankruptcy, the debtor never told CrossAmerica Partners that it had entered into contracts whereby these management companies were performing management and

operations of these locations.  Mr. Stern:  Stipulated.").

21.     The Debtor did not disclose the Management Agreements to CAP until months later, after the Petition Date, and CAP never approved the Debtor's requested assignment. Evidentiary Hearing Tr. at 81:21–82:15 (Q [Mr. Buckley]:  Prior to the bankruptcy, were you or anyone at CrossAmerica Partners aware that the debtor had outsourced management and operations of the convenience stores to these management companies? . . . A [Mr. Brecker]:  No I was not."); Evidentiary Hearing Tr.  at 380:21–382:19 ("Q [Mr. Buckley]:  So in Exhibit 77, Mr. Rizek, you wrote to Wayne Masoner on May 2nd, 2023:  'Hello, sir.  I am looking to assign all IYS Venture sites into Karee[m], Inc.  Thank you, sir.' Do you see that?  A [Mr. Rizek]:  Yes. . . . Q:  So when you wrote this e-mail, IYS had already retained management companies, many more than just Karee[m], Inc., to operate the locations that it leases from CrossAmerica, right?  A:  Yes."); Evidentiary Hearing Tr. at 384:21–23 ("Q:  You were asking [Mr. Masoner] to assign all of the sites to Karee[m], Incorporated, right?  A:  Yes.").  The Debtor argued that CAP waived its right to object to the Management Companies, but the contracts prohibit waiver and the Debtor acknowledged that it never told CAP that the Management Companies had taken over its operations and responsibilities.

22.     The Debtor used the Management Companies to evade creditors and procure sufficient inventory.  Evidentiary Hearing Tr. at 88:18–89:9 ("A [Mr. Brecker]:  Mo introduced these management companies and moving our agreements into these management companies in early June, that Friday. . . . So on Monday, we had that phone call, and Mo once again brought up the management companies, and he said 'All you guys really need to do is take the existing agreements with IYS and put them into these management companies.' . . . At that point, Keenan Lynch, our general counsel asked Greg and Mo, 'Well, what happens to the creditors here?'  And

151688169.4

Mr. Stern's response was, 'All the other creditors will take it on the chin.' And that's a quote."); Evidentiary Hearing Tr. at 278:9–12 ("Q [Mr. Buckley]: The management companies are using your brother's credit to purchase convenience store inventory, correct? A [Mr. Rizek]: Yes. It's both my brother and I."); Evidentiary Hearing Tr. at 280:10–13 ("Q: it wasn't difficult to operate because you were having a hard time bringing products to the stores? A: I'd say yes and no.").

23.     CAP did not have any opportunity to properly vet the Management Companies— or Munadel Rizek—through its normal processes, which include credit and background checks and review of licensing, insurance and indemnity considerations, among others. Evidentiary Hearing Tr. at 57:19–58:8 ("Q [Mr. Buckley]: I want to talk to you about the process that CrossAmerica Partners goes through when it brings on a new dealer. Is there a diligence process that's involved? A [Mr. Brecker]: Well, yes. I mean, we have to – first of all, you have to see the entity, what is it. And then we have to run that entity, who controls is. And then we do creditworthiness for financial. Do they have the financial wherewithal to do this. And then we do background checks. And then we match up against watch lists, and we make sure that we vetted this person, or people, group of people, to the best of our ability, to run the store.").

24.     CAP was aware of Management Companies Kareem Inc and Kenan Ventures LLC prior to the Petition Date only because the Debtor had introduced them as real estate holding companies, the purpose of which was to purchase and hold certain properties that CAP had agreed to sell. Evidentiary Hearing Tr. at 368:16–23 ("Q [Mr. Buckley]: And when you were in the process of discussing the Houghton, Michigan, purchase by Kenan Ventures, can we agree that you did not tell CrossAmerica that Kenan Ventures had entered into this management agreement, Exhibit 28, for the management and operation of two different CrossAmerica locations? A [Mr. Rizek]: Yes. We agreed and we stipulated to it."); Evidentiary Hearing Tr. at 369:15–19 ("Q: 22

is the agreement of sale between Erickson Oil Products and Kenan Ventures, LLC for the purchase of the Houghton, Michigan property, right?  A:  Yes.  Q:  And that is also dated March 3rd, 2023, right?  A:  Yes.").

25.     The Debtor concealed its breach of the Franchise Agreements by falsifying information on an ACH form that the Debtor provided to CAP.  *See* CAP Ex. 35; Evidentiary Hearing Tr. at 377:22–378:2 ("Q [Mr. Buckley]:  And that check has the Wells Fargo Bank account information, correct?  A [Mr. Rizek]:  Yes.  Q:  And it lists IYS Ventures, LLC, as the owner of the account, right?  A:  Yes.).  The falsified ACH form had the effect of re-routing millions of dollars in cash around the Debtor and to the Management Companies, to the detriment of the Debtor's creditors; as soon as CAP became aware of this fact, CAP brought the issue to the Court's attention.

26.     On May 2, 2023, Muwafak Rizek wrote to Wayne Masoner, CAP's Territory Manager, with the subject "IYS change" as follows: "hello sir i am looking to assign all IYS ventures sites into Kareem INC thank you sir." Evidentiary Hearing Tr. at 380:24–381:3.  When Mr. Rizek emailed Mr. Masoner regarding a potential assignment of the Fuel Supply Agreements and Leases, Mr. Rizek did not disclose that he had already assigned the Debtor's obligations to Kareem INC and the other Management Companies.  Evidentiary Hearing Tr. at 382:15–25 ("Q: So when you wrote this e-mail, IYS had already retained management companies, many more than just Karee[m], Inc., to operate the locations that it leases from CrossAmerica, right?  A:  Yes.  Q: And you didn't mention any of those in this e-mail, right?  A:  No, I did not.  Q:  And you didn't share with CrossAmerica any of those management or operation agreements, right?  A:  We stipulated to that many times.").  Mr. Masoner forwarded Mr. Rizek's May 2, 2023 email to other employees of CAP.  Evidentiary Hearing Tr. at 490:20–23 ("Q [Mr. Higgins]:  Okay.  What did

you do with this e-mail?  A [Mr. Masoner]:  I forwarded this e-mail to – I forget who it was, upper management, someone who would be able to help.").  However, CAP never consented to the requested assignment.

27.    Since involving the Management Companies, all of the revenue that would otherwise flow through the Debtor—and provide security for the Debtor's contractual obligations to CAP—has flowed through the Management Companies, with whom CAP has no contractual relationship and against whom CAP has no legal recourse.  *See* Debtor's Monthly Operating Reports; *see also* CAP Ex. 35, ACH Form and Voided Check (identifying a sweep account that was not owned by the Debtor); CAP Ex. 24, Kareem Management Agreement, § 4(d) (providing that the Debtor shall only be entitled to fixed fees plus five percent of the Management Companies' net profits; actual profits flow to the Management Company).

28.    Since the Petition Date, CAP has also discovered that the Debtor is using unauthorized point of sale equipment at certain locations in violation of the Franchise Agreements. *See* Debtor's Exhibit 42; Evidentiary Hearing Tr. at 487:16–19.  These unauthorized devices divert the Debtor's flow of credit card proceeds away from CAP and undermine CAP's contractually bargained-for security.

29.    The Debtor has also acknowledged that the convenience store sales at the Leased Locations operated by the Louisiana Management Companies exist completely outside of CAP's closed financial system and, as a result, that revenue is not available to CAP as security as required by the contracts and, moreover, it is not part of the Debtor's bankruptcy estate.  *See* Evidentiary Hearing Tr. at 353:11–22 ("Q [Mr. Buckley]:  With regard to the Louisiana management companies that are operating those locations in Louisiana, if IYS or any of the management companies owned by your brother were managing those stores, would you agree with me that the

convenience store revenue from those locations would run through the bankruptcy estate? A [Mr. Rizek]: yes. Q: And it's not doing that now because these other entities in Louisiana are earning the profits on the convenience store sales, correct? A: Yes.").

**C.** **The Debtor Initially Conceals Its Bankruptcy And Later Asks CAP To Transfer The Franchise Relationship To The Management Companies So That Its Creditors Would "Take It On The Chin."**

30.     On May 23, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor did not disclose the bankruptcy to CAP, its primary business partner.

31.     On May 30, 2023, Lehigh Gas, Kenan Ventures, LLC, and the Debtor entered into an Eleventh Amendment to PMPA Franchise Agreement, which related to the the sale of a property subject to the unitary franchise relationship. *See* Debtor Ex. 37. When the parties entered into the Eleventh Amendment to PMPA Franchise Agreement, the Debtor did not disclose to CAP that it had filed for bankruptcy or seek the Court's approval for the transaction. Evidentiary Hearing Tr. at 253:4–12 ("Q [Mr. Buckley]: And that amendment took this site out of the IYS portfolio of locations that were leased and put it in Kenan Ventures, right? A [Mr. Brecker]: That is correct. Q: At the time of that transaction, or at any point before that transaction, did Mr. Rizek or anyone with IYS tell you that IYS Ventures had filed bankruptcy on May 23rd, 2023?" A: No one had."].

32.     On or about June 9, 2023, Muwafak Rizek and Isam Y. Samara met with CAP management in Allentown, Pennsylvania and proposed that CAP permit the Debtor to assign the Fuel Supply Agreements and Leases to the Management Companies. *See* Evidentiary Hearing Tr. at 88:10–17 (Mr. Brecker: "On Friday, Mo introduced these management companies and moving our agreements into these management companies in early June, that Friday."). CAP requested an additional meeting with counsel present to discuss the request. *See* Evidentiary Hearing Tr. at

88:14–17 (Mr. Brecker: "I was ignorant about that whole bankruptcy thing, so I said, get Greg Stern, I'll get Keenan, [our general counsel,] the four of us will have a conversation so I can understand the issue better.").

33.     Soon thereafter, during a call among the Debtor's principal, the Debtor's counsel, and CAP management, the Debtor again requested that CAP approve assignment of the agreements to the Management Companies, indicating that other creditors "would take it on the chin." *See* Evidentiary Hearing Tr. at 89:2–6 (Mr. Brecker: "At that point, Keenan Lynch, our general counsel, asked Greg and Mo, 'Well, what happens to the creditors here?' And Mr. Stern's response was, 'All the other creditors will take it on the chin.'"). CAP clearly and emphatically denied that it would go along with such a plan. Evidentiary Hearing Tr. at 89:7–9 (Mr. Brecker: "And at that point, Keenan ended the call right away, because he didn't want to discuss that any further."). The Debtor did not challenge or rebut this testimony at the hearing.

34.     On November 2, 2023, the Ohio Department of Taxation filed Proof of Claim No. 35 (the "Ohio Tax Claim") against the Debtor, asserting a claim of $701,169.28 arising from unpaid sales taxes. The Debtor filed an objection to the Ohio Tax Claim [Docket No. 327] (the "Ohio Tax Claim Objection") and the Ohio Department of Taxation filed a response [Docket No. 366] (the "Ohio Tax Claim Response").

## ARGUMENT

35.     The evidence presented at the Evidentiary Hearing has clearly shown that the Debtor assigned the Fuel Supply Agreements and Leases to the Management Companies without CAP's knowledge or consent. Such assignment is a flagrant violation of the Fuel Supply Agreements and Leases; as such, the Debtor is in default of these agreements and is unable to cure such default. Further, when the Debtor assigned the Fuel Supply Agreements it breached the right

of first refusal provision of the Fuel Supply Agreements. This breach is a historical fact that the Debtor is unable to cure. Even if the Debtor could cure its defaults (it cannot), the Debtor's persistent track record of dishonest behavior towards CAP has extinguished all trust between the parties, such that it is impossible for the Debtor to provide CAP with adequate assurance of future performance as required by section 365(b)(1)(A). Therefore, the Debtor must reject the Fuel Supply Agreements and Leases.

36.     The Debtor argues that the relief sought in the Rejection Motion violates the PMPA relating to termination of franchise agreements. The Debtor is wrong because (1) CAP is not primarily seeking to terminate the Fuel Supply Agreements and Leases, so the PMPA is inapplicable, (2) the provisions of the Bankruptcy Code governing executory contracts and unexpired leases take precedence over the PMPA, and (3) even if CAP were to seek termination in accordance with a proposed modification to the automatic stay, section 108(c) of the Bankruptcy Code tolls the deadline for CAP to begin termination procedures under the PMPA.

A. **The Debtor Wrongfully Transferred And Assigned The Fuel Supply Agreements, The Leases And The Proprietary Marks Agreements To The Management Companies.**

37.     The Debtor argues that entry into the Management Agreements does not constitute a transfer or assignment under the Fuel Supply Agreements, Leases and Proprietary Marks Agreements. The Debtor further argues that its use of the Management Companies is authorized because the Fuel Supply Agreements provide that the Debtor shall have "independent responsibility for and control over the manner and means of the day-to-day operations of the Businesses, including Product deliveries, Product leak or release detection, Product leak or release reporting, and compliance with all laws." Fuel Supply Agreement, § 12.1; *see also, e.g.*, Evidentiary Hearing Tr. at 37:6–8 (Mr. Stern: "The management companies are merely a tool which IYS has employed to assist it in the operations of these stations").

38.     The Debtor is wrong because the Fuel Supply Agreements provide that the *Debtor* shall have control over the manner and means of day-to-day operations.  Through the Management Agreements, the Debtor no longer has control over the operations of the Stations because the Debtor has abdicated such responsibility to the Management Companies; the Management Companies are controlled not by the Debtor but by Munadel Rizek—who has not appeared in this case and who no employee of CAP has ever met.  Evidentiary Hearing Tr. at 267:11–24 ("Q [Mr. Buckley]:  The management companies run the business, right?  A [Mr. Rizek]:  Yes.  Q:  They bring in their own employees, right?  A:  It's the same employees of IYS.  They were basically transferred over to the management companies.  Q:  The management companies pay for the payroll?  A:  Yes.  Q:  They bring in their own inventory, right?  A:  Yes.  Q:  And they pay for the inventory, right?  A:  Yes.").  IYS Ventures, LLC is rendered an irrelevant shell as its operations have been completely subsumed by the Management Companies.  This creates substantial risk for CAP as CAP's agreements—and security—are tied to the Debtor entity, not the Management Companies.  What's more, the Debtor's interpretation complete reads the anti-assignment language out of the agreements.

39.     The Management Agreements state that the Management Companies shall: (a) "Administer and supervise all of the finances of the Business[;]" (b) select and employ all personnel necessary to service the Business[;]" (c) "[s]upervise and control the purchase of all materials and supplies, and acquire, lease, dispose of and repair equipment and facilities necessary to provide safe and adequate service to the business[;] (d) "[m]anage all costs and all pricing on a customer-by-customer basis, estimate all costs on new contracts, bid on and enter into new contracts, and control all costs for contracts in progress[;]" (e) "[c]ommence, defend and control all legal actions, arbitrations, investigations and proceedings that arise due to events occurring in

connection with the business[;]" (f) "[m]aintain the assets of the [Debtor] in good repair, order and condition[;]" and (g) "[p]ay all amounts necessary to maintain the Company in good standing with its transfer agent and the state of its incorporation, as well as any fees for licenses or permits necessary to carry[] on business as it is currently being conducted[.]" Management Agreements, § 2. The manner and means of the Stations' day-to-day operations is no longer in the Debtor's hands and the Debtor has unilaterally changed operators without CAP's permission.

40. This abdication of responsibility constitutes an assignment of the Fuel Supply Agreements and Leases from the Debtor to the Management Companies. When the terms of an anti-assignment provision are clear, a party may not offload its responsibilities to another without conforming to the requirements of the provision. *See Stevenson v. Dersam*, 119 A. 491 (Pa. 1923) (holding that a "management agreement" was "mere subterfuge" by the lessee to avoid compliance with an anti-assignment provision in the lease, and that the management agreement "was not the placing of a mere custodian or agent upon the premises to act for the lessee, but an assignment of all interests in the lease"); *see also Whitman v. Pet Inc.*, 335 So. 2d 577, 579–80 (Fla. Dist. Ct. App. 1976) (holding that lessor's "management agreement" with a property manager was an assignment after landlord refused to consent to an assignment).

41. Indeed, if the Management Agreements did not constitute an impermissible assignment of the Fuel Supply Agreements, Leases and Proprietary Marks Agreements, there would have been no reason for the Debtor to conceal their existence from CAP—which is exactly what the Debtor did.

**B. The Debtor's Assignment To The Management Companies Constitutes A Material Breach That The Debtor Has Not Attempted To Cure And Cannot Cure.**

42. The Fuel Supply Agreements and Leases prohibit assignment by the Debtor of the Debtor's relationship to CAP. Specifically, Section 8.1 of the Fuel Supply Agreements provides

18

that the Debtor may not transfer or assign "the Agreement, nor any part of the [Debtor's] interest in this Agreement . . . directly or indirectly, without the prior written consent of [CAP] which consent may be withheld, conditioned, or delayed, in the sole discretion of [CAP]." Fuel Supply Agreement, § 8.1. Section 9.1 of the Fuel Supply Agreements list several events of default, including "assignment of this Agreement by [Debtor] contrary to the terms of this Agreement." Fuel Supply Agreement, § 9.1. Like the Fuel Supply Agreements, the Leases provide that the Debtor's interest in the Leases "shall not be transferred, assigned, or sublet by [Debtor] in whole or in part, directly or indirectly, without the prior written consent of [CAP], except as otherwise required by Law." Leases, § 8.1. The Proprietary Marks agreement is in accord.

43. The Fuel Supply Agreements also contain a right of first refusal in favor of CAP. *See* Fuel Supply Agreements, § 8.3. The right of first refusal provides that if the Debtor proposes to assign its interest in the Fuel Supply Agreements, CAP "shall have the right to meet the offer of any transferee and acquire [the Debtor's] Interest on the same terms and conditions as those contained in the transferee's offer." *Id.*, § 8.3(a). The Debtor never disclosed the Management Companies' offers, let alone provided CAP an opportunity to exercise its right of first refusal. The Debtor's depriving CAP of its right of first refusal constitutes an additional breach of the Fuel Supply Agreements. Such breach is yet another historical fact that the Debtor is unable to cure. *See In re New Breed Realty Enterprises, Inc.*, 278 B.R. at 320 ("The debtor's failure to close the sale . . . constitutes a non-monetary default which cannot be cured because it is a historical fact.")

44. As explained above, the Debtor has assigned the Leases and the Fuel Supply Agreements on violation of the terms of such agreements. Due to such assignment, the Debtor is in default of these agreements. The Debtor has no plan to cure this default. Evidentiary Hearing Tr. at 285:25–286:5 ("Q [Mr. Buckley]: My question is, sitting here today, does IYS have a plan

to remove the management companies, both in Louisiana and that are owned by your brother, from the operation of its business?  A [Mr. Rizek]:  No, sir.").  Neither Muwafak Rizek nor the Debtor's Chief Restructuring Officer (who did not testify at the Trial) have provided any means of curing the Debtor's defaults.  Indeed, if the Debtor could cure its defaults then it would have done so by now.  Because the Debtor cannot cure its defaults, it may not assume the Fuel Supply Agreements.  *See In re Deppe*, 110 B.R. 898, 904 (Bankr. D. Minn. 1990) (holding that a debtor franchisee could not assume a PMPA agreement where the debtor could not cure the default because the default had already occurred and "the estate simply cannot overcome that historical fact."); *see also In re New Breed Realty Enterprises, Inc.*, 278 B.R. 314, 320 (Bankr. E.D.N.Y. 2002) ("Where the default is non-monetary and is not curable, the debtor is precluded from assuming an executory contract only if the default was material or if the default caused 'substantial economic detriment.'") (quoting *in re Joshua Slocum Ltd.*, 922 F.2d 1081, 1092 (3d Cir. 1990)); *In re Empire Equities Capital Corp.*, 405 B.R. 687, 691 (Bankr. S.D.N.Y. 2009) ("A default precludes assumption of an executory contract under § 365 if it is both incurable and material in the sense that it goes to the very essence of the contract, *i.e.*, the bargained for exchange.").

45.     Therefore, the Debtor may not assume the Fuel Supply Agreements and Leases and these agreements must be rejected.  *See In re Am. The Beautiful Dreamer, Inc.*, No 05-47435, 2006 WL 2038646, at *6 (Bankr. W.D. Wash. May 18, 2006) (holding that a motion to compel rejection would be granted unless the debtor could propose a plan to promptly cure its default).

46.     The Debtor states that the purpose for assigning operations to the Management Companies is to consolidate operations on a state-by-state basis.  *See* Evidentiary Hearing Tr. at 395:9–14 ("[Mr. Rizek]:  So when you separate them state by state – the management companies are intended almost state by state.  What that does, it's only dealing with that state's stuff, with

that state's taxes so you're not mixing other states within it."). Even if that were true, such a unilateraly reorganization would constitute a breach of the Fuel Supply Agreements and Leases because it cuts against the unitary nature of such agreements to which the parties agreed. This breach has not been cured and further supports rejection of these agreements.

47. The Debtor attempts to tie the Rejection Motion to a "nefarious" corporate strategy to convert dealer-operated stations into company-operated stations. *IYS Ventures Reply in Support of [Assumption Motion]* [Docket No. 280], p. 2 ("[CAP's] conduct is part of a broader and more nefarious plan to convert its 'retailer operated' businesses into 'company operated' businesses"); *see also* Evidentiary Hearing Tr. at 38:21–39:2 ([Mr. Stern]: the evidence will show that CAP's actions and conduct in this Chapter 11 have been interposed in bad faith and solely supports its corporate agenda to recapture and convert 40 dealer-operated sites, the company-operated sites, as confirmed by Mr. Nifong's deposition transcript and testimony."). First, there was no evidence presented at the Evidentiary Hearing that even suggests that CAP attempted to retake control of the Stations before the Debtor breached the contracts. Second, there is nothing improper about CAP's attempts to retake control of its properties when the Debtor has breached the terms of its agreements and shattered CAP's trust. The Rejection Motion is not part of any corporate strategy; it is a response to the Debtor's flagrant and inexcusable breaches.

**C. The Debtor's Breach Of The Fuel Supply Agreements And Leases Is Exhacerbated By The Debtor's Dishonest Behavior Both Before And After The Petition Date.**

48. The Debtor has irreparably breached CAP's trust. The Debtor intentionally concealed its assignment by submitting a fraudulent ACH form. *See, e.g.*, Evidentiary Hearing Tr. at 259:9–16 ("Q [Mr. Buckley]: Did CrossAmerica know where the [credit card sweeps were] going? A [Mr. Brecker]: We thought it was going to IYS Ventures until that day in June, when we discovered it wasn't. Q: And do you know what happened to the Money that was swept,

instead, to the Karee[m], Incorporated bank account? A: I do not."). The Debtor intentionally misled CAP by requesting an assignment to Kareem Inc. six months after such assignment had already been effected. *See* Evidentiary Hearing Tr. at 380:21–382:22.. The Debtor committed a criminal act by violating certain tobacco sales laws. *See State of Minnesota v. Muwafak S. Rizek*, Case No. 69HI-CR-23-369, 6th Dist. of Minn. (June 6, 2023) (CAP Ex. 33); *see also* Evidentiary Hearing Tr. at 355:4–356:15. The Debtor has used unauthorized point-of-sale equipment without CAP's knowledge or consent. *See* Debtor Ex. 42; *see also* Evidentiary Hearing Tr. at 487:3–488:19.

49. Further, the Debtor has failed to pay sales taxes to the Ohio Department of Taxation. The Ohio Tax Claim Response demonstrates certain of CAP's concerns about the assignment of the Fuel Supply Agreements and Leases to the Management Companies. Specifically, the Debtor "had and continues to have seven (7) open sales tax accounts" in Ohio and "each of those accounts were associated with a Liquor Permit[.]" Ohio Tax Claim Response at 2. In reality, however, the Debtor is not operating the Stations, creating a disconnect between regulating authorities, licensors, and what is actually taking place at the Stations. Such disconnect has resulted in the Debtor's failure to pay sales taxes in Ohio, demonstrating one of the many risks associated with the Debtor's corporate scheme, which puts CAP at risk.

50. The Debtor's abdication of operations to the Management Companies is not without consequence. Indeed, evidence presented at the Evidentiary Hearing suggests that the Management Companies are not properly licensed to operate in many locations. *See* Evidentiary Hearing Tr. at 337:1–4 ("Q [Mr. Buckley]: For each of those [Ohio] locations, the liquor licenses are in the name of IYS Ventures, Incorporated, right? A [Mr. Rizek]: They still are, yes."); *see also* Evidentiary Hearing Tr. at 56:8–25 ("Q [Mr. Buckley]: Are you familiar with the licensing

process for the sale of alcohol and tobacco?  A [Mr. Brecker] Unfortunately, I am to a large degree. But it is a mess.  Every state is different. . . . So for a situation like IYS, they need to show the lease agreement with us and fuel agreement with us to be able to even get that license.  So they're telling the state, yes, I'm legally allowed to be here, and then they go through the process of making sure that they have the financial wherewithal, the background checks, and all the different, you know, watch lists and checks that – in some states, they actually had the FBI come interview us."). It is doubtful that the Management Companies would be able to satisfy many state licensing requirements because they do not have a direct relationship with CAP.  As Mr. Brecker testified, this can result in fines and harm to the business.  *See, e.g.*, Evidentiary Hearing Tr. at 57:1–5 ("Q: What happens in terms of the business side if you – you have a licensing issue where you are unlicensed and unable to sell, for example, tobacco or alcohol products?  A:  People stop coming to your store."); *see also, e.g.*, Ohio Tax Claim.  These are risks that CAP should not be forced to accept.

51.     To assume a contract or lease, section 365(b)(1)(C) of the Bankruptcy Code requires a Debtor to provide adequate assurance of future performance under such contract or lease.  *See* 11 U.S.C. § 365(b)(1)(C); *see also In re Texas Health Enterprises, Inc.*, 246 B.R. 832, 836 (Bankr. E.D. Tex. 2000) (denying debtor's motion to assume a lease for lack of adequate assurance of future performance, in part due to the debtor's bad faith conduct).  The Debtor's repeated breaches of CAP's trust have rendered such assurance impossible.

52.     What's more, the Debtor is admittedly relying on the Management Companies' credit to fill its stores with convenience store inventory, but the Management Companies are not making any profit by doing so.  This gratuitous support is not a plan of reorganization and it does not provide adequate assurance that the Debtor will be able to continue.

151688169.4

**D. <u>Rejection And, In The Alternative, Termination Do Not Violate The PMPA.</u>**

53.     The Debtor argues that rejection of the Fuel Supply Agreements and Leases would violate the Petroleum Marketing Practices Act (the "<u>PMPA</u>") because CAP has not complied with certain notice requirements and the time has run for CAP to do so.  *See* Joint Pretrial Statement, ¶¶ 119–121; *see also* Evidentiary Hearing Tr. at 36:3–6 (Mr. Stern: "As a threshold matter, the evidence will show that CrossAmerica has waived its right to object to the management agreements under the PMPA statute.").  The Debtor is wrong because (1) the Debtor's compelled rejection of the Fuel Supply Agreements and Leases is not equivalent to a termination by CAP and (2) in the alternative, if the Court modifies the automatic stay, CAP may terminate the Fuel Supply Agreements and Leases by their own terms and in accordance with the PMPA and section 108(c) of the Bankruptcy Code.

54.     The Rejection Motion does not primarily seek termination of the Fuel Supply Agreements and Leases.  Instead, CAP asks the Court to compel the Debtor to reject such agreements.  Rejection is not equivalent to termination.  *See In re Smylie Bros. Brewing Co., LLC*, 651 B.R. 252, 256 (Bankr. N.D. Ill. 2023) ("A rejection converts a debtor's unfulfilled obligations to a pre-petition damages claim.  But it does not terminate the contract.) (quoting *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1659 (2019).

55.     If the Court compels the Debtor to reject the Fuel Supply Agreements and Leases, then there is no need for CAP to terminate them.  The Debtor certainly has the right under section 365 to reject the agreements; there is no provision in the PMPA or the Bankruptcy Code prohibiting the Debtor from rejecting the Fuel Supply Agreements and Leases at the Court's direction when such agreements cannot be assumed.  *See In re Caribbean Petroleum Corp.*, 444 B.R. 263, 267 (Bankr. D. Del. 2010) (holding that a debtor's right to reject executory contracts "trumps" any provisions of the PMPA).  Therefore the Debtor's rejection of the Leases and Fuel Supply

24

Agreements would not violate the PMPA.

56.     In the alternative, the Rejection Motion seeks relief from the automatic stay so that CAP may terminate the Fuel Supply Agreements and the Leases by their own terms and in accordance with the PMPA.  CAP has not yet begun termination procedures due to the presence of the automatic stay.  *See In re Deppe*, 110 B.R. 898, 902 (Bankr. D. Minn. 1990) (holding that an act to terminate a PMPA agreement violates the automatic stay).  Now, the Debtor argues that CAP may not terminate the Fuel Supply Agreements and Leases even if the stay is modified because the statutory period for providing notice of termination has passed under section 2802(b)(2) of the PMPA.  *See* Joint Pretrial Statement, ¶ 120; Evidentiary Hearing Tr. at 68:11–17 (Mr. Morgan:  "So in effect, they've allowed the statute of limitations to be passed on their right to raise this issue and to raise the issue about the check, and to raise any of the things that they brought up in their motion to reject.  As a result, they are barred as a matter of law.").  The Debtor is wrong because the Bankruptcy Code extends the period for non-debtors to take action against the Debtor until 30 days after termination of the automatic stay.  *See* 11 U.S.C. § 108(c).

57.     Section 108(c) of the Bankruptcy Code provides, "if applicable nonbankruptcy law . . . fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor . . . and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of— (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (2) 30 days after notice of the termination or expiration of the stay under section 362 . . . of this title[.]"  The stay has not yet been modified to allow CAP to commence procedures for terminating the Fuel Supply Agreements and Leases.  Therefore, the statutory period for terminating such agreements has not passed.

151688169.4

**E. CAP Complied With Discovery Requests; CAP Has The Right To Inspect The Stations And Station Inspections Are Irrelevant To The Debtor's Assignment Of Its Responsibilities To The Management Companies.**

58. The Fuel Supply Agreements provide for inspection of the Stations by CAP. *See* Fuel Supply Agreements, § 5.13 ("At all reasonable times, [Debtor] shall permit [CAP] . . . to enter and inspect the Marketing Premises, including any and all records relating to the Business or required to be maintained under this Agreement"). Before and during this Chapter 11 case, CAP has exercised its right to inspect the Stations to ensure they are operating properly and to provide assistance to the Debtor in meeting performance standards. *See* Evidentiary Hearing Tr. at 463:10–15 (Mr. Masoner: "I visit the locations. I work with the dealers to make sure everything's operating correctly, look at reports to see how the sales are looking, and just to make sure it's business as usual and everything's operating the way it should be operating.").

59. Throughout the Trial, and in the course of other proceedings before the Court, the Debtor has alleged that CAP failed to comply with discovery requests and that CAP's inspections of the Stations have been unreasonable. The Debtor makes much of documents that do not exist: Counsel to the Debtor has asserted that CAP is in possession of inspection reports that CAP failed to produce to the Debtor, but its own witness (Mark Yeary) acknowleged that was not the case. *See, e.g.*, Evidentiary Hearing Tr. at 98:14–17 (Mr. Stern: "They were required to produce the documentation regarding the inspection. They have, to this date, not produced one inspection report of all of these inspections that took place"); Evidentiary Hearing Tr. at 629:22–630:6 (Mr. Yeary: "And then when I went into the store, same type of thing. I made observations, but I didn't bring the paper with me. I filled it out when I got back to the office. . . . I think when I completed my visits, I went to my computer, entered the information on it, the shared drive, where this document you see was."). CAP produced to the Debtor a certain Excel spreadsheet that contains the only reports that CAP personnel created regarding inspections of the Stations. *See* Evidentiary

26

Hearing Tr. at 99:13–19 (Mr. Brecker: "I instructed somebody to create a OneDrive document, and that was Wayne, to construct a OneDrive document where instead of having to do individual e-mails and individual lists, when they finish their inspection, they just have to answer these questions in OneDrive, upload their photos, and they were done."). CAP complied with these discovery requests.

60.     In any event, these inspection reports are only relevant to the extent that they show that the Debtor has used unauthorized point-of-sale equipment in violation of the Fuel Supply Agreements and that the Debtor's operations are deteriorating under the corporate structure interposed by the Debtor.

## CONCLUSION

61.     The evidence demonstrates that the Debtor involved the Management Companies in a scheme to evade creditors and only changed course to bring the Management Companies within the ambit of the bankruptcy after CAP refused its invitation to approve the assignments and let the creditors "take it on the chin." The Management Companies did not even exist when the Debtor executed the Management Agreements and the principal of the Management Companies—Munadel Rizek—has never appeared in this case; for all CAP knows, Munadel Rizek does not exist. The Debtor's contracts with CAP authorize the Debtor to operate the Leased Stations, but only in conformity with the Debtor's contractual promises—including that the Debtor will not transfer or assign the agreements without CAP's express written permission. The Debtor wants to ignore those terms and unilaterally choose CAP's new tenant, but the agreements give CAP the right to decide who runs the Leased Locations if not the Debtor. To make matters worse, the Debtor's unilateral actions and lack of candor have destroyed CAP's trust. The Debtor has not cured and cannot cure these breaches and so the Debtor cannot assume the contracts. The Court

should compel rejection and transition the Leased Locations back to CAP's control. CAP respectfully requests that the Court grant the Rejection Motion and deny the Assumption Motion.

Respectfully submitted,

By: _/s/ Gordon Gouveia_
*Counsel for CrossAmerica Partners LPs*

Gordon E. Gouveia (#6282986)
Peter C. Buckley (admitted *pro hac vice*)
Matthew R. Higgins (#6336039)
Fox Rothschild LLP
321 North Clark Street, Suite 1600
Chicago, IL 60654
Tel: (312) 517-9200
ggouveia@foxrothschild.com

151688169.4