IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| IYS VENTURES, LLC, | ) | Case No. 23-06782 |
| | ) | |
| Debtor. | ) | Hon. David D. Cleary |

**POST-TRIAL BRIEF IN SUPPORT OF
IYS VENTURES LLC'S ASSUMPTION MOTION**

Now Comes IYS Ventures LLC ("Debtor" or "IYS"), by and through its attorneys, Gregory

K. Stern, John J. Morgan, Monica C. O'Brien, Dennis E. Quaid and Rachel S. Sandler and for its

Post-Trial Brief in Support of *Debtor's Motion to Approve Assumption of CrossAmerica Partners LP,*

*CAP Operations, Inc., Lehigh Gas Wholesale, LLC, LGP Realty Holdings, LP, Lehigh Gas Wholesale*

*Services, Inc., and Erickson Oil Products, Inc. Agreements* [Docket No. 206] (the "Assumption

Motion"), and in Opposition of *CrossAmerica Partners LP's Motion for Entry of an Order Compelling*

*Rejection of Agreements for Leased Stations or, Alternatively, Granting Relief from the Automatic*

*Stay* [Docket No. 74] (the "Rejection Motion") states as follows:

## I.      INTRODUCTION AND PROCEDURAL HISTORY

The Debtor seeks authority to assume certain agreements entered into with CrossAmerica

Partners LP and certain of its affiliates[1] ("CAP" or the "CAP Entities") pursuant to section 365(a) of

the Bankruptcy Code. The agreements entered into with the CAP Entities include PMPA Franchise

and Fuel Supply Agreements (the "Franchise Agreements" or "Fuel Supply Agreements"), Unitary

Lease Agreements (the "Leases") and other agreements (collectively, the "CAP Agreements"). The

CAP Agreements are critical to the Debtor's continued business operations and plan of reorganization

as they include leases for forty (40) service stations (the "Leased Stations") and Fuel Supply

---

[1]The CrossAmerica Partners LP's affiliates are LGP Realty Holdings LP, Erikson Oil Products, Inc., CAP Operations, Inc., Lehigh Gas Wholesale Services, Inc. and Lehigh Gas Wholesale LLC.

Agreements supplying branded and unbranded fuel to both the Debtor's Leased Stations and Owned Stations (collectively, the "Stations").

Through the Rejection Motion, CAP seeks to summarily misappropriate and takeover IYS's Leased Stations, including significant improvements and investments made to the Leased Stations by IYS, without any consideration whatsoever. The result would be almost the complete destruction of the Debtor's bankruptcy estate contrary to the best interests of the legitimate creditors of the Debtor's estate. To reap this immense windfall, the Rejection Motion advances a "false narrative" wherein it alleges defaults held out as momentous violations of the CAP Agreements between the parties significant enough to justify termination of the leases for the Leased Stations.

To the contrary, the Debtor submits the evidence – much of which is undisputed – all but conclusively demonstrates CAP's contentions are wrong. CAP failed to introduce any evidence of any violations of the CAP Agreements. Furthermore, CAP completely ignores applicable non-bankruptcy law[2] its own contracts and the Debtor and Debtor In Possession's rights under § 365 to assume the CAP Agreements and cure any non-financial pre-petition defaults even if they could ultimately be found to exist.

The Court convened an evidentiary hearing regarding the Assumption Motion and Rejection Motion November 15, 2023 through November 17, 2023. In addition to the documentary and testimonial evidence at the hearing, the Debtor and CAP (collectively referred to as the "Parties") submitted a Joint Pretrial Statement [Docket No. 321] which, *inter alia*, included a Statement of Uncontested Facts ("UF") [paragraphs 5 - 35] and Stipulated Issues of Law [paragraphs 112 – 114]. The pretrial filings are adopted by the Debtor and are incorporated by reference herein. During the course of the evidentiary hearing a number of the Parties' Exhibits were admitted into evidence and the Court heard the oral testimony of Robert Brecker, Muwafak Rizek, Glenn Faust, Wayne Masoner

---

[2] Petroleum Marketing and Practices Act ("PMPA") 15 U.S.C. 2801 *et seq*.

and Mark Yeary.  The Debtor will reference uncontested facts and specific additional facts adduced at the evidentiary hearing below.

## II.    ARGUMENT

Section 365(a) of the Bankruptcy Code provides, "[e]xcept as provided in . . . subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code provides, in part as follows:

> [i]f there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee— (A) cures, or provides adequate assurance that the trustee will promptly cure, such default[;] . . . (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such contract or lease."  11 U.S.C. § 365(b)(1).

The Court is being asked to determine whether to allow the Debtor's assumption of the Leases, Franchise Agreements, Fuel Supply Agreements and other agreements entered into with the CAP Entities.  Accordingly the Court must examine and focus on the CAP Agreements, the interpretation of the CAP Agreements, key provisions and terms referenced and set forth therein, and the Parties' actions, conduct and relationship thereunder.

Resolution of this dispute requires the Court's adjudication as to whether there exist any non-financial defaults under the CAP Agreements and if defaults exist *i*) whether the defaults summarily preclude assumption of the CAP Agreements, *ii*) whether CAP is barred from asserting the defaults because of its bad faith and, or whether the defaults have been waived by the CAP Entities, and *iii*) whether the defaults can be cured.

The evidence adduced at the evidentiary hearing supports assumption of the CAP Agreements and the contentions and positions advanced by the Debtor that the CAP Entities' conduct and intentions in this case and related to the CAP Agreements are (*i*) part of a broader

corporate plan to convert its "retailer operated" businesses into "company operated" businesses, (**ii**) demonstrative of its continuing and ongoing bad faith and sharp practices in its dealing with the Debtor as Debtor in Possession, (**iii**) an attempt to manufacture a default to compel rejection or prohibit assumption of the CAP Agreements where none exists; and (**iv**) interposed in these proceedings in bad faith and to hinder the Debtor and Debtor in Possession in its efforts to reorganize under Chapter 11.

### A. THERE EXISTS NO DEFAULTS UNDER THE CAP AGREEMENTS

The Debtor contends, and the evidence has shown, that IYS should be allowed to assume the CAP Agreements because, *inter alia*, it has not breached the CAP Agreements and there are no financial or non-financial defaults of any of the CAP Agreements.

There exist no financial default under the CAP Agreements. Mr. Rizek testified that through November 2023, IYS' obligation to make monthly payment to CAP for rent, real estate taxes, plus utilities and miscellaneous other charges was paid by IYS when billed and/or invoiced by CAP. That historically and through May 2023, IYS' obligation to make monthly payment to CAP for rent, real estate taxes, plus utilities and miscellaneous other charges was paid directly to CAP by IYS through an "electronic settlment program" designated by IYS (i.e. through ACH payments). That during the course of the instant Chapter 11 case, IYS' monthly payments to CAP for rent, real estate taxes, plus utilities and miscellaneous other charges have been paid from funds controlled and held by CAP representing the proceeds from customer credit card sales for fuel and other products at the Stations. **None of that testimony is disputed**.

CAP begrudgingly acknowledged and admitted that there are no financial defaults under the CAP agreements or defaults relating to the fuel operations of the Stations. Nonetheless CAP contends that IYS has committed non-financial defaults that prohibit its assumption of the CAP Agreements. The non-financial defaults alleged by CAP that prohibit the Debtor's assumption of

the CAP Agreements were limited to the following: *i*) IYS improperly assigned the Franchise Agreements to the Management Companies, *ii*) IYS failed to exert good faith efforts to carry out its obligations, *iii*) IYS engaged in fraud and criminal misconduct relevant to the operation of its business.  See, CAP's Statement of Disputed Facts in Joint Pretrial Statement, Docket No. 321, paragraph 44, at pages 8 and 9.

As set forth more fully below, CAP failed to present any competent evidence to support any of its allegations against the Debtor.

1. **The Debtor's Use of the Management Companies is not a Default Under the CAP Agreements**

CAP's contentions that the Debtor's agreements with the management companies were an improper and prohibited assignment of IYS's contractual obligations and its interests in the PMPA Franchise and Fuel Supply Agreements (the "Franchise Agreements" or "Fuel Supply Agreements") under Article VIII, paragraph 8.1 (IYS Exhibits 2 and 5, at page 12) is  contrary to the evidence.

The PMPA Franchise and Fuel Supply Agreements entered into by the CAP Entities and IYS were admitted into evidence as IYS Exhibits 2 and 5.  The Unitary Lease Agreements (the "Leases") entered into by the CAP Entities and IYS were admitted into evidence as IYS Exhibits 1 and 4.

CAP supplies fuel to the Debtor's gas stations under the Fuel Supply Agreements and the Debtor makes fuel sales directly to customers.  Lehigh Gas Wholesale LLC (hereinafter "Lehigh") is the fuel supplier under the Fuel Supply Agreements with the Debtor.  The Fuel Supply Agreements require IYS to purchase fuel exclusively from Lehigh and obligate IYS to purchase Minimum Monthly Contract Volumes.

CAP's contention is that the Debtor's adoption of management companies instead of W-2 wage earners was a prohibited assignment.  That contention is contrary to the evidence; specifically the CAP Agreements each provide explicit authority for the Debtor to manage its stations as it sees fit.  More particularly, under the Fuel Supply Agreements the Debtor has the absolute right pursuant

to Article XII to utilize management companies in managing 49 service stations in multiple jurisdictions, Article XII, paragraphs 12.1 (a-d).  (IYS Exhibit 2, at pages 17 and 18, IYS Exhibit 5, at page 18)  Paragraph 12.1 (a) of the Fuel Supply Agreements provide "Neither Distributor nor Franchise Dealer have a fiduciary relationship with the other."  Paragraph 12.1 (b) of the Fuel Supply Agreements provide "Franchise Dealer is an independent contractor with independent responsibility for and control over the manner and means of the day-to-day operations of the Businesses including Product deliveries, Product leak or release detection, Product leak or release reporting, and compliance with all laws."  Paragraph 12.1 (d) of the Fuel Supply Agreements provides, in pertinent part: "Franchise Dealer has exclusive control and direction over the duties, supervision, compensation, hiring and firing of its employees, contractors and agents."

The conclusion is the same under the Unitary Lease Agreements (IYS Exhibits 1 and 4) at Article XVI, Paragraph 16.5 which provides, in pertinent part "Nothing contained in this Lease shall be deemed or construed to confer upon Landlord any interest in the business of Tenant, and the relationship of the parties during the term of this Lease shall at all times be that of Landlord and Tenant and no other."  (IYS Exhibit 1, at page bate stamped CAP 0000355, and IYS Exhibit 4, at page bate stamped CAP 0000114)

CAP contention that the Debtor's agreements with the management companies was a prohibited assignment of IYS' interests in the Fuel Supply Agreements is neither supported by the Exhibits in evidence nor the testimony of the witnesses.  The Fuel Supply Agreements do not contain definitions of the dispositive words used therein, and specifically the terms "interest" and "agent."  Black's Law Dictionary defines "Interest" as "A legal share in something; all or part of a legal or equitable claim to or right in property."  INTEREST, Black's Law Dictionary (11th ed. 2019).  Under that definition, there cannot be any serious suggestion that the Debtor transferred any "interest" to anyone.  Black's Law dictionary defines an "Agent" as one "who is authorized to act for or in place of another; a

representative." BLACK'S LAW DICTIONARY 72 (9th ed.2009). An agency is "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006).

The Seventh Circuit has determined that the correct "test to determine whether a principal-agent relationship exists is whether the alleged principal has the right to control the agent, and whether the alleged agent can affect the legal relationships of the principal." *Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742, 745 (7th Cir. 1998) (citation omitted). "The test of agency is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Id*. (citation omitted) "Principal among these considerations is the right to control the manner that the work is done." *Id*. (citations omitted).

The uncontroverted evidence established that **(a)** IYS had the absolute and sole right to control the conduct of the management companies; and, **(b)** the management companies did not have the ability or power to affect the legal relations of IYS with CAP**.** Mr. Rizek's testimony was unequivocal. The management companies were agents of IYS. (Tr. at pages 273 and 275 – 276) He and IYS always had control over the Stations' operations and if anything, that control improved after IYS adopted the agreements with the management company structure. (Tr. at pages 273 – 274) There was no evidence whatsoever to support CAP's contentions that the CAP Agreements had been assigned to the management companies.

Despite all of CAP's attorneys' arguments and contentions to the contrary, the testimony of Mr. Rizek regarding the management companies stands uncontroverted and not contested by CAP and included but is not limited to the following:

i)     that none of the CAP Agreements were assigned to the Management Companies;

ii)     that CAP had knowledge of and was aware of Kareem Inc and Kenan Ventures LLC prior to the Petition Date and prior to March 2023;

iii)     that Kareem Inc. and Kenan Ventures LLC were not mere real estate holding companies the purpose of which was to purchase and hold certain properties purchased from CAP;

iv)     that on or about March 3, 2023, Kenan Ventures LLC entered into an Agreement of Sale with Erickson Oil Products, Inc. to purchase 107 East Montezuma Avenue, Houghton, Michigan property (the "Houghton Michigan Station")(IYS Exhibit 22) that provides, *inter alia*, at Paragraph 7.1 for Termination of Main Street PMPA Franchise Agreement and execution and delivery at closing of a Mutual Termination Agreement (IYS Exhibit 22, page 6) and at Paragraph 7.2 a new PMPA Franchise Agreement for the Real Property for the Buyer (IYS Exhibit 22, page 6);

v)     that CAP was aware that Kenan Ventures LLC was the operating entity of the Houghton Michigan Station as evidenced by the Agreement of Sale (IYS Exhibit 22) and the 11th Amendment to PMPA Franchise Agreement entered into by CAP, IYS and Kenan Ventures LLC (IYS Exhibit 37) that, *inter alia*, identifies Kenan Ventures LLC and IYS Ventures LLC as the "Franchise Dealer" and obligates Kenan Ventures at Paragraph 3 "to join in, and be obligated by, all obligations of the Franchise Agreement (IYS Exhibit 37, page 2);

vi)     that on or about May 17, 2023, Kareem Inc. entered into an Agreement of Sale to purchase and operate a station from the CAP affiliate Erickson Oil Products at 223-225 West Kemp Avenue, Watertown, South Dakota (the "Kemp Avenue Station") with Erickson Oil Products, Inc. (IYS Exhibit 27);

vii)     that on or about May 22, 2023, Kareem Inc entered into an Agreement of Sale to purchase and operate a station from the CAP affiliate Erickson Oil Products at 512 South Sanborn Boulevard, Mitchell, South Dakota (the "Sanborn Boulevard Station") (IYS Exhibit 28).

Mr. Rizek testified that prior to the fall of 2022, IYS operated the stations in house. (Tr. at pages 392 – 397) That IYS had less than 10 employees in the home office who were tasked with operating 50 gas stations in 10 states. *Id*. That each station was operated by separate managers and assistant managers and that the CAP Entities knew and fully understood that fact. *Id*. That prior to the filing of the instant case, CAP had actual knowledge that the Debtor operated the Stations using territory managers, station managers, assistant station managers, cashiers and other employees and that CAP never objected to the use of those individuals. (Tr. at page 296) That in order to consolidate and better organize its business operations, IYS entered into substantially similar agreements with

certain management companies to assist the Debtor in the day-to-day operations of the stations beginning in late 2022. That the Debtor has the absolute right pursuant to the Fuel Supply Agreements to utilize the assistance of management companies in managing the Stations and that the use of the management companies was not a non-financial default under any of the CAP Agreements.

Mr. Rizek testified that IYS is independent from CAP and has sole responsibility for and control over the manner and means of the day-to-day operations of the stations. (Tr. at pages 321 - 322) That IYS, through Mr. Rizek's management, has exclusive control and direction over all aspects of the operations of the Stations including the hiring, firing and supervision of all agents including the management companies and their employees. (Tr. at page 274 and 276)

Mr. Rizek testified repeatedly that both prior to and after the retention of the management companies he oversaw and controlled and continues to oversee and control all management functions for the stations and that the management companies remained subject to Mr. Rizek's direct supervision and control and he assisted, directed and managed the daily operations of the stations. (Tr. at pages 267 – 268, 274, 302, and 325) That IYS' utilization of the management companies did not impact, alter or otherwise affect its business relationship with CAP and its adoption of the management company structure strengthened IYS' abilities to manage and operate the stations.

Mr. Rizek's uncontroverted testimony was that IYS' decision to utilize management companies to assist in the operation of the stations effected no change to the business operations or IYS' business relationship with CAP. (Tr. at page 268 and 397) That the only changes that occurred after adoption of the management companies were positive ones that allowed IYS to operate more efficiently and cost effectively. (Tr. at pages 395 – 397)

Perversely, arguably the most compelling evidence on the issue was actually adduced by CAP's counsel. During Mr. Buckley's examination of Mr Rizek, there was an extended discussion regarding the implementation of the management companies. (Transcript ("Tr.") at pages 455-457)

During that extended colloquy Mr. Buckley confirmed the individuals involved in all aspects of the stations' operations were the **same**, did the **same** jobs, in the **same** locations and at the **same** desks. In effect, the only difference was the existence of the management companies. Nothing changed.

This lack of significant change was confirmed during the testimony of Glenn Faust. (Tr. at pages 592-599) During his testimony, Mr. Faust made clear that the management company was "innocuous to me" (Tr. at page 594) This was because Mr. Faust knew that neither Mr. Rizek nor his father-in-law were out running cash registers, pushing brooms, or changing price signs at 50 plus locations. (Tr. at page 596) He further had actual knowledge that IYS used territory managers who were supervised from Chicago. (Tr. at pages 596-97) He confirmed that during the time the management companies were utilized prepetition, he never observed anything out of the ordinary. (Tr. at pages 597 and 599) He then confirmed that neither he nor CAP had any knowledge about the internals of how IYS operated, and he did not care (Tr. at page 598)

Mr. Brecker's testimony was similar. There was an extended dialogue during cross-examination. (Tr. at Pages 124 through 129) During which Mr. Brecker confirmed that CAP knew IYS was operating the Stations using store managers and territory managers. (Tr. at page 125) He then confirmed he did not know how they hired, qualified, or paid managers. (Tr. at pages 125 - 126) CAP never investigated any of IYS' internal management. (Tr. at page 127) In fact, until the bankruptcy petition, the only thing CAP cared about was the outcome not the manner or means by which IYS delivered that outcome. (Tr. at pages 127 - 28) In fact, CAP felt IYS's franchise relationship was "great for them and for us." (Tr. at page 65)

It appears the entirety of CAP's position regarding the management companies derives from Robert Brecker's convoluted, if not willfully blind, interpretation of the Franchise Agreements. During his testimony, there was extended discussion regarding his, and by extension CAP's, understanding of the Franchise Agreements. (Tr. at pages 131 – 140) During that exchange, Mr.

Brecker incongruously concluded that while the agreements contemplated that franchise dealers could use employees, contractors or agents to do things, they were nevertheless required to operate the store with W-2 employees.  (Compare, Tr. page 136 *vs*. Tr. pages 39 - 40)

In short, far from creating problems, everyone agrees that nothing changed between the time the management companies were implemented and the bankruptcy petition.  All the same individuals were performing all the same functions.  The only distinction is that the individuals were no longer W-2 employees of IYS but were nevertheless supervised by Mr. Rizek from Chicago in exactly the same way he did so prior to the management companies.  The Franchise Agreements explicitly vest the authority over manner and means of operations and specifically whether to operate using employees, contractors or agents of the Debtor.  Everyone agrees that there were no issues with the management companies' performance prior to the bankruptcy petition.  Accordingly, IYS submits that the testimony demonstrates that  CAP's newfound objection to the management companies is merely a contrivance in support of their stated agenda to convert dealer operated sites into company operated sites as expounded by Mr. Nifong at length. (IYS Exhibit 45, Nifong Dep Tr. at page 27) The bankruptcy petition merely presented them an opportunity to make the argument, and the argument should fail because as amply set forth above, operation through the management companies is simply not a default under the CAP Agreements.

In addition to the foregoing, the issue of CAP's waiver of any non-monetary default will be addressed more fully under the bad faith argument set forth below. (IYS Exhibit 45, Nifong Dep Tr. at page 26)

**B. CAP FAILED TO INTRODUCE ANY EVIDENCE THAT IYS FAILED TO USE GOOD FAITH IN CARRYING OUT ITS OBLIGATIONS UNDER THE CAP AGREEMENTS**

CAP's contention regarding IYS' failure to use its POS system was not supported by the evidence and testimony of the witnesses at the trial. CAP provided no evidence that the Debtor was using unauthorized point of sale equipment.

Mr. Rizek testified about the POS system mandated and controlled by CAP which processes all credit and debit card transactions of the Stations, except for food stamps and limited other prepared food purchases that are processed through the goEBT credit card processing system, and that the Debtor did not use unauthorized point of sale equipment in violation of the CAP Agreements.

Mr. Masoner ("Masoner") (Tr. page 500, line 1 through page 502, line 11) and Mr. Yeary ("Yeary") (Tr. page 640, line 8 through page 641, line 17) also testified about the POS system processing credit and debit card purchases, the use and need for the use of the goEBT credit card processing system to process purchases using food stamp and government funded benefits, and the inability of the CAP POS system to process purchases using food stamp and government funded benefits.

Masoner did provide testimony regarding a second piece of equipment but was unable to definitively conclude and determine that this was a separate POS system or merely the Debtor's goEBT machine used to process purchases using food stamp and government funded benefits. (Tr. page 499, lines 13 – 25)

CAP's use of the the Ohio Department of Taxation filed Proof of Claim No. 35 (the "Ohio Tax Claim") as evidence of the lack of Debtor's lack of good faith is a red herring and wholly irrelevant to the dipostion of the Assumption Motion. On November 2, 2023, the Ohio Department of Taxation filed the Ohio Tax Claim against the Debtor, asserting a claim of $701,169.28. Mr. Rizek testified that the Ohio Tax Claim was contested by the Debtor, that it appeared to be based upon incorrect information and assumptions, that IYS had filed an Objection to the Ohio Tax Claim

[Docket No. 327] that he believed would be successfully resolved in favor of IYS. His testimony in these regards was once again uncontroverted.

## C. CAP HAS FAILED TO INTRODUCE ANY EVIDENCE OF FRAUD AND CRIMINAL MISCONDUCT

In addition to the defective claim regarding the Management Agreements, CAP alleges that Debtor defaulted under the Franchise Agreements based upon: the submission of an erroneous ACH form, and governmental complaints filed against the Debtor in Minnesota and Cincinnati. For the following reasons, none of these events is sufficient justification for termination under either the Franchise Agreements or the PMPA.

### 1. The Alleged Incorrect ACH Does Not Justify Termination of 40 Franchise Relationships

It is undisputed that an incorrect ACH form exists. CAP Exhibit 35. Mr. Rizek testified that the ACH form was likely filled out and submitted by one of the IYS administrative staff. (Tr. at 378, 433) The ACH form requested the dealer entity name - which was IYS Ventures LLC. The ACH form states "Entity named must be printed on check" and requires a blank check to be attached. The attached check would have been printed on an office printer using typical bond paper that was blank prior to printing - not a preprinted form. (Tr. at page 433) The ACH form itself has no errors, however the attached check references an incorrect account holder; namely, IYS Ventures LLC instead of Kareem, Inc., one of the management companies. Kareem, Inc, the entity on the check, is operated by a Rizek family member out of the same physical offices as IYS.

During Mr. Brecker's cross-examination, there was an extended discussion of the ACH form. (Tr. at pages 222 – 230) During that testimony, Mr. Brecker conceded that the purpose of the ACH form was to advise CAP where to make payments on behalf of the Debtor. (Tr. at pages 224 - 225) In other words, the ACH form only involved and related to the Debtor's money – not CAP money. *Id.*

It is unsurprising then that Mr. Brecker also conceded that the erroneous ACH form caused no damage whatsoever to CAP. (Tr. at pages 229 - 230) Of course, there is nothing in any of the Franchise CAP Agreements that suggests or implies that the erroneous ACH form constituted a breach of any term of the Franchise Agreements. Mr. Brecker could not point to a single term of the agreements implicated. (Tr. at page 228) Despite the inability to point to any term of the Franchise Agreements breached by the ACH form, Mr. Brecker nevertheless jumped to the conclusion that a breach occurred. His view - and by extension CAP's - was summarized as "I believe it is significant because that is the partnership. It is between IYS Ventures and Cross America. It is not with anybody else. It is not with his payroll company. I believe that was a dishonest maneuver and is a reason for default." (Tr. at page 229)

IYS submits that the ACH form is not, and cannot be, a breach of the Franchise Agreements in the absence of some apaplicable contract term. Further, even if an arguable noncompliance occurred, it is certainly "technical or unimportant" as used in the PMPA and not a sufficient basis, either standing alone or reviewed with reference to other claimed deficiencies, upon which to predicate the summary rejection of the CAP Agreements related to the Leased Stations as demanded by CAP.

2. **CAP Produced no Evidence to Support a Termination Based Upon the Minnesota or Cincinnati Complaints**

During the hearing, CAP cast a number of aspersions and submitted two charging documents related to complaints in Minnesota and Cincinnati. Notably missing was any determination of guilt or responsibility or even any evidence that a legal violation actually occurred. CAP made no investigation of either complaint and submitted no evidence that any legal violation actually occurred. As such, nothing in the record supports, much less justifies, the summary termination of the CAP Agreements and IYS' relationship with CAP related to the CAP Agreements.

CrossAmerica's evidence regarding the Minnesota Complaint was the complaint itself. (CAP Exhibit 33)  There was absolutely no evidence whatsoever that the allegations of the complaint were, in fact, true or in any way supportable.  In fact, the sole additional evidence received by the Court was a fully executed Agreement for Continuance for Dismissal under Minnesota law.  IYS Exhibit 34.  On its face, that document establishes that the Debtor resolved the complaint with no finding of liability, violation, or proof of any facts whatsoever.  Instead, the Debtor paid an amount demonstrably less than the costs for defense, including: necessary administrative costs, travel from Chicago to Minnesota for court appearances and attorneys fees.  On that woefully inadequate record, no finding of any conduct, improper or otherwise, can be found to exist.

The evidence regarding the Cincinnati Complaint was even less sufficient than that related to the Minnesota Complaint.  Again, CAP performed no investigation and offered no evidence other than the unsupported complaint itself.  On its face, the complaint alleges facts occurring prior to the Debtor's lease and occupancy of the premises and asserts charges against both the Debtor and CAP. (CAP Exhibit 34)  Mr. Rizek testified that the Debtor only recently took over the Cincinnati location after it had fallen into disrepair and after being closed for a number of months.  (Tr. at page 343)  Mr. Rizek further testified that CAP's prior manager of the location was a known drug addict who had himself died, while incarcerated for causing the vehicular death of a neighborhood toddler while he was inebriated.  (Tr. at pages 343 - 44)  The decedent was CAP's manager and had no relationship, whatsoever, with IYS.  All of those events relate to CAP's operation of the site not the Debtor's.  If anything, the only evidence is that Debtor dramatically improved and commenced operations at the site after CAP and its employees ran it into the ground.

Utterly lacking in CAP's case was any evidence whatsoever that the Debtor did anything wrong, or in violation of the Franchise Agreements.  Mr. Rizek testified - without contradiction - that he resolved the Cincinnati Complaint which was effectively dismissed outright pending only his

sworn statement.  (Tr. at pages 348 - 349)  CAP's presentation was almost entirely lacking in evidence much less any substance.  CAP's jump and knee jerk reaction to unsupported conclusions and casting of aspersion upon IYS is simply not a sufficient basis upon which to compel the summary rejection of Leased Stations' Leases and the termination of the Parties' franchise relationships.

### D.  CURE OF NON-FINANCIAL DEFAULTS IF DETERMINED TO EXIST

Even if this Court determines that non-monetary defaults exist, the Debtor has provided adequate assurance of its ability to cure any such defaults.  "[T]he requirement of adequate assurance is applicable only in the event that the debtor is in default under the contract it is seeking to assume." *In re UAL Corp.*, 293 B.R. 183, 190 (Bankr. N.D. Ill. 2003), aff'd, No. 02-B-48191, 2003 WL 22955997 (N.D. Ill. Dec. 12, 2003), aff'd sub nom. In re United Airlines, Inc., 368 F.3d 720 (7th Cir. 2004).  The term "adequate assurance of future performance" is not statutorily defined, but courts have determined that "[w]hether 'adequate assurance of future performance' has been provided is determined by the facts and circumstances of each case." *In re M. Fine Lumber Co.*, 383 B.R. 565, 572 (Bankr.E.D.N.Y.2008).

CAP's claims that the Debtor is unable to cure its defaults of the Franchise Agreements because: (1) the Debtor cannot secure sufficient inventory without the management companies' credit and (2) the defaults constitute historical facts, which cannot be cured.  Neither of those claims was supported, much less established by the testimony or evidence adduced at the evidentiary hearing.  Morevoer, CAP's contentions are irrelevant, as a matter of law because the ability of the Debtor to secure sufficient inventory is not relevant to the Assumption Motion.  Notwithstanding, Mr. Rizek's testimony regarding IYS' ability to cure a non-financial default if determined by the Court to exist was, once again, not contested by CAP and is uncontroverted.  Mr. Rizek testified that he had determined that IYS had several options to cure any non-financial default relating to the management companies if they were determined to be a non-financial default by the Court.  Mr. Rizek articulated

at least two (2) of the options to cure a non-financial default by either **1**) rejecting the management company agreements, or **2**) having the management companies become subsidiaries of IYS.

CAP's contentions that the Debtor is unable to provide adequate assurance of future performance because the Debtor has irreparably breached CAP's trust was not supported by the evidence. Moreover "adequate assurance of future performance" is not relevant to the assumption of the CAP Agreements as there has not been a financial default. Adequate assurance of future performance is limited under § 365 to where there hast been a default and IYS is not in default of the CAP Agreements. Tthe evidence and testimony was clear that there has been no damages or recognizable harm suffered by CAP and that IYS has not breached any of the CAP Agreement due to the absence of damage or recognizable harm.

### E. THERE IS NO STATUTORY BASIS IN THE BANKRUPTCY CODE TO SUPPORT THE REJECTION MOTION

The relief sought by CAP in the Rejection Motion is to retake and force the surrender of the Leased Stations to CAP. It cites 11 U.S.C. §365(b)(1) and 11 U.S.C §105(a) as the statutory authority for such relief. However, the relief sought by CAP is not authorized under any provision of the United States Bankruptcy Code and is CAP's attempt to obtain seek relief through the instant case that it could never obtain outside of bankruptcy and exceeds the relief available to it under nonbankrupcty law. The Rejection Motion goes far beyond the relief permitted in the context of rejection/assumption of leases and executory contracts. In essence, CAP wants the Court to act as judge, jury and executioner – all within the context of the Assumption Motion.

It is fundamental that even if the Court were to deny the Assumption Motion, that does not end the inquiry. If the Franchise Agreements are rejected (or deemed rejected), such a decision does not result in the immediate termination of the CAP Agreements nor does it pre-emptively justify CAP's headlong desire to "retake" the Leased Stations. The Debtor submits that the relief sought should therefore be denied – no matter the decision on assumption.

This Court previously addressed this issue in the case of *In Re Smylie Brothers Brewing Company LLC*, 651 B.R. 252, (Bankr. N.D. Ill. 2023). In reaching the conclusion that a rejection of a lease does result in its termination, this Court relied on (a) the Supreme Court case of *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, —— U.S. ——, 139 S. Ct. 1652, 1659, 203 L.Ed.2d 876 (2019)("A rejection converts a debtor's unfulfilled obligations to a pre-petition damages claim. But it does not terminate the contract[.]"); and, (b) the "plain language of §§ 365 and (g)" *Smylie Bros.*, 651 B.R. at 256-257. It is clear that the "[r]ejection of lease does not cancel or terminate it, but merely removes it from property of the estate." *Id*. at 257 (citiation omitted). As set forth below, any termination of the franchise relationship must be governed by nonbankuptcy law.

## F. THE PETROLEUM MARKETING PRACTICES ACT ("PMPA") AND OTHER STATE LAW PROVISIONS CONTROL THE TERMINATION OF THE FRANCHISE AGREEMENTS

Because CAP's Rejection Motion seeks to terminate the franchise relationship with IYS, PMPA and other state statutes must be analyzed. It is fundamental that in order to terminate the Franchise Agreements and summarily compel rejection of the CAP Agreements, the terminations must be supportable under non-bankruptcy law. *See, Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)("[t]he determination of property rights under lease agreements and otherwise is governed by state law and the agreement between the parties"). *See also, In re Passage Midland Meadows Operations, LLC*, 578 B.R. 367, 373–74 (Bankr. S.D.W. Va. 2017)(Court held that it would apply state law chosen by the parties to goven the agreement, including the right of termination). It is equally fundamental that the moving party cannot obtain greater rights under bankruptcy law than it would otherwise have under generally applicable non-bankruptcy law. "Section 365 ... does not give a landlord the right to improve its position upon the bankruptcy of a tenant. The statute affords no relief to a landlord simply because it might seek to escape the bargain it made." *In re Rock 49th Rest. Corp*., No. 09–14557, 2010 WL 1418863, at *7 (Bankr. S.D.N.Y. Apr. 7, 2010) (internal citation

omitted). "The provisions of §365(b)(1) do not, in fact, provide non-debtor parties to executory contracts with greater rights than they would have under applicable nonbankruptcy law." UAL Corp., 293 B.R. at 190–91. "If nonbankruptcy law would require the non-debtor to continue performing under the contract, the mere fact of a bankruptcy filing cannot eliminate that performance obligation." *Id*. at 191.

Contrary to existing law CAP's counsel conceded, during the evidentiary hearing, that CAP is seeking greater relief through bankruptcy than it could obtain under nonbankruptcy law. (Tr. at page 70, line 6 through page 71, line 9) For this reason alone, the Rejection Motion should be denied.

1. **CAP Cannot Terminate the Debtor's Franchise Relationships Under the Petroleum Marketing Practices Act**

This case is governed by the Petroleum Marketing Practices Act, commonly known as the PMPA. 15 U.S.C. §2801 et seq. In the PMPA, Congress recognized that the vast disparity between multinational oil companies and local gas dealers had led to severe abuses. S. Rep. No. 731-95, U.S. Code Cong. & Admin. News 873, 875-77 (1978); *Davy v. Murphy Oil Corp.*, 488 F. Supp. 1013, 1015 (W.D. Mich. 1980). As a result, protections were enacted to preserve the dealer network. The Act establishes "a single, uniform set of rules governing the grounds for termination and non-renewal of motor fuel marketing franchises and the notice which franchisors must provide franchisees prior to termination of a franchise." S.Rep. No. 731, *supra*, at 19, U.S.Code Cong. & Admin.News 1978, p. 877. Section 2802(b)(2) enumerates five (5) circumstances under which a franchise may be terminated during its term. The Act prohibits any termination that is not based on one of these grounds. S.Rep. No. 731, *supra*, at 15.

Courts interpreting the statutory definitions of § 2801 have clearly stated that a PMPA franchise consists of three (3) elements. These elements are: (1) the right to occupy leased marketing premises; (2) the right to sell motor fuel under a trademark owned or controlled by a refiner; and (3) the right to be supplied with that fuel. *Barnes v. Gulf Oil Corp.*, 795 F.2d 358, 360 (4th

19

Cir.1986); *Fresher v. Shell Oil Co*., 846 F.2d 45, 46–47 (9th Cir.1988). As stated by the *Barnes* court, the Act defines a franchise in terms of "a contract to use the refiner's trademark, a contract for the supply of motor fuel to be sold under the trademark, and a lease of the premises at which the motor fuel is sold. See S.Rep. No. 731, supra, at 29; *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1216 n. 2 (7th Cir.1982)" *Barnes*, 795 F.2d at 360. Where the franchisor, in this case, CAP seeks to end any one of the three elements, the franchisor must comply with the PMPA. See. e.g. *Garcia v. BP Products N. Am., Inc.*, No. 09 C 3529, 2009 WL 10706863, at *4 (N.D Ill. 2009). The pending motion would end all three elements of the Debtor's franchise relationship and the PMPA applies.

The PMPA contains a blanket prohibition on the termination of franchise relationships unless a specific statutory exception applies. 15 USC §2802(a). The only exceptions related to franchise termination (as distinct from franchise non-renewal which can only occur at the expiration of an individual franchise term) are narrowly limited to circumstances enumerated in 15 U.S.C. §2802(b)(2). Pursuant to 15 USC §2805(c) the burden of proof in this matter is as follows: The plaintiff only has the burden of proving that the Defendant is terminating or non-renewing its franchise. The Defendant then must produce evidence that the termination or non-renewal is permitted under 15 USC §2802(b).

In this case, the vast majority of the Debtor's Stations are protected under the PMPA without reference to the PMPA Franchise Agreements themselves. The Debtor submits that CAP has neither pled nor proven that any ground allowed by § 2802 exists to terminate the CAP Agreements. Moreover, CAP has not even attempted to comply with the notices required by the statute.

## 2. CAP's Claims are Procedurally Defective Under the PMPA

One of the major provisions of the PMPA requires the oil company to give proper notice to the dealer of termination. 15 U.S.C. §2804. In fact, such notice is a mandatory prerequisite for termination. *Davy v. Murphy Oil Co.*, 488 F. Supp. 1013, 1016 (W.D. Mich. 1980). The notice must

include a statement of intention to terminate the franchise together with the reasons for termination

(the "Termination Notice").  15 U.S.C. §2804(c)(3)(A).  The purpose of the Termination Notice is to

advise the dealer of the reasons relied upon by the franchisor to terminate.  This requirement exists

because the dealers' rights vary depending upon the grounds relied upon.  *Midwest Petroleum Co. v.*

*American Petrofina, Inc.*, 603 F. Supp. 1099, 1123 (E.D. Mo. 1985).  PMPA notices are critical and

must be strictly construed. *Ceraso v. Motiva Enterprises, LLC*, 326 F.3d 303, 314 (2d Cir. 2003);

*Escobar v. Mobil Oil Corp.,* 678 F.2d 398, 400 n. 2 (2d Cir.1982); *see, e.g., Thompson v. Kerr–McGee*

*Refining Corp.,* 660 F.2d 1380, 1390 (10th Cir.1981); *Mobil Oil Corp. v. Clark,* 652 F.2d 2, 3 (8th

Cir.1981); *Blankenship v. Arco*, 478 F. Supp. 1016, 1018 (D. Ore. 1979); *Mobil Oil Co. v. Vachon*,

580 F. Supp. 153, 158 (D. Mass. 1983); *Greco v. Mobil Oil Co.*, 579 F. Supp. 468, 471 (N.D. Ill.

1984); *Davy v. Murphy Oil Co.*, 488 F. Supp. 1013, 1015 (W.D. Mich. 1980).  In this case, the

complete failure to provide **any** notice or cite **any** proper PMPA or contractual term upon which it is

relying is fatal to CAP's attempt to terminate the Debtor's Franchises.

3.  **CAP's Claims Substantively Fail Under The PMPA**

The Petroleum Marketing Practices Act absolutely prohibits termination of franchises except

as provided by the act.  (15 U.S.C. §2802(a))  The exceptions which permit termination are found

exclusively in Section 2802(b)(2) of the statute.  Although no notice has been provided stating the

purported reasons for termination, the only provisions potentially relevant to this case are:

1)  Section 2802(b)(2)(A) which permits termination for:

A failure by the franchisee to comply with any provision of the franchise, which provision is
both reasonable and of material significance to the franchise relationship, if the franchisor first
acquired actual or constructive knowledge of such failure—

(i) not more than 120 days prior to the date on which notification of termination or
nonrenewal is given, if notification is given pursuant to section 2804(a) of this title...

2)  Section 2802(b)(2)(B) which permits termination for:

A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise, if—

> (i) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions

3) Section 2802(b)(2)(C) which permits termination on:

"The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurence –

> (i)    not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to 2804 (a) of this title, ...."

4) Subsection (b)(2)(C) is supplemented by 2802(c)(1) which defines "an event which is relevant to the franchise relationship and as a result of which termination of the franchise ... is reasonable" to include the "fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises.

Several of the words in those subsections are explicitly defined terms under the PMPA, as follows:

1) The word **"franchisor"** is defined as the distributor who authorizes a retailer to use a trademark in connection with the sale consignment or distribution of motor fuel. In this case, CAP (and its related entities) are the franchisor. 15 U.S.C. §2801(3).

2) The term **"franchisee"** means a retailer who is permitted under a franchise to use a trademark in connection with the sale consignment or distribution of motor fuel. IYS the Debtor is the franchisee. 15 U.S.C. §2801(4).

3) The term **"failure"** as defined, does <u>not</u> include - (A) any failure which is only technical or unimportant to the franchise relationship; (B) any failure for a cause beyond the reasonable control of the franchisee; or (C) any failure based upon a provision of the franchise which is illegal or unenforceable under the law of any state or subdivision thereof. 15 U.S.C. §2801(13).

At a minimum, before it can terminate the Debtor's franchises, CAP must prove to this Court

the following:

Under Section 2802(b)(2)(A):

1)      That IYS failed to comply with a franchise provision.
2)      That the provision is reasonable.
3)      That the provision is of material significance to the franchise relationship
4)      That the failure to comply was not technical or unimportant.

5)       That the failure was within IYS's reasonable control; and,
6)       That CAP did not have actual or constructive notice of the failure to comply more that 120 days prior to furnishing notice of termination.

The failure on any one prong is fatal to CAP's claims. The Debtor submits CAP blatantly ignores the PMPA requirements and made no attempt to comply. As such they failed to produce evidence on **any** of the prongs and claims on this section must fail.

Under Section 2802(b)(2)(B):

1)       That IYS failed to comply with a franchise provision.
2)       That the failure resulted from IYS' lack of good faith.
3)       That the provision is reasonable.
4)       That the failure is not technical.
5)       That failure was not unimportant.
6)       That the failure was within IYS' reasonable control.
7)       That CAP provided notice of the failure and a reasonable time to cure; and,
8)       That CAP did not have actual or constructive notice of the failure to comply more that 120 days prior to furnishing notice of termination.

Again, the failure of any prong is fatal to CAP's claims. The Debtor submits that CAP blatantly ignores the PMPA requirements and made no attempt to comply. As such they failed to produce evidence on **any** of the prongs – certainly neither of the TWO required notices have been given - and claims on this section must fail.

Under Section 2802(b)(2)(C):

1)       That IYS committed fraud or criminal misconduct.
2)       That the act was "relevant to the franchise relationship." And,
3)       That CAP did not have actual or constructive notice of the act more than 120 days prior to furnishing notice of termination.

The consideration "**relevant to the franchise relationship**" is also specific to the PMPA. In *Ackley v. Gulf Oil Corp.*, 726 F.Supp. 353 (D. Conn. 1989) aff'd 889 F. 2d 1280 (2d Cir. 1989). Judge Burns held that a PMPA franchise relationship consists of three, and only three, elements: the right to occupy the premises, the right to sell trademarked fuel and the right to be supplied with fuel. *Ackley v. Gulf Oil Corp.*, 726 F. Supp. at 361. So to be "relevant to the franchise relationship," the matter at issue must impact one of those three elements. IYS submits that the claims asserted by CAP

simply do not meet that threshold. For instance, how does the ACH statement which relates to the disposition of Debtor's money, causes no damage, and is not mentioned in any of the CAP Agreements, impact those three elements in any way?

The Court will note that the PMPA focuses on "an event" not any response to the same. *Heller v. Gulf Oil Corp*., CCH TRR ¶63, 701 (D. Mass. 1980). Therefore, if as CAP claims, there was a violation, then the relevant dates are when the event occurred, not the date a response occured. So with repsect to, for instance, the Cincinnatti matter, CAP knew just as much about it (if not more) than IYS and took no action for many years. CAP cannot now be heard to complain about events of which they knew.

The Leased Stations not expressly protected under the PMPA are protected under various applicable state statutes (See, Adversary Complaint, Docket No. 328, Count II, pages 10 through 11, Count III, page 11 (the "Adversary Complaint[3])) and under the express terms of CAP's Franchise Agreements. IYS Exhibit 2, 5, at Article IX. Article IX of the Franchise Agreements incorporates 15 U.S.C. §2802 nearly verbatim. Therefore, it is unsurprising that the basis for termination asserted by CAP in the Rejection Motion reflect PMPA provisions; namely, the failure of the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship (PMPA §2802(b)(2) and Franchise Agreements ¶ 9.1(a)); the failure of a franchisee to exert good faith efforts to carry out the provisions of the franchise and fails to cure such failure after notice from the franchisor of such failure and a reasonable opportunity to cure (PMPA §2802(b)(2)(B) and Franchise Agreement ¶ 9.1(B)(v)); and, fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises (PMPA §2802 (c) (1) and Franchise Agreement ¶ 9.1(b)(vii)).

---

[3] The Adversary Complaint is made a part hereof and incorporated herein

Both the PMPA and the Franchise Agreements require notice to the dealer prior to termination. PMPA §15 U.S.C. 2804 and Franchise Agreements ¶ ¶ 9.1(e), 15.4. No evidence was submitted demonstrating that notice of any kind was provided by CAP to the Debtor. The absence of notice and the provision of a reasonable right to cure is fatal to the "good-faith efforts" claim under both the PMPA and the Franchise Agreements. As such, any allegation on that basis cannot be the predicate of a summary rejection of the CAP Agreements as demanded by CAP. CAP is now time-barred from issuing any such notification pursuant to 15 U.S.C. §2802(b)(2) which imposes a 120 day sunset provision/notice requirement and prohibits assertion of stale claims - specifically those for which the franchisor has actual or constructive notice more than 120 days prior to notification. PMPA §2802(b)(2) at subsections (A)(i) and (C)(i). Those sunset/notification requirements are effectively incorporated into the PMPA Franchise Agreements both by their express terms (¶ ¶ 9.1(e), 15.4 ) and because the Franchise Agreements explicitly incorporate relevance and reasonability requirements of the PMPA. Franchise Agreements ¶ ¶ 9.1 at subsections (a) and (b). As such, even if CAP's allegations were true, they are nevertheless unenforceable under both federal law and their own Franchise Agreements. As a result, CAP is barred, as a matter of law, from imposing a termination based upon any of the allegations set out in the Rejection Motion and as such, the allegations cannot support an order of summary rejection as demanded by CAP. CAP has made no attempt to comply with any state statutes whatsoever. Other than the allegations with respect to the Management Agreements, the alleged defaults apply only to single operations locations. Accordingly the issues alleged in the Minnesota Complaint and Cincinnati Complaint - even if there was competent evidence to support them - would not justify termination of the Leases of all 40 of the Debtor's Leased Stations as the event only applies to individual locations.

### 4. The Purported "Unitary" Agreements Must be Applied Consistently

One suspects CAP will claim that because the Franchise Agreements are "unitary" a default at one location constitutes a default at all locations. However, that also means grounds for termination must be uniform across all locations as well. In other words, CAP cannot claim the franchises are "unitary" only when it suits their preferred outcome. The purported "unitary" franchise agreements are themselves a violation of the PMPA because they constitute a circumvention of 15 U.S.C. §2805(f). The text of Subsection 2805(f)(1) is clear; "a franchisor may not condition the renewal of a franchise relationship on a franchisee releasing or waiving rights under federal or state law. As such ... a franchisor [is not] permitted to use § 2802(b)(3)(A) to do an end run around § 2805(f)(1)...." *Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 859 (7th Cir. 2002). Instead, a franchisor must offer renewal documents without any strings attached. Where, as here, the franchisor conditions a renewal upon collateral matters, the non-renewal does not comply with the PMPA. *See* 15 U.S.C. §§ 2802(b)(3) and 2805(f); *Carter v. Exxon Co. USA, a Div. of Exxon Corp.*, 177 F.3d 197, 202 (3d Cir. 1999); *Riverdale Enterprises, Inc. v. Shell Oil Co.,* 41 F. Supp. 2d 56, 66 (D. Mass. 1999).

On their face, the 2021 Franchise Agreements removed the Debtor's right to renew each franchise location individually and to negotiate the terms of the franchise relationships individually. An all or nothing, take it or leave it, offer is not legal. As such, to the extent CAP seeks to terminate all the Debtor's locations based upon a default at an individual location, such a termination cannot stand.

Conversely, if the franchise relationships are deemed unitary, the grounds for termination and the procedure for effecting termination must also be unitary and CAP's position is barred as a matter of law. However, if the franchise relationships are considered individually (as they should be), then CAP must plead and prove an effective termination for each station and the Minnesota and Cincinnati matters are limited to single stations only. In this case, it appears CAP wants to have it both ways. They want to terminate a host of stations based upon a handful of arguable defaults while at the same

time ignoring state and federal laws that would apply uniformly across the "unitary" agreements. IYS submits that CAP's preferred outcome is not supported by the evidence and the PMPA.

### G. CAP HAS WAIVED ANY NON-MONETARY DEFAULTS AND ITS BAD FAITH REQUIRES APPROVING ASSUMPTION MOTION AND DENIAL OF REJECTION MOTION

The issue of waiver and bad faith are intertwined and will addressed accordingly. While the Debtor disputes the existence of any non-monetary defaults to CAP, if, in fact, this Court dertermines that such defaults exist, CAP's actions constitute a waiver of any alleged non-financial Defaults under the CAP Agreements. "In Illinois, 'waiver' is a voluntary and intentional relinquishment of a known right." *PPM Fin., Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 895 (7th Cir. 2004) (internal citations omitted). "Waiver can be either express or implied by conduct that is inconsistent with an intent to enforce the right." See, *PQ Corp. v. Lexington Ins. Co.*, 860 F.3d 1026, 1036 (7th Cir. 2017).

"Contract law imposes a duty, not to 'be reasonable,' but to avoid taking advantage of gaps in a contract in order to exploit the vulnerabilities that arise when contractual performance is sequential rather than simultaneous." *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992). "'Bad faith' is a term of art in contract law; it refers to one party's manipulation of contractual terms in order to take commercial advantage of another party." *Zeidler v. A & W Restaurants, Inc.*, 301 F.3d 572, 574–75 (7th Cir. 2002). "If a party is found to have acted in bad faith, then the other party is relieved of the effects of contractual breaches caused by that bad faith." Id. at 575. "Suppose A hires B to paint his portrait to his satisfaction, and B paints it and A in fact is satisfied but says he is not in the hope of chivvying down the agreed-upon price because the portrait may be unsaleable to anyone else. This would be bad faith, not because any provision of the contract was unreasonable and had to be reformed but because a provision had been invoked dishonestly to achieve a purpose contrary to that for which the contract had been made." *Original Great Am. Chocolate Chip Cookie Co.*, 970 F.2d at 280 (citation omitted).

### 1. **CAP has a Publicly Stated Agenda to Convert Dealer Stations to Company Control**

The Debtor originally entered the franchise relationship with CrossAmerica Partners while it had different equity ownership and different management. (IYS Exhibit 45, Nifong Dep Tr., at page 16) During Mr. Nifong's testimony there was an extended dialog regarding how CAP's original management was adverse to company operating service stations and thus supported dealer/lessee operations and how that changed with the current management in place. (IYS Exhibit 45, Nifong Dep Tr., at pages 11 - 12, 33 - 41, 45 – 47) After several complicated transactions, CAP's current management took over in late 2019. (Nifong Dep Tr., at page 31) Almost immediately, the new CAP management reversed course with respect to dealer/lessee operations. (Nifong Dep Tr. at, pages 34 – 36)

In fact, that course reversal was discussed at length during a mandatory earnings call on August 8, 2023, in which call, CAP's CEO, Charles Nifong referenced CAP's conversion of certain lessee dealers cites to Company operated sites stating: "These conversions are part of a strategy to convert certain lessee dealer locations with upside to company-operated sites." (IYS Exhibit, 43, Nifong Dep Tr., at pages 9 - 10) On the same earnings call, Mr. Nifong claimed "We have the ability to convert sites ... when the lessee dealer fails to perform in accordance with the terms of the contract." *Id.*

Given the fact that CAP's trumpeted the strategy on CAP's earning call and further given its reconfirmation by multiple officers, it is unquestionably a substantial corporate goal. CAP unabashedly supports the strategy – its people are seemingly proud of it. This pride is despite the policy being anathema in the petroleum marketing community, or prohibited outright. See, e.g., 15 USC § 2802(b)(3)(A)(ii) (prohibiting changes "for the purpose of converting" franchises to company operations). It is, therefore, apparent that at every possible turn, CAP will attempt to manufacture a default, even where none exists, in order to put their corporate strategy into effect - thus enabling

them to convert locations previously occupied and operated by franchisee dealers into company operated locations. The credibility of all arguments and factual assertions made by CAP representatives must be viewed through that lens.

2. **CAP is Attempting to Take Advantage of the Debtor's Chapter 11 filing.**

The evidence demonstrated that CAP is, not only attempting to do something that it could not otherwise do under non-bankruptcy law, but also trying to manufacture a default to compel rejection or prohibit assumption of the CAP Agreements where none exists and the extent to which it will resort to achieve its goals. The CAP Entities' actions, conduct and contentions relating to the CAP Agreements have been interposed in these proceedings in bad faith and to hinder the Debtor and Debtor in Possession in its efforts to restructure its debt and reorganize under Chapter 11. The record of the case is clear and the evidence adduced at the evidentiary hearing supports the contentions and positions advanced by the Debtor that the CAP Entities' conduct and intentions in this case and related to the CAP Agreements are (***i***) part of a broader corporate plan to convert its "retailer operated" businesses into "company operated" businesses, (***ii***) demonstrative of its continuing and ongoing bad faith and sharp practices in its dealing with the Debtor as Debtor in Possession, (***iii***) an attempt to manufacture a default to compel rejection or prohibit assumption of the CAP Agreements where none exists; and (***iv***) interposed in these proceedings in bad faith and to hinder the Debtor and Debtor in Possession in its efforts to reorganize under Chapter 11.

Foremost in the positions advanced by CAP is that the Debtor has committed non-financial defaults of the CAP agreements is CAP's self-serving objections to the Debtor's use of the management companies and its "false" narrative that Kenan Ventures LLC, one of the management companies, was merely a real estate holding company who sole purpose was to purchase and hold the Houghton Michigan Station purchased from CAP. The evidence is clear and uncontroverted that on or about March 3, 2023, Kenan Ventures LLC entered into an Agreement of Sale with Erickson Oil

Products, Inc. to purchase 107 East Montezuma Avenue, Houghton, Michigan property (the "Houghton Michigan Station")(IYS Exhibit 22).. That Paragraph 7.1 of the Agreement of Sale provides for Termination of Main Street PMPA Franchise Agreement and execution and delivery at closing of a Mutual Termination Agreement (IYS Exhibit 22, page 6). That Paragraph 7.2 of the Agreement of sale provides for a new PMPA Franchise Agreement for the Real Property for the Buyer, Kenan Ventures LLC (IYS Exhibit 22, page 6). CAP was aware that Kenan Ventures LLC was the operating entity of the Houghton Michigan Station as evidenced by not only the Agreement of Sale (IYS Exhibit 22), but by the 11th Amendment to PMPA Franchise Agreement entered into by CAP, IYS and Kenan Ventures LLC (IYS Exhibit 37) that, *inter alia*, identifies Kenan Ventures LLC and IYS Ventures LLC as the "Franchise Dealer" and obligates Kenan Ventures at Paragraph 3 "to join in, and be obligated by, all obligations of the Franchise Agreement (IYS Exhibit 37, page 2).

It was uncontested that on May 2, 2023, the Debtor wrote to Wayne Masoner, CAP's Territory Manager, with the subject "IYS change" as follows: "hello sir I am looking to assign all IYS ventures sites into Kareem INC thank you sir." In fact and as testified to by Mr. Rizek conversations regarding the use and assistance of the management companies began prior to that date and sometime in mid to late 2022.

CAP submission into evidence of an altered business record demonstrates its inherent bad faith, deceit and the lengths it will go to achieve its agenda in this case. The Recon Team Inspection (IYS Exhibit 42) was intended by CAP to demonstrate IYS' failure to comply with its obligations under the CAP Agreements. However, this report that was admitted as a business record kept in the ordinary course of business as an exception to hearsay was manipulated and altered by CAP to paint a false picture of the Debtor and its post-petition business operations.

Wayne Masoner testified extensively regarding, *inter alia*, his position with CAP, relationship with IYS as territory manager of multiple site operators ("MOS"), his pre-petition and

post-petition inspections of IYS Stations, CAP's post-petition inspections of the Stations and the objectives thereof, its use and deployment of the "recon team" in the inspections, the findings and documentation of the "recon team" inspections in the shared spreadsheet purportedly kept in the ordinary course of CAP's business, his involvement at the direction of Robert Brecker, to issue to IYS on November 6, 2023, a spreadsheet and Yardi invoices reflecting amounts due for October and November 2023, base rent, taxes and miscellaneous expenses. A function that Masoner had no involvement with and which was routinely done by CAP's accounting department.

Mr. Masoner testified in IYS' case in chief under direct examination that contrary to his testimony the previous day in CAP's case in chief, the shared spreadsheet (the "CAP Shared Spreadsheet") (IYS Exhibit 42) maintained by members of the "recon team" was not a "true and accurate" business record maintained by CAP in the ordinary course of its business but rather a businesss record that had been altered so as not to include at least one column of the CAP Shared Spreadsheet. Mr. Masoner testified that the deleted column had been labeled "EBIDITA" and reflected CAP's EBIDITA for the prior year of the Leased Stations of $3.25 million dollars. Mr. Masoner further testified that the "recon team" inspections had commenced in August of 2023, that he was believed that all inspections had been included in the CAP Shared Spreadsheet by the members of the 'recon team," and that the CAP Shared Spreadsheet was true and accurate and a business record kept in the ordinary course of CAP's business. Mr. Masoner's testimony in these regards was not credible, misleading and false despite his being sworn to testify under penalty of perjury.

On the other hand, Mark Yeary's testimony was credible, enlightening and expressly contradicted and corrected Mr. Masoner's false testimony relating to the "recon team" inspections and the CAP Shared Spreadsheet. Mr. Yeary's testimony was not only credible but uncontroverted by CAP. Mr. Yeary testified that he was a member of the "recon team" and a CAP territory manager responsible for approximately fifty (50) gas stations. That as a member of the "recon team" he was

assigned the majority of the forty (40) Leased Stations to inspect (IYS Exhibit 42, page 2), that he commenced his inspections of the Leased Stations he was assigned in June and July 2023, that after inspecting a Leased Station he input his information and findings in the CAP Shared Spreadsheet. When Mr. Yeary was presented the CAP Shared Spreadsheet he testified concerning the deleted EBIDITA column, that many of his inspections were not included in the CAP Shared Spreadsheet presented to the Court by CAP, that all of his June and July 2023 inspections that he had inputed into the CAP Shared Spreadsheet were missing in addition to other inspections thereafter. Mr. Yeary testified that his inspections of the Leased Stations revealed that the Stations were well maintained, stocked and operating and that the were as good as if not better than the stations he had been assigned as CAP territory manager.

The forgoing provides this Court with ample evidence that CAP has waived any alleged non-financial defaults and has acted in bad faith in taking advantage of the instant Chapter 11 case to advance its business agenda to the detriment of the Debtor, its estate and, most importantly its creditors.

## III.     CONCLUSION

The Debtor has met its burden to establish its entitlement to assume the CAP Agreements. Accordingly, "[a]s long as assumption of a lease appears to enhance a debtor's estate, Court approval of a debtor in possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc*., 25 B.R. 484, 495 (Bankr.S.D.Ohio 1982).

Meanwhile, CAP comes to this Court with a Motion to Compel Rejection of the CAP Agreements relating to the 40 Leased Stations. That Rejection Motion - unknown to bankruptcy procedure – seeks to summarily preempt IYS Ventures' right to reorganize its business and repay its legitimate creditors.

IYS submits that the Rejection Motion should be denied and the Debtor's Motion to Assume should be granted.

In support, we note that stripped of all the legal "window dressing," the Rejection Motion is a naked attempt to steal 40 franchised service stations from IYS and the Bankruptcy estate. That is not hyperbole. On its face, the Rejection Motion seeks to have this Court order IYS to deliver 40 service stations to CAP without payment or compensation for the capital improvements, gas and inventory located at these sites. The effect of such an order would be the wholesale destruction of the bankruptcy estate, the substantial impairment of any prospect for reorganization and any possibility for the creditors' repayment. All that while at the same time, handing CAP a windfall.

One would expect that such an existential demand would be predicated on profound, pervasive and untenable breaches of law or contract. CAP's evidence in this case fails to establish anything even close to that level of proof, in fact, there is little if any proof of any breach at all. CAP does not attempt to comply with applicable federal or state law, and does not even comply with the Franchise Agreements they claim to hold in such high regard. Even if (which IYS does not for one moment concede) a default could be found, CAP offers nothing that precludes the Debtor from curing the presumed default.

In other words, the Rejection Motion stands the Bankruptcy Code on its head and should be denied for the reasons set forth herein. Instead the Court should grant Debtor's Motion to Assume because under Section 365 as there has been no showing of any default requiring cure. Accordingly, for these reasons and for the reasons set forth hereinabove, the Debtor submits that the Motion to Assume should be granted and the Motion to Compel Rejection should be denied.


**INTENTIONALLY LEFT BLANK**

Respectfully submitted,

_____/s/ Gregory K. Stern_____
Gregory K. Stern, Attorney for Debtor

John J. Morgan
Barr & Morgan
2777 Summer Street
Stamford, Connecticut 06905
(203) 356-1595

Gregory K. Stern (Atty. ID #6183380)
Monica C. O'Brien (Atty. ID #6216626)
Rachel S. Sandler (Atty. ID #6310248)
Dennis E. Quaid (Atty. ID #02267012)
53 West Jackson Boulevard
Suite 1442
Chicago, Illinois 60604
(312) 427-1558