**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 23 B 6782 |
| | ) | |
| IYS VENTURES, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Judge David D. Cleary |

**OPINION**

These matters come before the court on the motion of CrossAmerica Partners, LP and

certain of its affiliates ("CAP") for entry of an order compelling rejection of agreements for

leased stations, or, alternatively, granting relief from the automatic stay ("Motion to Compel

Rejection"), and the motion of IYS Ventures, LLC ("IYS" or "Debtor") to approve assumption of

certain agreements ("Motion to Approve Assumption").  The parties briefed both motions, and

the court held an evidentiary hearing over three days.

Having heard the testimony of the witnesses, reviewed the exhibits and memoranda and

considered the applicable law, the court will enter an order denying the Motion to Compel

Rejection and granting the Motion to Approve Assumption.

**I.      JURISDICTION**

The court has subject matter jurisdiction under 28 U.S.C. § 1334(b) and the district

court's Internal Operating Procedure 15(a).  This is a core proceeding under 28 U.S.C. §

157(b)(2)(A), (G) and (O).  Venue is proper under 28 U.S.C. § 1409(a).

**II.      BACKGROUND**

At the time of the hearing on these motions, the Debtor operated 49 gas stations across

the United States, including locations in Illinois, Indiana, Louisiana, Michigan, Minnesota,

Mississippi, South Dakota, and Wisconsin.  CAP supplies fuel to all 49 stations.  (Joint Pretrial Statement ("JPS") ¶ 5.)

Forty of those stations were leased from CAP (the "Leased Stations").  (JPS ¶ 6.)  Debtor owned ten stations, nine of which were operating on the petition date (the "Owned Stations" and together with the Leased Stations, the "Stations").  Debtor purchased the Owned Stations from CAP.  (JPS ¶ 8.)

Debtor has since filed four motions requesting approval to "push back" several Leased Stations to CAP.  The court granted those motions.  (Case No. 23 B 6782, EOD 392, 431, 460 and 486.)  Debtor also requested court approval to sell the Owned Stations, which the court granted.  (*Id.*, EOD 498.)  This opinion therefore concerns assumption or rejection of the relevant agreements regarding the remaining Stations.

Additionally, non-debtor Kenan Enterprises Inc. (not to be confused with Kenan Ventures LLC, which is discussed below) leases a station from CAP and CAP supplies fuel to that station. (JPS ¶ 7.)

In or about February and March of 2021, the Debtor and CAP entered into PMPA Franchise and Fuel Supply Agreements (the "Fuel Supply Agreements") and Unitary Lease Agreements 00005 and 00006 (the "Leases") (and together with the Proprietary Marks Agreement, the "CAP Agreements" or the "Related Agreements"). The Fuel Supply Agreements are identified as CAP Exhibits 1 and 2 and Debtor's Exhibits 2 and 5.  The Leases are identified as CAP Exhibits 3 and 4 and Debtor's Exhibits 1 and 4.  (JPS ¶ 9.)

Through the Fuel Supply Agreements, CAP supplies fuel to the Stations and the Debtor makes fuel sales directly to customers.  (JPS ¶ 10.)

2

The Fuel Supply Agreements provide a "Right of First Refusal", stating that "[i]n connection with the proposed transfer of [Debtor's] interest under Section 8.1, [CAP] or its designee shall have the right to meet the offer of any transferee and acquire [Debtor's] Interest on the same terms and conditions as those contained in the transferee's offer." (CAP Ex. 2, § 8.3.)

The Fuel Supply Agreements require Debtor to purchase fuel exclusively from CAP affiliate Lehigh Gas Wholesale, LLC ("Lehigh LLC"). (JPS ¶ 11.) They also obligate Debtor to purchase "Minimum Monthly Contract Volumes" from Lehigh LLC. (JPS ¶ 12.)

The Fuel Supply Agreements provide that CAP may terminate the agreements under several conditions, including if Debtor "fails to comply with any provision of this Agreement, which provision is both reasonable and of material significance to the Franchise Relationship[.]" (CAP Ex. 2, § 9.1(a).)

The Fuel Supply Agreements define the relationship between Debtor and CAP in Article XII as follows:

(a) Neither [CAP] nor [Debtor] have a fiduciary relationship with the other;

(b) [Debtor[ is an independent contractor with independent responsibility for and control over the manner and means of the day-to-day operations of the Businesses…;

(c) Neither Party is an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose; and

(d) No person performing work for [Debtor] at the Marketing Premises or in connection with the Businesses is an agent, legal representative, joint venturer, partner, employee, or servant of [CAP] or its Affiliates. [Debtor] has exclusive control and direction over the duties, supervision, compensation, hiring and firing of its employees, contractors and agents.

(CAP Ex. 2, § 12.1.)

Pursuant to the Leases, the Debtor is obligated to make monthly payments to CAP, payable on the first day of each calendar month, for rent and real estate taxes for the Stations, plus utilities and miscellaneous other charges.  (JPS ¶ 13.)

Debtor leases locations from several CAP-affiliated landlord entities:  LGP Realty Holdings LP, Erikson Oil Products, Inc., CAP Operations, Inc., Lehigh Gas Wholesale Services, Inc. and Lehigh LLC (together with CAP, the "CAP Entities").  (JPS ¶ 14.)

Pursuant to the CAP Agreements, Debtor is required to use the Point of Sale ("POS") system and equipment (the "POS System") specified by the CAP Entities.  (JPS ¶ 15.)  The POS System processes credit and debit card purchases of the Debtor's retail customers.  (JPS ¶ 16.)

When using the authorized POS System, the proceeds from customer credit card sales for fuel and other products at the Stations are remitted to CAP in the first instance.  Then, using an account designated by the Debtor, CAP periodically transfers ("Sweeps") the Debtor's portion of the credit card proceeds via ACH.  (JPS ¶ 17.)

CAP controls the Sweeps of the proceeds after payment of invoices due to the CAP Entities, including rent and associated miscellaneous expenses.  (JPS ¶ 18.)

In order to designate an account into which funds are swept, Debtor completes and submits a form to CAP, titled Electronic Funds Transfer Authorization Agreement.  Debtor completed one of these forms, effective December 16, 2022.  (CAP Ex. 35.)  Although Debtor's principal and manager Muwafak Rizek ("Muwafak") did not complete the form, he signed it. (Tr. at 376.)  The form required Debtor to attach a voided check with its name printed on the check, which Debtor did.  (CAP Ex. 35.)  The account holder, however, was not Debtor but instead an entity named Kareem Inc.  (Tr. at 377.)

4

Robert Brecker ("Brecker"), executive vice president of operations for CAP (Tr. at 45), testified that he understood this to be a default under the CAP Agreements, because CAP has a relationship with IYS Ventures and no other entity.  (Tr. at 228.)  He did not know what happened to those funds (Tr. at 259), but when asked how much money CAP lost, Brecker admitted that it lost nothing.

> Q:      [T]he fact that he's sending his money someplace else, how many dollars did you lose because of that?
>
> A:      Zero….
>
> Q:      Had that relationship continued indefinitely, how many dollars would you have lost?
>
> A:      Zero.  That's what I answered.

(Tr. at pp. 229, line 20 – p. 230, line 19.)

CAP is currently holding a security deposit in the amount of $995,000.00 related to the Fuel Supply Agreements that was funded by Debtor prior to the filing of the Chapter 11 case. (JPS ¶ 19.)

On or about April 21, 2021, the Debtor and CAP executed a security and cross-default agreement (the "Cross-Default Agreement").  The Cross-Default Agreement is identified as CAP's Exhibit 7.  (JPS ¶ 20.)

Between November 1, 2022, and March 1, 2023, the Debtor entered into substantially similar "Management and Operations Agreements" (the "Management Company Agreements") pursuant to which the counterparties to the Management Agreements (the "Management Companies") have several enumerated duties set forth therein.  The Management Company Agreements are identified as Debtor's Exhibits 8-20 and CAP Exhibits 24-32.  (JPS ¶ 21.)

5

The Management Companies include:

(1) 7 Mart Inc. pursuant to a Management Company Agreement dated December 1, 2022;

(2) Ameer Investment Inc. pursuant to two separate Management Company Agreements dated November 1, 2022;

(3) Areej Investment Inc. pursuant to a Management Company Agreement dated November 1, 2022;

(4) F&M Stop Market LLC pursuant to a Management Company Agreement dated December 1, 2022;

(5) Kareem Inc pursuant to two separate Management Company Agreements both dated November 1, 2022;

(6) Kenan Ventures LLC pursuant to a Management Company Agreement dated March 1, 2023;

(7) Leanne Investment LLC pursuant to a Management Company Agreement dated November 1, 2022;

(8) Leanne Ventures LLC pursuant to a Management Company Agreement dated November 1, 2022; and

(9) M&A 200 Inc. pursuant to a Management Company Agreement dated December 1, 2022.

(JPS ¶ 22.)  Each of the Management Company Agreements provides that the Management Company "shall provide management and operational services to the Company," which is defined as the Debtor.  (CAP Exs. 24-32, ¶ 1.)  The Management Companies "at all times, shall be independent of the Company." *Id.*  The Management Company Agreements specifically describe the "management and operational support services … [that] are necessary to provide service to the Company[.]"  (*Id.*, ¶ 2.)

When asked whether Debtor had outsourced its managerial responsibility to the Management Companies, Muwafak testified:

A:      No, sir.  It's – the right word is they are kind – they're our agent.  They're not really – I mean, it doesn't matter.  I'm not an attorney, so I don't know these words, you know, outsourcing.  I've used them before.

6

But as far as I know, they're our agents.  They work with us.  We are – I am in control of all of them.

Q:      You control the management company?

A:      I mean, I can.  Of course.  I'm watching them.  I'm literally overseeing them….

I still have full control.  If I – at any moment, if I decided that I don't want them or that they're not doing what they're supposed to be doing, we can always move on with our – in our own direction….

The people that are there [at Louisiana 58], they're still my agents.  They don't – they don't have a lease.  They're not in control of everything.  They still work for me.

(Tr. at 268, lines 8-18, p. 274, lines 21-25, p. 276, lines 1-4.)

Prior to the filing of this bankruptcy case, Debtor never shared any of the Management Company Agreements with CAP.  (Tr. at 334.)  Neither did Debtor tell CAP that it had entered into contracts whereby the Management Companies were performing management and operations at the Stations.  (Tr. at 334-35.)

Prior to 2023, Debtor had between 250 and 400 full time and part time employees.  It employed about six territory or district managers, who were responsible for checking the stores, working with the managers and reviewing invoices.  "District manager kind of trains the managers to make sure that they're doing a good job."  (Tr. at 392-93 and p. 393, lines 9-10.)  At every Station, Debtor tried to have "a manager and assistant manager, and then a team lead or shift lead, you know, clerk lead.  Usually … we would have, let's say, between two to four part-time and two to four full-time employees … for each store[.]"  (Tr. at 394, lines 7-13.)

Muwafak testified that the Management Companies employ the same employees that Debtor had employed, affirming that they are "still performing the same functions and the same work that they did" for the Debtor.  (Tr. at 394, lines 22-23.)  The Management Companies pay those employees, and also order and pay for the inventory.  (Tr. at 267.)

Ameer Investment, Inc., Areej Investment, Inc., Kareem, Inc., Kenan Ventures LLC, Leanne Investment, LLC, and Leanne Ventures LLC are owned by Munadel Rizek ("Munadel"), Muwafak's brother. (Tr. at 270-72; JPS ¶ 23.)

The Management Companies that are owned by Munadel are using Munadel's credit to purchase convenience store inventory. (Tr. at 278.) Since the petition date, those Management Companies have not taken any profits. (Tr. at 283.)

7 Mart Inc., F & M Stop Market LLC and M&A 200 Inc. (the "Louisiana Management Companies") are not owned by the Debtor or affiliated with the other Management Companies. (JPS ¶ 23.) Wayne Masoner, a territory manager at CAP ("Masoner"), testified that the Louisiana locations "had a different credit card machine than every other one of our gas stations operates with." (Tr. at 487, lines 17-19.) Muwafak admitted that at the stations with the Louisiana Management Companies in place, revenue from the gasoline sales comes to the Debtor's estate, but revenue from the convenience store sales does not. (Tr. at 285, 353.) Muwafak believes that if Debtor ran the Louisiana locations instead of the Louisiana Management Companies, "then instead of us taking profit from them, we would be putting money in them." (Tr. at 353, lines 23-24.)

Masoner testified that "those credit cards [from the Louisiana locations] go to a personal bank account, someone else's bank account that we [CAP] have no involvement with." (Tr. at 488, lines 13-15.) He admitted, however, that his knowledge that the Louisiana locations were using a different POS system was based on a report from another CAP employee. (Tr. at 500.) He could not identify the other system, and he could not rule out that it might be an EBT-Go system, used to process food stamp purchases that, until three months before the evidentiary hearing, could not be processed through the CAP POS System. (Tr. at 500-01.) CAP's former

8

territory manager Mark Yeary ("Yeary") confirmed that "the only reason something wouldn't, to my knowledge, be processed through the normal POS or register system was if it was a, like, a food-stamp-type item or a government-assistance EBT machine." (Tr. at 641, lines 8-12.)

On March 3, 2023,[1] Erickson Oil Products, Inc. and Kenan Ventures LLC executed an Agreement of Sale (the "Houghton Agreement") for the purchase of the commercial property located at 107 E. Montezuma Avenue, Houghton, Michigan 49931 (the "Houghton Property"). The Houghton Agreement is identified as Debtor's Exhibit 22. (JPS ¶ 24; Tr. at 369.) At the time, Brecker believed that Muwafak owned Kenan Ventures LLC. (Tr. at 252.)

An Environmental Indemnity Agreement related to the Houghton Property was executed by Erickson Oil Products, Inc., Kenan Ventures, LLC and the Debtor (the "Houghton Environmental Agreement"). The Houghton Environmental Agreement is identified as Debtor's Exhibit 22. (JPS ¶ 27.)

On May 18, 2023, a Special Warranty Deed was prepared and executed by Erickson Oil Products, Inc. transferring the Houghton Property to Kenan Ventures LLC. (JPS ¶ 28.)

An Eleventh Amendment to PMPA Franchise Agreement (identified as Debtor's Exhibit 37) was entered into between Lehigh LLC, Lehigh Gas Wholesale Services, Inc., Kenan Ventures LLC and Debtor relating to the Houghton Property. (JPS ¶ 32.) The effective date of this agreement is May 30, 2023. (Debtor Ex. 37.) This took the Houghton Property out of Debtor's portfolio of Leased Stations. (Tr. at 253.) Although the parties executed the Eleventh Amendment approximately one week after Debtor filed its voluntary petition for relief under the Bankruptcy Code, Debtor did not disclose the bankruptcy filing to CAP. (Tr. at 253.) Neither did

---

[1] The Joint Pretrial Statement indicates that the date of the Agreement of Sale is March 7, 2023. The document at Debtor's Exhibit 22 is dated the 3rd of March, 2023.

9

Debtor seek the court's approval for the transaction.  (*See* docket for Case No. 23 B 6782, generally.)

On May 2, 2023, Muwafak sent an email to Masoner with the subject "IYS change".  The email read as follows: "hello sir i am looking to assign all IYS ventures sites into Kareem INC thank you sir."  (JPS ¶ 25; CAP Ex. 77.)  At trial, Muwafak agreed that he was asking Masoner to assign all of the Stations to Kareem.

> [T]he idea was to assign the stores that were in Minnesota to Karee[m], Inc.; stores that are in Wisconsin to Ameer, Inc.

> But when I asked about that [earlier], they said that's not going to happen right now.  We have a lot going on, and it wasn't going to happen.

> It's a lot of work to do all that.  You would have to separate all of them, then you would have to separate the portals had [sic], the PDI when you do all these separations.  So it's an ongoing thing.

(Tr. at 385, line 21 – p. 386, line 6.)

On May 17, 2023, Erickson Oil Products, Inc. and Kareem Inc. executed an Agreement of Sale (the "Kemp Avenue Agreement") for the purchase of the commercial property located at 223-225 West Kemp Avenue, Waterton, South Dakota, 57201 (the "Kemp Avenue Property").  The Kemp Avenue Agreement is identified as Debtor's Exhibit 27.  (JPS ¶ 26.)

An Environmental Indemnity Agreement related to the Kemp Avenue Property was executed by Erickson Oil Products, Inc., Kareem Inc. and the Debtor (the "Kemp Avenue Environmental Agreement").  The Kemp Avenue Environmental Agreement is identified as Debtor's Exhibit 27.   (JPS ¶ 29.)

At no time prior to the Petition Date, including in connection with the Houghton Agreement or the Kemp Avenue Agreement, did Debtor disclose to CAP that Debtor had entered into a Management Company Agreement with Kenan Ventures LLC or with Kareem Inc.  (JPS ¶ 30.)

On May 23, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor's petition and schedules were signed by Muwafak as the Debtor's "Manager – Member."  Section 28 of the Debtor's Statement of Financial Affairs indicates that Muwafak holds a 99% membership interest in the Debtor.[2]  (JPS ¶ 31.)

On or about June 1, 2023, the State of Minnesota, County of St. Louis ("Minnesota"), filed a criminal complaint against Muwafak.  The Statement of Probable Cause attached to the complaint alleges that during an inspection in October 2021, required invoices could not be located for vape products at a Station in Chisholm, Minnesota.  It further alleges that Muwafak eventually produced for the inspector an invoice from an unlicensed seller in China.  (CAP Ex. 33.)

Muwafak reached an agreement with Minnesota for a continuance for dismissal for two years.  (Tr. at 357-58; Debtor Ex. 34.)  Muwafak agreed that he would pay restitution in the amount of the uncollected taxes, that he would not possess tobacco products in his places of business without the required tax stamps, and that he would not be convicted of any same or similar offenses.  (Debtor Ex. 34.)  If Muwafak complies with these conditions for two years, Minnesota will dismiss the complaint, "and the case will be closed without a finding or adjudication of guilt."  (*Id.*)

On June 22, 2023, the Debtor's meeting of creditors under 11 U.S.C. § 341(a) was held but not adjourned.  (JPS ¶ 33.)

On August 8, 2023, CAP CEO Charles M. Nifong and CAP CFO Maura Topper participated in a conference call which was memorialized and transcribed in a document known

---

[2] Muwafak's name is spelled "Mumafak" in section 28.  The remaining 1% interest is held by I Mart Stores, LLC, an entity that has also filed for relief under the Bankruptcy Code.  (Case No. 23 B 10785 Bankr. N.D. Ill.).

as CrossAmerica Partners LP (CAPL) Q2 2023 Earning Call Transcript.  The transcript is

identified as Debtor's Exhibit 43.  (JPS ¶ 34.)

On November 2, 2023, the Ohio Department of Taxation filed Proof of Claim No. 35 (the

"Ohio Tax Claim") against the Debtor, asserting a claim of $701,169.28 based on estimated sales

taxes, where required returns had not been submitted.  (JPS ¶ 35; Case No. 23 B 6782, POC 35.)

Shortly thereafter, Debtor filed an objection to the Ohio Tax Claim.  (Case No. 23 B 6782, EOD

327.)  The Ohio Department of Taxation filed a response.  (*Id.*, EOD 366.)  The parties are

engaged in discovery, and the next status hearing on Debtor's objection is set for April 24, 2024.

### III.     DISCUSSION

Debtor seeks authority to assume the Related Agreements entered into with CAP and

certain of its affiliates.  CAP seeks entry of an order compelling Debtor to reject the Related

Agreements.  CAP seeks rejection of the Related Agreements only at the Leased Stations; it

would continue to supply fuel to the Owned Stations.[3]  In the alternative, CAP requests an order

granting it relief from the stay to terminate the Fuel Supply Agreements and Leases by their own

terms and in accordance with the Petroleum Marketing Practices Act ("PMPA").

#### A. Assumption or rejection of executory contracts and unexpired leases

As the Seventh Circuit acknowledges, "Chapter 11 is intended to 'permit business debtors

to reorganize and restructure their debts in order to revive the debtors' businesses.'"  *In re A & F*

*Enterprises, Inc. II*, 742 F.3d 763, 769 (7th Cir. 2014) (quoting *Toibb v. Radloff*, 501 U.S. 157,

163 (1991)).

---

[3] On February 21, 2024, the court approved Debtor's motion to sell the Owned Stations to Freedom Medical, Inc.
*See* Case No. 23 B 6782, EOD 498.  The court has not been informed as to whether that sale has closed.

**1.  Standard for analyzing a motion to approve assumption**

Pursuant to 11 U.S.C. § 365(a), a chapter 11 debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease[.]"

Although the Bankruptcy Code does not provide a standard for analyzing a decision to assume or reject a contract or lease, courts apply a deferential "business judgment" test.

> Section 365(a) enables the debtor (or its trustee), upon entering bankruptcy, to decide whether the contract is a good deal for the estate going forward. If so, the debtor will want to assume the contract, fulfilling its obligations while benefiting from the counterparty's performance. But if not, the debtor will want to reject the contract, repudiating any further performance of its duties. The bankruptcy court will generally approve that choice, under the deferential "business judgment" rule.

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. ___, 139 S. Ct. 1652, 1658 (2019) (citation omitted).  *See also Matter of Superior Toy & Mfg. Co., Inc.*, 78 F.3d 1169, 1172 (7th Cir. 1996) ("Section 365 requires a court to consider whether assumption of the contract in question will further either the rehabilitation or liquidation of the bankruptcy estate.").

Under this framework, "[t]he bankruptcy court reviews the debtor's business judgment with respect to the proposed assumption to determine if it would be beneficial or burdensome to assume the executory contract by evaluating whether assumption would serve the reorganization or whether it would take away funds available to other creditors." *In re UAL Corp.*, 635 F.3d 312, 319 (7th Cir. 2011), *as amended on denial of reh'g* (Apr. 13, 2011).  In this case, the court heard evidence that supports the conclusion that assumption of the CAP Agreements would be beneficial to the reorganization of Debtor's estate.  Operation of the Leased Stations under the CAP Agreements is critical to repayment of the estate's creditors.  The CAP Agreements are a "good deal for the estate going forward" and the court will defer to the Debtor's business judgment.  See *Tempnology*, 139 S. Ct. at 1658.

13

**2. In order to assume a contract or lease when there has been a default, a debtor must cure or provide adequate assurance that it will promptly cure certain defaults, compensate for any pecuniary loss and provide adequate assurance of future performance**

Deference to the Debtor's business judgment, however, is not the end of the court's analysis.  Pursuant to 11 U.S.C. § 365(b):

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee--

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).  In other words, "[a]s a condition to assuming an executory contract, the Bankruptcy Code … requires the debtor to cure any default or provide adequate assurance that the debtor will promptly cure any default under the contract." *In re Edison Mission Energy*, No. 12-49219, 2013 WL 5220139, at *5 (Bankr. N.D. Ill. Sept. 16, 2013).

Debtor contends that it has not defaulted under the CAP Agreements; CAP asserts that it has, and that the defaults are not curable.

14

There does not appear to be any dispute that there is no *monetary* default under the Related Agreements. CAP asserted the following *non-monetary* defaults: (1) Debtor improperly assigned the Fuel Supply Agreements and Leases to the Management Companies; and (2) when Debtor assigned the Fuel Supply Agreements, it breached the "right of first refusal" provision in those agreements.[4] CAP also adduced evidence at trial regarding the following events ("Additional Actions"):

--the Louisiana locations sell convenience store products outside of CAP's point-of-sale system;

--Debtor submitted a false ACH form for its sweep account;

--Muwafak sent an email asking if Debtor could "assign all IYS ventures sites into Kareem INC";

-- when an affiliate took over a Leased Station, Debtor executed amended agreements without disclosing the bankruptcy filing;

--Muwafak was indicted in Minnesota for selling untaxed vape products; and

--the State of Ohio alleged that Muwafak is complicit in a drug trafficking operation and accused Debtor of evading sales taxes.

CAP argues that a breach of any of the CAP Agreements constitutes a breach of all of them. *See* CAP Ex. 7, § 2 ("Any default of Franchise Dealer under this Agreement, or any of the Related Agreements (even if such default pertains to a single Property) shall be a default pertaining to all Properties and Related Agreements.").[5] Therefore, even if Debtor defaulted under only one of the CAP Agreements, CAP's position is that it defaulted under all of them.

---

[4] CAP also asserted that Debtor defaulted under the Fuel Supply Agreements by becoming insolvent or being subject to a bankruptcy proceeding. Violation of these *ipso facto* provisions is never a default that must be cured prior to approval of assumption. *See* 11 U.S.C. § 365(b)(2)(A) and (B).

[5] "[A] determination to enforce a cross-default provision necessarily is fact-specific." *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 251 (Bankr. S.D.N.Y. 2009), *aff'd*, 449 B.R. 14 (S.D.N.Y. 2011). If the court determines that Debtor has defaulted under one or more of the Related Agreements, it will "carefully scrutinize the facts and circumstances surrounding the particular transaction to determine whether enforcement of the provision would contravene an overriding federal bankruptcy policy and thus impermissibly hamper the debtor's reorganization." *Id.* at 250–51 (quotation omitted).

Since CAP contends that the defaults are not curable, Debtor's Motion to Approve Assumption would have to be denied.

**B. Debtor is not in default because its agreements with the Management Companies were not assignments of Debtor's contractual obligations under the Fuel Supply Agreements and Leases**

**1.   Contentions of the parties**

CAP asserts that the Fuel Supply Agreements and the Leases prohibit assignment.

> Neither this Agreement, nor any part of Franchise Dealer's interest in this Agreement ("Franchise Dealer's Interests") shall be transferred or assigned by Franchise Dealer, directly or indirectly, without the prior written consent of Distributor which consent may be withheld, conditioned, or delayed, in the sole discretion of Distributor.

CAP Ex. 2, § 8.1 (the Fuel Supply Agreements).

> Tenant's interest in this Lease ("Tenant's Interests") shall not be transferred, assigned, or sublet by Tenant in whole or in part, directly or indirectly, without the prior written consent of Landlord, except as otherwise required by Law.  Such consent shall be in the sole discretion of Landlord.  As a condition to Landlord's consent to the transfer or assignment of Tenant's Interests, Landlord shall have the right, to the extent permissible by Law, to require Tenant to execute a mutual termination agreement terminating this Lease.  Any such consent shall also require the consent of Landlord's Affiliates and may also require the approval of assignment of the Related Agreements and/or mutual termination thereof. Landlord reserves the right, in addition to any fees applicable to a transfer or assignment under any of the Related Agreements, to charge reasonable fees associated with Landlord's costs for effectuating the assignment of this Lease, as a requirement of a transfer or assignment hereunder.

CAP Ex. 4, § 8.1 (the Leases).  Based on these two provisions, CAP contends that Debtor's agreements with the Management Companies are prohibited assignments of Debtor's interests in the Fuel Supply Agreements and the Leases.

Debtor argues that CAP's position is neither supported by the testimony of the witnesses nor by the exhibits admitted into evidence.  First, the Fuel Supply Agreements do not contain a definition of "interest."  Debtor then refers to the Black's Law Dictionary definition of "interest" as "[a] legal share in something; all or part of a legal or equitable claim to or right in property,"

16

asserting that under that definition, "there cannot be any serious suggestion that the Debtor transferred any 'interest' to anyone."  Debtor's Post-Trial Brief, p. 6.

Furthermore, Debtor contends that the Management Companies are its "agents."  In support of its contention, Debtor cites to Seventh Circuit law.  "The test of agency is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal."  *Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742, 745 (7th Cir. 1998).

Debtor asserts that the evidence establishes it has and has always had the right to control the manner and method in which the Management Companies carry out their work.  Therefore, the Management Companies are Debtor's agents, and the CAP Agreements were not assigned.

In support of its argument that IYS did assign the Fuel Supply Agreements and the Leases to the Management Companies, CAP cites two cases. *See Stevenson v. Dersam*, 119 A. 491 (Pa. 1923); *Whitman v. Pet Inc.*, 335 So. 2d 577 (Fla. Dist. Ct. App. 1976).  CAP also points out that the Fuel Supply Agreements provide that the Debtor shall have "control over the manner and means of the day-to-day operations."  CAP Ex. 2, § 12.1(b).  Yet "[t]hrough the Management Agreements, the Debtor no longer has control over the operations of the Stations because the Debtor has abdicated such responsibility to the Management Companies[.]"  CAP's Post-Trial Brief, ¶ 38.

### 2.  The law of assignment

Neither the Bankruptcy Code nor the CAP Agreements define "assignment."  Under Pennsylvania law, which is the law applicable to the interpretation of the Related Agreements,[6] "[t]o effect a legal assignment, the assignor must at the time of the assignment have a present

---

[6] *See, e.g.*, CAP Ex. 2, § 15.16.

intent to transfer or divest himself of his rights." *Riley v. Mut. Ins. Co. Ltd.*, No. CV 17-489, 2019 WL 9596537, at *3 (E.D. Pa. Jan. 8, 2019) (quotation omitted), *aff'd*, 805 F. App'x 143 (3d Cir. 2020).

> An effective assignment … must evidence a present intent by the assignor, at the time of assignment, to divest himself of his rights.  Such an intent can be evidenced through clear language. For example … the plaintiff signed an agreement stating that it and its affiliates hereby: transfer, assign, convey to National Union *all* income ... *related in any way* to the Project, *or any other payments of any kind* payable to [plaintiff and its affiliates] ... coupled with the rights to enforce the payments of same[.]…  Expression of an intent to divest oneself of rights can also be expressed through a definitive act.

*In re Bradstreet*, No. 01-18357DWS, 2002 WL 1349588, at *7–8 (Bankr. E.D. Pa. June 3, 2002) (citations and quotation omitted).

On the one hand, some "intent to transfer or divest himself of his rights" is evident from CAP Ex. 77, the email that Muwafak sent to Masoner on May 2, 2023: "hello sir  i am looking to assign all IYS ventures sites into Kareem INC  thank you sir".  When asked about this email at the evidentiary hearing, Muwafak confirmed that he was "asking [Masoner] to assign all of the sites to Karee[m] Incorporated[.]"  Tr. at 384, lines 21-23.

Although this email used the word "assign," it is not a legal document.  Moreover, the Management Company Agreements were signed months before Muwafak sent this email.  If Muwafak had a "present intent to transfer or divest himself of his rights" at the time the Management Company Agreements were signed, why would he have sent the email on May 2, 2023?  One reasonable explanation is based on Muwafak's testimony.  He had asked CAP earlier about dividing up the Stations by state of location and assigning each division to a different Management Company.  But CAP told him, "[w]e have a lot going on, and it wasn't going to happen."  So, Muwafak executed the Management Company Agreements and waited six months to ask again about assignment.  Then, in the weeks leading up to the bankruptcy filing on May

18

23, 2023, Muwafak was exploring all possible options.  He sent the email just three weeks before the petition date to see if the timing was finally right for assignment of his interests under the CAP Agreements to the Management Companies.

Putting aside the email, the operative documents here are the Management Company Agreements signed by Debtor and each of the Management Companies.  *See* CAP Exs. 24–32. The title of each of these agreements is "Management and Operations Agreement."  While it does not control the court's interpretation of the language within the document, this title suggests that what follows will not be an assignment or transfer of one entity's rights to another.

In fact, the language of the Management Company Agreements bears this out.  The purpose of the Management Company Agreements is for the Management Companies to "provide management and operational services" to Debtor.  *Id.*, ¶ 1.  The Management Company Agreements do not use the words "transfer," "assign," "convey" or "divest" to describe the relationship between the parties.  Although no "magic words" are necessary for an agreement to work an assignment, that agreement must still evidence a "present intent to transfer or divest oneself" of one's rights under the contract.  *Melnick v. Pennsylvania Co. for Banking & Trusts*, 119 A.2d 825, 826 (Pa. Super. Ct. 1956).  *See also Riley v. Mut. Ins. Co. Ltd.*, 805 F. App'x 143, 147 (3d Cir. 2020) (unpublished opinion) ("Although Riley is correct that no magic words need be invoked, his argument misses the mark.  Critically, the Stipulation at issue is not simply missing words of art, it is missing any words that fairly indicate assignment.") (quotation omitted).

Instead, the Management Companies "will provide, supply and render such management and operational support services as are necessary" including: (1) administration and supervision of Debtor's finances; (2) selection and employment of personnel; (3) supervision and control of

19

all materials, supplies and equipment; (4) management of costs and pricing; (5) commencement, defense and control of all legal actions; (6) maintenance of the Debtor's assets in good repair; and (7) payment of all amounts necessary to maintain the Debtor's good standing with the state. *See* CAP Ex. 24, ¶ 2.  "Language that does not divest the assignor of a right, but instead merely gives written permission to do something, does not create either a legal or equitable assignment." *In Re Condemnation of Land in Bristol Twp.*, 238 A.3d 585, 589 (Pa. Commw. Ct. 2020).

Additionally, the court heard extensive testimony from Muwafak regarding his intent as to the relationship between Debtor and the Management Companies.  When asked whether Debtor had outsourced its managerial responsibility, he answered:

> A:      No, sir.  It's – the right word is they are kind – they're our agent.  They're not really – I mean, it doesn't matter.  I'm not an attorney, so I don't know these words, you know, outsourcing.  I've used them before.
>
> But as far as I know, they're our agents.  They work with us.  We are – I am in control of all of them.
>
> Q:      You control the management company?
>
> A:      I mean, I can.  Of course.  I'm watching them.  I'm literally overseeing them….
>
> I still have full control.  If I – at any moment, if I decided that I don't want them or that they're not doing what they're supposed to be doing, we can always move on with our – in our own direction….
>
> The people that are there [at Louisiana 58], they're still my agents.  They don't – they don't have a lease.  They're not in control of everything.  They still work for me.

Transcript, pp. 268, 274, 276.

Prior to 2023, Debtor had between 250 and 400 full time and part time employees, including several territory managers.  At each location Debtor employed managers, assistant managers and somewhere between four and eight other employees.  Muwafak testified that all of those individuals are still working at Debtor's various locations, performing the same functions

20

and doing the same tasks, except that now they are employed by the Management Companies.

Tr. at 394-95.

Moreover, the CAP Agreements provide that Debtor is an independent contractor with the ability to manage its locations however it deems appropriate:

(a) Neither Distributor nor Franchise Dealer have a fiduciary relationship with the other;

(b) Franchise Dealer is an independent contractor with independent responsibility for and control over the manner and means of the day-to-day operations of the Businesses including Product deliveries, Product leak or release detection, Product leak or release reporting, and compliance with all Laws;…

(d) ….Franchise Dealer has exclusive control and direction over the duties, supervision, compensation, hiring and firing of its employees, contractors and agents.

CAP Ex. 2, § 12.1.

The language of the Management Company Agreements and the testimony from Muwafak does not support a finding of an intent to assign Debtor's interests in the CAP Agreements to the Management Companies. Instead, Debtor chose to use the Management Companies to run the day-to-day operations of the various Stations. As an independent contractor with the ability to control the manner and means of running the Stations, Debtor was entitled to make this choice without entering into an impermissible assignment.

Neither of the cases cited by CAP suggest a contrary result. In *Stevenson*, owners of a hotel leased it to a tenant. Several years later, the owners decided to sell the hotel, only to discover that the tenant "had transferred his rights in the property to the Leslie Corporation, nominally as agent for the purpose of operation." *Stevenson*, 119 A. at 492. The lower court found this to be a device to get around the lease's prohibition against subletting. On appeal, the Supreme Court of Pennsylvania affirmed, stating:

[T]he agreement clearly shows it was an attempted transfer of the lease to be subsequently completed as to form, when the approval of the owners could be obtained. The corporation bought in full all the property of [the tenant], took

21

> possession and operated the hotel, and [the tenant] had no remaining financial
> interest in it. This was not the placing of a mere custodian or agent upon the
> premises to act for the lessee, but an assignment of all interest in the lease to
> another, an act prohibited by the contract.

*Stevenson*, 119 A. at 493.  By contrast, the Management Company Agreements are not transfers of Debtor's rights under the CAP Agreements.  Instead, the Management Company Agreements represent "the placing of a mere custodian or agent upon the premises to act for the lessee[.]"

As for *Whitman*, it is not a Pennsylvania case, and the court cited no legal standard for determining whether an assignment had taken place.  In fact, although the court reversed the trial judge's decision that the lessee had not violated the terms of the lease by transferring it without the landlord's consent, the court did not discuss that reversal at all.  Instead, its analysis was limited to reviewing whether the landlord unreasonably withheld its consent to an assignment.  It is true that in reaching its decision, the *Whitman* court would have had to accept the landlord's contention that the lessee's management agreement with another entity "in effect, had transferred the lease[.]"  *Id.*, 335 So. 2d at 579.  But the opinion contains no analysis of the legal underpinnings for this contention, let alone one based on Pennsylvania law.

Finally, CAP asserts that the provision in the Management Company Agreements that the Management Company "at all times, shall be independent of" IYS conflicts with the Fuel Supply Agreements' provision that the Debtor shall have "control over the manner and means of the day-to-day operations[.]"  CAP Ex. 2, § 12.1(b).  Section 12.1(b), however, is in Article XII of the Fuel Supply Agreements.  This Article is titled "Relationship of the Parties."  In other words, Article XII governs the relationship between Debtor and CAP.  *As between Debtor and CAP*, Debtor "is an independent contractor with independent responsibility for and control over" how the operations are to be carried out at the various Stations.  If Debtor's "manner and means" of

22

control is to contract with a management company, there is no conflict with the Fuel Supply Agreement.

For all of the reasons stated above, the court finds that the Management Company Agreements do not constitute an impermissible assignment, and therefore Debtor has not defaulted under the CAP Agreements.

### 3. Debtor did not breach the right of first refusal provision

Since the court concludes that the Management Company Agreements are not impermissible assignments, it necessarily follows that Debtor has not breached the right of first refusal in the Fuel Supply Agreements. The right of first refusal arises only "[i]n connection with the proposed transfer of [Debtor's] Interest under Section 8.1[.]" CAP Ex. 2, § 8.3(a). Since the Debtor did not assign the CAP Agreements, there was no transfer of Debtor's interest under Section 8.1. Therefore, Debtor did not breach the right of first refusal provision of the Fuel Supply Agreements.

### C. Whether the Additional Actions are defaults and, if so, must they be cured

CAP adduced evidence at trial regarding the following events, which the court has described as the Additional Actions:

--the Louisiana locations sell convenience store products outside of CAP's point-of-sale system;

--Debtor submitted a false ACH form for its sweep account;

--Muwafak sent an email asking if Debtor could "assign all IYS ventures sites into Kareem INC";

-- when an affiliate took over a Leased Station, Debtor executed amended agreements without disclosing the bankruptcy filing;

--Muwafak was indicted in Minnesota for selling untaxed vape products; and

--the State of Ohio alleged that Muwafak is complicit in a drug trafficking operation and accused Debtor of evading sales taxes.

23

As described below, after reviewing the evidence and applicable law, the court concludes that the Additional Actions are not defaults that need to be cured under either the Leases or the Fuel Supply Agreements.

### 1. General standard for defaults

As stated above, § 365(b) provides that in order for a court to approve assumption of an executory contract or lease, the debtor-in-possession must cure certain defaults, compensate the counterparty and provide adequate assurance of future performance.  Even if the default has been cured by the time the debtor wishes to assume the contract or lease, this provision still applies. *See In re Hawkeye Ent., LLC*, 49 F.4th 1232, 1237 (9th Cir. 2022) ("Using the present-perfect tense in this way refers to situations where a default has occurred regardless of whether that default has been resolved or is ongoing.").

The timing of the default is not relevant.  "The other party to the contract or lease that the trustee proposes to assume is entitled to insist that any defaults, whenever they may have occurred, be cured, that appropriate compensation be provided, and that, a past default having occurred, adequate assurance of future performance is available."  3 Collier on Bankruptcy ¶ 365.06[2] (16th ed. 2024) (footnote omitted).

### 2. Nonmonetary defaults in real property leases

Generally speaking, the cure need not comply exactly with the terms of the executory contract or lease.

> [T]he Code provides a broad right to cure, regardless of whether the agreement itself would permit cure.  The idea of cure in the Code is to provide the other party to the contract with the benefit of its economic bargain.  This suggests that if the trustee is able to provide a remedy that offers the other party to the contract the substantial equivalent to its economic rights under the contract, the trustee will have provided an adequate cure and, if the trustee complies with the other provisions of section 365(b), will be able to assume the contract or lease.

3 Collier on Bankruptcy ¶ 365.06[3][b] (16th ed. 2024) (footnotes omitted).

Some defaults, however, simply cannot be cured.  Prior to 2005 there was a split among the circuits as to

> whether § 365(b)(2)(D) carved out from § 365(b)(1)'s cure requirements only penalties triggered by nonmonetary defaults, or also the nonmonetary defaults themselves. In 1997, the Ninth Circuit had adopted the former of these readings, holding that § 365 required cure of nonmonetary defaults, even though many nonmonetary defaults are by their nature incapable of cure. *In re Claremont Acquisition Corp., Inc.*, 113 F.3d 1029 (9th Cir. 1997). The First Circuit subsequently adopted a contrary reading, holding that § 365(b)(2)(D) excuses cure of all nonmonetary defaults. *In re BankVest Cap. Corp.*, 360 F.3d 291, 298 (1st Cir. 2004).

*In re Golden Seahorse LLC*, 652 B.R. 593, 601 (Bankr. S.D.N.Y. 2023).

Congress attempted to resolve this issue in 2005 when it amended § 365(b).  Collier suggests "that the reference [in § 365(b)(1)(A)] to nonmonetary obligations and the impossibility of cure by subsequent performance means that the provision relates to continuous operation provisions and other provisions that are similar in that *they involve nonmonetary obligations and cannot be retroactively cured*."  3 Collier on Bankruptcy ¶ 365.06[3][c] (16th ed. 2024) (emphasis added).

In other words, § 365(b)(1)(A), as amended in 2005, exempts from the cure requirements of that section those nonmonetary defaults that cannot be cured – but only those nonmonetary defaults that stem from real property leases.

Therefore, even if the Additional Actions are nonmonetary defaults under the Leases, Debtor is not required to cure them in order to assume the Leases.  The 2005 Amendments, however, did not exempt nonmonetary defaults under other executory contracts, such as the Fuel Supply Agreements.

### 3.  The Additional Actions and the CAP Agreements

Article IX of the Fuel Supply Agreements addresses the conduct that constitutes a default and the remedy arising from any default.  *See* CAP Ex. 2, § 9.1.

### a. Defaults under the Fuel Supply Agreements

Default is not defined in the Bankruptcy Code. A default is a default, and materiality does not factor into the analysis under the Code. *See Hawkeye,* 49 F.4th at 1239 ("the Bankruptcy Code does not require that a 'default,' as that term is used in section 365(b)(1), be 'material.'"). The ordinary meaning of "default" is a failure to perform a task or fulfill an obligation. *See id.* at 1237. "To determine whether there was an omission or failure to perform a legal or contractual duty, we turn to the source of the duties – here, the real property lease[.]" *Id.* at 1238.

In this case, the source of the duties and obligations between the parties is the CAP Agreements. Defaults under the Fuel Supply Agreements are addressed in Article IX, which is titled "Default and Termination." The Fuel Supply Agreements specifically provide in section 9.1 that

(a)     [i]f [Debtor] fails to comply with any provision of this Agreement, which provision is both *reasonable and of material significance* to the Franchise Relationship, including without limitation those provisions specifically identified as such in this Agreement; *and*

(b)     [u]pon the occurrence of an event which is relevant to the Franchise Relationship and as a result of which the termination of this Agreement and the Franchise Relationship is reasonable, including: …

(v)     If [Debtor] fails to exert good faith efforts to carry out its obligations under this Agreement and fails to cure such failure after notice from [CAP] of such failure and reasonable opportunity to cure;…

(vii)     If [Debtor] engages in fraud or criminal misconduct relevant to the operation of the Businesses;…

(xiv)     If [Debtor] knowingly fails to comply with Law relevant to the operation of the Businesses.

CAP Ex. 2, § 9.1 (emphasis added).

### b. Historical facts

CAP argues that the Additional Actions are defaults and because they are historical facts, they cannot be cured. In support of this contention it cites *In re Deppe*, 110 B.R. 898 (Bankr. D. Minn. 1990), which found that a lapse in operations was a historical fact and therefore "a default which is incapable of cure or remedy." *Id.* at 904. This is only *dicta*, however, because the *Deppe* court was not considering a request to assume an executory contract. The parties came before the court on the franchisor's motion for relief from stay, similar to CAP's alternative request for relief in the Motion to Compel Rejection. When the trustee argued in opposition that the estate should have the opportunity to review the possibility of assumption, the court determined that the lapse in operations was a default that precluded assumption before it could even be considered.

Moreover, the default in *Deppe* was a lapse in operations for 19 days. None of the Additional Actions in this case involve a situation as grave as a 19-day interruption in operations. *See In re Minesen Co.*, 635 B.R. 533, 557 n. 16 (Bankr. D. Haw. 2021) ("the specific breach of interruption of operation was greatly significant in the damage it caused to goodwill such that not only did the contracts recognize its importan[ce] – in one case even allowing the franchisor to terminate the agreement immediately without the necessity of any notice or time to cure – but also state statutes allowed termination in the event of interrupted operations"), *appeal dismissed*, 2023 WL 2248382 (D. Haw. Feb. 27, 2023).

Limiting *Deppe's* historical fact theory to an "interruption of operations" breach comports with more recent case law discussing when nonmonetary, noncurable defaults should preclude assumption. In *New Breed Realty*, for example, also decided in the context of a request to vacate the automatic stay, the court considered whether the debtor was barred from assuming an

27

executory contract where it was "in default of a non-monetary obligation (here, an obligation to close by August 1, 2001) that by definition is incapable of cure." *In re New Breed Realty Enterprises, Inc.*, 278 B.R. 314, 320 (Bankr. E.D.N.Y. 2002). The *New Breed Realty* court determined that the assumption analysis should not turn *only* on a finding that a nonmonetary default is not curable.

> Where the default is non-monetary and is not curable, the debtor is precluded from assuming an executory contract only if the default was material or if the default caused "substantial economic detriment." *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1092 (3d Cir.1990)….
>
> In *Joshua Slocum*, the Third Circuit articulated a standard which may be applied to determine whether the existence of an incurable non-monetary default precludes assumption of an executory contract or unexpired lease. There, the court noted with approval the concept that "the [bankruptcy] court does retain some discretion in determining that lease provisions ... may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets." *Joshua Slocum*, 922 F.2d at 1092 (citing *In re Mr. Grocer, Inc.*, 77 B.R. 349, 354 (Bankr. D.N.H. 1987)). The Third Circuit found in *Joshua Slocum* that a provision in a shopping center lease, allowing for the termination of the lease if certain minimum sales figure[s] were not realized, was "material in the sense that it goes to the very essence of the contract, i.e., the bargained for exchange," and that it was "also reflective of the economic terms of the lease agreement governing occupancy." *Joshua Slocum*, 922 F.2d at 1092[.].

*New Breed Realty*, 278 B.R. at 321 (citations omitted).

In other words, if a nonmonetary default cannot be cured, this will not necessarily preclude a debtor or trustee from assuming an executory contract. It is only if that noncurable, nonmonetary default was *material* or if it caused *substantial economic detriment* that it should bar assumption. *See In re Vent Alarm Corp.*, No. 15-09316-MCF11, 2016 WL 1599599, at *2 (Bankr. D.P.R. Apr. 18, 2016) ("We adhere to the approaches reached in these courts' conclusions in order to maximize the viability of a debtor's ability to assume a contract in bankruptcy and hold that Debtor's delay did not constitute a material contractual default."); *In re Cumberland*

28

*Corral, LLC*, No. 313-06325, 2014 WL 948473, at *10 (Bankr. M.D. Tenn. Mar. 11, 2014) ("even if there were defaults under the Franchise Agreements … such defaults were immaterial and have not caused substantial economic detriment"); *In re Clearwater Nat. Res., LP*, No. 09-70011, 2009 WL 2208463, at *4 (Bankr. E.D. Ky. July 23, 2009) ("This court finds the reasoning articulated by the *New Breed* court to be persuasive, and concludes that it is the materiality and economic significance of the default which is the measure of whether a debtor may assume a contact in which a non-curable, non-monetary default has occurred."); *In re Chapin Revenue Cycle Mgmt., LLC*, 343 B.R. 728, 732 (Bankr. M.D. Fla. 2006) (granting motion to assume when "the Debtor did in fact default…, but that the default was not material and did not cause a significant economic detriment"); *In re Walden Ridge Dev., LLC*, 292 B.R. 58, 67 (Bankr. D.N.J. 2003) ("where the default is non-monetary the debtor may be precluded from assuming an executory contract only if the default is material or if the default causes substantial economic detriment"). *Cf. Hawkeye*, 49 F.4th at 1239 (distinguishing *Joshua Slocum* as limited to *ipso facto* and termination clauses, and *Vent Alarm* as concerning a default that was incurable).

As Collier acknowledges,

A contract or lease may be subject to a noncurable default but may not have terminated under state law.

This raises important questions concerning the cure under section 365(b). Must the cure of a default be upon the terms, and within the time, set forth in the contract or lease? Alternatively, is a cure of a default possible if there is no cure provision in the agreement?

The answer seems to be that the Code provides a broad right to cure, regardless of whether the agreement itself would permit cure. The idea of cure in the Code is to provide the other party to the contract with the benefit of its economic bargain.

3 Collier on Bankruptcy P 365.06[3][b] (16th ed. 2024) (footnotes omitted) (citing S. Rep. No. 989, 95th Cong., 2d Sess., 59; H.R. Rep. No. 595, 95th Cong., 2d Sess.).

Thus, a noncurable default should not preclude assumption if it is not material, and there are no damages.  Likewise, a default can be cured in some other form, by providing alternative benefit or performance.

CAP recognizes this principle.  In support of its arguments, CAP itself cites two cases for the proposition that nonmonetary and incurable defaults prevent assumption only if the default was material or created substantial economic detriment.  *See* CAP's Post-Trial Brief, p. 20 (citing *New Breed Realty*, 278 B.R. at 320 and *Joshua Slocum*, 922 F.2d at 1092).

### c.   Whether the Additional Actions are defaults under the Fuel Supply Agreements and, if so, is the Debtor required to cure

The court will consider each of the Additional Actions to determine whether they are defaults.  If not, no cure is required.  To the extent the Additional Actions are nonmonetary and noncurable defaults under the CAP Agreements, the court will also determine whether those defaults are material, or caused substantial economic detriment.  If not, then they do not preclude granting the Debtor's Motion to Approve Assumption.

### i.   The Louisiana locations sell convenience store products outside of CAP's POS System

The Fuel Supply Agreements require Debtor to use CAP's point of sale system and credit processing equipment.  *See* CAP Ex. 2, § 5.11.  CAP adduced testimony from Masoner that the Louisiana locations "had a different credit card machine than every other one of our gas stations operates with."  Masoner believed that this was significant because it meant that receipts coming in through those machines were not going to CAP.

On cross-examination, however, Masoner admitted that he did not have personal knowledge that a separate point of sale system was being used.  He also admitted that up until three months before the hearing, the CAP POS System did not process food stamp purchases.

Consequently, it was understood that purchases made using food stamps as currency could not have been processed through the CAP POS System.

Therefore, the court does not have sufficient evidence to conclude that the possible use of some other POS system to sell convenience store products at the Louisiana locations was a default under the CAP Agreements, because CAP has not shown that Debtor failed to comply with § 5.11. Moreover, there is no evidence that this provision is of material significance to a relationship that encompassed 50 Stations.

Even if Debtor had failed to comply with § 5.11 at the three Louisiana locations, CAP did not show that this would be a noncurable, nonmonetary default that was material or caused substantial economic detriment, as required by the case law.

### ii.      Debtor submitted a false ACH form for its sweep account

Debtor submitted an ACH form with a check attached that named Debtor as the account holder even though the true account holder was Kareem Inc., one of the Management Companies. On cross-examination, Debtor's counsel questioned Brecker regarding the economic impact of sweeping funds to that account:

> Q:      [T]he fact that he's sending his money someplace else, how many dollars did you lose because of that?
>
> A:      Zero….
>
> Q:      Had that relationship continued indefinitely, how many dollars would you have lost?
>
> A:      Zero. That's what I answered.

Tr. at pp. 229-30.

CAP argued it was damaged because the revenue that would flow through the Debtor and provide security for Debtor's obligations to CAP has instead gone through the Management

31

Companies.  The testimony above, however, is uncontroverted; CAP did not suffer financial harm as a result of the funds being swept to a different account.

Therefore, even though CAP did designate § 5.11 as a reasonable provision of material significance, the court does not have sufficient evidence to conclude that the submission of this form was a default under the CAP Agreements.  There is no evidence that the use of the ACH form in connection with the requirement to use the designated POS System is a default under § 5.11.  Nor is there any evidence that the Debtor failed to make payment to CAP for any noncompliance.  *See* CAP Ex. 2, § 5.11(a) ("Franchise Dealer is in default of this Agreement if … Franchise Dealer fails to pay promptly to Distributor or its designee any charge to Franchise Dealer's account resulting from non-compliance.").  Even if submission of the ACH form with a misleading check were a default under the CAP Agreements, CAP did not show that this would be a noncurable, nonmonetary default that was material.  And rather than proving that the form caused substantial economic detriment, as required by the case law, the testimony adduced at the hearing was that CAP lost no money at all.

### iii.      Muwafak's email to Masoner

CAP introduced into evidence an email that Muwafak sent to Masoner on May 2, 2023, that read: "hello sir  i am looking to assign all IYS ventures sites into Kareem INC  thank you sir."

An inquiry into whether assignment would be allowed is not a default under the CAP Agreements.  Indeed, the Fuel Supply Agreement anticipates the possibility of assignment in section 8.1 and requires CAP's prior written consent.  *See* CAP Ex. 2, § 8.1.  Whether the email was disingenuous is a different question from whether it constituted a default under the CAP Agreements.  It did not.

32

      **iv.**      **When an affiliate took over a Leased Station, Debtor executed amended agreements without disclosing the bankruptcy filing**

About a week after Debtor filed for relief under the Bankruptcy Code, two CAP affiliates, Kenan Ventures, LLC and the Debtor amended the CAP Agreements.  One of the locations that Debtor had leased was sold to Kenan Ventures, LLC. This action was taken without obtaining the approval of the bankruptcy court.

It should go without saying that a debtor's compliance with the statutory requirements of the Bankruptcy Code is mandatory.  Transferring property of the estate outside the ordinary course of business requires court approval pursuant to 11 U.S.C. § 363.  But, if necessary, failure to obtain court approval was not a default under any of the CAP Agreements.

      **v.**      **Muwafak was indicted in Minnesota for selling untaxed vape products**

Minnesota filed a criminal complaint against Muwafak, alleging that he was selling untaxed vape products, purchased from an unlicensed seller in China.  Muwafak reached an agreement with Minnesota for a continuance for dismissal for two years.  Muwafak agreed that he would pay restitution in the amount of the uncollected taxes, that he would not possess tobacco products in his places of business without the required tax stamps, and that he would not be convicted of any same or similar offenses.  If he complies with those conditions for two years, Minnesota will dismiss the complaint, and the case will be closed without a finding or an adjudication of guilt.

Although CAP did not allege that this criminal complaint constituted a default, the Fuel Supply Agreement does require Debtor to operate the Stations "in compliance [with] all applicable Laws including … tobacco sales[.]"  CAP Ex. 2, § 5.8.  Section 9.1(b)(vii) also provides that if Debtor "engages in fraud or criminal misconduct" and as a result the termination

of the Fuel Supply Agreement and the franchise relationship is reasonable, then CAP may terminate it.

CAP has not proven that there is a default under the Fuel Supply Agreements. If Muwafak complies with the continuance for dismissal for two years, the complaint will be dismissed without a finding of guilt. Therefore, there has been no finding that Debtor has not complied with applicable laws or has engaged in criminal misconduct. Without such a finding, there is no evidence that it would be reasonable for CAP to use this indictment as the basis for termination of the Fuel Supply Agreement and the franchise relationship.

Even if this event were to constitute a technical default under the Fuel Supply Agreements, there is no evidence to suggest that an indictment for selling untaxed vape products at one location, which was resolved by agreement, is material to the parties' relationship. Neither is there is any evidence that CAP suffered economic harm as a result of this incident.

vi. **The State of Ohio alleged that Muwafak is complicit in a drug trafficking operation and accused Debtor of evading sales taxes**

On November 2, 2023, the Ohio Department of Taxation filed the Ohio Tax Claim, asserting a claim in the amount of $701,169.28 based on unpaid sales taxes.

First, it is not clear that failure to pay sales taxes would be a default in Debtor's obligations under the Fuel Supply Agreement. *See* CAP Ex. 2, Article XI. Second, although a claim is allowed unless objected to, *see* 11 U.S.C. § 502, Debtor has filed an objection to the Ohio Tax Claim. The parties are currently in the middle of discovery. For both of these reasons, the court cannot conclude that the allegations in the Ohio Tax Claim constitute a default under the Fuel Supply Agreement, let alone a default of a provision that is both reasonable and of material significance to the parties' relationship.

Even if the alleged failure to pay sales taxes constituted a default under the Fuel Supply Agreement, as stated above, there is no evidence to suggest that this tax dispute with the State of Ohio is material to the parties' relationship, or that CAP suffered substantial economic detriment. Neither the exhibits nor the testimony of the witnesses suggest that CAP would be liable for any unpaid sales taxes.

### vii. The Additional Actions are not material and did not cause significant economic harm

The court has reviewed each of the Additional Actions separately, concluding that they do not preclude assumption of the CAP Agreements. CAP contends it is appropriate to consider whether, *taken together*, the Additional Actions would be material, or cause significant economic detriment to CAP.

For example, in analyzing an objection to discharge, when a court considers whether fraudulent intent may be inferred from the evidence presented, one of the "badges of fraud" that a court might weigh is "the existence or cumulative effect of the pattern or series of transactions or course of conduct[.]" *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 791 (7th Cir. 2002) (quotation omitted). Should the "existence or cumulative effect" of the Additional Actions add up to materiality?

The court has found no precedent suggesting that it is appropriate to consider all the Additional Actions together in determining whether materiality is present. Furthermore, a contractual default should not be placed on the same level as activities that suggest the occurrence of fraud. Sometimes, parties default on or breach a contract for reasons that are entirely benign, even economically appropriate. *See BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 981 F.3d 618, 632 (7th Cir. 2020) ("The law no longer treats commercial contracts as moral obligations, the breach of which must be punished."). While some of the Additional

35

Actions may in fact be misconduct under the CAP Agreements, the court will not consider them as a whole in its analysis of materiality.

**D. Since Debtor did not default under the Leases or the Fuel Supply Agreements, it need not provide adequate assurance of future performance**

CAP argues that, taken together, the Additional Actions constitute a showing of bad faith conduct that would preclude ever finding that Debtor can provide adequate assurance of future performance. CAP provides no legal authority in support of this argument, except *In re Texas Health Enterprises, Inc.*, 246 B.R. 832, 836 (Bankr. E.D. Tex. 2000).

But *Texas Health Enterprises* held only that the question of adequate assurance is determined by the facts and circumstances of each case. The court acknowledged that in making that determination, adequate assurance should "be given a practical, pragmatic construction[.]" *Id.* at 834 (quotation omitted). "Assurance of future performance is adequate if performance is likely (i.e. more probable than not) and the degree of assurance necessary to be deemed adequate falls considerably short of an absolute guaranty." *Id.* at 835 (quotation omitted). *See In re Res. Tech. Corp.*, 624 F.3d 376, 384 (7th Cir. 2010) (in considering whether an assignee had provided adequate assurance of future performance, approving the bankruptcy court's requirement that the assignee "show it was more likely than not to perform the obligations of the contract").

Although the *Texas Health Enterprises* court found no adequate assurance of future performance, this finding was based not only on the debtor's "bad faith in carrying out its duties" but also the "ample evidence of non-performance of duties pre- and post-petition." Furthermore, the counter-party "would have [had] substantial grounds for terminating its relationship" under non-bankruptcy law. *Id.* at 836-37.

"A debtor need not prove that it will thrive and make a profit. It must simply appear that the rent will be paid and other lease obligations met." *In re Citrus Tower Blvd. Imaging Ctr.,*

*LLC*, No. 11-70284-MGD, 2012 WL 1820814, at \*5 (Bankr. N.D. Ga. Apr. 2, 2012) (quotation

and citation omitted).  The parties do not dispute that the evidence shows that Debtor had no

financial defaults under the CAP Agreements.  The court takes judicial notice of the four motions

filed after the conclusion of the hearing on these motions, in which Debtor "pushed back" several

leased locations to CAP in an attempt to right-size its operations.  These motions provide further

support for the conclusion that Debtor is "more likely than not to perform the obligations of the

contract."  *Res. Tech.*, 624 F.3d at 384.

Most importantly, since the court finds no defaults under the CAP Agreements, Debtor

need not provide adequate assurance of future performance at all.

**E.  The court does not have the statutory authority to compel rejection, only to order a
debtor-in-possession to determine within a specified period of time whether to
assume or reject**

CAP argues that bankruptcy courts have the authority to compel a debtor to reject

executory contracts and unexpired leases, as it requested in the Motion to Compel Rejection.  For

this proposition, CAP cites *In re Am. the Beautiful Dreamer, Inc.*, No. 05-47435, 2006 WL

2038646, at \*6 (Bankr. W.D. Wash. May 18, 2006).  The *Beautiful Dreamer* court reviewed

competing motions to assume and to compel rejection.  It found that the debtor satisfied two of

the three requirements for approval of assumption.  The court then continued the motions for

several weeks, stating that "[t]he motion to assume will be denied and motion to reject granted

unless the Debtor … will be able to satisfy the requirement of a prompt cure under 11 U.S.C. §

365(b)(1)(A)."  *Id.*  The court did not engage in any analysis regarding the motion to compel

rejection (and in fact granted the motion to assume, after the continuance).

Having reviewed the *Beautiful Dreamer* decision, the court finds that it does not support

the proposition that a bankruptcy judge may compel a chapter 11 debtor to reject an executory

contract or unexpired lease.  Of course, the court does have the statutory authority to "order the

trustee to determine within a specified period of time whether to assume or reject" its executory

contracts.  11 U.S.C. § 365(d)(2).  That relief, however, has not been requested.  To the extent

courts have considered whether it is appropriate to *compel* rejection, they have reached the

conclusion that it is not.  *See Crown Equip. Corp. v. Toys "R" Us, Inc.*, No. 3:18-CV-810-JAG,

2019 WL 2713051, at *2 (E.D. Va. June 28, 2019) ("Section 365 allows courts to approve an

assumption of a contract, not to compel parties to assume a contract. Accordingly, the

Bankruptcy Court lacked the authority to use its equitable powers to compel TRU to assume the

MSA.") (citations omitted); *Ryan, Inc. v. Circuit City Stores, Inc.*, No. 3:10CV496-HEH, 2010

WL 4735821, at *3 (E.D. Va. Nov. 15, 2010) ("In this case, Ryan did not file a motion merely to

compel a *decision*; it filed a motion to compel *assumption*. As the Bankruptcy Court correctly

concluded, there is no authority supporting Ryan's position that the non-debtor party to an

executory contract should be able [to compel] the Debtors to assume the Ryan Contract.  Indeed,

Ryan conceded at the April 29 hearing before the Bankruptcy Court that it had not found any

authority supporting its position.") (footnote, quotation and citations omitted).  *See also In re*

*Sundial Asphalt Co., Inc.*, 147 B.R. 72, 80 (E.D.N.Y. 1992) ("The Court finds nothing in the

statute or the Bankruptcy Rules providing for rejection or assumption of an executory contract by

any party other than the trustee or debtor in possession[.]").

CAP also cites 11 U.S.C. § 105(a) in support of its request to compel rejection.  "The

court may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Section 105(a), however, is not a

general mandate to do equity.  *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206

(1988) ("whatever equitable powers remain in the bankruptcy courts must and can only be

exercised within the confines of the Bankruptcy Code").  Bankruptcy courts cannot make law

based on what they deem to be equitable.  *See Sunbeam Prod., Inc. v. Chicago Am. Mfg., LLC*, 686 F.3d 372, 376 (7th Cir. 2012) ("Rights depend … on what the Code provides rather than on notions of equity.").  The Bankruptcy Code does not authorize the court to compel a debtor-in-possession to reject an executory contract, and the court will not use § 105 to do so.

## IV.    CONCLUSION

Having heard the testimony of the witnesses, reviewed the exhibits admitted into evidence and read the memoranda submitted by the parties, the court finds that the Debtor properly exercised its business judgment with respect to the proposed assumption of the CAP Agreements.  Assumption of those agreements would be beneficial to Debtor's estate and would serve to advance the reorganization of the Debtor.

Debtor's agreements with the Management Companies were not assignments of Debtor's contractual obligations.  Therefore, they are not defaults under the CAP Agreements.  Neither are the Additional Actions defaults under any of the CAP Agreements.  To the extent the Additional Actions could be considered noncurable, nonmonetary defaults under the Fuel Supply Agreements, there is no evidence that they are material or caused substantial economic detriment.

Therefore, Debtor need not cure, or provide adequate assurance that it will promptly cure, any defaults.  Neither must the Debtor provide adequate assurance of future performance.  The court will grant the Motion to Approve Assumption by separate order.

Since the court will grant the Motion to Approve Assumption and concluded that it is not proper to compel a chapter 11 debtor to reject an executory contract, the court will deny the Motion to Compel Rejection.  To the extent CAP sought relief from the stay in the alternative, so that it could terminate the Fuel Supply Agreements and the Leases by their own terms and in

39

accordance with the PMPA, such relief is not appropriate at this time.  Debtor is authorized to

assume the CAP Agreements.

Date:   April 4, 2024

_____

DAVID D. CLEARY
United States Bankruptcy Judge