## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| IYS VENTURE, LLC, | Case No. 23-06782 |
| Debtor. | |

## COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY CROSSAMERICA PARTNERS LP

Gordon E. Gouveia (#6282986)
Peter C. Buckley (admitted *pro hac vice*)
Matthew R. Higgins (#6336039)
321 North Clark Street, Suite 1600
Chicago, IL 60654
Telephone: (312) 517-9200
Facsimile: (312) 517-9201
Email: ggouveia@foxrothschild.com

*Counsel to CrossAmerica Partners LP*

Dated:  August 14, 2024

# TABLE OF CONTENTS

Page

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION ...................................4

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS .......................................17

    2.1    **ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS.** ...............17

    2.2    **PROFESSIONAL FEE CLAIMS**.....................................................18

ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES .......................................................................................19

    3.1    **GENERAL RULES OF CLASSIFICATION.** ....................................19

    3.2    **UNIMPAIRED CLASS OF CLAIMS**..............................................21

ARTICLE IV BACKGROUND AND DISCLOSURES.........................................................25

    4.1    **BACKGROUND OF THE DEBTOR'S OPERATIONS** ...................25

    4.2    **EVENTS LEADING TO CHAPTER 11.** ...........................................26

    4.3    **THE CHAPTER 11 CASE.** ...............................................................27

ARTICLE V CONFIRMATION AND VOTING PROCEDURES ........................................37

    5.1    **CONFIRMATION PROCEDURE**...................................................37

    5.2    **PROCEDURE FOR OBJECTIONS**................................................37

    5.3    **REQUIREMENTS FOR CONFIRMATION**....................................37

    5.4    **CLASSIFICATION OF CLAIMS AND INTERESTS.** ...................38

    5.5    **IMPAIRED CLAIMS OR INTERESTS.** .........................................39

    5.6    **CONFIRMATION WITHOUT NECESSARY ACCEPTANCES**.................40

    5.7    **FEASIBILITY**.................................................................................41

    5.8    **BEST INTERESTS TEST AND LIQUIDATION ANALYSIS**.................41

    5.9    **RELEASES & EXCULPATIONS** ...................................................43

    5.10    **ACCEPTANCE OF THE PLAN**....................................................43

ARTICLE VI CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING........43

    6.1    **THE PLAN MAY NOT BE ACCEPTED**.......................................44

    6.2    **THE PLAN MAY NOT BE CONFIRMED**....................................44

    6.3    **DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS UNDER THE PLAN MAY BE INCONSISTENT WITH PROJECTIONS.** ...............44

    6.4    **OBJECTIONS TO CLASSIFICATION OF CLAIMS.** ...................44

    6.5    **FAILURE TO CONSUMMATE THE PLAN**...................................45

i

| | | |
|---|---|---|
| 6.6 | **ALLOWANCE OF CLAIMS MAY SUBSTANTIALLY DILUTE THE RECOVERY TO HOLDERS OF CLAIMS UNDER THE PLAN**. | 45 |
| 6.7 | **PLAN RELEASES MAY NOT BE APPROVED.** | 46 |
| 6.8 | **CERTAIN TAX CONSIDERATIONS.** | 46 |

ARTICLE VII MEANS OF IMPLEMENTING THE PLAN ..................................................46

| | | |
|---|---|---|
| 7.1 | **GENERAL** | 46 |
| 7.2 | **THE CAP SETTLEMENT.** | 46 |
| 7.3 | **LIQUIDATION TRUST** | 48 |
| 7.4 | **LIQUIDATION TRUSTEE.** | 49 |
| 7.5 | **CANCELLATION OF EXISTING SECURITIES AND AGREEMENTS.** | 52 |
| 7.6 | **EXEMPTION FROM CERTAIN TRANSFER TAXES** | 53 |
| 7.7 | **PRESERVATION OF RETAINED ACTIONS** | 53 |
| 7.8 | **CLOSING THE CHAPTER 11 CASE** | 54 |

ARTICLE VIII RELEASE, INJUNCTION, AND RELATED PROVISIONS ...........................54

| | | |
|---|---|---|
| 8.1 | **RELEASE OF LIENS** | 54 |
| 8.2 | **RELEASES BY THE DEBTOR.** | 55 |
| 8.3 | **NO LIABILITY PURSUANT TO SECTION 1125(E) OF THE BANKRUPTCY CODE** | 55 |
| 8.4 | **SETOFFS** | 56 |
| 8.5 | **BINDING EFFECT** | 56 |
| 8.6 | **TERMS OF INJUNCTIONS OR STAYS** | 56 |

ARTICLE IX EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...........................56

| | | |
|---|---|---|
| 9.1 | **REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** | 56 |
| 9.2 | **SUPPLEMENTAL BAR DATE FOR REJECTION DAMAGES** | 56 |
| 9.3 | **INSURANCE POLICIES** | 57 |

ARTICLE X DISTRIBUTIONS ...........................................................................................57

| | | |
|---|---|---|
| 10.1 | **DISTRIBUTIONS FOR CLAIMS ALLOWED AS OF THE EFFECTIVE DATE.** | 57 |
| 10.2 | **NO DISTRIBUTIONS ON DISPUTED CLAIMS** | 57 |
| 10.3 | **DISTRIBUTIONS ON CLAIMS ALLOWED AFTER THE EFFECTIVE DATE.** | 57 |

ii

10.4     **OBJECTIONS TO AND ESTIMATION OF CLAIMS**................................58

10.5     **DELIVERY OF DISTRIBUTIONS AND UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS**................................58

10.6     **INTEREST ON CLAIMS** ................................59

10.7     **WITHHOLDING AND REPORTING REQUIREMENTS** ................................59

10.8     **MISCELLANEOUS DISTRIBUTION PROVISIONS.**................................60

10.9     ***DE MINIMIS DISTRIBUTION PROVISIONS*** ................................60

10.10    **DISTRIBUTION RECORD DATE** ................................60

10.11    **ADJUSTMENT TO CLAIMS WITHOUT OBJECTION**................................61

10.12    **DISALLOWANCE OF UNTIMELY CLAIMS**................................61

ARTICLE XI CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ............61

11.1     **CONDITIONS TO EFFECTIVE DATE** ................................61

11.2     **SUBSTANTIAL CONSUMMATION**................................61

11.3     **CONSEQUENCES OF NON-OCCURRENCE OF EFFECTIVE DATE** ................................61

ARTICLE XII ADMINISTRATIVE PROVISIONS ................................62

12.1     **RETENTION OF JURISDICTION**................................62

12.2     **AMENDMENTS.**................................64

12.3     **WITHDRAWAL OF PLAN**................................64

12.4     **SUCCESSORS AND ASSIGNS** ................................64

12.5     **GOVERNING LAW** ................................64

12.6     **CORPORATE ACTION** ................................64

12.7     **EFFECTUATING DOCUMENTS AND FURTHER TRANSACTIONS**................................64

12.8     **CONFIRMATION ORDER AND PLAN CONTROL**................................65

12.9     **NOTICES**................................65

12.10    **NO ADMISSIONS OR WAIVER** ................................65

12.11    **2002 SERVICE LIST.**................................65

ARTICLE XIII RECOMMENDATION AND CONCLUSION ................................66

Exhibit A:  Liquidation Analysis

Exhibit B:  Security Deposit Itemized Summary

# DISCLAIMER

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE PROPONENTS' KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE PROPONENTS, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

THE COMBINED DISCLOSURE STATEMENT AND PLAN CONTEMPLATES THE LIQUIDATION OF THE DEBTOR, AND PAYMENTS TO CERTAIN CREDITORS ACCORDING TO BANKRUPTCY CODE AND STATE LAW PRIORITY, AS ADMINISTERED BY A LIQUIDATION TRUSTEE PURSUANT TO THE TERMS HEREOF.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN WHAT IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. NO REPRESENTATIONS CONCERNING THE DEBTOR, OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THE DEBTOR'S SCHEDULES AND OTHER FILINGS WITH THE BANKRUPTCY COURT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND THEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE,

BANKRUPTCY RULE 3016(b), AND LOCAL RULE 3017-2, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.

SEE ARTICLE VI OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

## **INTRODUCTION**

CAP, as a creditor and contract counterparty in the above-captioned Chapter 11 Case, proposes this Combined Disclosure Statement and Plan for the liquidation of the Debtor and Distribution of the proceeds of the Debtor's assets to Holders of Allowed Claims against the Debtor as set forth herein.

This Combined Disclosure Statement and Plan contains, among other things, a discussion of the Debtor's history, business, property, operations, risk factors and the Chapter 11 Case (including the Debtor's diminution in value during the Chapter 11 Case) as well as a summary and analysis of the Plan (which includes a global settlement of Claims by and between CAP and the Debtor and the creation of a Distribution Fund that will be created to fund distributions to General Unsecured Creditors), and certain related matters.

This Combined Plan and Disclosure Statement is proposed in parallel with the Debtor's *Second Amended Plan of Reorganization Filed by IYS Ventures, LLC (Dated July 17, 2024)* [Docket No. 615] (the "Debtor's Plan") and the Debtor's *Second Amended Disclosure Statement to Second Amended Plan of Reorganization Filed by IYS Ventures LLC (Dated July 17, 2024)* [Docket No. 616] (the "Debtor's Disclosure Statement").

For the reasons stated herein, the Proponents believe that the Debtor's creditors are best served by a plan of liquidation instead of a plan of reorganization and that an orderly plan of liquidation better serves stakeholders than a liquidation under chapter 7 of the Bankruptcy Code. The Proponents believe that the Debtor's Plan is not feasible, primarily because the Debtor does not currently generate enough income to meet its current monthly Lease Obligations on time and because the Debtor's Plan requires a recovery from the CAP Adversary Proceedings, which involve meritless claims that will only cost the Estate further resources. Therefore, the Proponents propose this Combined Plan and Disclosure Statement, which is a plan of liquidation, in competition with the Debtor's Plan.

The Debtor's Plan proposes to pay Holders of General Non-Priority Unsecured Claims over a five-year period an aggregate sum of $1.2 million in full and final satisfaction of their Claims, which are estimated to be allowed in the amount of $25,632,517.85. According to Section 4.6 of the Debtor's Plan, the Debtor proposes to fund the Debtor's Plan with its available cash (only $83,251 as of June 30, 2024 according to the Debtor's liquidation analysis), sale of the

Leased Stations (which the Debtor does not own and cannot sell), continued operation of the Leased Stations and Freedom Medical Stations (which the Debtor has been operating for more than a year in bankruptcy without generating any meaningful return to creditors) and the Net Proceeds of Litigation Claims including the PMPA Adversary and CAP Adversary (neither of which have any value as set forth below and both of which are responsible, in part, for the Debtor's disproportionate expenditure of Estate resources on professional fees). In other words, the Debtor's Plan proposes to pay Holders of General Non-Priority Unsecured Claims less than 5% of what they are owed, over five years if, and only if, the Debtor is able to generate funds to pay them from continued operations or pursuit of worthless litigation Claims. The Proponents of this Plan view the Debtor's Plan as entirely speculative, inconsistent with the Debtor's track record of performance and reliant on litigation cost-benefit assessments that have no basis in law or fact. Throughout this Chapter 11 Case, the Debtor has struggled to pay its administrative expenses as they come due, including by bouncing over $1.06 million in lease payments between December 2023 and July 2024. Accordingly, the Proponents have little confidence in the Debtor's ability to fulfill its undertakings set forth in the Debtor's Plan.

As an alternative to the Debtor's Plan, the Proponents are proposing this Combined Plan and Disclosure Statement, which liquidates the Debtor's assets as soon as practicable and provides a more certain recovery to creditors. As more fully set forth below, a central piece of the Plan is the CAP Settlement. As part of the CAP Settlement, CAP will (1) purchase the fuel and inventory at the Leased Stations for an estimated amount of approximately $1.2 million, (2) pay $100,000 to the Debtor's Estate solely for the benefit of Class 5 General Unsecured Creditors, (3) pay $100,000 to the Debtor's Estate solely to fund the Wind-Down Fund, (4) continue operations at all of the Leased Stations by hiring the current employees who are employed at such stations, and (5) fully satisfy the Class 1(b) Claims of Huntington National Bank by purchasing the collateral securing such Claims from the Holders of such Class 1(b) Claims. This Combined Plan and Disclosure Statement further provides for the creation of a Distribution Fund, which the Liquidation Trustee will use to provide distributions to General Unsecured Creditors as soon as practicable after the Plan becomes effective.

As the Debtor's own liquidation analysis shows, as of June 30, 2024, the Debtor had $1,086,738 in cash, fuel and convenience store inventory. The Proponents' Plan calls for the Debtor to return the remaining 18 Leased Stations to CAP, with CAP to purchase the fuel and convenience store inventory from the Debtor's Estate as it did for the 22 Stations that the Debtor previously "pushed back" to CAP and to pay Huntington Bank to satisfy its security interest in certain fuel dispensers purchased by the Debtor. Further, the Proponents' Plan calls for the Liquidating Trustee to liquidate the Debtor's interest in the fuel and convenience store inventory and leases at the Freedom Medical Stations, either by selling or abandoning those assets. Assuming that the Debtor's June 30, 2024 figures remain accurate, simply surrendering the Leased Stations to CAP and liquidating the fuel and convenience store inventory at the Freedom Medical Stations could result in a payment of nearly $1.8 million to the Estate for the benefit of creditors without the significant uncertainty and payout over time. In addition, although a significant portion of the Debtor's $995,000 Security Deposit held by CAP is already due to satisfy the Debtor's obligations under the CAP Agreements and the remainder of the Security Deposit will be required in

3

connection with the return of the remaining Leased Stations, the Proponents' Plan includes CAP's proposal to release its Claims against the Debtor for any deficiency in the Security Deposit, and pay $200,000 to the Estate, half of which would be earmarked for Distribution to Class 5 General Unsecured Creditors.[1]  The Debtor's liquidation could also result in the sale of the Debtor's leasehold interest in the Freedom Medical Stations, possibly generating additional Cash for the benefit of the Debtor's creditors.  In sum, a plan of liquidation, rather than reorganization, will maximize the remaining value of the Debtor's Estate, provide an immediate recovery for creditors, and avoid the substantial risk of relying on the future performance of a struggling business.  The Proponents will continue to try to build consensus with the Debtor's other stakeholders after solicitation and before the Confirmation Hearing.  ***The Proponents urge you to vote to accept the Plan***.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR ENTITLED TO VOTE ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE PROPONENTS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

**ARTICLE I**
**DEFINED TERMS AND RULES OF INTERPRETATION**

**Defined Terms**

      1.1    "1125(e) Parties" shall mean CAP

      1.2    "IYS Ventures, LLC" shall mean the Company or the Debtor, as applicable.

      1.3    "Administrative Claim" shall mean an unsecured Claim for payment of costs or expenses of administration specified in Bankruptcy Code sections 503(b), 507(a)(2), 507(b), or 1114(e)(2), including: (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Debtor's estate and operating the business of the Debtor; and (b) Professional Fee Claims.

---

[1]    The Debtor's Disclosure Statement falsely states that the Debtor is currently entitled to receive a portion of the Security Deposit.  However, the CAP Agreements clearly state that the Debtor is not entitled to receive any portion of the Security Deposit until the final Leased Station is returned to CAP.  What's more, as demonstrated on Exhibit B, a substantial portion of the Security Deposit is owed for damages to the "Pushback Stations" and more may be needed to satisfy the Debtor's obligations at the remaining 18 Leased Stations if Proponents' Plan is approved.

1.4     "Administrative Claim Bar Date" shall mean the deadline for filing requests for allowance and payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which shall be the date that is thirty (30) days after the Effective Date.

1.5     "Affiliate" shall mean "affiliate" as defined in section 101(2) of the Bankruptcy Code.

1.6     "Allowed" shall mean with respect to any Claim, except as otherwise provided in the Plan:  (a) a Claim that is either (i) scheduled by the Debtor in its Schedules in a liquidated amount and not listed as contingent, unliquidated, zero, undetermined, or disputed; or (ii) asserted in this Chapter 11 Cas by a proof of claim which has been timely filed, or deemed timely filed  in accordance with the procedures set forth in the Bar Date Order or late filed with leave of the Bankruptcy Court; and (b) a Claim that is either (i) not objected to within the period fixed by the Bankruptcy Code, the Bankruptcy Rules, and/or applicable orders of the Bankruptcy Court; or (ii) that has otherwise been allowed by a Final Order or pursuant to the Plan.  An Allowed Claim: (y) includes a previously Disputed Claim to the extent such Disputed Claim becomes allowed when the context so requires, and (z) shall be net of any valid setoff amount, which amount shall be deemed to have been set off in accordance with the provisions of the Plan.   For the avoidance of doubt:  (aa) any Claim that is withdrawn shall not be an Allowed Claim; (bb) any proof of claim filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; (cc) except as otherwise specified in the Plan or any Final Order, and except for any Allowed Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date; and (dd) the Debtor or Liquidation Trustee may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.   "Allow" and "Allowing" shall have correlative meanings.

1.7     "Amended Schedules Bar Date" shall have the meaning ascribed to it in Section 4.3(e)(iii)(3) herein.

1.8     "Ballot" shall mean the form approved by the Bankruptcy Court and distributed to Holders of Claims entitled to vote on this Plan on which is to be indicated an acceptance or rejection of this Plan.

1.9     "Bankruptcy Code" shall mean title 11 of the United States Code, as in effect on the Petition Date or thereafter amended.

1.10     "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division.

1.11     "Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure and the Local Rules.

1.12    "Bar Date" shall mean, with respect to any particular Claim, the specific date set forth in the Bar Date Order or in this Plan as the last day for filing a proof of claim or a request for allowance of an Administrative Claim or a proof of interest against the Debtor in this Chapter 11 Case for that specific Claim.

1.13    "Bar Date Order" shall mean that certain *Order and Notice Setting Time to File Claims* [Docket No. 54], entered by the Bankruptcy Court on June 28, 2023.  The General Bar Date is September 1, 2023.

1.14    "Business Day" shall mean any day, other than a Saturday, Sunday, or a legal holiday (as used in Bankruptcy Rule 9006(a)).

1.15    "Cash" shall mean legal tender of the United States of America or its equivalents, including but not limited to bank deposits, checks, and other similar items.

1.16    "CAP" shall mean, collectively, CrossAmerica Partners LP, Lehigh Gas Wholesale LLC, LGP Realty Holdings LP, Erikson Oil Products, Inc., CAP Operations, Inc., Lehigh Gas Wholesale Services, Inc., and Lehigh Gas Wholesale LLC.

1.17    "CAP Adversary Proceedings" shall mean, collectively, the adversary proceeding styled as *IYS Ventures, LLC v. CrossAmerica Partners LP, et al.*, Case No. 23-00352, Bankruptcy Court for the Northern District of Illinois, Eastern Division, and *IYS Ventures, LLC v. CrossAmerica Partners, LP, et al.*, Case No. 24-00088, Bankruptcy Court for the Northern District of Illinois, Eastern Division.

1.18    "CAP Agreements" shall mean, collectively, the PMPA Franchise and Fuel Supply Agreements entered into in or about February and March of 2021 between CAP and the Debtor (the "Fuel Supply Agreements"), those certain Unitary Lease Agreements 00005 and 00006 entered into concurrently with the Fuel Supply Agreements (the "Leases"), that certain security and cross default agreement entered into on April 1, 2021 between the Debtor and CAP (the "Security and Cross Default Agreement"), and those certain Proprietary Marks Agreements 00005 and 00006 entered into concurrently with the Fuel Supply Agreements.

1.19    "CAP Settlement" shall have the meaning described in detail in Section 7.2 of the Plan.

1.20    "CAP Settlement Payment" shall mean the $200,000.00 to be paid by CAP to the Debtor, the Estate, or the Liquidation Trust, on or as soon as reasonably practicable after the Effective Date, one half of which shall be used solely to fund Distributions to the Holders of Class 5 General Unsecured Claims and one half shall be contributed to the Wind-Down Funds.

1.21    "Causes of Action" shall mean any and all of any Debtor's actions, suits, claims for relief, causes of action, Chapter 5 Causes of Action, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated,

6

unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise, whether arising prior to or after the Petition Date. Causes of Action include, but are not limited to, those Causes of Action listed on a schedule to be filed with the Plan Supplement, which exhibit may be modified up through and including the Effective Date, subject to the terms of Article 12.2 hereof.

1.22 "Chapter 5 Causes of Action" shall mean any and all actual or potential claims and causes of action arising under Chapter 5 of the Bankruptcy Code, including claims, rights, and causes of action arising under sections 510, 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code, including but not limited to, the recovery of preferences and fraudulent transfers from any Entity that received cash or any other interest in property from any Debtor.

1.23 "Chapter 11 Case" shall mean this Chapter 11 Case commenced by the Debtor under case number 23-06782 in the Bankruptcy Court.

1.24 "Claim" shall mean a claim, as such term is defined in Bankruptcy Code section 101(5), against the Debtor.

1.25 "Class" shall mean a group of Claims or Interests described in Article III of this Plan.

1.26 "Combined Disclosure Statement and Plan" means this Combined Disclosure Statement and Chapter 11 Plan of Liquidation, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

1.27 "Company" shall mean IYS Ventures, LLC.

1.28 "Confirmation Date" shall mean the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of this Chapter 11 Case.

1.29 "Confirmation Hearing" shall mean the hearing held by the Bankruptcy Court to consider confirmation of the Plan.

1.30 "Confirmation Order" shall mean an order of the Bankruptcy Court (i) confirming this Plan pursuant to, among others, section 1129 of the Bankruptcy Code and (ii) determining that the Disclosure Statement is adequate per Section 1125 of the Bankruptcy Code.

1.31 "Debtor" shall mean IYS Ventures, LLC.

1.32 "Debtor's Disclosure Statement" shall have the meaning provided in the Introduction of the Plan.

1.33 "Debtor's Liquidation Analysis" shall have the meaning provided in Section 4.2 of the Plan.

7

1.34    "Debtor's Plan" shall have the meaning provided in the Introduction of the Plan.

1.35    "DIP Loans" shall have the meaning provided in Section 4.3 of the Plan.

1.36    "Disallowed" shall mean, when used in reference to a Claim, all or that portion, as applicable, of any Claim that has been disallowed under the Plan, the Bankruptcy Code, applicable law or by a Final Order.

1.37    "Disclosure Statement" shall mean the disclosure statement, as amended, supplemented or modified from time to time, that is embodied within this Combined Disclosure Statement and Plan and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, Local Rule 3017-1, and other applicable law.

1.38    "Disputed" shall mean, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

1.39    "Distribution" shall mean the distribution of Cash and other non-Cash consideration, including mutual releases, as the case may be, in accordance with the Plan.

1.40    "Distribution Address" shall mean the address set forth in (a) the Proof of Claim filed by the Holder, (b) any written notice of address change delivered to the Debtor after the date of filing of any related Proof of Claim, (c) the Schedules, if no Proof of Claim has been filed and the Debtor has not received a written notice of a change of address, (d) the other records of the Debtor at the time of the Distribution if no Proof of Claim has been filed, the Debtor has not received a written notice of a change of address, and the Schedules do not include an address, or (e) any change of address as reflected on the Bankruptcy Court docket.

1.41    "Distribution Date" shall mean the date(s) determined by the Liquidation Trustee when Distributions shall be made under the Plan.

1.42    "Distribution Fund" shall mean the Cash transferred from the Debtor to the Liquidation Trustee, plus one half of the CAP Settlement Payment (which amount shall be earmarked for Distributions to Holders of Class 5 General Unsecured Creditors), plus any other sale proceeds of the Debtor's assets, plus any litigation proceeds, less amounts reserved for Administrative Claims, Priority Tax Claims, Other Priority Claims, and Wind-Down Funds.

1.43    "Distribution Record Date" shall mean the record date for purposes of making Distributions under this Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing, or such other date as is designated in a Final Order of the Bankruptcy Court.

1.44    "Effective Date" shall mean the first date on which all of the conditions of Section 11.1 of the Plan have been satisfied or have been waived in writing and the Debtor declares

the Plan effective.  For the avoidance of doubt, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

1.45    "Entity" shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.46    "Estate" shall mean the estate of the Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case on the Petition Date and all property (as defined in section 541 of the Bankruptcy Code) owned by the Debtor on the Petition Date or acquired by the Debtor after the Petition Date through the Effective Date.

1.47    "Estimation Order" shall mean an order or orders of the Bankruptcy Court estimating for voting and/or Distribution purposes (under section 502(c) of the Bankruptcy Code or Rule 3018 of the Federal Rules of Bankruptcy Procedure) the amount of any Claim, or the aggregate (and if applicable, individual) Face Amount of Disputed Claims in each relevant Class. The defined term Estimation Order includes the Confirmation Order if the Confirmation Order grants the same relief that would have been granted in a separate Estimation Order.

1.48    "Exculpated Parties" shall mean, each in their respective capacities as such, the Proponents, the Liquidation Trustee, and their respective financial advisors, attorneys, accountants, investment bankers, consultants, agents, and other professionals, including the Professionals, who served in such capacities during this Chapter 11 Case, and such Person's or Entity's successors and assigns.

1.49    "Executory Contract or Lease" shall mean a contract or lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.50    "Face Amount" shall mean (a) with respect to any Claim for which a proof of claim is filed, an amount equal to:  (i) the liquidated amount, if any, set forth therein, or (ii) any other amount set forth in an Estimation Order; or (b) with respect to any Claim scheduled in the Debtor's Schedules, but for which no proof of claim is timely filed, the amount of the Claim scheduled as undisputed, noncontingent, and liquidated.

1.51    "File," "Filed," or "Filing" shall mean, file, filed, or filing with the Bankruptcy Court or its authorized designee in this Chapter 11 Case.

1.52    "Final Order" shall mean an order or judgment as entered on the docket in this Chapter 11 Case, that has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, seek review, rehearing, or to file a petition for *certiorari* has expired and no timely filed appeal or petition for review, rehearing, remand, or *certiorari* is pending, or (b) any appeal taken or petition for *certiorari* filed has been resolved by the highest court to which the order or judgment was appealed or from which *certiorari* was sought; *provided*, *however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other rules

9

governing procedure in cases before the Bankruptcy Court, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.53   "Freedom Medical Stations" shall have the meaning provided in Section 4.3 of the Plan.

1.54   "General Unsecured Claim" shall mean any unsecured Claim that is not (a) an Administrative Claim, (b) a Priority Tax Claim, (c) an Other Priority Claim, (d) a Prepetition Secured Parties Claim, (e) an Interest, or (f) a Claim that is Secured, subordinated, or entitled to priority under the Bankruptcy Code.

1.55   "General Bar Date" shall mean September 1, 2023.

1.56   "Governmental Unit" shall have the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

1.57   "Governmental Bar Date" shall mean November 20, 2023.

1.58   "Holder" or "Holders" shall mean a Person or an Entity holding a Claim or Interest.

1.59   "Impaired" shall have the meaning provided to it in section 1124 of the Bankruptcy Code.

1.60   "Impaired Class" shall mean a Class of Claims or Interests that is Impaired.

1.61   "Insider" shall have the meaning ascribed to such term in section 101(31) of the Bankruptcy Code.

1.62   "Interest" shall mean an equity security, within the meaning of section 101(16) of the Bankruptcy Code, or ownership units of IYS Ventures, LLC.

1.63   "Interim Approval and Procedures Order" shall mean that certain *Order (I) Approving the Proponents Combined Disclosure Statement and Plan on an Interim Basis for Solicitation Purposes Only; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Combined Disclosure Statement and Plan; (III) Approving the Form of Ballot and Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling a Combined Hearing for Final Approval of the Adequacy of Disclosures in, and Confirmation of, the Combined Disclosure Statement and Plan; and (VI) Granting Related Relief* [D.I. __].[2]

1.64   "Leased Stations" shall have the meaning provided in Section 4.1 of the Plan.

---

[2] [NTD: Update upon entry of Solicitation Motion Order]

ACTIVE\1601451207.6

1.65 "Lien" shall mean: (a) a judicial lien as defined in section 101(36) of the Bankruptcy Code; (b) a lien as defined in section 101(37) of the Bankruptcy Code; (c) a security interest as defined in section 101(51) of the Bankruptcy Code; (d) a statutory lien as defined in section 101(53) of the Bankruptcy Code; and (e) any other lien, interest, charge, or encumbrance.

1.66 "Liquidation Trust" shall mean the trust described in Article VII of the Plan established under Illinois law.

1.67 "Liquidation Trust Agreement" means the agreement between the Debtor and the Liquidation Trustee (and agreed to by the Proponents) to be entered into as of the Effective Date, substantially in form and substance as that filed as part of the Plan Supplement, as it may be amended from time to time in accordance with its terms.

1.68 "Liquidation Trustee" shall mean the Person identified as such in the Plan Supplement or other filing with the Bankruptcy Court, and retained as of the Effective Date pursuant to the terms of the Liquidation Trust Agreement, as the fiduciary responsible for implementing the applicable provisions of the Plan and the Liquidation Trust Agreement. The Liquidation Trustee shall be selected by the Proponents.

1.69 "Local Rules" shall mean the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Illinois as now in effect or hereafter amended.

1.70 "Marketing Premises" shall mean all real property leased to the Debtor by CAP pursuant to the CAP Agreements.

1.71 "Mutual Termination Agreements" shall mean the agreements to be entered into on the Effective Date, or as soon as reasonably practicable thereafter, whereby the Debtor and CAP shall terminate the CAP Agreements, the Debtor shall turn over possession of the Marketing Premises to CAP, and CAP shall pay to the Debtor (a) an amount equal to the cost of the remaining fuel at the Marketing Premises; and (b) an amount equal to 67% of the retail value of the legal, saleable inventory at the Marketing Premises as determined by CAP in its sole discretion.

1.72 "Objection(s)" shall mean any objection, application, motion, complaint, or any other legal action seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, establish the priority of, expunge, subordinate, or estimate any Claim (including any objection or opposition to any request for allowance or payment of any Administrative Claim), which may be combined with other relief.

1.73 "Other Priority Claim" shall mean any Claim entitled to priority under sections 503(b) or 507(a)(2) of the Bankruptcy Code that is not a Priority Tax Claim.

1.74 "Other Secured Claim" shall mean any Secured Claim, including a Secured Tax Claim, other than the Secured Prepetition Parties Claim.

11

1.75 "Other Secured Deficiency Claim" shall mean any portion of any Other Secured Claim constituting a general unsecured claim under section 506(a) of the Bankruptcy Code.

1.76 "Person" shall mean any individual, corporation, partnership, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit, or any political subdivision thereof, Holders of Interests, Holders of Claims, current or former employees of the Debtor, or any other Entity.

1.77 "Petition Date" shall mean May 23, 2023, the date on which the Debtor commenced the Chapter 11 Case in the Bankruptcy Court.

1.78 "Plan" shall mean this joint plan under chapter 11 of the Bankruptcy Code, together with any amendments, modifications, or supplements hereto as the Proponents may file hereafter in accordance with the terms of this Plan.

1.79 "Plan Documents" shall mean the documents, including this Combined Disclosure Statement and Plan, to be executed, delivered, assumed, and/or performed in connection with the consummation of this Plan, including, without limitation, the documents to be included in the Plan Supplement, and any and all exhibits to the Plan and the Disclosure Statement.

1.80 "Plan Supplement" shall mean the supplemental appendix to this Plan, filed with the Bankruptcy Court not less than seven (7) calendar days prior to the Voting Deadline, which contains, among other things, draft forms or signed copies, as the case may be, of the Schedule of Retained Causes of Action, the Wind-Down Budget, the Liquidation Trust Agreement, and any other schedules, lists, or documents that supplement or clarify aspects of this Plan and are identified as part of the Plan Supplement.

1.81 "Post Effective Date Reserve" shall mean any reserve established by the Liquidation Trustee in accordance with Section 7.4 hereof and funded from Cash available in the Estate on the Effective Date. For the avoidance of doubt, the Post Effective Date Reserve shall include the Wind-Down Funds.

1.82 "Prepetition Secured Parties" shall mean all Persons that filed one or more proofs of claim in the Chapter 11 Case evidencing a claim arising under, derived from, secured by, or bason on the Prepetition Secured Parties Credit Documents.

1.83 "Prepetition Secured Parties Claim" shall mean any Claim of the Prepetition Secured Parties arising under, derived from, secured by, or based on the Prepetition Secured Parties Credit Documents.

1.84 "Prepetition Secured Parties Credit Documents" shall mean all agreements, documents, and instruments giving rise to a Secured Claim against the Debtor, including any pledge and collateral agreements, subordination agreements, intercreditor agreements, and other security agreements.

12

1.85  "Prepetition Secured Parties Deficiency Claim" shall mean any portion of the Prepetition Secured Parties Claim constituting a general unsecured claim under section 506(a) of the Bankruptcy Code that remains unpaid following or not assumed by a Purchaser in connection with a Sale.

1.86  "Priority Tax Claim" shall mean any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.87  "Pro Rata" shall mean the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

1.88  "Professional" shall mean any professional Person or Entity employed in this Chapter 11 Case by Court order pursuant to Bankruptcy Code sections 327, 328, 363, or 1103 or otherwise.

1.89  "Professional Fee Claim" shall mean a Claim for compensation or reimbursement of expenses of a Professional pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code in connection with this Chapter 11 Case.

1.90  "Professional Fee Claims Estimate" shall mean (i) with respect to each Professional, the Professional's good faith estimate of the amount of such Professional's accrued unpaid Professional Fee Claims through the Confirmation Date, to be provided by each Professional in writing to the Debtor, not less than five days prior to the Confirmation Date, and (ii) with respect to all of the Professionals, collectively, the sum of all individual Professional Fee Claims Estimates.

1.91  "Professional Fee Reserve" shall mean an account to hold an amount of Cash equal to the Professional Fee Claims Estimate funded by the Debtor on the Effective Date solely for the purpose of paying all remaining Allowed Professional Fee Claims.

1.92  "Proponents" shall mean CrossAmerica Partners LP, Lehigh Gas Wholesale LLC, LGP Realty Holdings LP, Erikson Oil Products, Inc., CAP Operations, Inc., Lehigh Gas Wholesale Services, Inc., and Lehigh Gas Wholesale LLC.

1.93  "Pushback Stations" means those certain twenty-two (22) Stations that were previously Leased Stations but were surrendered by the Debtor to CAP during the pendency of the Chapter 11 Case.

1.94  "Related Parties" shall mean, with respect to any (w) Person or Entity, (x) such Person's or Entity's current and former direct or indirect subsidiaries, affiliates, parents, predecessors, successors, and assigns, (y) with respect to each of the foregoing in clause (w) and (x), their current and former directors, managers, officers, limited partners, general partners, equity holders (regardless of whether such interests are held directly or indirectly),

13

predecessors, participants, successors, and assigns, (z) with respect to each of the foregoing in clause (w) through (y), each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, designees, trustees, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals or representatives, and any other fiduciaries to such Person or Entity with any involvement related to the Debtor; (zz) with respect to each of the foregoing in clauses (w) through (z), such Person's or Entity's respective heirs, executors, estates, servants, and nominees.

1.95    "Released Claims" shall mean any and all claims or Causes of Action, except for the Retained Actions, against the Released Parties, relating to any pre- or post-Petition Date acts or omissions, whether known or unknown, pertaining to the business activities and operations of the Debtor, the debts, liabilities, obligations and assets of the Debtor, the ownership, management, direction, or control of the Debtor, the Sale, the Plan, or any transactions or communications among the Released Parties with respect to any of the foregoing.  Causes of Action, if any, against Muwafak Rizek are not Released Claims.

1.96    "Released Parties" shall mean collectively, and in each case in its capacity as such, the Proponents, the Liquidation Trustee, and their Related Parties.  Muwafak Rizek is not a Released Party.

1.97    "Reserves" shall mean, collectively, the Post Effective Date Reserve and the Professional Fee Reserve.

1.98    "Residual Assets" shall mean all property of the Estate that has not been sold, transferred, assigned, or disposed of as of the Effective Date.

1.99    "Retained Actions" shall mean the Causes of Action of the Debtor that are not released, waived, or transferred pursuant to the Plan, a schedule of which may be set forth in the Plan Supplement, as may be amended, modified, or supplemented from time to time; *provided*, that, for the avoidance of doubt, Retained Actions shall not include any Causes of Action that are or were settled, released, waived, exculpated, or transferred (a) prior to the Petition Date by the Debtor, or (b) pursuant to the Plan or any Order of the Bankruptcy Court entered in this Chapter 11 Case, as the same may be amended, modified, or supplemented from time to time.  Causes of Action, if any, against Muwafak Rizek are Retained Actions.

1.100    "Schedules" shall mean the schedules of assets and liabilities, schedules of Executory Contracts or Leases, and statements of financial affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

1.101    "Secured" shall mean when referring to a Claim: (a) secured by a Lien on property of an Estate in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the

14

creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to this Plan as a Secured Claim (subject to the Confirmation Order becoming a Final Order).

1.102 "Secured Tax Claim" shall mean any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under Bankruptcy Code section 507(a)(8) (determined irrespective of time limitations), including any related Secured Claim for penalties.

1.103 "Security Deposit" shall mean the Debtor's deposit of $995,000.00 held by CAP to secure the Debtor's obligations under the CAP Agreements in accordance with the Security and Cross Default Agreement.

1.104 "Stations" shall mean any motor fuel station and/or convenience store operated by the Debtor at any point in time.

1.105 "Unclaimed Distributions" shall mean any Cash or other distributable property unclaimed on or after the Effective Date or the date on which an additional Distribution would have been made in respect of an Allowed Claim. Unclaimed Distributions shall include (a) checks (and the funds represented thereby) mailed to a Distribution Address and returned as undeliverable without a proper forwarding address, (b) funds for checks that have not been cashed within ninety (90) days of the mailing of the Distribution upon which time the Liquidation Trustee may issue a stop payment, (c) checks (and the funds represented thereby) not mailed or delivered because no Distribution Address to mail or deliver such property was available, and (d) any Distribution deemed to be an Unclaimed Distribution pursuant to Section 10.5 hereof.

1.106 "Unimpaired" shall mean, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.107 "U.S. Trustee" shall mean the Office of the United States Trustee for Region 11.

1.108 "U.S. Trustee Fees" shall have the meaning ascribed to it in Section 2.1 hereof.

1.109 "Voting Deadline" shall mean [_] at 4:00 p.m. (prevailing Eastern Time), the date specified in the Disclosure Statement, the Ballots, the Interim Approval and Procedures Order, and/or any related solicitation documents approved by the Bankruptcy Court through the Interim Approval and Procedures Order as the last date for Holders of Claims entitled to vote on this Plan to submit their Ballots with respect to this Plan, as such date may be extended by the Proponents.

1.110 "Wind-Down" means the wind-down and dissolution of the Debtor and final administration of the Estate following the Effective Date as set forth in Article VII hereof.

15

1.111 "Wind-Down Budget" means that certain budget governing the fees, expenses, and disbursements attached to the Confirmation Order and funded on the Closing Date of the Sale.

1.112 "Wind-Down Funds" shall mean Cash in an amount not less than $100,000 to be reserved and used in accordance with the Wind-Down Budget for the sole purpose of paying any and all Wind-Down expenses, including Wind-Down expenses incurred by the Liquidation Trustee in administering the Liquidation Trust.

### 1.113 **Rules of Interpretation**

1.114 Unless otherwise specified, all section or exhibit references in this Combined Disclosure Statement and Plan are to the respective section in, or exhibit to, this Combined Disclosure Statement and Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Combined Disclosure Statement and Plan as a whole and not to any particular section, subsection, or clause contained therein, unless the context requires otherwise. The words "include" and "including" shall mean "include, without limitation," or "including," as the case may be. Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.115 Any reference in this Combined Disclosure Statement and Plan to a contract, instrument, release, indenture, or other agreement or documents being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, and any reference in this Combined Disclosure Statement and Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented. Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, release, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Combined Disclosure Statement and Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.

1.116 Except as otherwise specifically provided in the Combined Disclosure Statement and Plan to the contrary, references in the Combined Disclosure Statement and Plan to the Debtor, the Liquidation Trust or the Liquidation Trustee shall mean the Debtor, the Liquidation Trust, and the Liquidation Trustee, as applicable and to the extent the context requires.

1.117 The captions and headings in this Combined Disclosure Statement and Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

ACTIVE\1601451207.6

1.118   **Rules of Construction**.

(a)   **Undefined Terms**.  Any term used herein that is not defined herein shall have the meaning ascribed to any such term used in the Bankruptcy Code and/or the Bankruptcy Rules, if used therein.

(b)   **Miscellaneous Rules**.  This Combined Disclosure Statement and Plan is subject to the following miscellaneous rules:  (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, unless superseded herein or in the Confirmation Order; (ii) any reference in this Plan to an existing document or Exhibit means such document or Exhibit as it may have been amended, restated, modified or supplemented as of the Effective Date; (iii) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (iv) whenever this Plan provides that a payment or Distribution shall occur "on" any date, it shall mean "on, or as soon as reasonably practicable after," such date; and (v) references in this Plan and other Plan Documents to "Section" or "Article" shall be interchangeable.

(c)   **Appendices and Plan Documents.**  All Plan Documents and appendices to the Plan are incorporated into this Combined Disclosure Statement and Plan by reference and are a part of the Combined Disclosure Statement and Plan as if set forth in full herein.  The documents contained in the exhibits and Plan Supplement shall be subject to approval by the Bankruptcy Court pursuant to the Confirmation Order.  Holders of Claims and Interests may inspect a copy of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours.

## ARTICLE II
## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

2.1   **Administrative Claims and Priority Tax Claims**.  Except with respect to Administrative Claims that are Professional Fee Claims, Claims for U.S. Trustee Fees, Prepetition Secured Parties Claims, or subject to section 503(b)(1)(D) of the Bankruptcy Code, Holders of Administrative Claims **must File** and serve on the Liquidation Trustee **requests for payment**, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, so as to be actually received on or before the Administrative Claim Bar Date.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim or Allowed Priority Tax Claim, each Holder of an Allowed Administrative Claim or Allowed Priority Tax Claim will receive (as applicable) payment in full, as soon as practicable after (i) the Effective Date but in no event later than 30 days after the Administrative Claim Bar Date, or (ii) the date such Administrative Claim or Priority Tax Claim becomes an Allowed Claim by Final Order of

17

the Bankruptcy Court, to be paid in cash or pursuant to such other treatment as may be agreed upon by the Holder of such Claim and the Debtor or the Liquidation Trust, as applicable. Any Person or Entity who is required to timely file such request for payment but fails to do so shall not be treated as a creditor with respect to such Claim for Distribution purposes in this Chapter 11 Case on account of such Claim.  The notice of the Effective Date of the Plan that will be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Administrative Claim Bar Date and shall constitute notice of such Administrative Claim Bar Date.

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("U.S. Trustee Fees") prior to the Effective Date shall be paid by the Debtor on the Effective Date. After the Effective Date, the Liquidation Trust (a "Disbursing Entity"), shall be liable to pay any and all U.S. Trustee Fees when due and payable.  The Debtor shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  Within **two business days** of the Effective Date, the Liquidation Trust shall file a Notice of Occurrence of the Effective Date, identifying the Effective Date and indicating that it has occurred.  After the Effective Date, the Liquidation Trust shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  The Liquidation Trust shall remain obligated to pay U.S. Trustee Fees to the Office of the U.S. Trustee until the earliest of the Chapter 11 Case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing or receiving any release under the Plan.

2.2  **Professional Fee Claims**.  All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed and served within 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders.  The Professional Fee Reserve shall be maintained in trust solely for the exclusive benefit of the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been indefeasibly paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No liens, claims, or interests shall encumber the Professional Fee Reserve or Cash held in the Professional Fee Reserve in any way. Funds held in the Professional Fee Reserve shall not be considered property of the Estate or the Debtor or Liquidation Trust.

Allowed Professional Fee Claims shall be paid from the Professional Fee Reserve or Cash in the other Reserves, as applicable, as and when such Claims are Allowed by entry of an order of the Bankruptcy Court.  When all Allowed Professional Fee Claims have been indefeasibly paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Reserve shall promptly be transferred to the Post Effective Date Reserve for all purposes hereunder.  Notwithstanding the foregoing, the Holder of an Allowed Professional Fee Claim may receive such other, less favorable treatment as may be agreed upon by such Holder and the Debtor.

18

From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Liquidation Trustee, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE III
## CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE, THEREFORE, SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE PROPONENTS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

3.1     **General Rules of Classification**.  The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the claims reconciliation process.  Actual recoveries may vary widely within these ranges, and without any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by Creditors.  The projected recoveries are based on information available to the Proponents as of the date hereof and reflect the Proponents estimates as of the date hereof only.  In addition to the cautionary notes contained elsewhere in the Combined Disclosure Statement and Plan, the Proponents emphasize that they make no representation as to the accuracy of these recovery estimates.  The Proponents expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

All Claims and Interests except Administrative Claims and Priority Tax Claims are placed in the Classes set forth below.  The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation, and Distribution under the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtor's rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

19

| Class | Status / Voting | Projected Allowed Amount of Claims / Interests | Projected Recovery |
|---|---|---|---|
| **Class 1(a)** <br> Itria Ventures, LLC | Unimpaired / Deemed to Accept | $828,000.00 | 100% |
| **Class 1(b)** <br> Huntington National Bank | Unimpaired / Deemed to Accept | $75,000 | 100% |
| **Class 2(a)** <br> Mercedes-Benz Financial Services USA LLC | Unimpaired / Deemed to Accept | $134,326.75 | 100% |
| **Class 2(b)** <br> BMW Bank of North America | Unimpaired / Deemed to Accept | $258,800.67 | 100% |
| **Class 2(c)** <br> Ally Bank | Unimpaired / Deemed to Accept | $30,433.86 | 100% |
| **Class 3** <br> Other Secured Claims | Unimpaired / Deemed to Accept | $0 | 100% |
| **Class 4** <br> Other Priority Claims | Unimpaired / Deemed to Accept | $0 | 100% |
| **Class 5** <br> General Unsecured Claims | Impaired / Entitled to Vote | $25,732,014.04 | Approx. 0.4%–1% |
| **Class 6** <br> Equity Interests | Impaired / Deemed to Reject | $0 | 0% |

ACTIVE\1601451207.6

3.2 **Unimpaired Class of Claims**.

**Class 1(a): Itria Ventures, LLC Secured Claims**.

(a) **Classification, Impairment, and Voting**

Class 1(a) shall consist of the Itria Ventures, LLC Secured Claims. The Class 1(a) Secured Claims are Unimpaired by the Plan and are, therefore, deemed to accept the Plan and not entitled to vote on the Plan.

(b) **Treatment**

Except to the extent that a Holder of an Itria Ventures, LLC Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the Effective Date or the date such Itria Ventures, LLC Secured Claim becomes an Allowed Secured Claim, each Holder of an Itria Ventures, LLC Secured Claim shall receive, in full and final satisfaction, settlement, compromise, and release of each such Allowed Secured Claim:

(i) Cash equal to the value of such Holder's Allowed Itria Ventures, LLC Secured Claim; or

(ii) the return of the Holder's Collateral securing such Secured Claim; or

(iii) such other treatment rendering such Holder's Allowed Itria Ventures, LLC Secured Claim Unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code.

**Class 1(b): Huntington National Bank Secured Claims**.

(a) **Classification, Impairment, and Voting**

Class 1(b) shall consist of Huntington National Bank Secured Claims. The Class 1(b) Secured Claims are Unimpaired by the Plan and are, therefore, deemed to accept the Plan and not entitled to vote on the Plan.

(b) **Treatment**

Except to the extent that a Holder of a Huntington National Bank Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the Effective Date or the date such Huntington National Bank Secured Claim becomes an Allowed Secured Claim, each Holder of a Huntington National Bank Secured Claim shall receive, in full and final satisfaction, settlement, compromise, and release of each such Allowed Secured Claim:

21

(i)     Cash, from the Liquidation Trust or the Debtor, equal to the value of such Holder's Allowed Huntington National Bank Secured Claim; or

(ii)    Cash, from CAP, equal to the value of such Holders Allowed Huntington National Bank Secured Claim in accordance with the terms of the CAP Settlement; or

(iii)   the return of the Holder's Collateral securing such Secured Claim; or

(iv)    such other treatment rendering such Holder's Allowed Huntington National Bank Secured Claim Unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code.

**Class 2(a): Mercedes-Benz Financial Services USA LLC Secured Claims**.

(a)     **Classification, Impairment, and Voting**

Class 2(a) shall consist of Mercedes-Benz Financial Services USA LLC Secured Claims.  The Class 2(a) Secured Claims are Unimpaired by the Plan and are, therefore, deemed to accept the Plan and not entitled to vote on the Plan.

(b)     **Treatment**

Except to the extent that a Holder of a Mercedez-Benz Financial Services USA LLC Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the Effective Date or the date such Mercedes-Benz Financial Services USA LLC Secured Claim becomes an Allowed Secured Claim, each Holder of a Mercedez-Bez Financial Services USA LLC Secured Claim shall receive, in full and final satisfaction, settlement, compromise, and release of each such Allowed Secured Claim:

(i)     Cash equal to the value of such Holder's Allowed Mercedes-Benz Financial Services USA LLC Secured Claim; or

(ii)    the return of the Holder's Collateral securing such Secured Claim; or

(iii)   such other treatment rendering such Holder's Allowed Mercedes-Benz Financial Services USA LLC Secured Claim Unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code.

22

**Class 2(b): BMW Bank of North America Secured Claims**.

(a) **Classification, Impairment, and Voting**

Class 2(b) shall consist of BMW Bank of North America Secured Claims. The Class 2(b) Secured Claims are Unimpaired by the Plan and are, therefore, deemed to accept the Plan and not entitled to vote on the Plan.

(b) **Treatment**

Except to the extent that a Holder of a BMW Bank of North America Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the Effective Date or the date such BMW Bank of North America Secured Claim becomes an Allowed Secured Claim, each Holder of a BMW Bank of North America Secured Claim shall receive, in full and final satisfaction, settlement, compromise, and release of each such Allowed Secured Claim:

(i) Cash equal to the value of such Holder's Allowed BMW Bank of North America Secured Claim; or

(ii) the return of the Holder's Collateral securing such Secured Claim; or

(iii) such other treatment rendering such Holder's Allowed BMW Bank of North America Secured Claim Unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code.

**Class 2(c): Ally Bank Secured Claims**.

(a) **Classification, Impairment, and Voting**

Class 2(c) shall consist of Ally Bank Secured Claims. The Class 2(c) Secured Claims are Unimpaired by the Plan and are, therefore, deemed to accept the Plan and not entitled to vote on the Plan.

(b) **Treatment**

Except to the extent that a Holder of an Ally Bank Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the Effective Date or the date such Ally Bank Secured Claim becomes an Allowed Secured Claim, each Holder of an Ally Bank Secured Claim shall receive, in full and final satisfaction, settlement, compromise, and release of each such Allowed Claim:

(i) Cash equal to the value of such Holder's Allowed Ally Bank Secured Claim; or

23

      (ii)      the return of the Holder's Collateral securing such Secured Claim; or

      (iii)     such other treatment rendering such Holder's Allowed Ally Bank Secured Claim Unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code.

**Class 3: Other Secured Claims**.

      (a)     **Classification, Impairment, and Voting**

Class 3 shall consist of Other Secured Claims. The Class 3 Secured Claims are Unimpaired by the Plan and are, therefore, deemed to accept the Plan and not entitled to vote on the Plan.

      (b)     **Treatment**

Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the Effective Date or the date such Other Secured Claim becomes an Allowed Secured Claim, each Holder of an Other Secured Claim shall receive, in full and final satisfaction, settlement, compromise, and release of each such Allowed Secured Claim:

      (i)      Cash equal to the value of such Holder's Allowed Other Secured Claim; or

      (ii)     the return of the Holder's Collateral securing such Secured Claim; or

      (iii)     such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code.

**Class 4: Other Priority Claims**.

      (a)     **Classification, Impairment, and Voting**

Class 4 shall consist of Other Priority Claims. The Class 4 Claims are Unimpaired by the Plan and are, therefore, deemed to accept the Plan and not entitled to vote on the Plan.

      (b)     **Treatment**

Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable or different treatment, on the Effective Date or the date such Other Priority Claim becomes an Allowed Claim, each Holder of an Other Priority Claim shall receive, in full and final satisfaction, settlement, compromise, and release of each such Allowed Claim:

    (i)  Cash equal to the Allowed Amount of such Other Priority Claim.

**Class 5: General Unsecured Claims.**

    (a)  **Classification, Impairment, and Voting**

  Class 5 shall consist of all General Unsecured Claims against the Debtor. Class 5 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

    (a)  **Treatment**

  Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such General Unsecured Claim becomes an Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, and release of such General Unsecured Claim,

      (i)  Cash in an amount equal to its Pro Rata share among all Holders of General Unsecured Claims of the Distribution Fund, not to exceed the amount of such Allowed General Unsecured Claim.

**Class 6**: **Interests in Debtor IYS Ventures, LLC**

  (a)  **Classification, Impairment, and Voting**

  Class 6 shall consist of all Interests in Debtor IYS Ventures, LLC. Because Holders of such Class 6 Interests will not receive any Distribution or retain any property under the Plan, Holders of Class 6 Interests are deemed to reject the Plan and, therefore, not entitled to vote on the Plan.

  (b)  **Treatment**

  On the Effective Date, Interests in Debtor IYS Ventures, LLC shall be canceled, released, and expunged without any Distribution on account of such Interests, and such Interests will be of no further force or effect.

**ARTICLE IV**
**BACKGROUND AND DISCLOSURES**

4.1  **Background of the Debtor's Operations**

  The Debtor, IYS Ventures, LLC, is an Illinois limited liability company that operates gas stations and convenience stores in ten (10) states including Illinois, Indiana, Ohio, South Dakota, Louisiana, Michigan, Mississippi, Minnesota, Wisconsin, and Virginia. Fuel is supplied to all of the Stations by CAP under the terms of the Fuel Supply Agreements. Before

25

filing the Chapter 11 Case, the Debtor operated fifty (50) Stations. The Debtor owned ten (10) of the Stations and leased forty (40) Stations from CAP (the "Leased Stations").

IYS Ventures, LLC was expanded by Muwafak Rizek ("Rizek") out of a business owned by his father-in-law Isam Y. Samara that leased and operated a limited number of individual gas stations. These early stations were owned by Circle K and managed by one of the entities owned or acquired by CrossAmerica Partners, LP ("CAP").

IYS continued its business and expansion plan by leasing the Leased Stations from CAP. In 2021, IYS began purchasing gas stations from CAP. A program of purchasing gas stations leased from CAP was intended to give IYS greater control over the gas stations and reduce the monthly costs of operating those stations including but not limited to amounts paid for rent. By May of 2023, IYS had purchased ten (10) Stations and had contracted to purchase an additional two stations in South Dakota. The number of Stations operated by the Debtor ultimately grew to fifty (50).

The income realized from the operations of the Stations is derived from two (2) sources. The first source of income is from the sale of gas and motor fuels to retail customers, and the second source of income is from the sale of convenience stores food products, such as candy, alcohol products, convenience food items and in some instances prepared foods to retail customers inside the Marketing Premises.

### 4.2 Events Leading to Chapter 11.

Prior to 2022, IYS purchased convenience store products primarily from Eby-Brown Company, LLC, ("Eby-Brown") a nationwide company that is a large seller and distributor of such items. During the implementation of its business and expansion plan, IYS needed funds to pay for its purchases of convenience store products to stock the Stations. IYS sought loans from various sources including but not limited to family members and high interest rate merchant cash advances to assist its funding needs. At the same time, the Debtor's purchases from Eby-Brown increased proportionally as did IYS' balance owed to Eby-Brown, which disrupted its relationship with Eby-Brown and resulted in a lawsuit being filed by Eby-Brown (as discussed below).

The first loan obtained by IYS to fund its business and expansion plan originated in the Rizek Family in 2021. Mr. Rizek's brother, Munadel Rizek, caused his business, Marks Supermarket NC, Inc., to lend $5.2 million to the Debtor (the "Marks Supermarket Loan"). As security for repayment of the Marks Supermarket Loan, IYS executed and delivered mortgages on the stations owned by the Debtor to Marks Supermarket NC, Inc. However, the mortgages securing the Marks Supermarket Loan were not recorded contemporaneously with their execution and only some mortgages were ever recorded. The dates of recording varied and were in the first quarter of 2023.

The Debtor needed further financing to pay for maintain its operations. The Debtor obtained merchant cash advances ("MCAs") initially from Itria Ventures, LLC ("Itria"). An MCA

26

is generally structured as a purchase of a defined percentage of the accounts receivable of the merchant at high rates of return and requiring regular daily, weekly, and/or monthly payments initiated through ACH drafts on the merchant's bank account. In addition to the purchase, the Debtor granted a security interest in all of its assets to Itria to secure its performance. Additional MCAs were obtained from 2021 through 2022 from Itria. IYS also obtained MCAs from Fox Capital Group, Inc., Byzfunder NY, LLC, and Samson Funding.

On March 4, 2022, Eby-Brown filed a complaint against the Debtor in the Circuit Court for the 18th Judicial Circuit, Illinois, DuPage County, styled as *Eby-Brown v. IYS Ventures, LLC, Imart Stores, LLC, Muwafak S. Rizek and Isam Samara*, Case No. 2022LA00021 (the "Circuit Court Lawsuit"). The Eby-Brown Complaint contained seven (7) counts: Breach of Contract (Counts I and II), Breach of Personal Guaranty (Counts III and IV), Account Stated (Count V), Unjust Enrichment (Count VI), and Illinois Consumer Fraud and Deceptive Business Practices Act (Count VII), seeking, *inter alia*, compensatory and punitive damages in an unspecified amount. On July 26, 2022, Eby-Brown obtained a prejudgment action order that, *inter alia*, enjoined the defendants in the Circuit Court Lawsuit from transferring and/or disposing of any assets until further order of the court.

The Debtor's use of its bank accounts was impaired by the filing of the Circuit Court Lawsuit. This led the Debtor to establish a new banking relationship with The Huntington National Bank ("Huntington"). Huntington has alleged that that deposits into the Debtor's new accounts were dishonored by the preceding banking institution. Therefore, Huntington filed a ten (10) count complaint in the United State District Court for the Northern District of Illinois (the "District Court"), styled as *The Huntington National Bank v. IYS Ventures, LLC, Muwafak Rizek, Leanne Holdings LLC and Kenan Enterprises, Inc.*, Case No. 23-cv-01368 (the "District Court Lawsuit"), seeking recovery for breach of contract (Counts I and II), fraud (Count III), wire fraud (Count IV), conspiracy to commit wire fraud (Count V), bank fraud (Count VI), conspiracy to commit bank fraud (Count VII), civil conspiracy (Count VIII), conversion (Count IX), and unjust enrichment (Count X). On March 16, 2023, the District Court entered an *ex parte* Order on Motion for Prejudgment Attachment under Seal (the "Attachment Order"). Pursuant to the Attachment Order, Huntington sought to seize the Debtor's property.

### 4.3 **The Chapter 11 Case**.

(a) *Generally*.

On May 23, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the Chapter 11 Case styled *In re IYS Ventures, LLC*, Case No. 23-06782 in the Bankruptcy Court.

During the Chapter 11 Case, the Debtor negotiated two (2) post-petition loans (the "DIP Loans") from Freedom Medical, Inc. The total amount of the DIP Loans was $1 million. During this Chapter 11 Case, the Debtor sold one of the ten Stations that it owned for $350,000.00 to the owner of an adjacent property. The Debtor sold the remaining nine (9) Stations that it owned

27

(the "<u>Freedom Medical Stations</u>") to Freedom Medical, Inc. for $2.45 million. $1 million of such amount was used to repay the DIP Loan, and the remaining $1.45 million was paid in cash to the Debtor's Estate. Despite receiving a net amount of $1.8 million of Cash from the sale of ten (10) Stations, the Debtor's Cash balance as of June 30, 2024 was only $83,994—the Proceeds from the sale of the Stations have already been exhausted to fund Administrative Expenses incurred during the Chapter 11 Case.

On June 16, 2023, the Debtor filed its Schedules [Docket No. 20] (the "<u>Initial Schedules</u>") and Statement of Financial Affairs [Docket No. 21]. The Initial Schedules stated that, as of the Petition Date, the Debtor had property worth a total of $2,911,856.55—exclusive of fuel and inventory as such amounts were not known at the time but were likely in excess of $1.2 million—and debt of $22,947,818.98. On July 17, 2024, the Debtor filed the Debtor's Plan and the Debtor's Disclosure Statement. The Debtor's Disclosure Statement includes a liquidation analysis (the "<u>Debtor's Liquidation Analysis</u>"). The Debtor's Liquidation Analysis states that the Debtor has assets worth $2,265,638.00—inclusive of fuel and inventory—and liabilities of $27,944,155.68. According to the Debtor's own filings, the Debtor's financial position has only declined during this Chapter 11 Case, despite the sale of all of its real property and continued operations for over a year. The Debtor is losing money and selling off its assets, but the creditors have not benefitted.

The period during which the Debtor had the exclusive right to file a plan (the "<u>Plan Exclusivity Period</u>") initially ended on September 20, 2023. The Debtor filed, and the Bankruptcy Court granted, two motions extending the Plan Exclusivity Period to December 15, 2023 and January 12, 2024, respectively. The Debtor did not file any additional motions seeking extensions of the Plan Exclusivity Period. The period during which the Debtor had the exclusive right to solicit votes on a plan (the "<u>Solicitation Period</u>") initially ended on November 19, 2023. The Debtor Filed, and the Bankruptcy Court granted, two motions extending the Solicitation Period to February 15, 2024 and March 13, 2024, respectively. The Debtor did not file any additional motions seeking extensions of the Solicitation Period.

Because the Plan Exclusivity Period and the Solicitation Period have lapsed, other parties in interest are authorized under § 1121(c) of the Bankruptcy Code to file a plan. Accordingly, the Proponents have standing to file the Plan.

(b)     *Retention of Professional Advisors*

On June 7, 2023 the Debtor filed the *Application to Employ Attorneys* [Docket No. 12] (the "<u>Counsel Retention Application</u>"), seeking authority to employ the attorneys Gregory K. Stern, Monica C. O'Brien, Dennis E. Quaid and Rachel S. Sandler as attorneys for the Debtor and Debtor in Possession.

On June 7, 2023, the Debtor filed the *Application to Employ Accountants* [Docket No. 13] (the "<u>Accountant Retention Application</u>"), seeking authority to employ the accounting firm N & G Services, Inc. and Raed Najjar, CPA as accountants for the Debtor and Debtor in Possession.

28

On July 5, 2023, the Bankruptcy Court entered orders granting the Counsel Retention Application and Accountant Retention Application. *See* Docket Nos. 58 and 59, respectively.

On July 13, 2023, the Debtor filed the *Debtor's Application to Employ Matthew Brash of Newpoint Advisors Corporation as Chief Restructuring Officer; (2) Request to Approve Payment of Retainer and Procedure for Compensation; and (3) to Shorten and Limit Notice* [Docket No. 83] (the "CRO Retention Application"). On July 19, 2023, the Bankruptcy Court entered an order granting the CRO Retention Application. *See* Docket No. 103.

The following table shows the fees and expenses awarded to the Debtor's professionals by the Bankruptcy Court to date, but does not include amounts for which such professionals have submitted applications but the Bankruptcy Court has not yet approved:

| Date of Order | Docket No. of Order | Professional | Amount Awarded |
|---|---|---|---|
| 10/25/2023 | 258 | Debtor's Accountant | $18,925.00. |
| 11/15/2023 | 338 | Debtor's Counsel | $283,558.26 |
| 1/24/2024 | 433 | Debtor's Financial Advisor and Chief Restructuring Officer | $104,789.74 |
| 3/27/2024 | 546 | Debtor's Accountant | $65,050.00 |
| 3/27/2024 | 547 | Debtor's Counsel | $583,441.18 |
| | | **TOTAL** | **1,036,839.18** |

As illustrated above, by March 27, 2024, the Debtor had incurred more than $1 million in Professional Fees. This amount has continued to grow and will continue to grow as long as the Chapter 11 Case continues. As discussed below, if the Debtor's Plan is confirmed, the Estate will continue to incur Professional Fees because the Debtor is pursuing meritless litigation against CAP that will not provide a benefit to the Estate or the Debtor's creditors.

(c) *Claims Process and Bar Dates*

i. *Section 341(a) Meeting of Creditors*

On June 22, 2023, the Debtor's meeting of creditors under section 341(a) of the Bankruptcy Code was held but not adjourned.

ii. *Bar Date Order and Bar Dates*

On June 28, 2024, the Bankruptcy Court entered the *Order and Notice Setting Time to File Claims* [Docket No. 54] (the "Bar Date Order"). The Bar Date Order set the deadline for governmental units to file proofs of claim to November 20, 2023 and set the deadline for all other parties to file proofs of claim to September 1, 2023.

(d)     *Cash Collateral*

Certain Prepetition Secured Parties held security interests in the prepetition Cash proceeds of the Debtor's operations. As detailed below, the Debtor has been unable to reach a final agreement with its secured creditors regarding the use of such cash collateral. In total the Bankruptcy Court has entered ten (10) interim cash collateral orders, but no final order has been entered with regard to the Debtor's use of its cash collateral.

On June 22, 2023, the Debtor filed a *Motion for Interim use of Cash Collateral Pursuant to § 363(c)(2) and (3) of the Bankruptcy Code and Bankruptcy Rule 4001(b)* [Docket No. 35] (the "Cash Collateral Motion"). The Cash Collateral Motion disclosed that several entities may have a security interest in the Debtor's cash on hand. The lienholders were disclosed as Huntington National Bank, Byzfunder, Fox Capital Group, Inc., Itria Ventures, and Samson Funding. On June 28, 2023, the Bankruptcy Court entered an *Interim Order Authorizing Use of Cash Collateral Pursuant to § 363(c)(2) and Bankruptcy Rule 4001(b)* [Docket No. 56] (the "First Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral for approximately two weeks and continued the hearing on the Cash Collateral Motion. On July 14, 2023, the Bankruptcy Court entered an order [Docket No. 90] ("the Second Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through July 31, 2023. On August 3, 2023, the Bankruptcy Court entered an order [Docket No. 117] (the "Third Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through August 31, 2023. On August 30, 2023, the Bankruptcy Court entered an order [Docket No. 161] (the "Fourth Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through September 30, 2023. On October 4, 2023, the Bankruptcy Court entered an order [Docket No. 246] (the "Fifth Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through November 10, 2023. On November 11, 2023, the Bankruptcy Court entered an order [Docket No. 316] that authorized the Debtor to use its cash collateral through December 16, 2023. On December 18, 2023, the Bankruptcy Court entered an order [Docket No. 375] (the "Sixth Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through January 20, 2024. On January 17, 2024, the Bankruptcy Court entered an order [Docket No. 407] (the "Seventh Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through March 22, 2024. On March 13, 2024, the Bankruptcy Court entered an order [Docket No. 527] (the "Eighth Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through May 31, 2024. On May 29, 2024, the Bankruptcy Court entered an order [Docket No. 599] (the "Ninth Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through July 27, 2024. On July 24, 2024, the Bankruptcy Court entered an order [Docket No. 626] (the "Tenth Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through September 28, 2024.

(e)     *Motions to Appoint a Chapter 11 Trustee and Motions to Dismiss or Convert the Case to a Case Under Chapter 7 of the Bankruptcy Code*

On July 14, 2023, the U.S. Trustee filed the *United States Trustee's Motion to Appoint Chapter 11 Trustee and Shorten Notice* [Docket No. 86] (the "Chapter 11 Trustee Motion"). The Chapter 11 Trustee Motion requested that the Bankruptcy Court appoint a chapter 11 trustee to replace the Debtor in Possession as the administrator of the Debtor's Estate. The U.S. Trustee raised concerns about inconsistencies between the Debtor's operating agreement and certain records filed with state agencies. The U.S. Trustee also raised concerns that the Debtor's operating agreement was not signed by one of the Debtor's members. The Chapter 11 Trustee Motion also raised concerns regarding the Debtor's credit card proceeds. Specifically, pursuant to the CAP Agreements, when customers make purchases from the Debtor using credit cards, the credit card proceeds are initially deposited into an account owned and controlled by CAP. Under the CAP Agreements, the credit card proceeds must then be swept to an account controlled by the Debtor, less any amounts owed by the Debtor to CAP. However, the Chapter 11 Trustee Motion raised concerns that the Debtor had designated a third party's account into which the credit card proceeds would be swept. The U.S. Trustee also cited the Debtor's tumultuous relationship with Eby-Brown Company, LLC. The U.S. Trustee raised concerns regarding the Debtor's operational structure. Specifically, in approximately November 2022, the Debtor began entering into certain Management and Operations Agreement (the "Management Agreements") The Management Agreements provided a mechanism for certain management companies (the "Management Companies") to operate certain Stations. The Management Companies are owned by Munadel Rizek, the brother of Muwafak Rizek, the Debtor's principal. The U.S. Trustee also raised concerns about the Debtor's litigation with Huntington National Bank.

On August 30, 2023, the U.S. Trustee filed a supplement to the Chapter 11 Trustee Motion [Docket No. 154] (the "Supplement"). In the Supplement alleged that the Debtor's principal had lost trust with the Illinois Lottery (a scheduled creditor) and that the Debtor's principal was indicted in Minnesota on three felony allegations.

On September 21, 2023, the U.S. Trustee filed a second supplement [Docket No. 214] (the "Second Supplement"), stating that post-petition, the Debtor had attempted to transfer two liquor licenses to a Management Company and that the City of Cincinnati had sued the Debtor under a public nuisance claim.

The U.S. Trustee asserted that, in light of the above-stated concerns about the Debtor's operations, cause existed to appoint a chapter 11 trustee. Specifically, the U.S. Trustee asserted that "[t]he Debtor's pre- and post- petition conduct, as described above, illustrates fraud, dishonesty, or gross mismanagement, or some combination of all three."

The U.S. Trustee and the Debtor reached an agreement with respect to the Chapter 11 Trustee Motion, and on November 15, 2023, the Bankruptcy Court entered an *Order Resolving United States Trustee's Motion to Appoint Chapter 11 Trustee and to Shorten Notice* [Docket No. 339] (the "Chapter 11 Trustee Order"). The Chapter 11 Trustee Order set certain deadlines for the

31

Debtor to file a plan and disclosure statement and to obtain approval thereof. The Chapter 11 Trustee Order further stated "[i]f for any reason due to the fault of the Debtor the Debtor fails to meet any of the milestones set forth in paragraphs A – D, then the Debtor consents to entry of an order either (a) converting this case to one under chapter 7 or (b) appointing a chapter 11 trustee, whichever the Court believes to be in the best interests of creditors." Chapter 11 Trustee Order at 1.

The Debtor met some deadlines set forth in the Chapter 11 Trustee Order but failed to meet all of the deadlines. The Debtor and the U.S. Trustee agreed to continue the hearing on the Chapter 11 Trustee Order and the Debtor's Plan and the Debtor's Disclosure Statement until August 14, 2024.

On February 8, 2024, the U.S. Trustee filed a second motion to appoint a chapter 11 trustee [Docket No. 471] (the "Second Chapter 11 Trustee Motion"). In the Second Chapter 11 Trustee Motion, the U.S. Trustee raised concerns about the Debtor's honesty with respect to the value of the Freedom Medical Stations. The U.S. Trustee stated that cause existed to convert the case to chapter 7 or appoint a chapter 11 trustee because "the Debtor made material misrepresentations to this Court in the context of securing debtor in possession financing, failed to correct those misrepresentations for months, and did so only after the U.S. Trustee raised the issue in its objection to the Sale Motion." Second Chapter 11 Trustee Motion, ¶ 53.

On March 1, 2024, the U.S. Trustee withdrew the Second Chapter 11 Trustee Motion.

(f)     *Motions to Reject and Assume the CAP Agreements*

On July 12, 2023, CAP filed *CrossAmerica Partners LP's Motion for Entry of an Order Compelling Rejection of Agreements for Leased Stations or, Alternatively, Granting Relief from the Automatic Stay* [Docket No. 74] (the "Rejection Motion"), requesting entry of an order compelling the rejection of the CAP Agreements pursuant to sections 365(a), 365(b), and 105(a) of the Bankruptcy Code. The basis for the Rejection Motion was that CAP believed the Debtor was in default of the CAP Agreements and was unable to cure such breach.

The Debtor opposed the Rejection Motion and on September 1, 2023, filed the *Debtor's Response to CrossAmerica Partners, LP's Motion for Entry of an Order Compelling Rejection of Agreements for Leased Stations, or, Alternatively Granting Relief from Automatic Stay* [Docket No. 171] (the "Rejection Motion Response"). The Debtor believed (a) it was not in default of the CAP Agreements and (2) even if it were, there was no statutory authority for the Bankruptcy Court to compel the Debtor to reject executory contracts.

On September 18, 2023, the Debtor filed the *Debtor's Motion to Approve Assumption of CrossAmerica Partners LP, CAP Operations, Inc., Lehigh Gas Wholesale, LLC, LGP Realty Holdings, LP, Lehigh Gas Wholesale Services, Inc., and Erickson Oil Products, Inc. Agreements* [Docket No. 206] (the "Assumption Motion"), seeking authority to assume the CAP Agreements pursuant to section 365(a) of the Bankruptcy Code.

32

On November 15, 16, and 17, 2023, the Bankruptcy Court held an evidentiary hearing on the Rejection Motion and Assumption Motion and CAP and the Debtor each filed a post-trial brief on December 15, 2023. *See* Docket Nos. 369 and 371.

After taking the matter under advisement, on April 4, 2023, the Bankruptcy Court entered orders [Docket Nos. 554 and 555] granting the Assumption Motion and denying the Rejection Motion. The Bankruptcy Court issued an *Opinion* [Docket no. 553] explaining its reasoning for denying the Rejection Motion and granting the Assumption Motion.

Because the Debtor has assumed the CAP Agreements, the Debtor is now required to comply with all terms thereof. This includes complying with the Security and Cross Default Agreement, which requires the Debtor to maintain the entire Security Deposit with CAP until all leases encompassed in the CAP Agreements are terminated. In the Debtor's Disclosure Statement, the Debtor asserts that it is currently entitled to a partial refund of the Security Deposit. Debtor's Disclosure Statement at 19. However, the Security and Cross Default Agreement clearly states that the Security Deposit "shall be returned to [the Debtor] no later than 120 days following the termination or expiration of last remaining [CAP Agreement], subject to the deduction for any sums due [CAP] with respect to each [CAP Agreement] unpaid at the time of such termination or expiration." Security and Cross Default Agreement § 1.B.

Under the CAP Agreements, the Debtor is also required to use authorized point-of-sale credit card equipment that is approved by CAP (the "POS System"). Under the POS System, credit card receipts are remitted to CAP in the first instance before being "swept" into the Debtor's designated bank account. However, the Debtor has used, and continues using, unauthorized credit card receipt systems that bypass the Debtor's normal flow of funds. The Proponents are not aware of whether the unauthorized credit card receipt systems deliver funds to the Debtor's designated bank account or somewhere else.

(g)     *Failure to Pay Lease Obligations*

The Debtor incurs monthly obligations to CAP for rent, property taxes, and other miscellaneous expenses associated with its leases with CAP (the "Lease Obligations"). In December 2023, the Debtor began a pattern of failing to fulfill its Lease Obligations. The below table shows each instance where a draft from the Debtor's bank account for Lease Obligations bounced. In sum, the Debtor has failed to pay approximately $1.14 million on time between December 2023 and August 2024. As of the filing of this Plan, the Debtor has caught up with its Lease Obligations. However, the persistent pattern of failing to pay Lease Obligations as they come due causes concerns for the Proponents as to whether the Debtor is capable of fulfilling its obligations on a go-forward basis, including obligations under the Debtor's Plan. For example, the Debtor's Plan proposes to make five (5) annual payments of $240,000 to Holders of General Unsecured Claims. However, such payments would require the Debtor to generate excess Cash from operations. Currently, the Debtor is unable to fulfill even its most basic monthly obligations in a timely manner. The Proponents believe the Debtor's Plan is not remotely feasible because it assumes there will be sufficient revenue to cover the obligations the Debtor commits to under the Debtor's Plan and because the Debtor's Plan relies on meritless claims against CAP.

| Date | Amount |
|---|---|
| 12/6/2023 | $33,659.83 |
| 12/6/2023 | $296,268.90 |
| 12/18/2023 | $70,399.66 |
| 12/18/2023 | $11,130.35 |
| 1/22/2024 | $25,191.40 |
| 1/29/2024 | $69,093.31 |
| 1/29/2024 | $13,189.21 |
| 3/8/2024 | $33,589.29 |
| 4/4/2024 | $160,757.13 |
| 4/22/2024 | $88,473.48 |
| 4/23/2024 | $63,336.46 |
| 7/5/2024 | $118,773.45 |
| 7/19/2024 | $75,408.31 |
| 8/13/2024 | $54,745.33 |
| **TOTAL** | $1,114,016.11 |

(h)     *Adversary Proceedings*

    *i.*     Adversary Proceeding 23-00167 Against Marks Supermarket NC, Inc.

The first adversary complaint was filed against Marks Supermarket NC, Inc. to avoid under § 547 of the Bankruptcy Code the mortgages securing the Marks Supermarket Loans as preferential transfers.  IYS and Marks Supermarket NC, Inc. entered into a consent judgment avoiding such mortgages.  The consent judgment was entered by the Bankruptcy Court and Marks Supermarket NC, Inc. filed a general unsecured claim in the sum of $5,200,000.00.

    *ii.*     Adversary Proceeding 23-00168 Against Huntington National Bank

The second adversary proceeding was filed against Huntington National Bank to avoid its attachment order as a preferential transfer under § 547 of the Bankruptcy Code.  IYS and Huntington National Bank entered into a consent judgment ordering that Huntington National Bank's liens against the Debtor's property would be set aside if a chapter 11 plan is confirmed or if the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code.  The consent judgment was finalized and entered by the Bankruptcy Court on January 18, 2024 [Adv. Docket No. 18].  The Huntington Nation Bank adversary proceeding was dismissed on February 1, 2024.

*iii.*      Adversary Proceeding 23-00194 Against Itria Ventures, LLC, *et al.*

On July 6, 2023, the Debtor filed an adversary complaint against Itria Ventures, LLC, seeking a determination of the nature, extent, and priority of Itria Ventures, LLC, Fox Capital Group, Inc., Byzfunder NY, LLC, and Huntington National Bank's liens and interests in the property of the Debtor's Estate. The adversary complaint was later amended to add Eby-Brown Company, LLC as a defendant.

On May 8, 2024, the Bankruptcy Court entered *Consent Judgments* [Adv. Docket Nos. 57 and 58] negating all liens and security interests that were claimed or could be claimed by Byzfunder NY, LLC and Fox Capital Group, Inc.

On May 8, 2024, the Bankruptcy Court also entered the *Stipulated Judgement Determining Liens and Interests in Property of IYS Ventures, LLC* [Adv. Docket No. 59], which stated, "Plaintiff and Itria agree that Itria holds a valid, non-avoidable and first-priority perfected general security interest in all property of the estate to secure a claim in the amount of $899,286.90 minus any adequate protection payments received by Itria during the course of the Chapter 11 case."

On May 8, 2024, the Bankruptcy Court also entered a *Judgment Determining Liens and Interests of the Huntington National Bank as Assignee in Property of IYS Ventures, LLC* [Adv. Docket No. 60], which stated that Huntington National Bank "holds a valid, non-avoidable and first perfected general security interest in that certain property of the estate described in the Joint-Pretrial Stipulation consisting of pumps and related equipment to secure its claim, with priority over all of the other Defendants in this Adversary Proceeding."

Accordingly, consent judgments were agreed to between and among the Debtor and all defendants except Eby-Brown Company, LLC. The Bankruptcy Court issued a *Memorandum Opinion* [Adv. Docket No. 62], in which the Bankruptcy Court held that "Eby-brown does not hold a perfected lien securing its debt, that its debt shall be subordinate and inferior to Debtor's status as hypothetical lien creditor, and that its interest is unsecured." *Memorandum Opinion* at 1–2.

*iv.*      Adversary Complaint 23-00352 Against CAP

On November 14, 2023, IYS filed an adversary complaint (the "PMPA Complaint") against CAP. The PMPA Complaint alleges that CAP violated of the Petroleum Protection Practices Act ("PMPA") and that CAP breached the CAP Agreements. On January 12, 2024, CAP filed a *Motion to Dismiss the Complaint* [Adv. Docket No. 10] (the "Motion to Dismiss"). The Motion to Dismiss asserts that the PMPA Complaint fails to state a claim upon which relief may be granted and that the PMPA Complaint addresses duplicative issues to the issues presented by the Rejection Motion and Assumption Motion. On March 13, 2024, the Bankruptcy Court heard oral arguments for and against the Motion to Dismiss. The Bankruptcy Court has taken the matter under advisement and the parties await the Bankruptcy Court's decision regarding the Motion to

35

Dismiss. The Debtor's Plan acknowledges that the value of the PMPA Adversary is "unknown"; however, as a practical matter, it is zero and likely negative if the Debtor's professionals accrue additional expenses in pursuit of it. The PMPA Adversary has been mooted by the Court's denial of CAP's Rejection Motion. The Debtor seems to argue that it is entitled to damages because CAP filed its Rejection Motion, but there is no theory of recovery or case law supporting this claim.

<em>v.</em>      Adversary Complaint 24-00088 Against CAP

On April 3, 2024, the Debtor filed a four-count adversary complaint against CAP and three of its employees. The adversary complaint seeks injunctive relief and monetary damages and falsely alleges violations of the automatic stay, breach of contract, and tortious interference with business and business relationships. On May 23, 2024, CAP filed an answer and counter-claim [Adv. Docket No. 26] (the "<u>Answer</u>"), which includes communications from the Debtor's principal that undermine the Debtor's claims. CAP's Preliminary Statement in the Answer summarizes why the CAP Adversary has no value to the Estate:

> This adversary proceeding is a waste of the Estate's resources and an attempt to harass Defendants. Plaintiff complains about inspections that the CAP Defendants have a contractual right to conduct and about a security deposit that the CAP Defendants have a contractual right to withhold. Plaintiff complains about the timing of fuel deliveries, but Defendants do not manage Plaintiff's fuel deliveries; either Plaintiff manages the deliveries or the deliveries are managed automatically. Plaintiff complains about Defendants' contact with third parties to facilitate the transition of stations that Plaintiff either suggested it would "pushback" or where the "pushback" actually occurred; Defendants made contact with the relevant third-parties to ensure a smooth transition and with Plaintiff's knowledge and consent. Finally, Plaintiff complains about impacts on its employees; however, Plaintiff has previously testified that Plaintiff has no employees. Meanwhile, the Debtor has continued to use unauthorized point of sale equipment at its stations in violation of the parties' contract; such unauthorized point of sale equipment diverts security from Lehigh Gas Wholesale LLC—and possibly from the Debtor's Estate.

On July 11, 2024, the Debtor filed a motion to dismiss CAP's counterclaim [Adv. Docket No. 32], stating that even if CAP's allegations are true, there is no basis for a claim because CAP has not suffered any damages on account of the Debtor's breach. The motion to dismiss CAP's counterclaim is set for oral argument on August 14, 2024.

(i)      <em>The Debtor's Plan of Reorganization and Disclosure Statement</em>

As discussed above, the Debtor has filed the Debtor's Plan and the Debtor's Disclosure Statement. The Debtor's Plan is a plan of reorganization, rather than liquidation. Under the Debtor's Plan, Holders of General Unsecured Claims will be paid $240,000 annually for five (5) years, for a total amount of $1.2 million, on account of Claims estimated at $25,632,517.85, for a total recovery of less than 5% over five (5) years.

36

The Debtor's Plan assumes that the Debtor's projected income will exceed its projected expenses by enough to make the annual payments to Holders of General Unsecured Claims, in addition to payments to all other classes of claims. *See* Disclosure Statement, Ex. C ("Debtor's Cashflow Projections"). There is no guaranty that the Debtor will be able to make such payments as the Debtor has barely been able to pay its regular monthly expenses throughout the pendency of the Chapter 11 Case.

Indeed, throughout the Chapter 11 Case, the Debtor's actual net cashflow has consistently been lower than its projected net cashflow, notwithstanding the unanticipated proceeds from the sale of inventory at the Pushback Stations and the sale of the Freedom Medical Stations. Indeed, the Debtor's own financial statements (Doc. 629-3) show a net loss of $537,736.91 for the Quarter ending December 31, 2023 and a net loss of $1,509,999.61 from January 1, 2024 through June 30, 2024. Accordingly, the Proponents believe that creditors would be better served by a plan of liquidation that does not rely on the Debtor's projections, which have been historically inaccurate, and the Debtor's continued operations, which have resulted in net losses.

## ARTICLE V
## CONFIRMATION AND VOTING PROCEDURES

5.1 **Confirmation Procedure**. On [ ], 2024, the Bankruptcy Court entered the Interim Approval and Procedures Order conditionally approving the Combined Disclosure Statement and Plan for solicitation purposes only and authorizing the Proponents to solicit votes to accept or reject the Plan. The Confirmation Hearing has been scheduled for [ ], 2024, at [ ] a.m. (prevailing Central Time) to consider (a) final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

5.2 **Procedure for Objections**. Any Objection to final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served via email on (i) counsel for CrossAmerica Partners LP, Fox Rothschild LLP, 321 N. Clark Street, Chicago, Illinois 60654 (Attn.: Gordon E. Gouveia, ggouveia@foxrothschild.com and Matthew R. Higgins, mhiggins@foxrothschild.com) (ii) the Office of the United States Trustee, 219 S. Dearborn Street, Suite 873, Chicago, Illinois 60604 (Attn.: Jeffrey L. Gansberg, Jeffrey.l.gansberg@usdoj.gov), by no later than [ ], 2024, at 4:00 p.m. (prevailing Central Time). Unless an Objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

5.3 **Requirements for Confirmation**. The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such rejecting Class. The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan

37

complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be presumed to have accepted the Plan.

5.4  **Classification of Claims and Interests**.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).

The Bankruptcy Code also requires that a plan provide the same treatment for each Claim or Interest of a particular Class unless the Claim Holder or Interest Holder agrees to a less favorable treatment of its Claim or Interest. The Proponents believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Proponents believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If this occurs, the Proponents intend, in accordance with the terms of the Plan, to make such modifications to the Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A

38

HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by creditors. The projected recoveries are based on information available to the Proponents as of the date hereof and reflect the Proponents' views as of the date hereof only.

The Proponents believe that the consideration, if any, provided under the Plan to holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including contractual subordination, if any) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Proponents and the Liquidation Trust reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

5.5     **Impaired Claims or Interests**.

Pursuant to section 1126 of the Bankruptcy Code, only classes of claims or interests that are Impaired under a plan may vote to accept or reject a plan. Under section 1124 of the Bankruptcy Code, a claim or interest is Impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an Impaired Class do not receive or retain any property under a plan on account of such claims or interests, such Impaired Class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

39

Under the Plan, holders of Claims in Class 5 are Impaired and are entitled to vote on the Plan. Holders of Interests in Class 6 are Impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and deemed to reject the Plan under section 1126(g) of the Bankruptcy Code. Under the Plan, holders of Claims in Classes 1, 2, 3, and 4 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code.

### 5.6    Confirmation without Necessary Acceptances

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.

In the event that any Impaired Class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all Impaired Classes, if the plan has been accepted by at least one Impaired Class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting Impaired Class of claims or interests. Here, because holders of Interests in Class 6 are deemed to reject the Plan, the Proponents may seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Proponents believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those in Class 5 will receive any property under the Plan. In addition, the Proponents reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Proponents believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Proponents believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

40

(a)     *Secured Creditors*.  Either (i) each Impaired secured creditor retains its liens securing its secured claim and receives, on account of its secured claim, deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each Impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b)     *Unsecured Creditors*.  Either (i) each Impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the Plan.

(c)     *Equity Interests*.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Proponents believe that the Distributions provided under the Plan satisfy the absolute priority rule, where required.

### 5.7     **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the Plan).  Inasmuch as substantially all of the Debtor's assets will be liquidated and the Plan provides for the Distribution of all of the Cash proceeds of the Debtor's assets to holders of Claims that are Allowed as of the Effective Date in accordance with the Plan, for purposes of this test, the Proponents have analyzed the ability of the Liquidation Trust to meet its obligations under the Plan. Based on the Proponents' analysis, the Liquidation Trust will have sufficient assets to accomplish its tasks under the Plan.  Therefore, the Proponents believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

### 5.8     **Best Interests Test and Liquidation Analysis**

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all Holders of claims or interests that are Impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an Impaired Class of Claims or Interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the Effective Date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

41

To calculate the probable Distribution to holders of each Impaired Class of claims and interests if a debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its Chapter 11 Case were converted to a chapter 7 case under the Bankruptcy Code. To determine if a plan is in the best interests of each Impaired class, the present value of the Distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any Impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such Impaired class.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, there would be additional costs, expenses, and delays that the Estate would incur as a result of liquidating the Estate in a chapter 7 case. Additionally, the CAP Settlement, which includes a "gift" to the Holders of Class 5 General Unsecured Claims of $100,000, would not exist in a hypothetical chapter 7 liquidation. Further, in a hypothetical chapter 7 liquidation, CAP would be entitled to contract rejection damages in connection with the assumed CAP Agreements. Such rejection damages would be in excess of the Security Deposit. Because the Debtor has assumed the CAP Agreements post-petition, any Claims of CAP on account of rejection of the CAP Agreements would be entitled to administrative expense priority status. Therefore, the Proponents believe that creditors will receive Distributions faster and in greater amounts under this Plan than they would in any chapter 7 liquidation.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Proponents believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtor. Conversion also would likely delay the liquidation process and ultimately Distribution of the proceeds of assets of the Debtor's Estate. The Estate would also be obligated to pay all unpaid expenses incurred by the Debtor during the Chapter 11 Case (such as compensation for Professionals) that are allowed in the chapter 7 case.

For a more detailed description of a hypothetical liquidation scenario under chapter 7 as compared to the Plan, please also refer to the liquidation analysis attached hereto as **Exhibit A**, which is incorporated herein by reference.

Accordingly, the Proponents believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Case was converted to chapter 7, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

ACTIVE\1601451207.6

5.9 **Releases & Exculpations**

The Plan proposes to release the Released Parties and exculpate the Exculpated Parties. The Debtor's releases and exculpation provisions included in the Plan are an integral part of the Plan and were an essential element among the Proponents and such parties in obtaining their continued support for the Plan.

The Proponents believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Seventh Circuit. Moreover, the Proponents will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The releases, exculpation, and injunction provisions are set forth in Article VIII hereof.

5.10 **Acceptance of the Plan**

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of Ballots are set forth in the Interim Approval and Procedures Order.

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of Insiders, must actually vote to accept the Plan.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, THE PROPONENTS URGE YOU TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. Please be sure to complete the Ballot properly and legibly and to identify the exact amount of your Claim and the name of the Holder. If you are a Holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, you received a damaged Ballot, or you lost your Ballot, or if you have any questions concerning the Plan or procedures for voting on the Plan, please contact Fox Rothschild LLP, Attn. Matthew R. Higgins, 312-617-9200, mhiggins@foxrothschild.com.

## ARTICLE VI
## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND ASSOCIATED DOCUMENTS BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

43

6.1     **The Plan May Not Be Accepted**.

The Proponents can make no assurances that the requisite acceptances to the Plan will be received, and the Proponents may need to obtain acceptances to an alternative plan of liquidation for the Debtor, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Plan.

6.2     **The Plan May Not Be Confirmed**.

Even if the Proponents receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan. Even if the Bankruptcy Court determined that the Combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met. Moreover, there can be no assurance that modifications to the Combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what Distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent liquidation.

6.3     **Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections**.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Proponents' estimates. If the total amount of Allowed Claims in a Class is higher than the Proponents' estimates, or the funds available for Distribution to such Class are lower than the Proponents' estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

6.4     **Objections to Classification of Claims**.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Proponents believe that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Proponents would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a

44

member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Proponents will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member. The Proponents believe that they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Proponents believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

6.5 **Failure to Consummate the Plan**.

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

6.6 **Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan**.

There can be no assurance that the estimated Claim amounts set forth in the Plan are correct, and the actual allowed amounts of Claims may differ from the estimates. The estimated amounts are based on certain assumptions with respect to a variety of factors. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein, thereby materially reducing the recovery to the Holders of Class 5 General Unsecured Claims under the Plan.

6.7     **Plan Releases May Not Be Approved**.

There can be no assurance that the releases, as provided in Article VIII of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a chapter 11 plan that differs from the Plan or the Plan not being confirmed.

6.8     **Certain Tax Considerations**.

There are a number of material income tax considerations, risks and uncertainties associated with the Plan described herein.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE VII
## <u>MEANS OF IMPLEMENTING THE PLAN</u>

In addition to the provisions set forth elsewhere in this Plan, the following shall constitute the means of execution and implementation of this Plan.

7.1     **General**

Upon confirmation of the Plan, and in accordance with the Confirmation Order, the Debtor or the Liquidation Trust, as applicable, will be authorized to take all necessary or appropriate steps, and perform all necessary or appropriate acts, to consummate the terms and conditions of the Plan. Such actions may include: (a) the execution and delivery of appropriate agreements or other documents that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; and (c) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

7.2     **The CAP Settlement.**

(a)     Settlement Overview

In full and final settlement of the CAP Adversary Proceedings, any claims related to the Security Deposit, and any other Claims, known or unknown, asserted or unasserted, that arose before or after the Petition Date, that CAP may have against the Debtor and that the Debtor

46

may have against CAP (the "CAP Settlement"), on the Effective Date, CAP and the Debtor shall enter into the Mutual Termination Agreements. The Debtor, the Debtor's Estate, and the Liquidation Trust shall release any claims they may have against CAP, including any claims asserted in the CAP Adversary Proceedings and any claims relating to the Security Deposit. In return, CAP will (1) agree to purchase the Debtor's fuel and convenience store inventory as more fully set forth below and in the Mutual Termination Agreements, immediately generating the Cash upon which the Proponents' Plan relies to provide a return to creditors; and (2) pay to the Debtor, the Debtor's Estate, or the Liquidation Trust, the CAP Settlement Payment of $200,000.00, half of which shall be used solely for Distributions to Holders of Class 5 General Unsecured Claims and half of which shall be contributed to the Wind-Down Funds. Further, the Mutual Termination Agreements shall be entered into in lieu of the Debtor's rejection of the CAP Agreements pursuant to Section 365 of the Bankruptcy Code. Accordingly, CAP shall release any Claims it may have for the Debtor's prepetition or post-petition breach of the CAP Agreements, if any, including any Claims that could have arisen under section 365 of the Bankruptcy Code if the Debtor had rejected the CAP Agreements. Finally, CAP will immediately hire all of the Debtor's current employees who are employed at the Leased Stations, so operations at the Leased Stations will continue seamlessly.

(b)      Dismissal of the CAP Adversary Proceedings

On the Effective Date, or as soon as reasonably practicable thereafter, the Liquidation Trust and CAP shall file an agreed order dismissing the CAP Adversary Proceedings with prejudice.

(c)      The Mutual Termination Agreements

Pursuant to the Mutual Termination Agreements, CAP shall pay to the Debtor (a) an amount equal to the cost of the remaining fuel at the Marketing Premises; and (b) an amount equal to 67% of the retail value of the legal, saleable inventory at the Marketing Premises as determined by CAP in its sole discretion. On the Effective Date, or as soon as reasonably practicable thereafter, the Debtor shall surrender possession of the Leased Stations to CAP.

(d)      The Security Deposit and the CAP Settlement Payment

The Security and Cross-Default Agreement provides that the Security Deposit "shall be returned to [the Debtor] no later than 120 days following the termination or expiration of [the] last remaining [CAP Agreement], subject to the deduction for any sums due [CAP] with respect to each of the [CAP Agreements] unpaid at the time of such termination or expiration." Security and Cross-Default Agreement, § I.B. Pursuant to § 5.4 of the Fuel Supply Agreements, the Debtor was required, at its own expense, to maintain the Leased Stations, but failed to do so. CAP estimates that, upon termination of the CAP Agreements, CAP's expenses in repairing the Leased Stations (which may be deducted from the Security Deposit) will exceed the amount of the Security Deposit. Accordingly, CAP estimates that the Debtor will not be entitled to receive any portion of the Security Deposit after entry into the Mutual Termination Agreements. A detailed

47

summary of the amount of the Security Deposit to be withheld by CAP is attached hereto as **Exhibit B** (the "Security Deposit Itemized Summary").

As consideration for the releases contained in the CAP Settlement, and in full settlement of any Claims the Debtor may have against the Security Deposit, or any other Claims the Debtor may have against CAP, including the Claims asserted in the CAP Adversary Proceedings, CAP will pay the CAP Settlement Payment of $200,000.00 to the Debtor, the Estate, or the Liquidation Trust. Further, CAP will release any Claim for damages in excess of the Security Deposit.

(e)     The Huntington National Bank Claims

In full and final satisfaction of the Class 1(b) Claims, CAP shall pay to the Estate or the Liquidation Trust the Allowed amount of the Class 1(b) Claims and the Estate or the Liquidation Trust shall pay such Allowed amount to the holders of the Class 1(b) Claims. CAP may, in the alternative, pay to the Holders of Class 1(b) Claims the value of the Collateral securing the Class 1(b) Claims in full and final satisfaction of such Class 1(b) Claims. In exchange, CAP shall receive the Collateral securing Class 1(b) Claims.

(f)     CAP's Continuing Relationship with Eby-Brown Company, LLC

After the Leased Stations are returned to CAP, CAP and Eby-Brown Company, LLC will enter into a contractual relationship whereby Eby-Brown Company, LLC will provide product distribution services with respect to the Leased Stations that are returned to CAP.

7.3     **Liquidation Trust**[3]

(a)     **Creation of Liquidation Trust**. On or prior to the Effective Date, the Liquidation Trustee and the Debtor shall execute the Liquidation Trust Agreement. The Liquidation Trust shall become effective on the Effective Date. On the Effective Date, the Liquidation Trust shall be deemed to be valid, binding and enforceable in accordance with the terms and provisions of the Plan and the Liquidation Trust Agreement. After the Effective Date, the Liquidation Trust Agreement may be amended in accordance with its terms without further order of the Bankruptcy Court. The Liquidation Trust Agreement shall be satisfactory in form and substance to the Debtor and the Proponents.

(b)     **Purpose of the Liquidation Trust**. On the Effective Date, the Liquidation Trust shall be created for the purposes of (a) winding down the Debtor's business and affairs as expeditiously as reasonably possible and liquidating any assets held by the Liquidation Trust after the Effective Date, (b) resolving any Disputed Claims, (c) paying or otherwise satisfying Allowed Claims, (d) filing appropriate tax returns, and (e) administering the Plan in an efficacious manner. The Liquidation Trust shall be deemed to be substituted as the party-in-lieu of the Debtor in all

---

[3]     In the event of inconsistencies between the Plan and the terms of the Liquidation Trust Agreement, the terms of the Liquidation Trust Agreement shall control.

48

matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forum, or administrative proceedings outside of the Bankruptcy Court, in each case without the requirement or need for the Liquidation Trustee to file motions or substitutions of parties or counsel in each such matter. It is intended that the Liquidation Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d). Although the Liquidation Trust shall not be deemed a successor of the Debtor, any privileges held by the Debtor shall be transferred to the Liquidation Trust, provided, however, that such transfer does not impair or waive any privilege.

(c) **Transfer of Assets to the Liquidation Trust.** Upon the occurrence of the Effective Date, any Estate non-Cash assets remaining shall vest in the Liquidation Trust for the purpose of administering the Estate and consummating the Plan. Such assets shall be held free and clear of all Liens, claims, and interests of Holders of Claims and Interests, except as otherwise **expressly** provided in this Plan. Any distributions to be made under the Plan from such assets shall be made by the Liquidation Trustee or its designee. The Liquidation Trust and the Liquidation Trustee shall be deemed to be fully bound by the terms of the Plan, the Liquidation Trust Agreement, and the Confirmation Order.

(d) **Dissolution of Debtor**. At any time after the Effective Date, the Liquidation Trustee shall be authorized to dissolve the Debtor upon filing a notice of such dissolution with the Bankruptcy Court, notwithstanding any requirements of applicable state law, without the necessity for any other or further actions to be taken by or on behalf of the Debtor or payments to be made in connection therewith.

7.4 **Liquidation Trustee**.

(b) **Appointment**. The Liquidation Trustee shall be appointed by the Proponents. The appointment of the Liquidation Trustee shall be effective as of the Effective Date. Successor Liquidation Trustee(s) shall be appointed in accordance with this Plan.

(c) **Powers and Duties**. The Liquidation Trustee shall act for the Liquidation Trust, subject to the provisions hereof (and all certificates of incorporation, bylaws, shareholder agreements, and related documents are deemed amended by the Plan to permit and authorize same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the Debtor shall be deemed to have resigned, solely in their capacities as such, and the Liquidation Trustee shall succeed to the powers of the Debtor's officers. From and after the Effective Date, the Liquidation Trustee shall be the sole representative of, and shall act for, the Liquidation Trust. For the avoidance of doubt, the foregoing shall not limit the authority of the Liquidation Trust or Liquidation Trustee, as applicable, to continue the employment of any former officer, employee, or other agent or representative.

The powers of the Liquidation Trustee shall include any and all powers and authority to implement the Plan and to make distributions thereunder and wind-down the

businesses and affairs of the Debtor and the Liquidation Trust, as applicable, including, without limitation:

(i)     To exercise all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced and take all actions that may be or could have been taken by the Debtor with like effect as, if authorized, exercised and taken by unanimous action of the Debtor's partners, members, officers, and equity holders; including, without limitation, amendment of the articles of organization and by-laws of the Debtor, the dissolution of the Debtor and the assertion or waiver of the Debtor's attorney/client privilege;

(ii)     to open and maintain bank and other deposit accounts, escrows and other accounts, calculate and implement Distributions to Holders of Allowed Claims as provided for or contemplated by the Plan and take other actions consistent with the Plan and the implementation thereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate Reserves in accordance with this Plan, in the name of the Debtor or the Liquidation Trust, even in the event of the dissolution of the Debtor;

(iii)     to make a good faith valuation of the non-Cash assets of the Estate;

(iv)     subject to the applicable provisions of the Plan, to collect and liquidate all Residual Assets pursuant to the Plan, to make Distributions generated by the sale or disposition of Residual Assets and to administer the winding-up of the affairs of the Debtor;

(v)     to object to any Claims (Disputed or otherwise), including any Administrative Claims and Professional Fee Claims, and to defend, compromise and/or settle any Claims prior to or following objection without the necessity of notice or approval of the Bankruptcy Court;

(vi)     to make decisions without further Bankruptcy Court approval, regarding the retention or engagement of professionals, employees and consultants by the Liquidation Trust or Liquidation Trustee, including (i) the charges incurred on or after the Effective Date for services of professionals, without application to the Bankruptcy Court, and (ii) disbursements, expenses or related support services relating to the winding down of the Debtor and implementation of the Plan, without application to the Bankruptcy Court;

(vii)     to cause, on behalf of the Debtor, the Liquidation Trust, and their Estates all necessary tax returns and all other appropriate or necessary documents related to municipal, State, Federal or other tax law to be prepared or filed timely, in accordance with the Plan; *provided*, that the Liquidation Trustee, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the

50

administration of such Debtor's chapter 11 case, as determined under applicable tax laws;

(viii)   to enter into any agreement or execute any document required by or consistent with the Plan and perform all of the obligations of the Debtor or the Liquidation Trust hereunder;

(ix)   to abandon property or unclaimed funds in any commercially reasonable manner, including abandonment or donation to a charitable organization, any assets that the Liquidation Trustee determines, at the conclusion of the Chapter 11 Case, are of no benefit to creditors of the Debtor or too impractical to distribute;

(x)   to investigate (including pursuant to Bankruptcy Rule 2004), prosecute and/or settle any Retained Action, participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction, participate as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding, litigate, or settle such Retained Actions on behalf of the Liquidation Trust and pursue to settlement or judgment such actions;

(xi)   to use assets of the Liquidation Trust to purchase or create and carry all appropriate insurance policies, bonds or other means of assurance and protection of the Liquidation Trust and Liquidation Trustee and pay all insurance premiums and other costs he or she deems necessary or advisable to insure the acts and omissions of the Liquidation Trustee and its representatives;

(xii)   to implement and/or enforce all provisions of this Plan;

(xiii)   to maintain appropriate books and records (including financial books and records) to govern the distributions hereunder;

(xiv)   as and to the extent set forth in Section 2.1 hereof, to pay fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and to file with the Bankruptcy Court and serve on the United States Trustee quarterly post-confirmation financial reports for the Debtor until such time as such reports are no longer required, or the Bankruptcy Court orders otherwise, a final decree is entered closing this Chapter 11 Case or this Chapter 11 Case is converted or dismissed;

(xv)   to dissolve the Liquidation Trust if the Liquidation Trustee determines, in reasonable reliance on such professionals as it may retain, that the expense of administering the Liquidation Trust so as to make a final Distribution to Holders of Allowed Claims is likely to exceed the value of the remaining assets;

(xvi)   to seek one or more final decrees closing the Chapter 11 Case; and

51

(xvii)   to do all other acts or things consistent with the provisions of this Plan that the Liquidation Trustee deems reasonably necessary or desirable with respect to implementing the Plan.

(d)   **Compensation**.  The Liquidation Trustee's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement.

(e)   **Post Effective Date Reserve**.   The Liquidation Trustee shall be authorized to establish and fund a Post Effective Date Reserve with an amount of Cash, inclusive of the Wind-Down Funds, it deems necessary or appropriate to satisfy future costs and expenses for the implementation of the Plan and discharge of its duties hereunder.  The Post Effective Date Reserve shall be used by the Liquidation Trustee solely to satisfy the distributions set forth herein and the expenses of the Liquidation Trust and the Liquidation Trustee as set forth herein.   The Liquidation Trustee is authorized, but not directed, in accordance with its business judgment, to establish and fund one or more reserves, which shall be deemed part of the Post Effective Date Reserve, in specific amounts from the Post Effective Date Reserve as necessary or appropriate to discharge its duties and make distributions hereunder.  In no event shall the Liquidation Trustee be required or permitted to use its personal funds or assets for such purposes.

(f)   **Limitation of Liability; Exculpation of Liquidation Trustee**.  To the extent provided for under applicable Illinois law and/or as provided for in any applicable governing documents, the Liquidation Trustee and all professionals retained by the Liquidation Trust or Liquidation Trustee, as applicable, each in their capacities as such, shall be deemed exculpated and indemnified, except for gross negligence, willful misconduct, bad faith, reckless disregard of any duty, self-dealing, fraud, or a criminal act in the performance of its duties, in all respects by the Liquidation Trust; provided, however, that the foregoing indemnification shall be subject to the parameters, if any, established by any applicable professional rules of responsibility governing such professional; *provided, further, however,* that the Liquidation Trustee may seek a further exculpation consistent with Section 8.4 hereof in connection with the closing of this Chapter 11 Case. The Liquidation Trustee and any such professionals may rely upon written information previously generated by the Debtor.

(g)   **Successor Liquidation Trustee(s)**.  The Liquidation Trustee may resign at any time upon 30 days' written notice; *provided*, that such resignation shall only become effective upon the appointment of a permanent or interim successor Liquidation Trustee.  Upon its appointment, the successor Liquidation Trustee, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Liquidation Trustee relating to the Liquidation Trust shall be terminated.

7.5   **Cancellation of Existing Securities and Agreements**.

Except as otherwise provided in this Plan, and in any contract, instrument or other agreement or document created in connection with this Plan, on the Effective Date, the Interests and any other promissory notes, other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, and commitments, including, without limitation, any

52

agreements purporting to relate to deferred compensation that relate to Interests or options, shall be deemed cancelled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtor under the notes and other agreements and instruments governing such Claims and Interests shall be released; *provided, however*, that the cancellation, release, and discharge of the foregoing shall not affect whether a timely Claim made on account of such obligation may become an Allowed Claim; *provided, further, however,* that certain instruments, documents, and credit agreements related to Claims shall continue in effect solely for the purpose of allowing the Liquidation Trustee to make Distributions in accordance with this Plan. The Holders of or parties to such cancelled notes, share certificates, and other agreements and instruments, shall have no rights against the Debtor, the Estate, and the Liquidation Trust or the Liquidation Trustee arising from or relating to such notes and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to this Plan.

7.6     **Exemption from Certain Transfer Taxes**. Pursuant to Bankruptcy Code section 1146(a), any transfers from the Debtor to any other Entity pursuant to this Plan, shall not be subject to any stamp tax or similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any applicable instruments or documents without the payment of any such tax or governmental assessment

7.7     **Preservation of Retained Actions**. Unless a Retained Action against any Entity is expressly waived, relinquished, released, compromised, exculpated, or settled pursuant to this Plan or any Final Order, the Debtor expressly reserves such Retained Action to be vested in the Liquidation Trust for possible prosecution by the Liquidation Trustee, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Actions upon or after the entry of the Confirmation Order or Effective Date based on the Plan or the Confirmation Order, except where such Retained Actions have been waived, relinquished, released, compromised, exculpated, or settled pursuant to the Plan or any Final Order (including the Confirmation Order and the Sale Order). In accordance with section 1123(b) of the Bankruptcy Code, the Liquidation Trust may enforce all rights to commence and pursue, as appropriate, any and all such Retained Actions, whether arising prior to or after the Petition Date, and the Liquidation Trust's rights to commence, prosecute, or settle any such Retained Actions shall be preserved notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date.

The failure of the Debtor to list a claim, right, cause of action, suit or proceeding shall not constitute a waiver or release by the Debtor or their Estates of such claim, right of action, suit or proceeding. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Retained Actions against them as any indication that the Liquidation Trustee will not pursue any and all available Retained Actions against them. The Debtor or the Liquidation Trustee, as applicable, expressly reserve all rights to investigate and prosecute, but are not obligated to, any and all Causes of**

53

**Action against any Entity, except as otherwise expressly provided herein, including Article VIII hereof.**

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Action that the Debtor may hold against any Entity shall vest in the Liquidation Trust. In addition, the Liquidation Trustee reserves the right to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits. After the Effective Date, the Liquidation Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Retained Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

7.8    **Closing the Chapter 11 Case.** The Liquidation Trustee intends to file a motion to close the Chapter 11 Case under the Bankruptcy Rules and Local Rules as soon as reasonably practicable.

### ARTICLE VIII
### RELEASE, INJUNCTION, AND RELATED PROVISIONS

8.1    **Release of Liens.**

**Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtor elects to reinstate in accordance with Article III hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released, compromised, and satisfied, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of the Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Liquidation Trustee to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

54

8.2     **Releases by the Debtor**.

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Debtor and the Liquidation Trust, on their own behalf and as a representative of the Estate, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to the Debtor (including the management, ownership, or operation thereof, including as such entities existed prior to or after the Petition Date), the Chapter 11 Case, the negotiation, preparation, dissemination, solicitation, and Filing of this Combined Disclosure Statement and Plan, the Filing of the Chapter 11 Case, the settlement of Claims or renegotiation of Executory Contracts or Leases, the pursuit of confirmation of this Combined Disclosure Statement and Plan, the consummation of this Combined Disclosure Statement and Plan, or the administration of this Combined Disclosure Statement and Plan or the property to be Distributed under this Combined Disclosure Statement and Plan, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date (including before the Petition Date) related or relating to the foregoing, that may be asserted by or on behalf of the Debtor or its Estate, against any of the Released Parties.**

**Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iii) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan, (v) Retained Causes of Action, (vi) defenses to any Claims filed, scheduled or asserted by any of the Released Parties, whether or not such defenses are to be brought by objections, complaints or other similar types of pleadings.**

8.3     **No Liability Pursuant to Section 1125(e) of the Bankruptcy Code**.

**Without in any way limiting the releases and exculpation set forth in Sections 8.1 and 8.2 hereof, to the fullest extent permitted by section 1125(e) of the Bankruptcy Code, each of the 1125(e) Parties is hereby entitled to all of the protections and benefits afforded by section 1125(e) in connection with such party's solicitation and participation in relation to the Plan.**

ACTIVE\1601451207.6

8.4    **Setoffs**.  Except for Claims expressly allowed hereunder, on or after the Effective Date, the Liquidation Trust, may, pursuant to applicable law (including section 553 of the Bankruptcy Code), offset against any Claim, including an Administrative Claim, before any Distribution is made on account of such Claim, any and all of the claims, rights and Causes of Action of any nature that the Debtor or the Liquidation Trust may hold against the Holder of such Claim.

8.5    **Binding Effect**.  This Plan shall be binding upon and inure to the benefit of the Debtor, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Liquidation Trust and the Liquidation Trustee.

8.6    **Terms of Injunctions or Stays**.  Unless otherwise provided in this Plan, all injunctions or stays provided for in this Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until this Chapter 11 Case is closed.

## ARTICLE IX
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1    **Rejection of Executory Contracts and Unexpired Leases**.  Except as otherwise provided in the Confirmation Order, this Plan, any other Plan Document, the Sale Order, the Bar Date Order, or any other relevant order of the Bankruptcy Court, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code rejecting all prepetition Executory Contracts or Leases to which the Debtor is a party, to the extent such contracts or leases are Executory Contracts or Leases, on and subject to the occurrence of the Effective Date; *provided*, *however*, that as to all policies and agreements giving rise to insurance in favor of the Debtor or its Estate, the Debtor believes that the insurance agreements of the Debtor are not Executory Contracts or Leases and therefore are not subject to assumption or rejection.  To the extent that an insurance policy or agreement is determined to be an Executory Contract or Lease subject to assumption by the Debtor, such executory insurance policy or agreement, as the case may be, is hereby assumed and assigned to, and shall vest with, the Liquidation Trust.  For the avoidance of doubt, all insurance policies and agreements of the Debtor, and all obligations of the Debtor and the other counterparties thereto, shall be unaffected by the Plan and shall remain enforceable according to their terms and applicable law.

9.2    **Supplemental Bar Date for Rejection Damages**.  If the rejection of any Executory Contract or Lease under this Plan gives rise to a Claim by the non-Debtor party or parties to such Executory Contract or Lease, such Claim, to the extent that it is timely filed and is an Allowed Claim, shall be classified in Class 5; *provided*, *however*, that any potential General Unsecured Claim arising from such rejection shall be forever barred and shall not be enforceable against the Debtor, the Liquidation Trust, their successors or properties, unless a proof of such Claim is filed and served on the Debtor or the Liquidation Trust, as applicable, within thirty (30) days after the date of notice of the entry of the order of the Bankruptcy Court rejecting the Executory Contract or Lease (which may include the Confirmation Order).

56

9.3     **Insurance Policies**.

All of the Debtor's Insurance Policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtor shall be deemed to have assumed all Insurance Policies and any agreements, documents and instruments related thereto. Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtor shall assume (and assign to the Liquidation Trust if necessary to continue the Insurance Policies in full force) all of the Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor's assumption of the Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption of the Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan as to which no Proof of Claim need be Filed.

## ARTICLE X
## DISTRIBUTIONS

10.1     **Distributions for Claims Allowed as of the Effective Date**. Except as otherwise provided herein, and only after the funding of the Reserves, or as ordered by the Bankruptcy Court, all Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on a Distribution Date. Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made pursuant to the terms and conditions of this Plan. Notwithstanding any other provision of this Plan to the contrary, no Distribution shall be made on account of any Claim or portion thereof that (i) has been satisfied after the Petition Date pursuant to an order of the Bankruptcy Court; (ii) is listed in the Schedules as contingent, unliquidated, disputed or in a zero amount, and for which a proof of Claim has not been timely filed; or (iii) is evidenced by a proof of Claim that has been amended by a subsequently filed proof of Claim that purports to amend the prior proof of Claim.

10.2     **No Distributions on Disputed Claims**. No Distribution shall be made by the Liquidation Trust with respect to a Disputed Claim until the same, or some portion thereof, becomes an Allowed Claim.

10.3     **Distributions on Claims Allowed after the Effective Date**. Payments and Distributions from the Liquidation Trust to each respective Holder on account of a Disputed Claim, to the extent that such Disputed Claim ultimately becomes an Allowed Claim, shall be made in accordance with provisions of this Plan that govern Distributions to such Holders of Allowed Claims. Except as otherwise provided in this Plan, within ninety (90) days after such Disputed Claim becomes an Allowed Claim, the Liquidation Trustee shall distribute to such Holder any property from the applicable Reserve or the Liquidation Trust that would have been distributed on the dates Distributions were previously made to Holders of Allowed Claims if such Disputed Claim had been an Allowed Claim on such dates.

57

All Distributions made under this Article X on account of an Allowed Claim will be as if such Disputed Claim had been an Allowed Claim on the dates Distributions were previously made to, or reserved for, Holders of Allowed Claims included in the applicable Class.

10.4 **Objections to and Estimation of Claims**.  Unless otherwise provided in this Plan, after the Effective Date, the Liquidation Trustee shall have standing to object to Claims in order to have the Bankruptcy Court determine the amount and treatment of any Claim; *provided*, that, for the avoidance of doubt, nothing herein shall be deemed to prejudice any other party in interest with requisite standing from interposing an objection in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and any order of the Bankruptcy Court.  From and after the Effective Date, the Liquidation Trustee may settle or compromise any Disputed Claim without notice or approval of the Bankruptcy Court.  Except as otherwise provided in this Plan, if a party files a Proof of Claim and (i) the Debtor or the Liquidation Trustee, as applicable, file an objection to that Claim or otherwise formally challenge the Claim or (ii) the Claim otherwise is a Disputed Claim under this Plan, then such Claim shall be Disputed unless Allowed or Disallowed by a Final Order or as otherwise set forth in this Plan.  Except as otherwise provided in this Plan, all Proofs of Claim filed after the Effective Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Debtor or the Estates, without the need for any objection by the Liquidation Trustee or any further notice to or action, order, or approval of the Bankruptcy Court.

10.5 **Delivery of Distributions and Undeliverable or Unclaimed Distributions**.

(a) **Delivery of Distributions in General**.  Distributions to Holders of Allowed Claims shall be made at such Holder's Distribution Address.

Distributions shall be made from the Liquidation Trust, as applicable, in accordance with the terms of this Plan.

In making Distributions under this Plan, the Liquidation Trustee may rely upon the accuracy of the claims register maintained by the Claims Agent in the Case, as modified by any Final Order of the Bankruptcy Court disallowing Claims in whole or in part.

To be eligible to receive a Distribution under this Plan, the Holder of an Allowed Claim must complete and return to the Liquidation Trustee the appropriate Form W-8 or Form W-9, as applicable, to each Holder.

(b) **Undeliverable and Unclaimed Distributions**.  If the Distribution to any Holder of an Allowed Claim is returned to the Liquidation Trustee as undeliverable or is otherwise an Unclaimed Distribution, no further Distributions shall be made to such Holder unless and until the Liquidation Trustee is notified in writing of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest.  If a Distribution is returned as undeliverable, the Liquidation Trustee shall use reasonable efforts to determine such Creditor's

58

then-current address.  Unclaimed Distributions shall be returned to the Liquidation Trust until such Distributions are claimed.

(c)  **Treatment of Unclaimed Distributions**.  Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an Unclaimed Distribution within three (3) months after the final Distribution Date shall be deemed to have forfeited its Claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such Claim for an Unclaimed Distribution against the Debtor and its Estate, the Liquidation Trustee, the Liquidation Trust, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its and their property.  In such cases, any Cash otherwise reserved for Unclaimed Distributions shall become the property of the Liquidation Trust free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be distributed in accordance with the terms of this Plan.  Nothing contained in this Plan shall require the Debtor or the Liquidation Trustee to attempt to locate any Holder of an Allowed Claim; *provided*, *however*, that in his / her sole discretion, the Liquidation Trustee may periodically publish notice of Unclaimed Distributions.

10.6  **Interest on Claims**.  Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim.  Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

10.7  **Withholding and Reporting Requirements**.  In connection with this Plan and all Distributions under this Plan, the Liquidation Trustee shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding, payment, and reporting requirements.  The Liquidation Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder.

All Entities holding Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes.  No Distribution shall be made to or on behalf of such Entity pursuant to this Plan unless and until such Entity has furnished such information.  Any property to be distributed pursuant to this Plan shall be deemed:  (i) pending the receipt of such information in the manner established by the Liquidation Trustee, an Undeliverable Distribution pursuant to Section 10.5 of this Plan; or (ii) if such information is not received by the deadline established by the Liquidation Trustee and approved by the Bankruptcy Court upon notice and a hearing, forfeited and treated in accordance with Section 10.5 of this Plan.

Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Liquidation Trustee for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Liquidation Trustee in connection with such Distribution. Any property to be distributed pursuant to this Plan shall be deemed: (i) pending the implementation of such arrangements, an Undeliverable Distribution pursuant to Section 10.5 of this Plan; or (ii) if such arrangements are not implemented by the deadline established by the Liquidation Trust and approved by the Bankruptcy Court upon notice and a hearing, forfeited and treated in accordance with Section 10.5 of this Plan.

10.8 **Miscellaneous Distribution Provisions**.

(a) **Method of Cash Distributions**. Any Cash payment to be made by the Liquidation Trust pursuant to this Plan will be in U.S. dollars and may be made, at the sole discretion of the Liquidation Trustee, by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law. In the case of foreign creditors, Cash payments may be made, at the option of the Liquidation Trust, in such funds and by such means as are necessary or customary in a particular jurisdiction.

(b) **Distributions on Non-Business Days**. Any payment or Distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

10.9 ***De Minimis Distribution Provisions***. No Distribution shall be required to be made hereunder to any Holder of a Claim unless such Holder is to receive in such Distribution at least $100. Any such Distribution not made in accordance with the provisions of this Article X shall be retained by the Liquidation Trust and invested as provided in this Plan. Any Distribution not made in accordance with this Article X to such Holder, shall be held in trust for the relevant Holder until the earlier of (x) the date the next Distribution is scheduled to be made to such Holder; *provided, however*, that such subsequent Distribution, taken together with amounts retained hereby, equals at least $100.

10.10 **Distribution Record Date**. As of the close of business on the Distribution Record Date, the various lists of Holders of Claims and Interests in each of the Classes, as maintained by the Debtor, or their agents, shall be deemed closed and there shall be no further changes in the record Holders of any of the Claims or Interests. Neither the Liquidation Trust nor the Liquidation Trustee will have any obligation to recognize the transfer of or sale of any participation in any Allowed Claim that occurs after the close of business on a Distribution Record Date, and will be entitled for all purposes herein to recognize, deal with and distribute only to those Holders of Allowed Claims who are record Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date, as stated on the official claims register.

60

10.11  **Adjustment to Claims Without Objection**.

Any Claim that has been paid or satisfied, amended, or superseded may be marked as satisfied, adjusted or expunged on the Claims Register by the Liquidating Trustee or the Liquidation Trust without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

10.12  **Disallowance of Untimely Claims**.

Claims for which proofs of claim or requests for allowance were required to be filed by a Bar Date occurring before the Effective Date, and with respect to which no proof of claim or request for allowance was filed before the applicable Bar Date, shall be forever Disallowed, barred, and discharged in their entirety as of the Effective Date, and shall not be enforceable against the Debtor, the Liquidation Trust, or the Debtor's Estate, unless such proofs of claim or requests for allowance are deemed timely filed by a Final Order of the Bankruptcy Court before the Effective Date.

**ARTICLE XI**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**

11.1  **Conditions to Effective Date**.  The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Proponents in writing:

(a)  the Bankruptcy Court shall have entered the Confirmation Order; and

(b)  the Reserves shall have been established and funded in accordance with the Plan.

11.2  **Substantial Consummation**.  "Substantial Consummation" of the Plan, as defined in sections 1101 and 1127 of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

11.3  **Consequences of Non-Occurrence of Effective Date**.  If the Effective Date does not timely occur, the Proponents reserve all rights to seek an order from the Bankruptcy Court directing that the Confirmation Order be vacated and that this Plan be null and void in all respects.  If the Bankruptcy Court shall have entered an order vacating the Confirmation Order, the time within which the Debtor may assume and assign or reject all Executory Contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated, without prejudice to further extensions.

ACTIVE\1601451207.6

# ARTICLE XII
## ADMINISTRATIVE PROVISIONS

12.1 **Retention of Jurisdiction**. Notwithstanding confirmation of this Plan or occurrence of the Effective Date, and except as otherwise provided by applicable law, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including for the following purposes:

(a) To determine the allowability, classification, or priority of Claims upon objection of the Debtor, the Liquidation Trust, the Liquidation Trustee, or any other party in interest entitled to file an objection, and the validity, extent, priority and nonavoidability of consensual and nonconsensual liens and other encumbrances;

(b) To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any Entity, to construe and to take any other action to enforce and execute this Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of this Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Case on or before the Effective Date with respect to any Entity;

(c) To protect the property of the Estate, from claims against, or interference with, such property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens on property of the Estates;

(d) To determine any and all applications for allowance of Professional Fee Claims;

(e) To determine any Administrative Claims, Priority Tax Claims, Other Priority Claims, or any other request for payment of claims or expenses entitled to priority under section 507(a) of the Bankruptcy Code;

(f) To resolve any disputes arising under or related to the implementation, execution, consummation or interpretation of this Plan and the making of Distributions hereunder;

(g) To determine any and all motions related to the rejection, assumption or assignment of Executory Contracts or unexpired leases, or to determine any motion to reject an Executory Contract or unexpired lease;

(h) To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Case, including any remands;

(i) To enter a Final Order closing the Debtor's Chapter 11 Case;

(j)     To modify this Plan under section 1127 of the Bankruptcy Code, to remedy any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order so as to carry out its intent and purposes;

(k)     To issue such orders in aid of consummation of this Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity, to the full extent authorized by the Bankruptcy Code;

(l)     To enable the Liquidation Trustee to prosecute any and all proceedings to set aside Liens and to recover any transfers, assets, properties or damages to which the Estate may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws except as may be expressly waived pursuant to this Plan;

(m)     To determine any tax liability of the Debtor or the Liquidation Trust pursuant to section 505 of the Bankruptcy Code, and to address any request by the Liquidation Trustee for a prompt audit pursuant to section 505(b) of the Bankruptcy Code;

(n)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(o)     To resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Case, the Bar Date Order, or the otherwise applicable Claims bar date, the hearing to consider approval of the Combined Disclosure Statement and Plan or the Confirmation Hearing;

(p)     To resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in this Chapter 11 Case;

(q)     To authorize sales of assets as necessary or desirable and resolve objections, if any, to such sales;

(r)     To hear and resolve Claims and Retained Actions;

(s)     To resolve any disputes concerning any exculpation of a non-debtor hereunder or the injunction against acts, employment of process or actions against such non-debtor arising hereunder;

(t)     To approve any Distributions, or objections thereto, under this Plan;

(u)     To approve any Claims settlement entered into or offset exercised by the Liquidation Trust; and

(v)     To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

63

12.2 **Amendments**.

(a) **Preconfirmation Amendment**.

The Proponents may modify this Plan at any time prior to the entry of the Confirmation Order, provided that this Combined Disclosure Statement and Plan, as modified, meet applicable Bankruptcy Code requirements.

(b) **Postconfirmation Amendment Not Requiring Resolicitation**.

After the entry of the Confirmation Order, the Proponents may modify this Plan to remedy any defect or omission or to reconcile any inconsistencies in this Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of this Plan, provided that such modification shall not materially and adversely affect the interests, rights, treatment or Distributions of any Class of Allowed Claims or Interests under this Plan.

12.3 **Withdrawal of Plan**. The Proponents reserve the right to revoke and withdraw or modify this Plan at any time prior to the Confirmation Date or, if the Debtor or the Proponents are for any reason unable to consummate this Plan after the Confirmation Date, at any time up to the Effective Date. If the Proponents revoke or withdraw this Plan, (a) nothing contained in this Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtor or to prejudice in any manner the rights of the Debtor or any Entity in any further proceeding involving the Debtor and (b) the result shall be the same as if the Confirmation Order were not entered, this Plan was not filed and the Effective Date did not occur.

12.4 **Successors and Assigns**. The rights, benefits and obligations of any person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person or Entity.

12.5 **Governing Law**. Except to the extent that the Bankruptcy Code, Bankruptcy Rules or other federal laws apply, the rights and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the laws of the State of Illinois, without giving effect to principles of conflicts of law.

12.6 **Corporate Action**. Any matters provided for under this Plan involving the corporate structure of the Debtor or corporate action, as the case may be, to be taken by or required of the Debtor shall be deemed to have occurred and be effective as of the Effective Date and shall be authorized and approved in all respects, without any requirement of further action by the Debtor or the Liquidation Trust, as the case may be.

12.7 **Effectuating Documents and Further Transactions**. The Debtor, the Proponents, and the Liquidation Trustee shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements and take such other actions as they deem necessary to effectuate and further evidence the terms and conditions of this Plan, and sign and deliver lien releases or termination notices to Secured Claim Holders.

64

12.8    **Confirmation Order and Plan Control**.  To the extent the Confirmation Order is inconsistent with this Plan, the Confirmation Order (and any other orders of the Bankruptcy Court) controls over this Plan.

12.9    **Notices**.  All notices or requests in connection with this Plan shall be in writing and will be deemed to have been given when received by mail and addressed to:

**Proponents:**

FOX ROTHSCHILD LLP
Gordon E. Gouveia (#6282986)
Peter C. Buckley (admitted *pro hac vice*)
Matthew R. Higgins (#6336039)
321 North Clark Street, Suite 1600
Chicago, IL 60654
Telephone: (312) 980-3816
Facsimile: (312) 517-9201
Email: ggouveia@foxrothschild.com

**Liquidation Trustee:**

[See Plan Supplement]

12.10  **No Admissions or Waiver**.  Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed an admission or waiver by the Debtor with respect to any matter set forth herein, including liability on any Claim or the propriety of a Claim's classification.

12.11  **2002 Service List.**

On and after the Effective Date, the Liquidation Trustee shall maintain the list of parties entitled to receive notices in this Chapter 11 Case (the "2002 List").  Any party that desires to remain on the 2002 List in the Chapter 11 Case shall, within thirty (30) days of the Effective Date, file a renewed request for receipt of notices and serve copies of such request by mail upon the Liquidation Trust and the Liquidation Trustee.  The Liquidation Trust and the Liquidation Trustee may remove from the 2002 List any party that does not file and serve a renewed request within 30 days after the Effective Date, *provided, however*, that the Office of the United States Trustee for the Northern District of Illinois shall remain on the 2002 List without the need to file a renewed request for receipt of notices.  Any party removed from the 2002 List in accordance with this paragraph shall be added back to the 2002 List promptly upon the filing and service of a renewed request by such party in accordance with this paragraph.

[*Signature Page Follows*]

65

## ARTICLE XIII
## RECOMMENDATION AND CONCLUSION

The Proponents believe that this Combined Disclosure Statement and Plan is in the best interests of the Estates and creditors and urge the Holders of Impaired Claims who are entitled to vote to timely return their Ballots with a vote in favor of this Combined Disclosure Statement and Plan.

**CrossAmerica Partners LP**

By: _____
Name: Robert Brecker
Title: Executive Vice President of Operations

66