**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>IYS Ventures, LLC,<br><br>        Debtor. | Chapter 11<br><br>Case No. 23-06782 |

**DISCLOSURE STATEMENT TO
CROSSAMERICA PARTNERS LP'S
AMENDED CHAPTER 11 PLAN OF LIQUIDATION**

Gordon E. Gouveia (#6282986)
Peter C. Buckley (admitted *pro hac vice*)
Matthew R. Higgins (#6336039)
321 North Clark Street, Suite 1600
Chicago, IL 60654
Telephone: (312) 517-9200
Facsimile: (312) 517-9201
Email: ggouveia@foxrothschild.com

*Counsel to CrossAmerica Partners LP*

Dated: November 14, 2024

## DISCLAIMER

THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE PROPONENTS' KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE PROPONENTS, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THE PLAN CONTEMPLATES THE LIQUIDATION OF THE DEBTOR, AND PAYMENTS TO CERTAIN CREDITORS ACCORDING TO BANKRUPTCY CODE AND STATE LAW PRIORITY, AS ADMINISTERED BY A LIQUIDATION TRUSTEE PURSUANT TO THE TERMS OF THE PLAN.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN WHAT IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTOR, OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THE DEBTOR'S SCHEDULES AND OTHER FILINGS WITH THE BANKRUPTCY COURT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND THEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3016(b), AND LOCAL RULE 3017-2, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.

SEE SECTION VI OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE PLAN.

# I.  INTRODUCTION

CrossAmerica Partners LP and certain of its affiliates (collectively, "CAP"), as a creditor and contract counterparty in the above-captioned Chapter 11 Case, proposes *CrossAmerica Partners LP's Amended Chapter 11 Plan of Liquidation* filed November 14, 2024, (the "Plan")[1] for the liquidation of the Debtor and Distribution of the proceeds of the Debtor's assets to Holders of Allowed Claims against the Debtor as set forth herein.

This *Disclosure Statement to CrossAmerica Partners LP's Amended Chapter 11 Plan of Liquidation* (this "Disclosure Statement") contains, among other things, a discussion of the Debtor's history, business, property, operations, risk factors and the Chapter 11 Case (including the Debtor's diminution in value during the Chapter 11 Case) as well as a summary and analysis of the Plan (which includes a global settlement of Claims by and between CAP and the Debtor and the creation of a Distribution Fund that will be created to fund distributions to General Unsecured Creditors), and certain related matters.

The Plan is proposed in parallel with the Debtor's *Second Amended Plan of Reorganization Filed by IYS Ventures* filed November 14, 2024, (the "Debtor's Plan") and the Debtor's *Amended Disclosure Statement to Second Amended Plan of Reorganization Filed by IYS Ventures LLC* filed November 14, 2024 (the "Debtor's Disclosure Statement").

For the reasons stated herein, the Proponents believe that the Debtor's creditors are best served by a plan of liquidation instead of a plan of reorganization and that an orderly plan of liquidation better serves stakeholders than a liquidation under chapter 7 of the Bankruptcy Code. The Proponents believe that the Debtor's Plan is not feasible, primarily because the Debtor does not currently generate enough income to meet its current monthly Lease Obligations on time and because the Debtor's Plan requires a recovery from the CAP Adversary Proceedings, which involve meritless claims that will only cost the Estate further resources. Therefore, the Proponents propose the Plan, which is a plan of liquidation, in competition with the Debtor's Plan.

The Debtor's Plan proposes to pay Holders of General Non-Priority Unsecured Claims over a one-year period an aggregate sum of $800,000 in full and final satisfaction of their Claims, which are estimated to be allowed in the amount of $25,632,517.85. According to Section 4.4 of the Debtor's Plan, the Debtor proposes to fund the Debtor's Plan with its available cash (only $77,918.00 as of September 30, 2024 according to the Debtor's liquidation analysis), a new $800,000.00 loan, continued operation of the Leased Stations (which the Debtor has been operating for more than a year in bankruptcy without generating any meaningful return to creditors), and the Net Proceeds of Litigation Claims including the PMPA Adversary and CAP Adversary (neither of which have any value as set forth below and both of which are responsible, in part, for the Debtor's disproportionate expenditure of Estate resources on professional fees). The Proponents of the Plan view the Debtor's Plan as entirely speculative, inconsistent with the Debtor's track record of performance and reliant on taking out more debt as well as litigation cost-benefit assessments that have no basis in law or fact. Throughout this Chapter 11 Case, the Debtor has struggled to pay its administrative expenses as they come due, including by bouncing over $1.1 million in lease payments between December 2023 and August 2024. Accordingly, the

---

[1] Except as otherwise provided herein, capitalized terms used herein have the meanings ascribed to them in the Plan.

Proponents have little confidence in the Debtor's ability to fulfill its undertakings set forth in the Debtor's Plan.

As an alternative to the Debtor's Plan, the Proponents are proposing the Plan, which liquidates the Debtor's assets as soon as practicable and provides a more certain recovery to creditors. As more fully set forth below, a central piece of the Plan is the CAP Settlement. As part of the CAP Settlement, CAP will (1) purchase the fuel and inventory at the Leased Stations and the Freedom Medical Stations for an estimated amount of approximately $1.8 million, (2) pay $100,000 to the Debtor's Estate solely for the benefit of Class 5 General Unsecured Creditors, (3) pay $100,000 to the Debtor's Estate solely to fund the Wind-Down Fund, (4) continue operations at all of the Leased Stations by hiring the current employees who are employed at such stations, and (5) fully satisfy the Class 1(b) Claims of Huntington National Bank by purchasing the collateral securing such Claims from the Holders of such Class 1(b) Claims. The Plan further provides for the creation of a Distribution Fund, which the Liquidation Trustee will use to provide distributions to General Unsecured Creditors as soon as practicable after the Plan becomes effective.

The Proponents assert that the Debtor has been operating the Freedom Medical Stations and has a leasehold interest in such stations. The Proponents base this assertion on the fact that they have continued to supply fuel to these stations under contracts with the Debtor. The Debtor disputes this assertion and contends that it has no leasehold interest in the Freedom Medical Stations.

The Proponents' Plan calls for the Debtor to return the remaining 18 Leased Stations to CAP, with CAP to purchase the fuel and convenience store inventory from the Debtor's Estate as it did for the 22 Stations that the Debtor previously "pushed back" to CAP and to pay Huntington Bank to satisfy its security interest in certain fuel dispensers purchased by the Debtor. Further, the Proponents' Plan calls for the Liquidating Trustee to liquidate the Debtor's interest in the fuel and convenience store inventory and leases at the Freedom Medical Stations, either by selling or abandoning those assets. The Proponents estimate that simply surrendering the Leased Stations to CAP and liquidating the fuel and convenience store inventory at the Freedom Medical Stations could result in a payment of nearly $1.8 million to the Estate for the benefit of creditors without the significant uncertainty and payout over time. In addition, although a significant portion of the Debtor's $995,000 Security Deposit held by CAP is already due to satisfy the Debtor's obligations under the CAP Agreements and the remainder of the Security Deposit will be required in connection with the return of the remaining Leased Stations, the Proponents' Plan includes CAP's proposal to release its Claims against the Debtor for any deficiency in the Security Deposit, and pay $200,000 to the Estate, half of which would be earmarked for Distribution to Class 5 General Unsecured Creditors. The Debtor's liquidation could also result in the sale of the Debtor's leasehold interest in the Freedom Medical Stations, possibly generating additional Cash for the benefit of the Debtor's creditors. In sum, a plan of liquidation, rather than reorganization, will maximize the remaining value of the Debtor's Estate, provide an immediate recovery for creditors, and avoid the substantial risk of relying on the future performance of a struggling business. The Proponents will continue to try to build consensus with the Debtor's other stakeholders after solicitation and before the Confirmation Hearing. ***The Proponents urge you to vote to accept the Plan***.

2

ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR ENTITLED TO VOTE ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, AND TO CONSULT WITH AN ATTORNEY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, **AND IN THE PLAN, THE PROPONENTS RESERVE THE RIGHT TO MODIFY THE PLAN, OR ANY PART THEREOF, PRIOR TO OR AFTER ENTRY OF THE CONFIRMATION ORDER, PROVIDED THAT THE PLAN, AS MODIFIED MEETS APPLICABLE BANKRUPTCY CODE REQUIREMENTS AND DOES NOT MATERIALLY AND ADVERSELY AFFECT THE INTERESTS, RIGHTS, TREATMENT OR DISTRIBUTIONS OF ANY CLASS OF ALLOWED CLAIMS OR INTERESTS UNDER THE PLAN.**

## II.    BACKGROUND AND DISCLOSURES

### a.  Background of the Debtor's Operations

The Debtor, IYS Ventures, LLC, is an Illinois limited liability company that operates gas stations and convenience stores in ten (10) states including Illinois, Indiana, Ohio, South Dakota, Louisiana, Michigan, Mississippi, Minnesota, Wisconsin, and Virginia.  Fuel is supplied to all of the Stations by CAP under the terms of the Fuel Supply Agreements.  Before filing the Chapter 11 Case, the Debtor operated fifty (50) Stations.  The Debtor owned ten (10) of the Stations and leased forty (40) Stations from CAP (the "Leased Stations").

IYS Ventures, LLC was expanded by Muwafak Rizek ("Rizek") out of a business owned by his father-in-law Isam Y. Samara that leased and operated a limited number of individual gas stations.  These early stations were owned by Circle K and managed by one of the entities owned or acquired by CrossAmerica Partners, LP ("CAP").

IYS continued its business and expansion plan by leasing the Leased Stations from CAP.  In 2021, IYS began purchasing gas stations from CAP.  A program of purchasing gas stations leased from CAP was intended to give IYS greater control over the gas stations and reduce the monthly costs of operating those stations including but not limited to amounts paid for rent.  By May of 2023, IYS had purchased ten (10) Stations and had contracted to purchase an additional two stations in South Dakota. The number of Stations operated by the Debtor ultimately grew to fifty (50).

The income realized from the operations of the Stations is derived from two (2) sources.  The first source of income is from the sale of gas and motor fuels to retail customers, and the second source of income is from the sale of convenience stores food products, such as candy, alcohol products, convenience food items and in some instances prepared foods to retail customers inside the Marketing Premises.

b. **Events Leading to Chapter 11**.

Prior to 2022, IYS purchased convenience store products primarily from Eby-Brown Company, LLC, ("Eby-Brown") a nationwide company that is a large seller and distributor of such items. During the implementation of its business and expansion plan, IYS needed funds to pay for its purchases of convenience store products to stock the Stations. IYS sought loans from various sources including but not limited to family members and high interest rate merchant cash advances to assist its funding needs. At the same time, the IYS's purchases from Eby-Brown increased proportionally as did IYS's balance owed to Eby-Brown, which disrupted its relationship with Eby-Brown and resulted in a lawsuit being filed by Eby-Brown (as discussed below).

The first loan obtained by IYS to fund its business and expansion plan originated in the Rizek Family in 2021. Mr. Rizek's brother, Munadel Rizek, caused his business, Marks Supermarket NC, Inc., to lend $5.2 million to the Debtor (the "Marks Supermarket Loan"). As security for repayment of the Marks Supermarket Loan, IYS executed and delivered mortgages on the stations owned by the Debtor to Marks Supermarket NC, Inc. However, the mortgages securing the Marks Supermarket Loan were not recorded contemporaneously with their execution and only some mortgages were ever recorded. The dates of recording varied and were in the first quarter of 2023.

IYS needed further financing to pay for maintain its operations. IYS obtained merchant cash advances ("MCAs") initially from Itria Ventures, LLC ("Itria"). An MCA is generally structured as a purchase of a defined percentage of the accounts receivable of the merchant at high rates of return and requiring regular daily, weekly, and/or monthly payments initiated through ACH drafts on the merchant's bank account. In addition to the purchase, IYS granted a security interest in all of its assets to Itria to secure its performance. Additional MCAs were obtained from 2021 through 2022 from Itria. IYS also obtained MCAs from Fox Capital Group, Inc., Byzfunder NY, LLC, and Samson Funding.

On March 4, 2022, Eby-Brown filed a complaint against IYS in the Circuit Court for the 18th Judicial Circuit, Illinois, DuPage County, styled as *Eby-Brown v. IYS Ventures, LLC, Imart Stores, LLC, Muwafak S. Rizek and Isam Samara*, Case No. 2022LA00021 (the "Circuit Court Lawsuit"). The Eby-Brown Complaint contained seven (7) counts: Breach of Contract (Counts I and II), Breach of Personal Guaranty (Counts III and IV), Account Stated (Count V), Unjust Enrichment (Count VI), and Illinois Consumer Fraud and Deceptive Business Practices Act (Count VII), seeking, *inter alia*, compensatory and punitive damages in an unspecified amount. On July 26, 2022, Eby-Brown obtained a prejudgment action order that, *inter alia*, enjoined the defendants in the Circuit Court Lawsuit from transferring and/or disposing of any assets until further order of the court.

IYS's use of its bank accounts was impaired by the filing of the Circuit Court Lawsuit. This led IYS to establish a new banking relationship with The Huntington National Bank ("Huntington"). Huntington has alleged that the deposits into IYS's new accounts were dishonored by the preceding banking institution. Therefore, Huntington filed a ten (10) count complaint in the United State District Court for the Northern District of Illinois (the "District Court"), styled as *The Huntington National Bank v. IYS Ventures, LLC, Muwafak Rizek, Leanne*

*Holdings LLC and Kenan Enterprises, Inc.*, Case No. 23-cv-01368 (the "<u>District Court Lawsuit</u>"), seeking recovery for breach of contract (Counts I and II), fraud (Count III), wire fraud (Count IV), conspiracy to commit wire fraud (Count V), bank fraud (Count VI), conspiracy to commit bank fraud (Count VII), civil conspiracy (Count VIII), conversion (Count IX), and unjust enrichment (Count X). On March 16, 2023, the District Court entered an *ex parte* Order on Motion for Prejudgment Attachment under Seal (the "<u>Attachment Order</u>"). Pursuant to the Attachment Order, Huntington sought to seize IYS's property.

      c.  **The Chapter 11 Case**.

           i.  *Generally*.

On May 23, 2023 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the Chapter 11 Case styled *In re IYS Ventures, LLC*, Case No. 23-06782 in the Bankruptcy Court.

During the Chapter 11 Case, the Debtor negotiated two (2) post-petition loans (the "<u>DIP Loans</u>") from Freedom Medical, Inc. The total amount of the DIP Loans was $1 million. During this Chapter 11 Case, the Debtor sold one of the ten Stations that it owned for $350,000.00 to the owner of an adjacent property. The Debtor sold the remaining nine (9) Stations that it owned (the "<u>Freedom Medical Stations</u>") to Freedom Medical, Inc. for $2.45 million. $1 million of such amount was used to repay the DIP Loan, and the remaining $1.45 million was paid in cash to the Debtor's Estate. Despite receiving a net amount of $1.8 million of Cash from the sale of ten (10) Stations, the Debtor's Cash balance as of June 30, 2024 was only $83,994—the Proceeds from the sale of the Stations have already been exhausted to fund Administrative Expenses incurred during the Chapter 11 Case.

On June 16, 2023, the Debtor filed its Schedules [Docket No. 20] (the "<u>Initial Schedules</u>") and Statement of Financial Affairs [Docket No. 21]. The Initial Schedules stated that, as of the Petition Date, the Debtor had property worth a total of $2,911,856.55—exclusive of fuel and inventory as such amounts were not known at the time but were likely in excess of $1.8 million—and debt of $22,947,818.98. On BLANK, the Debtor filed the Debtor's Plan and the Debtor's Disclosure Statement. The Debtor's Disclosure Statement includes a liquidation analysis (the "<u>Debtor's Liquidation Analysis</u>"). The Debtor's Liquidation Analysis states that the Debtor has assets worth $1,882,466.00—inclusive of fuel and inventory—and liabilities of $28,840,985.42. According to the Debtor's own filings, the Debtor's financial position has only declined during this Chapter 11 Case, despite the sale of all of its real property and continued operations for over a year. The Debtor is losing money and selling off its assets, but its creditors have not benefitted.

The period during which the Debtor had the exclusive right to file a plan (the "<u>Plan Exclusivity Period</u>") initially ended on September 20, 2023. The Debtor filed, and the Bankruptcy Court granted, two motions extending the Plan Exclusivity Period to December 15, 2023, and January 12, 2024, respectively. The Debtor did not file any additional motions seeking extensions of the Plan Exclusivity Period. The period during which the Debtor had the exclusive right to solicit votes on a plan (the "<u>Solicitation Period</u>") initially ended on November 19, 2023. The

Debtor Filed, and the Bankruptcy Court granted, two motions extending the Solicitation Period to February 15, 2024, and March 13, 2024, respectively. The Debtor did not file any additional motions seeking extensions of the Solicitation Period.

Because the Plan Exclusivity Period and the Solicitation Period have lapsed, other parties in interest are authorized under § 1121(c) of the Bankruptcy Code to file a plan. Accordingly, the Proponents have standing to file the Plan.

## ii. *Retention of Professional Advisors*

On June 7, 2023, the Debtor filed the *Application to Employ Attorneys* [Docket No. 12] (the "Counsel Retention Application"), seeking authority to employ the attorneys Gregory K. Stern, Monica C. O'Brien, Dennis E. Quaid and Rachel S. Sandler as attorneys for the Debtor and Debtor in Possession.

On June 7, 2023, the Debtor filed the *Application to Employ Accountants* [Docket No. 13] (the "Accountant Retention Application"), seeking authority to employ the accounting firm N & G Services, Inc. and Raed Najjar, CPA as accountants for the Debtor and Debtor in Possession.

On July 5, 2023, the Bankruptcy Court entered orders granting the Counsel Retention Application and Accountant Retention Application. *See* Docket Nos. 58 and 59, respectively.

On July 13, 2023, the Debtor filed the *Debtor's Application to Employ Matthew Brash of Newpoint Advisors Corporation as Chief Restructuring Officer; (2) Request to Approve Payment of Retainer and Procedure for Compensation; and (3) to Shorten and Limit Notice* [Docket No. 83] (the "CRO Retention Application"). On July 19, 2023, the Bankruptcy Court entered an order granting the CRO Retention Application. *See* Docket No. 103.

The following table shows the fees and expenses awarded to the Debtor's professionals by the Bankruptcy Court on an interim basis, but does not include the monthly statements submitted by the Debtor's Chief Restructuring Officer:

| Date of Order | Docket No. of Order | Professional | Amount Awarded |
|---|---|---|---|
| 10/25/2023 | 258 | Debtor's Accountant | $18,925.00. |
| 11/15/2023 | 338 | Debtor's Counsel | $283,558.26 |
| 1/24/2024 | 433 | Debtor's Financial Advisor and Chief Restructuring Officer | $104,789.74 |
| 3/27/2024 | 546 | Debtor's Accountant | $65,050.00 |
| 3/27/2024 | 547 | Debtor's Counsel | $583,441.18 |
| | | **TOTAL** | **1,036,839.18** |

As illustrated above, by March 27, 2024, the Debtor had incurred more than $1 million in professional fees. This amount has continued to grow and will continue to grow as long as the Chapter 11 Case continues. As discussed below, if the Debtor's Plan is confirmed, the Estate will continue to incur professional fees because the Debtor is pursuing meritless litigation against CAP that will not provide a benefit to the Estate or the Debtor's creditors.

The Debtor alleges that it has incurred professional fees due to CAP's actions in the Chapter 11 Case including but not limited to allegedly forcing a three (3) day trial before this Court on a nonexistent bankruptcy remedy of compelling rejection of the CAP leases and agreements which is neither authorized by applicable statute or legal precedent. CAP disputes the Debtor's characterization.

### iii. *Claims Process and Bar Dates*

#### 1. *Section 341(a) Meeting of Creditors*

On June 22, 2023, the Debtor's meeting of creditors under section 341(a) of the Bankruptcy Code was held but not adjourned.

#### 2. *Bar Date Order and Bar Dates*

On June 28, 2024, the Bankruptcy Court entered the *Order and Notice Setting Time to File Claims* [Docket No. 54] (the "Bar Date Order"). The Bar Date Order set the deadline for governmental units to file proofs of claim to November 20, 2023 and set the deadline for all other parties to file proofs of claim to September 1, 2023.

### iv. *Cash Collateral*

Certain Prepetition Secured Parties held security interests in the prepetition Cash proceeds of the Debtor's operations. As detailed below, the Debtor has been unable to reach a

final agreement with its secured creditors regarding the use of such cash collateral. In total the Bankruptcy Court has entered eleven (11) interim cash collateral orders, but no final order has been entered with regard to the Debtor's use of its cash collateral.

On June 22, 2023, the Debtor filed a *Motion for Interim use of Cash Collateral Pursuant to § 363(c)(2) and (3) of the Bankruptcy Code and Bankruptcy Rule 4001(b)* [Docket No. 35] (the "Cash Collateral Motion"). The Cash Collateral Motion disclosed that several entities may have a security interest in the Debtor's cash on hand. The lienholders were disclosed as Huntington National Bank, Byzfunder, Fox Capital Group, Inc., Itria Ventures, and Samson Funding. On June 28, 2023, the Bankruptcy Court entered an *Interim Order Authorizing Use of Cash Collateral Pursuant to § 363(c)(2) and Bankruptcy Rule 4001(b)* [Docket No. 56] (the "First Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral for approximately two weeks and continued the hearing on the Cash Collateral Motion. On July 14, 2023, the Bankruptcy Court entered an order [Docket No. 90] ("the "Second Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through July 31, 2023. On August 3, 2023, the Bankruptcy Court entered an order [Docket No. 117] (the "Third Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through August 31, 2023. On August 30, 2023, the Bankruptcy Court entered an order [Docket No. 161] (the "Fourth Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through September 30, 2023. On October 4, 2023, the Bankruptcy Court entered an order [Docket No. 246] (the "Fifth Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through November 10, 2023. On November 11, 2023, the Bankruptcy Court entered an order [Docket No. 316] that authorized the Debtor to use its cash collateral through December 16, 2023. On December 18, 2023, the Bankruptcy Court entered an order [Docket No. 375] (the "Sixth Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through January 20, 2024. On January 17, 2024, the Bankruptcy Court entered an order [Docket No. 407] (the "Seventh Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through March 22, 2024. On March 13, 2024, the Bankruptcy Court entered an order [Docket No. 527] (the "Eighth Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through May 31, 2024. On May 29, 2024, the Bankruptcy Court entered an order [Docket No. 599] (the "Ninth Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through July 27, 2024. On July 24, 2024, the Bankruptcy Court entered an order [Docket No. 626] (the "Tenth Interim Cash Collateral Order") that authorized the Debtor to use its cash collateral through September 28, 2024. The Court has authorized the use of cash collateral on an interim basis through December 12, 2024 [Docket No. 676].

v. *Motions to Appoint a Chapter 11 Trustee and Motions to Dismiss or Convert the Case to a Case Under Chapter 7 of the Bankruptcy Code*

On July 14, 2023, the U.S. Trustee filed the *United States Trustee's Motion to Appoint Chapter 11 Trustee and Shorten Notice* [Docket No. 86] (the "Chapter 11 Trustee Motion"). The Chapter 11 Trustee Motion requested that the Bankruptcy Court appoint a chapter 11 trustee to replace the Debtor in Possession as the administrator of the Debtor's Estate. The U.S. Trustee raised concerns about inconsistencies between the Debtor's operating agreement and certain records filed with state agencies. The U.S. Trustee also raised concerns that the Debtor's operating agreement was not signed by one of the Debtor's members. The Chapter 11 Trustee

Motion also raised concerns regarding the Debtor's credit card proceeds. Specifically, pursuant to the CAP Agreements, when customers make purchases from the Debtor using credit cards, the credit card proceeds are initially deposited into an account owned and controlled by CAP. Under the CAP Agreements, the credit card proceeds must then be swept to an account controlled by the Debtor, less any amounts owed by the Debtor to CAP. However, the Chapter 11 Trustee Motion raised concerns that the Debtor had designated a third party's account into which the credit card proceeds would be swept. The U.S. Trustee also cited the Debtor's tumultuous relationship with Eby-Brown Company, LLC. The U.S. Trustee raised concerns regarding the Debtor's operational structure. Specifically, in approximately November 2022, the Debtor began entering into certain Management and Operations Agreement (the "<u>Management Agreements</u>") The Management Agreements provided a mechanism for certain management companies (the "<u>Management Companies</u>") to operate certain Stations. The Management Companies are owned by Munadel Rizek, the brother of Muwafak Rizek, the Debtor's principal. The U.S. Trustee also raised concerns about the Debtor's litigation with Huntington National Bank.

On August 30, 2023, the U.S. Trustee filed a supplement to the Chapter 11 Trustee Motion [Docket No. 154] (the "<u>Supplement</u>"). In the Supplement alleged that the Debtor's principal had lost trust with the Illinois Lottery (a scheduled creditor) and that the Debtor's principal was indicted in Minnesota on three felony allegations.

On September 21, 2023, the U.S. Trustee filed a second supplement [Docket No. 214] (the "<u>Second Supplement</u>"), stating that post-petition, the Debtor had attempted to transfer two liquor licenses to a Management Company and that the City of Cincinnati had sued the Debtor under a public nuisance claim.

The U.S. Trustee asserted that, in light of the above-stated concerns about the Debtor's operations, cause existed to appoint a chapter 11 trustee. Specifically, the U.S. Trustee asserted that "[t]he Debtor's pre- and post- petition conduct, as described above, illustrates fraud, dishonesty, or gross mismanagement, or some combination of all three."

The U.S. Trustee and the Debtor reached an agreement with respect to the Chapter 11 Trustee Motion, and on November 15, 2023, the Bankruptcy Court entered an *Order Resolving United States Trustee's Motion to Appoint Chapter 11 Trustee and to Shorten Notice* [Docket No. 339] (the "<u>Chapter 11 Trustee Order</u>"). The Chapter 11 Trustee Order set certain deadlines for the Debtor to file a plan and disclosure statement and to obtain approval thereof. The Chapter 11 Trustee Order further stated "[i]f for any reason due to the fault of the Debtor the Debtor fails to meet any of the milestones set forth in paragraphs A – D, then the Debtor consents to entry of an order either (a) converting this case to one under chapter 7 or (b) appointing a chapter 11 trustee, whichever the Court believes to be in the best interests of creditors." Chapter 11 Trustee Order at 1.

The Debtor met some deadlines set forth in the Chapter 11 Trustee Order but failed to meet all of the deadlines. The Debtor and the U.S. Trustee agreed to continue the hearing on the Chapter 11 Trustee Order and the Debtor's Plan and the Debtor's Disclosure Statement until August 14, 2024.

On February 8, 2024, the U.S. Trustee filed a second motion to appoint a chapter 11 trustee [Docket No. 471] (the "Second Chapter 11 Trustee Motion"). In the Second Chapter 11 Trustee Motion, the U.S. Trustee raised concerns about the Debtor's honesty with respect to the value of the Freedom Medical Stations. The U.S. Trustee stated that cause existed to convert the case to chapter 7 or appoint a chapter 11 trustee because "the Debtor made material misrepresentations to this Court in the context of securing debtor in possession financing, failed to correct those misrepresentations for months, and did so only after the U.S. Trustee raised the issue in its objection to the Sale Motion." Second Chapter 11 Trustee Motion, ¶ 53.

On March 1, 2024, the U.S. Trustee withdrew the Second Chapter 11 Trustee Motion.

### vi. *Motions to Reject and Assume the CAP Agreements*

On July 12, 2023, CAP filed *CrossAmerica Partners LP's Motion for Entry of an Order Compelling Rejection of Agreements for Leased Stations or, Alternatively, Granting Relief from the Automatic Stay* [Docket No. 74] (the "Rejection Motion"), requesting entry of an order compelling the rejection of the CAP Agreements pursuant to sections 365(a), 365(b), and 105(a) of the Bankruptcy Code. The basis for the Rejection Motion was that CAP believed the Debtor was in default of the CAP Agreements and was unable to cure such breach.

The Debtor opposed the Rejection Motion and on September 1, 2023, filed the *Debtor's Response to CrossAmerica Partners, LP's Motion for Entry of an Order Compelling Rejection of Agreements for Leased Stations, or, Alternatively Granting Relief from Automatic Stay* [Docket No. 171] (the "Rejection Motion Response"). The Debtor believed (a) it was not in default of the CAP Agreements and (2) even if it were, there was no statutory authority for the Bankruptcy Court to compel the Debtor to reject executory contracts.

On September 18, 2023, the Debtor filed the *Debtor's Motion to Approve Assumption of CrossAmerica Partners LP, CAP Operations, Inc., Lehigh Gas Wholesale, LLC, LGP Realty Holdings, LP, Lehigh Gas Wholesale Services, Inc., and Erickson Oil Products, Inc. Agreements* [Docket No. 206] (the "Assumption Motion"), seeking authority to assume the CAP Agreements pursuant to section 365(a) of the Bankruptcy Code.

On November 15, 16, and 17, 2023, the Bankruptcy Court held an evidentiary hearing on the Rejection Motion and Assumption Motion and CAP and the Debtor each filed a post-trial brief on December 15, 2023. *See* Docket Nos. 369 and 371.

After taking the matter under advisement, on April 4, 2023, the Bankruptcy Court entered orders [Docket Nos. 554 and 555] granting the Assumption Motion and denying the Rejection Motion. The Bankruptcy Court issued an *Opinion* [Docket no. 553] explaining its reasoning for denying the Rejection Motion and granting the Assumption Motion.

Because the Debtor has assumed the CAP Agreements, the Debtor is now required to comply with all terms thereof. This includes complying with the Security and Cross Default Agreement, which requires the Debtor to maintain the entire Security Deposit with CAP until all leases encompassed in the CAP Agreements are terminated. In the Debtor's Disclosure Statement,

the Debtor asserts that it is currently entitled to a partial refund of the Security Deposit. Debtor's Disclosure Statement at 19. However, the Security and Cross Default Agreement clearly states that the Security Deposit "shall be returned to [the Debtor] no later than 120 days following the termination or expiration of last remaining [CAP Agreement], subject to the deduction for any sums due [CAP] with respect to each [CAP Agreement] unpaid at the time of such termination or expiration." Security and Cross Default Agreement § 1.B.

Under the CAP Agreements, the Debtor is also required to use authorized point-of-sale credit card equipment that is approved by CAP (the "<u>POS System</u>"). Under the POS System, credit card receipts are remitted to CAP in the first instance before being "swept" into the Debtor's designated bank account. However, the Debtor has used, and continues using, unauthorized credit card receipt systems that bypass the Debtor's normal flow of funds. The Proponents are not aware of whether the unauthorized credit card receipt systems deliver funds to the Debtor's designated bank account or somewhere else.

### vii. *Failure to Pay Lease Obligations*

The Debtor incurs monthly obligations to CAP for rent, property taxes, and other miscellaneous expenses associated with its leases with CAP (the "<u>Lease Obligations</u>"). In December 2023, the Debtor began a pattern of failing to fulfill its Lease Obligations. The below table shows each instance where a draft from the Debtor's bank account for Lease Obligations bounced.

| Date | Amount |
|---|---|
| 12/6/2023 | $33,659.83 |
| 12/6/2023 | $296,268.90 |
| 12/18/2023 | $70,399.66 |
| 12/18/2023 | $11,130.35 |
| 1/22/2024 | $25,191.40 |
| 1/29/2024 | $69,093.31 |
| 1/29/2024 | $13,189.21 |
| 3/8/2024 | $33,589.29 |
| 4/4/2024 | $160,757.13 |
| 4/22/2024 | $88,473.48 |
| 4/23/2024 | $63,336.46 |
| 7/5/2024 | $118,773.45 |
| 7/19/2024 | $75,408.31 |
| 8/13/2024 | $54,745.33 |
| **TOTAL** | $1,114,016.11 |

In sum, the Debtor has failed to pay approximately $1.14 million on time between December 2023 and August 2024. As of the filing of this Plan, the Debtor has caught up with its Lease Obligations. However, the persistent pattern of failing to pay Lease Obligations as they come due causes concerns for the Proponents as to whether the Debtor is capable of fulfilling its

obligations on a go-forward basis, including obligations under the Debtor's Plan. Currently, the Debtor is unable to fulfill even its most basic monthly obligations in a timely manner. The Proponents believe the Debtor's Plan is not remotely feasible because it assumes there will be sufficient revenue to cover the obligations the Debtor commits to under the Debtor's Plan and because the Debtor's Plan relies on meritless claims against CAP.

The Debtor alleges that its operating losses and 'bounced' payments to CAP were caused by CAP's alleged wrongful actions of (1) accelerating the Debtor's payment date of expenses owed to CAP to the date of delivery or one day thereafter in violation of the three or four day credit terms provided to IYS and (2) CAP's delaying transfer via sweeps to the Debtor of its funds. CAP disputes the Debtor's allegations.

viii. *Adversary Proceedings*

1. Adversary Proceeding 23-00167 Against Marks Supermarket NC, Inc.

The first adversary complaint was filed against Marks Supermarket NC, Inc. to avoid under § 547 of the Bankruptcy Code the mortgages securing the Marks Supermarket Loans as preferential transfers. IYS and Marks Supermarket NC, Inc. entered into a consent judgment avoiding such mortgages. The consent judgment was entered by the Bankruptcy Court and Marks Supermarket NC, Inc. filed a general unsecured claim in the sum of $5,200,000.00.

2. Adversary Proceeding 23-00168 Against Huntington National Bank

The second adversary proceeding was filed against Huntington National Bank to avoid its attachment order as a preferential transfer under § 547 of the Bankruptcy Code. IYS and Huntington National Bank entered into a consent judgment ordering that Huntington National Bank's liens against the Debtor's property would be set aside if a chapter 11 plan is confirmed or if the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code. The consent judgment was finalized and entered by the Bankruptcy Court on January 18, 2024 [Adv. Docket No. 18]. The Huntington Nation Bank adversary proceeding was dismissed on February 1, 2024.

3. Adversary Proceeding 23-00194 Against Itria Ventures, LLC, *et al.*

On July 6, 2023, the Debtor filed an adversary complaint against Itria Ventures, LLC, seeking a determination of the nature, extent, and priority if Itria Ventures, LLC, Fox Capital Group, Inc., Byzfunder NY, LLC, and Huntington National Bank's liens and interests in the property of the Debtor's Estate. The adversary complaint was later amended to add Eby-Brown Company, LLC as a defendant.

On May 8, 2024, the Bankruptcy Court entered *Consent Judgments* [Adv. Docket Nos. 57 and 58] negating all liens and security interests that were claimed or could be claimed by Byzfunder NY, LLC and Fox Capital Group, Inc.

On May 8, 2024, the Bankruptcy Court also entered the *Stipulated Judgement Determining Liens and Interests in Property of IYS Ventures, LLC* [Adv. Docket No. 59], which

stated, "Plaintiff and Itria agree that Itria holds a valid, non-avoidable and first-priority perfected general security interest in all property of the estate to secure a claim in the amount of $899,286.90 minus any adequate protection payments received by Itria during the course of the Chapter 11 case."

On May 8, 2024, the Bankruptcy Court also entered a *Judgment Determining Liens and Interests of the Huntington National Bank as Assignee in Property of IYS Ventures, LLC* [Adv. Docket No. 60], which stated that Huntington National Bank "holds a valid, non-avoidable and first perfected general security interest in that certain property of the estate described in the Joint-Pretrial Stipulation consisting of pumps and related equipment to secure its claim, with priority over all of the other Defendants in this Adversary Proceeding."

Accordingly, consent judgments were agreed to between and among the Debtor and all defendants except Eby-Brown Company, LLC. The Bankruptcy Court issued a *Memorandum Opinion* [Adv. Docket No. 62], in which the Bankruptcy Court held that "Eby-brown does not hold a perfected lien securing its debt, that its debt shall be subordinate and inferior to Debtor's status as hypothetical lien creditor, and that its interest is unsecured." *Memorandum Opinion* at 1–2.

### 4. Adversary Complaint 23-00352 ("PMPA Adversary") Against CAP

On November 14, 2023, IYS filed an adversary complaint (the "PMPA Complaint") against CAP. The PMPA Complaint alleged that CAP violated of the Petroleum Marketing Practices Act ("PMPA") and that CAP breached the CAP Agreements. On January 12, 2024, CAP filed a *Motion to Dismiss the Complaint* [Adv. Docket No. 10] (the "Motion to Dismiss"). The Motion to Dismiss asserted that the PMPA Complaint failed to state a claim upon which relief may be granted and that the PMPA Complaint addresses duplicative issues to the issues presented by the Rejection Motion and Assumption Motion. On March 13, 2024, the Bankruptcy Court heard oral arguments for and against the Motion to Dismiss. On September 26, 2024, the Court granted CAP's Motion to Dismiss with leave to amend, concluding that the Debtor failed to state any claims upon which relief could be granted. As of this date, the Debtor has not filed any amended complaint in the PMPA Adversary.

### 5. Adversary Complaint 24-00088 Against CAP

On April 3, 2024, the Debtor filed a four-count adversary complaint against CAP and three of its employees. The adversary complaint seeks injunctive relief and monetary damages and falsely alleges violations of the automatic stay, breach of contract, and tortious interference with business and business relationships. On May 23, 2024, CAP filed an answer and counter-claim [Adv. Docket No. 26] (the "Answer"), which includes communications from the Debtor's principal that undermine the Debtor's claims. CAP's Preliminary Statement in the Answer summarizes why the CAP Adversary has no value to the Estate:

This adversary proceeding is a waste of the Estate's resources and an attempt to harass Defendants. Plaintiff complains about inspections that the CAP Defendants have a contractual right to conduct and about a security deposit that the CAP Defendants have a contractual right to withhold. Plaintiff complains about the timing of fuel deliveries, but Defendants do not manage Plaintiff's fuel deliveries; either Plaintiff manages the deliveries or the deliveries are managed automatically. Plaintiff complains about Defendants' contact with third parties to facilitate the transition of stations that Plaintiff either suggested it would "pushback" or where the "pushback" actually occurred; Defendants made contact with the relevant third-parties to ensure a smooth transition and with Plaintiff's knowledge and consent. Finally, Plaintiff complains about impacts on its employees; however, Plaintiff has previously testified that Plaintiff has no employees. Meanwhile, the Debtor has continued to use unauthorized point of sale equipment at its stations in violation of the parties' contract; such unauthorized point of sale equipment diverts security from Lehigh Gas Wholesale LLC—and possibly from the Debtor's Estate.

On July 11, 2024, the Debtor filed a motion to dismiss CAP's counterclaim [Adv. Docket No. 32], stating that even if CAP's allegations are true, there is no basis for a claim because CAP has not suffered any damages on account of the Debtor's breach. On August 16, 2024, the Court denied the Debtor's motion to dismiss CAP's counterclaim, concluding that CAP has asserted a plausible claim for breach of the CAP Agreements based on the Debtor's use of unauthorized point-of-sale systems.

### ix. *The Debtor's Plan of Reorganization and Disclosure Statement*

As discussed above, the Debtor has filed the Debtor's Plan and the Debtor's Disclosure Statement. The Debtor's Plan is a plan of reorganization, rather than liquidation. Under the Debtor's Plan, Holders of General Unsecured Claims will be paid $800,000 over one (1) year, on account of Claims estimated at $25,632,517.85, for a total recovery of roughly 3%.

The Debtor's Plan assumes that the Debtor's projected income will exceed its projected expenses by enough to make the annual payments to Holders of General Unsecured Claims, in addition to payments to all other classes of claims. *See* Disclosure Statement, Ex. C ("Debtor's Cashflow Projections"). There is no guarantee that the Debtor will be able to make such payments as the Debtor has barely been able to pay its regular monthly expenses throughout the pendency of the Chapter 11 Case.

Indeed, throughout the Chapter 11 Case, the Debtor's actual net cashflow has consistently been lower than its projected net cashflow, notwithstanding the unanticipated proceeds from the sale of inventory at the Pushback Stations and the sale of the Freedom Medical Stations. The Debtor filed a Statement of Revenue & Expenses with its Second Amended Plan Dated July 17, 2024 [Docket No. 629-3] which showed a net loss of $1,509,999.61 from January 1, 2024, through June 30, 2024. The Debtor filed an updated Statement of Revenue & Expenses with its latest Plan which shows a net profit of $78,529.25 for the period between January 1, 2024, through September 30, 2024, with an increase of only $19,649.03 in total income [Docket No. 723-1]. The Debtor notes that in calculating the most recent Statement of Revenue & Expenses it

excluded payments of expenses to CAP [Docket 723-1]. However, the Debtor fails to detail the amount of expenses excluded or the reason why they were excluded. Accordingly, the Proponents believe that creditors would be better served by a plan of liquidation that does not rely on either the Debtor's projections, which omit necessary expenses, nor on the Debtor's continued operations, which have resulted in net losses when all the necessary expenses are accounted for, as shown in the Debtor's own Statement of Revenue & Expenses filed in July.

## III.    THE CAP SETTLEMENT

### a.    Standard for Settlements in Chapter 11 Cases

The Plan contemplates a settlement between CAP and the Debtor to resolve all outstanding litigation and to help fund the Plan. Section 1123(b)(3)(a) of the Bankruptcy Code provides that a plan may include "settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C § 1123(b)(3)(a). Section 1123(b)(6) further allows that a plan may "include any other provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). "But whether the claim is compromised as part of the plan or pursuant to a separate motion, the standards for approval of the compromise are the same." *In re Best Prod. Co., Inc*., 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994); *see Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968) ("Compromises are a normal part of the process of reorganization."). The Court has broad discretion under FED. R. BANKR. P. 9019(a) to approve the proposed settlement provided that it is in the best interests of the Estate. *In re Energy Co-op., Inc*., 886 F.2d 921, 927 (7th Cir. 1989) ("The benchmark for determining the propriety of a bankruptcy settlement is whether the settlement is in the best interests of the estate."). In order to make that determination, a court must compare "the value of the settlement with the probable costs and benefits of litigating." *In re Doctors Hosp. of Hyde Park, Inc*., 474 F.3d 421, 426 (7th Cir. 2007). Compromises are tools for expediting the administration of the case and reducing administrative costs and are favored in bankruptcy. See *Fogel v. Zell*, 221 F.3d 955, 960 (7th Cir. 2000). A settlement must fall within the reasonable range of possible litigation outcomes *Doctors Hosp.*, 474 F.3d at 426.

The Proponents submit that the CAP Settlement and the proposed compromise of the claims resolved thereunder is fair and reasonable under the circumstances, and in the best interests of the Debtor's Estate and creditors. Further, the settlement is within the reasonable range of possible litigation outcomes because the litigation at issue is without merit and a negative value to the Debtor's estate due to the accompanying and ever growing asserted professional fees. The CAP Settlement will help generate Cash to pay Creditors and fund an orderly wind-down process.

### b.    The CAP Settlement.

#### i.    Settlement Overview

In full and final settlement of the CAP Adversary Proceedings, any claims related to the Security Deposit, and any other Claims, known or unknown, asserted or unasserted, that arose before or after the Petition Date, that CAP may have against the Debtor and that the Debtor may have against CAP (the "CAP Settlement"), on the Effective Date, CAP and the Debtor shall

enter into the Mutual Termination Agreements. The Debtor, the Debtor's Estate, and the Liquidation Trust shall release any claims they may have against CAP, including any claims asserted in the CAP Adversary Proceedings and any claims relating to the Security Deposit. In return, CAP will (1) agree to purchase the Debtor's fuel and convenience store inventory as more fully set forth below and in the Mutual Termination Agreements, immediately generating the Cash upon which the Proponents' Plan relies to provide a return to creditors; and (2) pay to the Debtor, the Debtor's Estate, or the Liquidation Trust, the CAP Settlement Payment of $200,000.00, half of which shall be used solely for Distributions to Holders of Class 5 General Unsecured Claims and half of which shall be contributed to the Wind-Down Funds. Further, the Mutual Termination Agreements shall be entered into in lieu of the Debtor's rejection of the CAP Agreements pursuant to Section 365 of the Bankruptcy Code. Accordingly, CAP shall release any Claims it may have for the Debtor's prepetition or post-petition breach of the CAP Agreements, if any, including any Claims that could have arisen under section 365 of the Bankruptcy Code if the Debtor had rejected the CAP Agreements. Finally, CAP will immediately hire all of the Debtor's current employees who are employed at the Leased Stations, so operations at the Leased Stations will continue seamlessly.

### ii. Dismissal of the CAP Adversary Proceedings

On the Effective Date, or as soon as reasonably practicable thereafter, the Liquidation Trust and CAP shall file an agreed order dismissing the CAP Adversary Proceedings with prejudice. The PMPA Adversary Proceeding was dismissed by the Court once already and CAP maintains that any amendment is futile, and any further claim asserted by the Debtor for alleged violation of the PMPA or for breach of the CAP Agreements would be frivolous. The other CAP Adversary Proceeding, 24-00088, as discussed above, has no merit and is driving professional fees higher the longer it continues. Settling these two adversary proceedings is in the best interests of the estate and creditors.

### iii. The Mutual Termination Agreements

Pursuant to the Mutual Termination Agreements, CAP shall pay to the Debtor (a) an amount equal to the cost of the remaining fuel at the Marketing Premises; and (b) an amount equal to 67% of the retail value of the legal, saleable inventory at the Marketing Premises as determined by CAP in its sole discretion. On the Effective Date, or as soon as reasonably practicable thereafter, the Debtor shall surrender possession of the Leased Stations to CAP.

### iv. The Security Deposit and the CAP Settlement Payment

The Security and Cross-Default Agreement provides that the Security Deposit "shall be returned to [the Debtor] no later than 120 days following the termination or expiration of [the] last remaining [CAP Agreement], subject to the deduction for any sums due [CAP] with respect to each of the [CAP Agreements] unpaid at the time of such termination or expiration." Security and Cross-Default Agreement, § I.B. Pursuant to § 5.4 of the Fuel Supply Agreements, the Debtor was required, at its own expense, to maintain the Leased Stations, but failed to do so. CAP estimates that, upon termination of the CAP Agreements, CAP's expenses in repairing the Leased Stations (which may be deducted from the Security Deposit) will exceed the amount of the

Security Deposit. Accordingly, CAP estimates that the Debtor will not be entitled to receive any portion of the Security Deposit after entry into the Mutual Termination Agreements.

CAP asserts that its damages related to Debtor's failure to perform repair, maintenance, and technology compliance requirements under the CAP Agreements equal or exceed the amount of the Security Deposit.

On August 28, 2024, CAP filed its Motion to Allow and Compel Payment of Administrative Expense by Applying Debtor's Security Deposit to Satisfy Debtor's Obligations Under Assumed Agreements [Docket No. 661], asserting an administrative expense claim in the amount of $696,893.88, and providing the factual and legal support for such claim.

On September 20, 2024, the Debtor filed its Objection to CrossAmerica Partners, LP's Motion to Allow and Compel Payment of Administrative Expense by Applying Debtor's Security Deposit to Satisfy Debtor's Obligation Under Assumed Agreements [Docket No. 667], objecting to CAP's motion on procedural grounds and denying responsibility for the costs incurred by CAP, including $102,797 of expenses related to a station known as IL0084 that is not owned by the Debtor.

On October 2, 2024, CAP filed its Reply in Support of CrossAmerica Partners, LP's Motion to Allow and Compel Payment of Administrative Expense by Applying Debtor's Security Deposit to Satisfy Debtor's Obligations Under Assumed Agreements [Doc. 687], responding to the Debtor's objection and reducing its request for allowance of an administrative expense claim by $102,797 related to IL0084. Accordingly, CAP currently asserts an administrative expense claim in the amount of $594,094.88 related to the 22 Pushback Stations.

In addition to CAP's $594,094.88 asserted administrative expense claim related to the 22 Pushback Stations, CAP estimated damages related to Debtor's failure to perform repair, maintenance, and technology compliance requirements at the remaining 18 Leased Stations are $398,600, as detailed in <u>Exhibit B</u> hereto. Thus, CAP's total actual and estimated damages and administrative expense claim against the Debtor and the Estate, and payable from the Security Deposit is $992,694.88.

As consideration for the releases contained in the CAP Settlement, and in full settlement of any Claims the Debtor may have against the Security Deposit, or any other Claims the Debtor may have against CAP, including the Claims asserted in the CAP Adversary Proceedings, CAP will pay the CAP Settlement Payment of $200,000.00 to the Debtor, the Estate, or the Liquidation Trust. Further, CAP will release any Claim for damages in excess of the Security Deposit.

### v. The Huntington National Bank Claims

In full and final satisfaction of the Class 1(b) Claims, CAP shall pay to the Estate or the Liquidation Trust the Allowed amount of the Class 1(b) Claims and the Estate or the Liquidation Trust shall pay such Allowed amount to the holders of the Class 1(b) Claims. CAP may, in the alternative, pay to the Holders of Class 1(b) Claims the value of the Collateral securing

the Class 1(b) Claims in full and final satisfaction of such Class 1(b) Claims. In exchange, CAP shall receive the Collateral securing Class 1(b) Claims.

### vi. CAP's Continuing Relationship with Eby-Brown Company, LLC

After the Leased Stations are returned to CAP, CAP and Eby-Brown Company, LLC will enter into a contractual relationship whereby Eby-Brown Company, LLC will provide product distribution services with respect to the Leased Stations that are returned to CAP.

## IV.     TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### a.  **Administrative Claims and Priority Tax Claims**.

Except with respect to Administrative Claims that are Professional Fee Claims, Claims for U.S. Trustee Fees, Prepetition Secured Parties Claims, or subject to section 503(b)(1)(D) of the Bankruptcy Code, Holders of Administrative Claims **must File** and serve on the Liquidation Trustee **requests for payment**, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, so as to be actually received on or before the Administrative Claim Bar Date.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim or Allowed Priority Tax Claim, each Holder of an Allowed Administrative Claim or Allowed Priority Tax Claim will receive (as applicable) payment in full, as soon as practicable after (i) the Effective Date but in no event later than 30 days after the Administrative Claim Bar Date, or (ii) the date such Administrative Claim or Priority Tax Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court, to be paid in cash or pursuant to such other treatment as may be agreed upon by the Holder of such Claim and the Debtor or the Liquidation Trust, as applicable. Any Person or Entity who is required to timely file such request for payment but fails to do so shall not be treated as a creditor with respect to such Claim for Distribution purposes in this Chapter 11 Case on account of such Claim. The notice of the Effective Date of the Plan that will be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Administrative Claim Bar Date and shall constitute notice of such Administrative Claim Bar Date.

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("U.S. Trustee Fees") prior to the Effective Date shall be paid by the Debtor on the Effective Date. After the Effective Date, the Liquidation Trust (a "Disbursing Entity"), shall be liable to pay any and all U.S. Trustee Fees when due and payable. The Debtor shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. Within **two business days** of the Effective Date, the Liquidation Trust shall file a Notice of Occurrence of the Effective Date, identifying the Effective Date and indicating that it has occurred. After the Effective Date, the Liquidation Trust shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. The Liquidation Trust shall remain obligated to pay U.S. Trustee Fees to the Office of the U.S. Trustee until the earliest of the Chapter

11 Case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing or receiving any release under the Plan.

      b.   **Professional Fee Claims**.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed and served within 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders. The Professional Fee Reserve shall be maintained in trust solely for the exclusive benefit of the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been indefeasibly paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No liens, claims, or interests shall encumber the Professional Fee Reserve or Cash held in the Professional Fee Reserve in any way. Funds held in the Professional Fee Reserve shall not be considered property of the Estate or the Debtor or the Liquidation Trust.

Allowed Professional Fee Claims shall be paid from the Professional Fee Reserve or Cash in the other Reserves, as applicable, as and when such Claims are Allowed by entry of an order of the Bankruptcy Court. When all Allowed Professional Fee Claims have been indefeasibly paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Reserve shall promptly be transferred to the Post Effective Date Reserve for all purposes hereunder. Notwithstanding the foregoing, the Holder of an Allowed Professional Fee Claim may receive such other, less favorable treatment as may be agreed upon by such Holder and the Debtor.

From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Liquidation Trustee, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## V.   CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE, THEREFORE, SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE PROPONENTS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

      a.   **General Rules of Classification**.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those

related to the claims reconciliation process. Actual recoveries may vary widely within these ranges, and without any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by Creditors. The projected recoveries are based on information available to the Proponents as of the date hereof and reflect the Proponents estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in this Disclosure Statement, the Proponents emphasize that they make no representation as to the accuracy of these recovery estimates. The Proponents expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

All Claims and Interests except Administrative Claims and Priority Tax Claims are placed in the Classes set forth below. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation, and Distribution under the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtor's rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

| Class | Status / Voting | Projected Allowed Amount of Claims / Interests | Projected Recovery |
|---|---|---|---|
| **Class 1(a)** Itria Ventures, LLC | Unimpaired / Deemed to Accept | $837,000.00, not including allowed attorney fees | 100% |
| **Class 1(b)** Huntington National Bank | Unimpaired / Deemed to Accept | $100,000 | 100% |
| **Class 2(a)** Mercedes-Benz Financial Services USA LLC | Unimpaired / Deemed to Accept | $134,326.75 | 100% |
| **Class 2(b)** BMW Bank of North America | Unimpaired / Deemed to Accept | $258,800.67 | 100% |

| Class | Status / Voting | Projected Allowed Amount of Claims / Interests | Projected Recovery |
|-------|-----------------|-----------------------------------------------|--------------------|
| **Class 2(c)** Ally Bank | Unimpaired / Deemed to Accept | $30,433.86 | 100% |
| **Class 3** Other Secured Claims | Unimpaired / Deemed to Accept | $0 | 100% |
| **Class 4** Other Priority Claims | Unimpaired / Deemed to Accept | $0 | 100% |
| **Class 5** General Unsecured Claims | Impaired / Entitled to Vote | $25,732,014.04 | Approx. 0.4%–1% |
| **Class 6** Equity Interests | Impaired / Deemed to Reject | $0 | 0% |

### b. Unimpaired Class of Claims.

### Class 1(a): Itria Ventures, LLC Secured Claims.

(a) **Classification, Impairment, and Voting**

Class 1(a) shall consist of the Itria Ventures, LLC Secured Claims. The Class 1(a) Secured Claims are Unimpaired by the Plan and are, therefore, deemed to accept the Plan and not entitled to vote on the Plan.

(b) **Treatment**

Except to the extent that the Holder of an Itria Ventures, LLC Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the Effective Date or the date such Itria Ventures, LLC Secured Claim becomes an Allowed Secured Claim, the Holder of the Itria Ventures, LLC Secured Claim shall receive, in full and final satisfaction, settlement, compromise, and release of the Itria Ventures, LLC Secured Claim, Cash sufficient to pay the Allowed Itria Ventures, LLC Secured Claim in full from CAP's purchase of the Debtor's fuel and convenience store inventory pursuant to Mutual Termination Agreements contemplated by the CAP Settlement Agreement.

**Class 1(b): Huntington National Bank Secured Claims**.

(a)      **Classification, Impairment, and Voting**

Class 1(b) shall consist of the Huntington National Bank Secured Claim.  The Class 1(b) Secured Claim is Unimpaired by the Plan and is, therefore, deemed to accept the Plan and not entitled to vote on the Plan.

(b)      **Treatment**

Except to the extent that a Holder of a Huntington National Bank Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the Effective Date or the date such Huntington National Bank Secured Claim becomes an Allowed Secured Claim, each Holder of a Huntington National Bank Secured Claim shall receive, in full and final satisfaction, settlement, compromise, and release of each such Allowed Secured Claim:

  (i)     Cash, from CAP, in the amount of $100,000 in accordance with the terms of the CAP Settlement.

**Class 2(a): Mercedes-Benz Financial Services USA LLC Secured Claims**.

(a)      **Classification, Impairment, and Voting**

Class 2(a) shall consist of Mercedes-Benz Financial Services USA LLC Secured Claims.  The Class 2(a) Secured Claims are Unimpaired by the Plan and are, therefore, deemed to accept the Plan and not entitled to vote on the Plan.

(b)      **Treatment**

Except to the extent that a Holder of a Mercedes-Benz Financial Services USA LLC Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the Effective Date or the date such Mercedes-Benz Financial Services USA LLC Secured Claim becomes an Allowed Secured Claim, each Holder of a Mercedes-Bez Financial Services USA LLC Secured Claim shall receive, in full and final satisfaction, settlement, compromise, and release of each such Allowed Secured Claim:

  (i)     Cash equal to the value of such Holder's Allowed Mercedes-Benz Financial Services USA LLC Secured Claim; or

  (ii)    the return of the Holder's Collateral securing such Secured Claim; or

  (iii)   such other treatment rendering such Holder's Allowed Mercedes-Benz Financial Services USA LLC Secured Claim Unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code.

**Class 2(b): BMW Bank of North America Secured Claims**.

(a) **Classification, Impairment, and Voting**

Class 2(b) shall consist of BMW Bank of North America Secured Claims. The Class 2(b) Secured Claims are Unimpaired by the Plan and are, therefore, deemed to accept the Plan and not entitled to vote on the Plan.

(b) **Treatment**

Except to the extent that a Holder of a BMW Bank of North America Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the Effective Date or the date such BMW Bank of North America Secured Claim becomes an Allowed Secured Claim, each Holder of a BMW Bank of North America Secured Claim shall receive, in full and final satisfaction, settlement, compromise, and release of each such Allowed Secured Claim:

      (i)      Cash equal to the value of such Holder's Allowed BMW Bank of North America Secured Claim; or

      (ii)      the return of the Holder's Collateral securing such Secured Claim; or

      (iii)      such other treatment rendering such Holder's Allowed BMW Bank of North America Secured Claim Unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code.

**Class 2(c): Ally Bank Secured Claims**.

(a) **Classification, Impairment, and Voting**

Class 2(c) shall consist of Ally Bank Secured Claims. The Class 2(c) Secured Claims are Unimpaired by the Plan and are, therefore, deemed to accept the Plan and not entitled to vote on the Plan.

(b) **Treatment**

Except to the extent that a Holder of an Ally Bank Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the Effective Date or the date such Ally Bank Secured Claim becomes an Allowed Secured Claim, each Holder of an Ally Bank Secured Claim shall receive, in full and final satisfaction, settlement, compromise, and release of each such Allowed Claim:

      (i)      Cash equal to the value of such Holder's Allowed Ally Bank Secured Claim; or

<ol type="i" start="2">
<li>the return of the Holder's Collateral securing such Secured Claim; or</li>
<li>such other treatment rendering such Holder's Allowed Ally Bank Secured Claim Unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code.</li>
</ol>

**Class 3: Other Secured Claims**.

(a) **Classification, Impairment, and Voting**

Class 3 shall consist of Other Secured Claims. The Class 3 Secured Claims are Unimpaired by the Plan and are, therefore, deemed to accept the Plan and not entitled to vote on the Plan.

(b) **Treatment**

Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the Effective Date or the date such Other Secured Claim becomes an Allowed Secured Claim, each Holder of an Other Secured Claim shall receive, in full and final satisfaction, settlement, compromise, and release of each such Allowed Secured Claim:

<ol type="i">
<li>Cash equal to the value of such Holder's Allowed Other Secured Claim; or</li>
<li>the return of the Holder's Collateral securing such Secured Claim; or</li>
<li>such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code.</li>
</ol>

**Class 4: Other Priority Claims**.

(a) **Classification, Impairment, and Voting**

Class 4 shall consist of Other Priority Claims. The Class 4 Claims are Unimpaired by the Plan and are, therefore, deemed to accept the Plan and not entitled to vote on the Plan.

(b) **Treatment**

Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable or different treatment, on the Effective Date or the date such Other Priority Claim becomes an Allowed Claim, each Holder of an Other Priority Claim shall receive, in full and final satisfaction, settlement, compromise, and release of each such Allowed Claim:

(i)     Cash equal to the Allowed Amount of such Other Priority Claim.

**Class 5: General Unsecured Claims.**

(a)     **Classification, Impairment, and Voting**

Class 5 shall consist of all General Unsecured Claims against the Debtor.  Class 5 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

(a)     **Treatment**

Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such General Unsecured Claim becomes an Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, and release of such General Unsecured Claim,

(i)     Cash in an amount equal to its Pro Rata share among all Holders of General Unsecured Claims of the Distribution Fund, not to exceed the amount of such Allowed General Unsecured Claim.

**Class 6**:  **Interests in Debtor IYS Ventures, LLC**

(b)     **Classification, Impairment, and Voting**

Class 6 shall consist of all Interests in Debtor IYS Ventures, LLC.  Because Holders of such Class 6 Interests will not receive any Distribution or retain any property under the Plan, Holders of Class 6 Interests are deemed to reject the Plan and, therefore, not entitled to vote on the Plan.

(c)     **Treatment**

On the Effective Date, Interests in Debtor IYS Ventures, LLC shall be canceled, released, and expunged without any Distribution on account of such Interests, and such Interests will be of no further force or effect.

## VI.    <u>CONFIRMATION AND VOTING PROCEDURES</u>

a.  **Confirmation Procedure**.  On [ ], 2024, the Bankruptcy Court entered an order approving this Disclosure Statement for solicitation purposes and authorizing the Proponents to solicit votes to accept or reject the Plan.  The Confirmation Hearing will be scheduled by the Court at a later date.

b.  **Procedure for Objections**.  Any Objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served via email on (i) counsel for CrossAmerica Partners LP, Fox Rothschild LLP, 321 N. Clark Street, Chicago, Illinois 60654 (Attn.: Gordon E. Gouveia, ggouveia@foxrothschild.com

and Matthew R. Higgins, mhiggins@foxrothschild.com) (ii) the Office of the United States Trustee, 219 S. Dearborn Street, Suite 873, Chicago, Illinois 60604 (Attn.: Jeffrey L. Gansberg, Jeffrey.l.gansberg@usdoj.gov), by no later than [_], 2024, at 4:00 p.m. (prevailing Central Time). Unless an Objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

    **c.** **Requirements for Confirmation**. The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such rejecting Class. The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be presumed to have accepted the Plan.

    **d.** **Classification of Claims and Interests**.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).

The Bankruptcy Code also requires that a plan provide the same treatment for each Claim or Interest of a particular Class unless the Claim Holder or Interest Holder agrees to a less favorable treatment of its Claim or Interest. The Proponents believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan

only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Proponents believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If this occurs, the Proponents intend, in accordance with the terms of the Plan, to make such modifications to the Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by creditors. The projected recoveries are based on information available to the Proponents as of the date hereof and reflect the Proponents' views as of the date hereof only.

The Proponents believe that the consideration, if any, provided under the Plan to holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including contractual subordination, if any) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Proponents and the Liquidation

Trust reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### e. Impaired Claims or Interests.

Pursuant to section 1126 of the Bankruptcy Code, only classes of claims or interests that are Impaired under a plan may vote to accept or reject a plan. Under section 1124 of the Bankruptcy Code, a claim or interest is Impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an Impaired Class do not receive or retain any property under a plan on account of such claims or interests, such Impaired Class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, holders of Claims in Class 5 are Impaired and are entitled to vote on the Plan. Holders of Interests in Class 6 are Impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and deemed to reject the Plan under section 1126(g) of the Bankruptcy Code. Under the Plan, holders of Claims in Classes 1, 2, 3, and 4 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code.

### f. Confirmation without Necessary Acceptances

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.

In the event that any Impaired Class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all Impaired Classes, if the plan has been accepted by at least one Impaired Class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting Impaired Class of claims or interests. Here, because holders of Interests in Class 6 are deemed to reject the Plan, the Proponents may seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Proponents believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those in Class 5 will receive any property under the Plan. In addition, the Proponents reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Proponents believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with

the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Proponents believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

i. *Secured Creditors*. Either (i) each Impaired secured creditor retains its liens securing its secured claim and receives, on account of its secured claim, deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each Impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

ii. *Unsecured Creditors*. Either (i) each Impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the Plan.

iii. *Equity Interests*. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Proponents believe that the Distributions provided under the Plan satisfy the absolute priority rule, where required.

**g. Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the Plan). Inasmuch as substantially all of the Debtor's assets will be liquidated and the Plan provides for the Distribution of all of the Cash proceeds of the Debtor's assets to holders of Claims that are Allowed as of the Effective Date in accordance with the Plan, for purposes of this test, the Proponents have analyzed the ability of the Liquidation Trust to meet its obligations under the Plan. Based on the Proponents' analysis, the Liquidation Trust will have sufficient assets to accomplish its tasks under the Plan. Therefore, the Proponents believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

### h. Best Interests Test and Liquidation Analysis

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all Holders of claims or interests that are Impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an Impaired Class of Claims or Interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the Effective Date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable Distribution to holders of each Impaired Class of claims and interests if a debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its Chapter 11 Case were converted to a chapter 7 case under the Bankruptcy Code. To determine if a plan is in the best interests of each Impaired class, the present value of the Distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any Impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such Impaired class.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, there would be additional costs, expenses, and delays that the Estate would incur as a result of liquidating the Estate in a chapter 7 case. Additionally, the CAP Settlement, which includes a "gift" to the Holders of Class 5 General Unsecured Claims of $100,000, would not exist in a hypothetical chapter 7 liquidation. Further, in a hypothetical chapter 7 liquidation, CAP would be entitled to contract rejection damages in connection with the assumed CAP Agreements. Such rejection damages would be in excess of the Security Deposit. Because the Debtor has assumed the CAP Agreements post-petition, any Claims of CAP on account of rejection of the CAP Agreements would be entitled to administrative expense priority status. Therefore, the Proponents believe that creditors will receive Distributions faster and in greater amounts under this Plan than they would in any chapter 7 liquidation.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Proponents believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtor. Conversion also would likely delay the liquidation process and ultimately Distribution of the proceeds of assets of the Debtor's Estate. The Estate would also be obligated to pay all unpaid expenses incurred by the Debtor during the Chapter 11 Case (such as compensation for Professionals) that are allowed in the chapter 7 case.

For a more detailed description of a hypothetical liquidation scenario under chapter 7 as compared to the Plan, please also refer to the liquidation analysis attached hereto as **<u>Exhibit A</u>**, which is incorporated herein by reference.

Accordingly, the Proponents believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Case was converted to chapter 7, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

## VII.  RELEASE, INJUNCTION AND RELATED PROVISIONS OF PLAN

The Plan provides for release of Liens upon satisfaction of Allowed Secured Claims in Section 5.1.  The Plan further provides for the Debtor and the Estate to release any Released Claims against the Released Parties pursuant to Section 5.2 of the Plan.  The Plan further provides for exculpation of the Released Parties related to plan solicitation under Section 1125(e) of the Bankruptcy Code pursuant to Section 5.3 of the Plan.  Each of these plan provisions is set forth below.  For the avoidance of doubt, the Plan does not seek approval of any third-party releases.  The releases and the exculpation provision included in the Plan are an integral part of the Plan and the CAP Settlement.

The Proponents believe that the releases and exculpation provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Seventh Circuit. Moreover, the Proponents will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The releases, exculpation, and injunction provisions are set forth below and in Article V of the Plan.

Section 5.1 of the Plan entitled "Release of Liens" provides that:

Except as otherwise provided in the Plan, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtor elects to reinstate in accordance with Article III hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released, settled, compromised, and satisfied, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of the Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Liquidation Trustee to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.

The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

Section 5.2 of the Plan entitled "Releases by the Debtor" provides that:

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Debtor and the Liquidation Trust, on their own behalf and as a representative of the Estate, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Released Claims.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iii) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan, (v) Retained Causes of Action, (vi) defenses to any Claims filed, scheduled or asserted by any of the Released Parties, whether or not such defenses are to be brought by objections, complaints or other similar types of pleadings.

Section 1.90 of the Plan defines "Released Claims" as "any and all claims or Causes of Action, except for the Retained Actions, against the Released Parties, relating to any pre- or post-Petition Date acts or omissions, whether known or unknown, pertaining to the business activities and operations of the Debtor, the debts, liabilities, obligations and assets of the Debtor, the ownership, management, direction, or control of the Debtor, the Plan, or any transactions or communications among the Released Parties with respect to any of the foregoing" and provides that "Causes of Action, if any, against Muwafak Rizek are not Released Claims."

Section 1.91 of the Plan defines "Released Parties" as "the Proponents and their Related Parties, and provides that "Muwafak Rizek is not a Released Party."

Section 1.89 of the Plan defines "Related Parties" as the Released Parties' employees, officers, directors, shareholders, employees, agents, attorneys, accountants, advisors, affiliates, subsidiaries, and each of their successors and assigns.

Section 5.3 of the Plan entitled "No Liability Pursuant to Section 1125(e) of the Bankruptcy Code" provides that:

Without in any way limiting the releases and exculpation set forth in Sections 5.1 and 5.2 hereof, to the fullest extent permitted by section 1125(e) of the Bankruptcy

Code, each of the 1125(e) Parties is hereby entitled to all of the protections and benefits afforded by section 1125(e) in connection with such party's solicitation and participation in relation to the Plan.

Section 5.4 of the Plan entitled "Setoffs" provides that:

Except for Claims expressly allowed hereunder, on or after the Effective Date, the Liquidation Trust, may, pursuant to applicable law (including section 553 of the Bankruptcy Code), offset against any Claim, including an Administrative Claim, before any Distribution is made on account of such Claim, any and all of the claims, rights and Causes of Action of any nature that the Debtor or the Liquidation Trust may hold against the Holder of such Claim.

Section 5.5 of the Plan entitled "Binding Effect" provides that:

This Plan shall be binding upon and inure to the benefit of the Debtor, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Liquidation Trust and the Liquidation Trustee.

Section 5.6 of the Plan entitled "Terms of Injunctions or Stays" provides that:

Unless otherwise provided in this Plan, all injunctions or stays provided for in this Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until this Chapter 11 Case is closed.

## VIII.  CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND ASSOCIATED DOCUMENTS BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### a.      The Plan May Not Be Accepted.

The Proponents can make no assurances that the requisite acceptances to the Plan will be received, and the Proponents may need to obtain acceptances to an alternative plan of liquidation for the Debtor, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Plan.

### b. The Plan May Not Be Confirmed.

Even if the Proponents receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan. Even if the Bankruptcy Court determined that the Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what Distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent liquidation.

### c. Distributions to Holders of Allowed Claims Under the Plan May Be Inconsistent with Projections.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Proponents' estimates. If the total amount of Allowed Claims in a Class is higher than the Proponents' estimates, or the funds available for Distribution to such Class are lower than the Proponents' estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

### d. Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Proponents believe that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Proponents would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Proponents will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member. The Proponents believe that they would be required to resolicit votes for

or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Proponents believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

       **e.**       **Failure to Consummate the Plan**.

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

       **f.**       **Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan**.

There can be no assurance that the estimated Claim amounts set forth in the Plan are correct, and the actual allowed amounts of Claims may differ from the estimates. The estimated amounts are based on certain assumptions with respect to a variety of factors. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein, thereby materially reducing the recovery to the Holders of Class 5 General Unsecured Claims under the Plan.

       **g.**       **Plan Releases May Not Be Approved**.

There can be no assurance that the releases, as provided in Article V of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a chapter 11 plan that differs from the Plan or the Plan not being confirmed.

       **h.**       **Certain Tax Considerations**.

There are a number of material income tax considerations, risks and uncertainties associated with the Plan described herein.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE

AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## IX. MEANS OF IMPLEMENTING THE PLAN

### a. General

Upon confirmation of the Plan, and in accordance with the Confirmation Order, the Debtor or the Liquidation Trust, as applicable, will be authorized to take all necessary or appropriate steps, and perform all necessary or appropriate acts, to consummate the terms and conditions of the Plan. Such actions may include: (a) the execution and delivery of appropriate agreements or other documents that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; and (c) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

### b. The CAP Settlement.

#### i. Settlement Overview

As discussed more fully in Article III herein, in full and final settlement of the CAP Adversary Proceedings, any claims related to the Security Deposit, and any other Claims, known or unknown, asserted or unasserted, that arose before or after the Petition Date, that CAP may have against the Debtor and that the Debtor may have against CAP (the "CAP Settlement"), on the Effective Date, CAP and the Debtor shall enter into the Mutual Termination Agreements. The Debtor, the Debtor's Estate, and the Liquidation Trust shall release any claims they may have against CAP, including any claims asserted in the CAP Adversary Proceedings and any claims relating to the Security Deposit. In return, CAP will (1) agree to purchase the Debtor's fuel and convenience store inventory as more fully set forth above and in the Mutual Termination Agreements, immediately generating the Cash upon which the Proponents' Plan relies to provide a return to creditors; and (2) pay to the Debtor, the Debtor's Estate, or the Liquidation Trust, the CAP Settlement Payment of $200,000.00, half of which shall be used solely for Distributions to Holders of Class 5 General Unsecured Claims and half of which shall be contributed to the Wind-Down Funds. Further, the Mutual Termination Agreements shall be entered into in lieu of the Debtor's rejection of the CAP Agreements pursuant to Section 365 of the Bankruptcy Code. Accordingly, CAP shall release any Claims it may have for the Debtor's prepetition or post-petition breach of the CAP Agreements, if any, including any Claims that could have arisen under section 365 of the Bankruptcy Code if the Debtor had rejected the CAP Agreements. Finally, CAP

will immediately hire all of the Debtor's current employees who are employed at the Leased Stations, so operations at the Leased Stations will continue seamlessly.

### c. Liquidation Trust[2]

#### i. Creation of Liquidation Trust.

On or prior to the Effective Date, the Liquidation Trustee and the Debtor shall execute the IYS Liquidation Trust Agreement a copy of which is attached as **Exhibit 1** to the Plan. The Liquidation Trust shall become effective on the Effective Date. On the Effective Date, the Liquidation Trust shall be deemed to be valid, binding and enforceable in accordance with the terms and provisions of the Plan and the Liquidation Trust Agreement. After the Effective Date, the Liquidation Trust Agreement may be amended in accordance with its terms without further order of the Bankruptcy Court.

#### ii. Purpose of the Liquidation Trust.

On the Effective Date, the Liquidation Trust shall be created for the purposes of (a) winding down the Debtor's business and affairs as expeditiously as reasonably possible and liquidating any assets held by the Liquidation Trust after the Effective Date, (b) resolving any Disputed Claims, (c) paying or otherwise satisfying Allowed Claims, (d) filing appropriate tax returns, and (e) administering the Plan in an efficacious manner. The Liquidation Trust shall be deemed to be substituted as the party-in-lieu of the Debtor in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forum, or administrative proceedings outside of the Bankruptcy Court, in each case without the requirement or need for the Liquidation Trustee to file motions or substitutions of parties or counsel in each such matter. It is intended that the Liquidation Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d). Although the Liquidation Trust shall not be deemed a successor of the Debtor, any privileges held by the Debtor shall be transferred to the Liquidation Trust, provided, however, that such transfer does not impair or waive any privilege.

#### iii. Transfer of Assets to the Liquidation Trust.

Upon the occurrence of the Effective Date, any Estate non-Cash assets remaining shall vest in the Liquidation Trust for the purpose of administering the Estate and consummating the Plan. Such assets shall be held free and clear of all Liens, claims, and interests of Holders of Claims and Interests, except as otherwise expressly provided in this Plan. Any distributions to be made under the Plan from such assets shall be made by the Liquidation Trustee or its designee. The Liquidation Trust and the Liquidation Trustee shall be deemed to be fully bound by the terms of the Plan, the Liquidation Trust Agreement, and the Confirmation Order.

### iv.  Dissolution of Debtor.

At any time after the Effective Date, the Liquidation Trustee shall be authorized to dissolve the Debtor upon filing a notice of such dissolution with the Bankruptcy Court, notwithstanding any requirements of applicable state law, without the necessity for any other or further actions to be taken by or on behalf of the Debtor or payments to be made in connection therewith.

### d.  Liquidation Trustee.

### i.  Appointment.

The Liquidation Trustee shall be Creative Planning Business Alliance LLC with James Busk as the designated representative as further described in the IYS Liquidation Trust Agreement.  The curriculum vitae of James Busk is attached as **Exhibit C**.  The appointment of the Liquidation Trustee shall be effective as of the Effective Date.  Successor Liquidation Trustee(s) shall be appointed in accordance with this Plan and the IYS Liquidation Trust Agreement.

### ii.  Powers and Duties.

The Liquidation Trustee shall act for the Liquidation Trust, subject to the provisions hereof (and all certificates of incorporation, bylaws, shareholder agreements, and related documents are deemed amended by the Plan to permit and authorize same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the Debtor shall be deemed to have resigned, solely in their capacities as such, and the Liquidation Trustee shall succeed to the powers of the Debtor's officers.  From and after the Effective Date, the Liquidation Trustee shall be the sole representative of, and shall act for, the Liquidation Trust.  For the avoidance of doubt, the foregoing shall not limit the authority of the Liquidation Trust or Liquidation Trustee, as applicable, to continue the employment of any former officer, employee, or other agent or representative.

The powers of the Liquidation Trustee shall include any and all powers and authority to implement the Plan and to make distributions thereunder and wind-down the businesses and affairs of the Debtor and the Liquidation Trust, as applicable, including, without limitation:

> a.  To exercise all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced and take all actions that may be or could have been taken by the Debtor with like effect as, if authorized, exercised and taken by unanimous action of the Debtor's partners, members, officers, and equity holders; including, without limitation, amendment of the articles of organization and by-laws of the Debtor, the dissolution of the Debtor and the assertion or waiver of the Debtor's attorney/client privilege;

> b.  to open and maintain bank and other deposit accounts, escrows and other accounts, calculate and implement Distributions to Holders of Allowed Claims

38

as provided for or contemplated by the Plan and take other actions consistent with the Plan and the implementation thereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate Reserves in accordance with this Plan, in the name of the Debtor or the Liquidation Trust, even in the event of the dissolution of the Debtor;

       c.      to make a good faith valuation of the non-Cash assets of the Estate;

       d.      subject to the applicable provisions of the Plan, to collect and liquidate all Residual Assets pursuant to the Plan, to make Distributions generated by the sale or disposition of Residual Assets and to administer the winding-up of the affairs of the Debtor;

       e.      to object to any Claims (Disputed or otherwise), including any Administrative Claims and Professional Fee Claims, and to defend, compromise and/or settle any Claims prior to or following objection without the necessity of notice or approval of the Bankruptcy Court;

       f.      to make decisions without further Bankruptcy Court approval, regarding the retention or engagement of professionals, employees and consultants by the Liquidation Trust or Liquidation Trustee, including (i) the charges incurred on or after the Effective Date for services of professionals, without application to the Bankruptcy Court, and (ii) disbursements, expenses or related support services relating to the winding down of the Debtor and implementation of the Plan, without application to the Bankruptcy Court;

       g.      to cause, on behalf of the Debtor, the Liquidation Trust, and their Estates all necessary tax returns and all other appropriate or necessary documents related to municipal, State, Federal or other tax law to be prepared or filed timely, in accordance with the Plan; *provided*, that the Liquidation Trustee, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's chapter 11 case, as determined under applicable tax laws;

       h.      to enter into any agreement or execute any document required by or consistent with the Plan and perform all of the obligations of the Debtor or the Liquidation Trust hereunder;

       i.      to abandon property or unclaimed funds in any commercially reasonable manner, including abandonment or donation to a charitable organization, any assets that the Liquidation Trustee determines, at the conclusion of the Chapter 11 Case, are of no benefit to creditors of the Debtor or too impractical to distribute;

       j.      to investigate (including pursuant to Bankruptcy Rule 2004), prosecute and/or settle any Retained Action, participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction, participate

as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding, litigate, or settle such Retained Actions on behalf of the Liquidation Trust and pursue to settlement or judgment such actions;

k.       to use assets of the Liquidation Trust to purchase or create and carry all appropriate insurance policies, bonds or other means of assurance and protection of the Liquidation Trust and Liquidation Trustee and pay all insurance premiums and other costs he or she deems necessary or advisable to insure the acts and omissions of the Liquidation Trustee and its representatives;

l.       to implement and/or enforce all provisions of this Plan;

m.       to maintain appropriate books and records (including financial books and records) to govern the distributions hereunder;

n.       as and to the extent set forth in Article 4 hereof, to pay fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and to file with the Bankruptcy Court and serve on the United States Trustee quarterly post-confirmation financial reports for the Debtor until such time as such reports are no longer required, or the Bankruptcy Court orders otherwise, a final decree is entered closing this Chapter 11 Case or this Chapter 11 Case is converted or dismissed;

o.       to dissolve the Liquidation Trust if the Liquidation Trustee determines, in reasonable reliance on such professionals as it may retain, that the expense of administering the Liquidation Trust so as to make a final Distribution to Holders of Allowed Claims is likely to exceed the value of the remaining assets;

p.       to seek one or more final decrees closing the Chapter 11 Case; and

q.       to do all other acts or things consistent with the provisions of this Plan that the Liquidation Trustee deems reasonably necessary or desirable with respect to implementing the Plan.

### iii.  Compensation.

The Liquidation Trustee's compensation, on a post-Effective Date basis, shall be as described in the IYS Liquidation Trust Agreement.

### iv.  Post Effective Date Reserve.

The Liquidation Trustee shall be authorized to establish and fund a Post Effective Date Reserve with an amount of Cash, inclusive of the Wind-Down Funds, it deems necessary or appropriate to satisfy future costs and expenses for the implementation of the Plan and discharge of its duties hereunder. The Post Effective Date Reserve shall be used by the Liquidation Trustee solely to satisfy the distributions set forth herein and the expenses of the Liquidation Trust and the Liquidation Trustee as set forth herein. The Liquidation Trustee is authorized, but not directed, in accordance with its business judgment, to establish and fund one or more reserves, which shall be

deemed part of the Post Effective Date Reserve, in specific amounts from the Post Effective Date Reserve as necessary or appropriate to discharge its duties and make distributions hereunder. In no event shall the Liquidation Trustee be required or permitted to use its personal funds or assets for such purposes.

### v. Limitation of Liability; Exculpation of Liquidation Trustee.

To the extent provided for under applicable Illinois law and/or as provided for in any applicable governing documents, the Liquidation Trustee and all professionals retained by the Liquidation Trust or Liquidation Trustee, as applicable, each in their capacities as such, shall be deemed exculpated and indemnified, except for gross negligence, willful misconduct, bad faith, reckless disregard of any duty, self-dealing, fraud, or a criminal act in the performance of its duties, in all respects by the Liquidation Trust; provided, however, that the foregoing indemnification shall be subject to the parameters, if any, established by any applicable professional rules of responsibility governing such professional; *provided, further, however,* that the Liquidation Trustee may seek a further exculpation consistent with Article 5 of the Plan in connection with the closing of this Chapter 11 Case. The Liquidation Trustee and any such professionals may rely upon written information previously generated by the Debtor.

### vi. Successor Liquidation Trustee(s).

The Liquidation Trustee may resign at any time upon 30 days' written notice; *provided*, that such resignation shall only become effective upon the appointment of a permanent or interim successor Liquidation Trustee. Upon its appointment, the successor Liquidation Trustee, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Liquidation Trustee relating to the Liquidation Trust shall be terminated.

### e. Cancellation of Existing Securities and Agreements.

Except as otherwise provided in this Plan, and in any contract, instrument or other agreement or document created in connection with this Plan, on the Effective Date, the Interests and any other promissory notes, other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, and commitments, including, without limitation, any agreements purporting to relate to deferred compensation that relate to Interests or options, shall be deemed cancelled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtor under the notes and other agreements and instruments governing such Claims and Interests shall be released; *provided, however*, that the cancellation, release, and discharge of the foregoing shall not affect whether a timely Claim made on account of such obligation may become an Allowed Claim; *provided, further, however,* that certain instruments, documents, and credit agreements related to Claims shall continue in effect solely for the purpose of allowing the Liquidation Trustee to make Distributions in accordance with this Plan. The Holders of or parties to such cancelled notes, share certificates, and other agreements and instruments, shall have no rights against the Debtor, the Estate, and the Liquidation Trust or the Liquidation Trustee arising from or relating to such notes

41

and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to this Plan.

**f.      Exemption from Certain Transfer Taxes.**

Pursuant to Bankruptcy Code section 1146(a), any transfers from the Debtor to any other Entity pursuant to this Plan, shall not be subject to any stamp tax or similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any applicable instruments or documents without the payment of any such tax or governmental assessment

**g.      Preservation of Retained Actions.**

Unless a Retained Action against any Entity is expressly waived, relinquished, released, compromised, exculpated, or settled pursuant to this Plan or any Final Order, the Debtor expressly reserves such Retained Action to be vested in the Liquidation Trust for possible prosecution by the Liquidation Trustee, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Actions upon or after the entry of the Confirmation Order or Effective Date based on the Plan or the Confirmation Order, except where such Retained Actions have been waived, relinquished, released, compromised, exculpated, or settled pursuant to the Plan or any Final Order (including the Confirmation Order). In accordance with section 1123(b) of the Bankruptcy Code, the Liquidation Trust may enforce all rights to commence and pursue, as appropriate, any and all such Retained Actions, whether arising prior to or after the Petition Date, and the Liquidation Trust's rights to commence, prosecute, or settle any such Retained Actions shall be preserved notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date.

The failure of the Debtor to list a claim, right, cause of action, suit or proceeding shall not constitute a waiver or release by the Debtor or their Estates of such claim, right of action, suit or proceeding. **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Retained Actions against them as any indication that the Liquidation Trustee will not pursue any and all available Retained Actions against them. The Debtor or the Liquidation Trustee, as applicable, expressly reserve all rights to investigate and prosecute, but are not obligated to, any and all Causes of Action against any Entity, except as otherwise expressly provided herein, including Article V of the Plan.**

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Action that the Debtor may hold against any Entity shall vest in the Liquidation Trust. In addition, the Liquidation Trustee reserves the right to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits. After the Effective Date, the Liquidation Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Retained Action and

to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**h.      Closing the Chapter 11 Case.**

The Liquidation Trustee intends to file a motion to close the Chapter 11 Case under the Bankruptcy Rules and Local Rules as soon as reasonably practicable.

## X.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**a.      Rejection of Executory Contracts and Unexpired Leases.**

Except as otherwise provided in the Confirmation Order, the Plan, any other Plan Document, the Bar Date Order, or any other relevant order of the Bankruptcy Court, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code rejecting all prepetition Executory Contracts or Leases to which the Debtor is a party, to the extent such contracts or leases are Executory Contracts or Leases, on and subject to the occurrence of the Effective Date; *provided*, *however*, that as to all policies and agreements giving rise to insurance in favor of the Debtor or its Estate, the Debtor believes that the insurance agreements of the Debtor are not Executory Contracts or Leases and therefore are not subject to assumption or rejection. To the extent that an insurance policy or agreement is determined to be an Executory Contract or Lease subject to assumption by the Debtor, such executory insurance policy or agreement, as the case may be, is hereby assumed and assigned to, and shall vest with, the Liquidation Trust. For the avoidance of doubt, all insurance policies and agreements of the Debtor, and all obligations of the Debtor and the other counterparties thereto, shall be unaffected by the Plan and shall remain enforceable according to their terms and applicable law.

**b.      Supplemental Bar Date for Rejection Damages.**

If the rejection of any Executory Contract or Lease under the Plan gives rise to a Claim by the non-Debtor party or parties to such Executory Contract or Lease, such Claim, to the extent that it is timely filed and is an Allowed Claim, shall be classified in Class 5; *provided*, *however*, that any potential General Unsecured Claim arising from such rejection shall be forever barred and shall not be enforceable against the Debtor, the Liquidation Trust, their successors or properties, unless a proof of such Claim is filed and served on the Debtor or the Liquidation Trust, as applicable, within thirty (30) days after the date of notice of the entry of the order of the Bankruptcy Court rejecting the Executory Contract or Lease (which may include the Confirmation Order).

**c.      Insurance Policies**.

All of the Debtor's Insurance Policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtor shall be deemed to have assumed all Insurance Policies and any agreements, documents and instruments related thereto. Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtor shall assume (and assign to the Liquidation Trust if necessary to continue the Insurance Policies in full force) all of the Insurance Policies

pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor's assumption of the Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption of the Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan as to which no Proof of Claim need be Filed.

XI.    **DISTRIBUTIONS**

a.    **Distributions for Claims Allowed as of the Effective Date.**

Except as otherwise provided in the Plan, and only after the funding of the Reserves, or as ordered by the Bankruptcy Court, all Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on a Distribution Date. Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made pursuant to the terms and conditions of this Plan. Notwithstanding any other provision of the Plan to the contrary, no Distribution shall be made on account of any Claim or portion thereof that (i) has been satisfied after the Petition Date pursuant to an order of the Bankruptcy Court; (ii) is listed in the Schedules as contingent, unliquidated, disputed or in a zero amount, and for which a proof of Claim has not been timely filed; or (iii) is evidenced by a proof of Claim that has been amended by a subsequently filed proof of Claim that purports to amend the prior proof of Claim.

b.    **No Distributions on Disputed Claims.**

No Distribution shall be made by the Liquidation Trust with respect to a Disputed Claim until the same, or some portion thereof, becomes an Allowed Claim.

c.    **Distributions on Claims Allowed after the Effective Date.**

Payments and Distributions from the Liquidation Trust to each respective Holder on account of a Disputed Claim, to the extent that such Disputed Claim ultimately becomes an Allowed Claim, shall be made in accordance with provisions of the Plan that govern Distributions to such Holders of Allowed Claims. Except as otherwise provided in the Plan, within ninety (90) days after such Disputed Claim becomes an Allowed Claim, the Liquidation Trustee shall distribute to such Holder any property from the applicable Reserve or the Liquidation Trust that would have been distributed on the dates Distributions were previously made to Holders of Allowed Claims if such Disputed Claim had been an Allowed Claim on such dates.

All Distributions made under Article VII of the Plan on account of an Allowed Claim will be as if such Disputed Claim had been an Allowed Claim on the dates Distributions were previously made to, or reserved for, Holders of Allowed Claims included in the applicable Class.

### d. Objections to and Estimation of Claims.

Unless otherwise provided in the Plan, after the Effective Date, the Liquidation Trustee shall have standing to object to Claims in order to have the Bankruptcy Court determine the amount and treatment of any Claim; *provided*, that, for the avoidance of doubt, nothing herein shall be deemed to prejudice any other party in interest with requisite standing from interposing an objection in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and any order of the Bankruptcy Court. From and after the Effective Date, the Liquidation Trustee may settle or compromise any Disputed Claim without notice or approval of the Bankruptcy Court. Except as otherwise provided in the Plan, if a party files a Proof of Claim and (i) the Debtor or the Liquidation Trustee, as applicable, file an objection to that Claim or otherwise formally challenge the Claim or (ii) the Claim otherwise is a Disputed Claim under this Plan, then such Claim shall be Disputed unless Allowed or Disallowed by a Final Order or as otherwise set forth in the Plan. Except as otherwise provided in the Plan, all Proofs of Claim filed after the Effective Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Debtor or the Estates, without the need for any objection by the Liquidation Trustee or any further notice to or action, order, or approval of the Bankruptcy Court.

### e. Delivery of Distributions and Undeliverable or Unclaimed Distributions.

Distributions to Holders of Allowed Claims shall be made at such Holder's Distribution Address.

Distributions shall be made from the Liquidation Trust, as applicable, in accordance with the terms of the Plan.

In making Distributions under the Plan, the Liquidation Trustee may rely upon the accuracy of the claims register as modified by any Final Order of the Bankruptcy Court disallowing Claims in whole or in part.

To be eligible to receive a Distribution under the Plan, the Holder of an Allowed Claim must complete and return to the Liquidation Trustee the appropriate Form W-8 or Form W-9, as applicable, to each Holder.

If the Distribution to any Holder of an Allowed Claim is returned to the Liquidation Trustee as undeliverable or is otherwise an Unclaimed Distribution, no further Distributions shall be made to such Holder unless and until the Liquidation Trustee is notified in writing of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest. If a Distribution is returned as undeliverable, the Liquidation Trustee shall use reasonable efforts to determine such Creditor's then-current address. Unclaimed Distributions shall be returned to the Liquidation Trust until such Distributions are claimed.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an Unclaimed Distribution within three (3) months after the final Distribution Date shall be deemed to have forfeited its Claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such Claim for an Unclaimed Distribution against the Debtor and its Estate, the Liquidation Trustee, the Liquidation Trust, and their respective

agents, attorneys, representatives, employees or independent contractors, and/or any of its and their property. In such cases, any Cash otherwise reserved for Unclaimed Distributions shall become the property of the Liquidation Trust free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be distributed in accordance with the terms of this Plan. Nothing contained in this Plan shall require the Debtor or the Liquidation Trustee to attempt to locate any Holder of an Allowed Claim; *provided*, *however*, that in his / her sole discretion, the Liquidation Trustee may periodically publish notice of Unclaimed Distributions.

**f.** **Interest on Claims.**

Except as specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim. Except as specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

**g.** **Withholding and Reporting Requirements.**

In connection with the Plan and all Distributions under the Plan, the Liquidation Trustee shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding, payment, and reporting requirements. The Liquidation Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder.

All Entities holding Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes. No Distribution shall be made to or on behalf of such Entity pursuant to the Plan unless and until such Entity has furnished such information. Any property to be distributed pursuant to the Plan shall be deemed: (i) pending the receipt of such information in the manner established by the Liquidation Trustee, an Undeliverable Distribution pursuant to Section 7.5 of the Plan; or (ii) if such information is not received by the deadline established by the Liquidation Trustee and approved by the Bankruptcy Court upon notice and a hearing, forfeited and treated in accordance with Section 7.5 of the Plan.

Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Liquidation Trustee for the

payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Liquidation Trustee in connection with such Distribution.

**h.** **Miscellaneous Distribution Provisions**.

**i.** **Method of Cash Distributions.** Any Cash payment to be made by the Liquidation Trust pursuant to this Plan will be in U.S. dollars and may be made, at the sole discretion of the Liquidation Trustee, by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law. In the case of foreign creditors, Cash payments may be made, at the option of the Liquidation Trust, in such funds and by such means as are necessary or customary in a particular jurisdiction.

**ii.** **Distributions on Non-Business Days**. Any payment or Distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

**iii.** *De Minimis Distribution Provisions*. No Distribution shall be required to be made hereunder to any Holder of a Claim unless such Holder is to receive in such Distribution at least $100. Any such Distribution not made in accordance with the provisions of this Article VII shall be retained by the Liquidation Trust and invested as provided in this Plan. Any Distribution not made in accordance with this Article VII to such Holder, shall be held in trust for the relevant Holder until the earlier of (x) the date the next Distribution is scheduled to be made to such Holder; *provided, however*, that such subsequent Distribution, taken together with amounts retained hereby, equals at least $100.

**iv.** **Distribution Record Date**. As of the close of business on the Distribution Record Date, the various lists of Holders of Claims and Interests in each of the Classes, as maintained by the Debtor, or their agents, shall be deemed closed and there shall be no further changes in the record Holders of any of the Claims or Interests. Neither the Liquidation Trust nor the Liquidation Trustee will have any obligation to recognize the transfer of or sale of any participation in any Allowed Claim that occurs after the close of business on a Distribution Record Date, and will be entitled for all purposes herein to recognize, deal with and distribute only to those Holders of Allowed Claims who are record Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date, as stated on the official claims register.

### i. Adjustment to Claims Without Objection.

Any Claim that has been paid or satisfied, amended, or superseded may be marked as satisfied, adjusted or expunged on the Claims Register by the Liquidating Trustee or the Liquidation Trust without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### j. Disallowance of Untimely Claims.

Claims for which proofs of claim or requests for allowance were required to be filed by a Bar Date occurring before the Effective Date, and with respect to which no proof of claim or request for allowance was filed before the applicable Bar Date, shall be forever Disallowed, barred, and discharged in their entirety as of the Effective Date, and shall not be enforceable against the Debtor, the Liquidation Trust, or the Debtor's Estate, unless such proofs of claim or requests for allowance are deemed timely filed by a Final Order of the Bankruptcy Court before the Effective Date.

### XII. RECOMMENDATION AND CONCLUSION

The Proponents believe that the Plan is in the best interests of the Estate and creditors and urge the Holders of Impaired Claims who are entitled to vote to timely return their Ballots with a vote in favor of the Plan.

**CrossAmerica Partners LP**

By: */s/ Robert Brecker*
Name: Robert Brecker
Title: Executive Vice President of Operations

Dated: November 14, 2024          **CrossAmerica Partners LP**

*/s/ Gordon E. Gouveia*
One of its attorneys

FOX ROTHSCHILD LLP
Gordon E. Gouveia (#6282986)
Peter C. Buckley (admitted *pro hac vice*)
Matthew R. Higgins (#6336039)
321 North Clark Street, Suite 1600
Chicago, IL 60654
Telephone: (312) 980-3816
Facsimile: (312) 517-9201
Email: ggouveia@foxrothschild.com