UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| IYS VENTURES LLC, | ) | Case No. 23-06782 |
| | ) | |
| Debtor. | ) | Hon. David D. Cleary |

**SECOND AMENDED DISCLOSURE STATEMENT TO
SECOND AMENDED PLAN OF REORGANIZATION
FILED BY IYS VENTURES, LLC**

**Dated: November 14, 2024**

Gregory K. Stern, Esq.
Monica C. O'Brien, Esq.
Dennis E. Quaid, Esq.
Rachel S. Sandler, Esq.
GREGORY K. STERN, P.C.
53 West Jackson Boulevard
Suite 1442
Chicago, Illinois 60604
(312) 427-1558

## ATTORNEYS FOR DEBTOR AND DEBTOR IN POSSESSION

**SECOND AMENDED DISCLOSURE STATEMENT WITH RESPECT TO**
**SECOND AMENDED PLAN OF REORGANIZATION FILED BY IYS VENTURES, LLC**

On May 23, 2023, the Debtor filed a Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois. The Debtor, as Debtor In Possession, has managed its financial affairs as Debtor In Possession, pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or committee of unsecured creditors has been appointed in this case.

## SUMMARY OF PLAN

The Debtor's Second Amended Plan of Reorganization (the "Plan" or "Plan of Reorganization") provides for distribution to the holders of allowed claims and interests from cash, cash equivalents and other funds and income derived from *i*) the continued operations of the Leased Stations, *ii*) post confirmation loan of $800,000.00 to the Reorganized Debtor and IYS Ventures, LLC Creditor Trust to fund distributions to allowed Class 5 general unsecured non-priority claims, *iii*) the Net Proceeds of Litigation Claims including the PMPA Adversary and CAP Adversary, and *iv*) the monetization and sale of the Reorganized Debtor's equity membership interests upon completion of all plan payments.

The Reorganized Debtor and IYS Ventures LLC Creditors Trust's post-confirmation loan (the "New Credit Facility") in the total amount of $800,000.00 from Saed Awadallah or his affiliates, assignees or nominees will be utilized solely to fund distributions of $400,000.00 on the Effective Date of the Plan and $400,000.00 one hundred and eighty (180) days after the Effective Date of the Plan to allowed Class 5 general non-priority unsecured claims.

The $800,000.00 Post Confirmation New Credit Facility shall be documented by loan documents including but not limited to a Promissory Note and Security Agreement secured by the assets and equity membership interests of the Reorganized Debtor held by the IYS Ventures LLC Creditors Trust. The New Credit Facility loan shall be repaid as follows: commencing in the month following receipt and distribution of the first installment of the loan, the Reorganized Debtor shall make periodic monthly payments of interest only at the rate of ten percent (10%) per annum until the second distribution of $400,000.00 is made, after which date the Reorganized Debtor shall make monthly payments of principal and interest amortized over a term of years not to exceed ten (10) years with interest at the rate of ten percent (10%) per annum.

In addition to certain remedies in the event of default, including the right to foreclosure security interests, the Promissory Note and Security Agreement contain provisions and terms allowing the conversion of the $800,000.00 New Credit Facility to the equity membership interests in the Reorganized Debtor at the election of the Debtor or the Lender. If the New Credit Facility Promissory Note is converted to equity membership interests in the Reorganized Debtor there will be no further monetization or sale of the Reorganized Debtor's equity membership interests upon completion of all plan payments. See, New Credit Facility Promissory Note and Security Agreement attached as Exhibit D to the Plan.

The Reorganized Debtor and Matthew Brash as Disbursing Agent and Trustee of the IYS Ventures LLC Creditors Trust shall distribute payments as provided by the Plan to each class of claims according to the priorities set forth in the Bankruptcy Code and on a *pro rata* basis within each class of claims, as follows:

Commencing on the Effective Date of the Plan, which date shall be thirty (30) days following the entry of a Final Order confirming the Debtor's Plan, or such other date as is set forth therein, the Debtor anticipates disbursing payments to its creditors, as follows:

| Category | Allowed Claims | Plan Treatment |
|---|---|---|
| Administrative Priority Fee Claims | $950,000.00 Estimated and including anticipated services and fees not yet allowed and/or rendered | Administrative Priority Fee Claims of the Debtor's retained professionals including, the attorneys of Gregory K. Stern, PC ($666,232.23), John Morgan ($31,333.35), Ray Luck ($52,161.48), and Matthew Brash and Newpoint Advisors Corporation ($50,000.00) shall be paid on the later of (*i*) the Effective Date or (*ii*) approval and allowance of interim and final compensation by the Bankruptcy Court, or (*iii*) on such other terms as agreed upon between the Debtor and the claimant asserting the Administrative Priority Fee Claim. |
| Other Administrative Priority Claims | $317,229.00 Estimated | Other Administrative Priority Claims of the United States Trustee ($133,062.00 estimated), Muwafak Rizek ($184,167.00 estimated for unpaid compensation) and unknown others shall be paid on the Effective Date, or as soon as practical thereafter. |
| Priority Tax Claim – Illinois Lottery (POC 30) | $25,648.30 | The Priority Tax Claim of the Illinois Lottery shall be paid, in full, with interest at the rate of three percent (3%) per annum in equal monthly installments of principal and interest in the amount of $579.08, commencing on the 15th of the month sixty (60) days following the Effective Date and the 15th of the month thereafter for Forty-Seven (47) months and until paid in full. |
| Priority Tax Claim – Minnesota Revenue (POC 38) | $6,852.24 | The Priority Tax Claim of Minnesota shall be paid, in full, with interest at the rate of three percent (3%) per annum in equal monthly installments of principal and interest in the amount of $151.67 commencing on the 15th of the month sixty (60) days following the Effective Date and the 15th of the month thereafter for Forty-Seven (47) months and until paid in full. |
| Priority Tax Claim - South Dakota Department of Revenue (POC 7) | $16,003.60 | The Priority Tax Claim of the South Dakota Department of Revenue shall be paid, in full, with interest at the rate of three percent (3%) per annum in equal monthly installments of principal and interest in the amount of $361.32 commencing on the 15th of the month sixty (60) days following the Effective Date and the 15th of the month thereafter for Forty-Seven (47) months and until paid in full. |
| Priority Tax Claims - Ohio Department of Taxation (POC 35) | $470,897.13 | The Priority Tax Claim of the Ohio Department of Taxation is disputed in its entirety and after adjudication of the objection to the Ohio Department of Taxation's Claim the allowed Priority Tax Claim shall be paid, in full, in equal monthly installments in the amount of $5,605.91 commencing on the 15th of the month sixty (60) days following the Effective Date and the 15th of the month thereafter for Eighty-Three (83) months and until paid in full. |
| Priority Tax Claims – Wisconsin Department of Revenue | $78,082.05 | The Priority Tax Claim of the Wisconsin Department of Revenue shall be paid, in full, with interest at the rate of three percent (3%) per annum in equal monthly installments of principal and interest in the amount of $1,762.91 commencing on the 15th of the month sixty (60) |

| | | |
|---|---|---|
| | | days following the Effective Date and the 15th of the month thereafter for Forty-Seven (47) months and until paid in full. |
| **Other Priority Claims - PepsiCo Sales, Inc. (POC 26)** | $25,727.02 | The Priority Claim of PepsiCo Sales, Inc. shall be paid, in full, with interest at the rate of three percent (3%) per annum in equal monthly installments of principal and interest in the amount of $581.31 commencing on the 15th of the month sixty (60) days following the Effective Date and the 15th of the month thereafter for Twenty-Three (23) months and until paid in full. |
| **Class 1(a) and 1(b) Secured Claims:** | | Class 1(a) and 1(b) Claims are impaired under the Plan. |
| **Class 1(a) Itria Ventures, LLC (POC 24)** | $899,286.90 | The Secured Claim of the Class 1(a) Claimant will be paid, in full, with interest at the rate of five percent (5%) per annum in equal monthly installments of principal and interest in the estimated amount of $13,334.88, after adjustment and credit for adequate protection payments made up to and including the Confirmation Date, commencing on the 15th of the month sixty (60) days following the Effective Date and the 15th of the month thereafter for Seventy-Two (72) months and until paid in full. The Plan does not provide for any further distributions to the Class 1(a) Claimant. Class 1(a) Claimant may be prepaid without penalty or discount. |
| **Class 1(b) The Huntington National Bank (POC 12)** | $5,640,225.03 | The Secured Claim of the Class 1(b) Claimant will receive no distribution as a Class 1(b) Claimant and its allowed claim will be paid as a Class 5 general unsecured non-priority claim. |
| **Class 2 – The Huntington National Bank Secured Claim (POC 13)** | $373,711.42 | The Secured Claim of the Class 2 Claimant in the amount of $67,497.02 will be paid, in full, with interest at the rate of five percent (5%) per annum in equal monthly installments of principal and interest in the amount of $1,554.41, commencing on the 15th of the month sixty (60) days following the Effective Date and the 15th of the month thereafter for Forty-Eight (48) months and until paid in full. The balance of the Class 2 Claim in the amount of $306,214.40 will be paid as a Class 5 general unsecured non-priority claim.<br>Class 2 Claims are impaired under the Plan. |
| **Class 3 – CrossAmerica Partners, LP Secured Claim (Amended POC 23)** | $332,003.83 | The Secured Claim of the Class 3 Claimant is disputed in its entirety. After adjudication of an objection to the allowed Class 3 Claimant's Secured Claim will be paid, in full, through equal monthly payments commencing on the 15th day of the month sixty (60) days following the Effective Date and continuing for Ninety-Nine (99) months thereafter and until paid, in full. The Plan does not provide for any further distributions to the Class 3 Claimant. The Class 3 Claimant may be prepaid without penalty or discount.<br>Class 3 Claims are impaired under the Plan. |

| Class 4(a) and 4(b) Secured Motor Vehicle Claims | | Class 4(a) and 4(b) Claims are impaired under the Plan. The Debtor shall surrender and abandon motor vehicles to Class 4(a) claimants. Any deficiency claims of Class 4(a) claimants resulting from the sale of the motor vehicles shall be treated as a Class 5 claim. |
|---|---|---|
| Class 4(a) Mercedes-Benz Financial Services USA LLC (POC 2) | $43,268.72 | Surrender and abandon Motor Vehicle to the Class 4(a) Claimant. Any surplus of sale shall be remitted to the Debtor within thirty (30) days of sale. |
| Class 4(a) BMW Bank of North America (POC 4) | $155,443,27 | Surrender and abandon Motor Vehicle to Class 4(a) Claimant. Any surplus of sale shall be remitted to the Debtor within thirty (30) days of sale. |
| Class 4(a) Ally Bank (POC 5) | $30,433.86 | Surrender and abandon Motor Vehicle to the Class 4(a) Claimant. Any surplus of sale shall be remitted to the Debtor within thirty (30) days of sale. |
| Class 4(a) BMW Bank of North America (POC 6) | $103,357.40 | Surrender and abandon Motor Vehicle to the Class 4(a) Claimant. Any surplus of sale shall be remitted to the Debtor within thirty (30) days of sale. |
| Class 4(a) Mercedes-Benz Financial Services USA LLC (POC 8) | $71,927.20 | Surrender and abandon Motor Vehicle to the Class 4(a) Claimant. Any surplus of sale shall be remitted to the Debtor within thirty (30) days of sale. |
| Class 4(b) Mercedes-Benz Financial Services USA LLC (POC 25) | $19,130.83 | Class 4(b) - Motor Vehicle Claim of Mercedes-Benz Financial Services USA LLC secured by 2021 Mercedes-Benz Sprinter. The installment note in the approximate principal amount of $19,130.83 shall be repaid, in full, and all terms and provisions of the installment note shall remain in full force and effect. Payments in the amount of $1,619.40 will be made on the 15th of the month after the Effective Date and each 15th of the month thereafter until the balance due under the installment note is paid in full. The Plan does not provide for any further distributions to the Class 4(b) Claimant. The Class 4(b) Claimant may be prepaid without penalty or discount. |
| Class 5 General Non-Priority Unsecured Claims | $25,632,517.85 | Class 5 Claims including the non-priority unsecured portion of Priority and Priority Tax Claims, Class 1, Class 2 Claims, and Class 4(a) Claims, and excluding claims for penalties and punitive damages which shall receive no distributions under the Plan, shall be paid pro rata distributions of deferred cash payments aggregating $800,000.00 by the Reorganized Debtor and IYS Ventures LLC Creditors Trust payable in two (2) distributions of $400,000.00 each, with the first payment on the Effective Date and the second one hundred and eighty (180) days following the Effective Date. Additionally, the Class 5 Claims will be paid annual pro rata distributions of all Net Litigation Proceeds resulting from recovery of Litigation Claims including the PMPA Adversary, the CAP Adversary and the monetization and sale of the Reorganized Debtor's equity membership interests upon completion of all plan payments. Class 5 Claims are impaired under the Plan. |

| Class 6 - Equity Interests | Interests of Muwafak Rizek and IMart Stores, LLC | All equity interests shall be deemed to be terminated and canceled upon the Effective Date. Newly issued membership interests of the Reorganized Debtor consisting of one hundred per cent (100%) of the membership interests shall be issued to the IYS Ventures LLC Creditors Trust, care of Matthew Brash as Trustee of the IYS Ventures LLC Creditors Trust. |
|---|---|---|

**THE ABOVE IS A SUMMARY OF THE PLAN THAT PROVIDES FOR THE REORGANIZATION OF THE DEBTOR. CREDITORS ARE URGED TO STUDY THE PLAN IN FULL AND TO CONSULT WITH COUNSEL TO UNDERSTAND THE PLAN BECAUSE IT IS A COMPLEX AND LEGALLY BINDING DOCUMENT**

Purpose of Disclosure Statement - The Debtor submits this disclosure statement (the "Disclosure Statement") to holders of claims against, and equity interests in the Debtor in connection with a solicitation of acceptances of the Plan of Reorganization of the Debtor, as the same may be amended. The Debtor will seek approval of this Disclosure Statement under § 1125 of the Bankruptcy Code and if this Disclosure Statement is approved as having "adequate information" the Debtor will, thereafter, seek confirmation of its Plan at a hearing to be held on a date to be determined at the U.S. Bankruptcy Court located at 219 South Dearborn Street, Courtroom 644, Chicago, Illinois.

Provisions of Plan Control any Conflict with Disclosure Statement - The statements contained in this Disclosure Statement include summaries of provisions contained in the Plan and in documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference should be made to the Plan and to such documents for the full and complete statements of such terms and provisions. The Plan itself and the documents referred to therein control the actual treatment of claims against and interests in the Debtor under the Plan and will, upon the effective date of the Plan, be binding upon all holders of claims against and equity interests in the Debtor and its estate, and other parties in interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document, on the other hand, the terms of the Plan and such other operative document are controlling.

Debtor's Recommendation to Parties to Accept the Plan - Under the Plan, the Debtor seeks to reorganize its assets and restructure its debts. The Debtor and Matthew Brash and Newpoint Advisors Corporation, as Disbursing Agent and Trustee of the IYS Ventures LLC Creditors Trust, shall distribute all payments required by the Plan to classes of claims of creditors according to the priorities set forth in the Bankruptcy Code and within each class of claims, on a *pro rata* basis. The Debtor believes that the terms of the Plan are fair and equitable to all parties and confirmation is in the best interests of the Debtor, its creditors and holders of the equity interests and all other parties in interest. Accordingly, the Debtor urges each creditor and holder of equity interests that is impaired under the Plan, and therefore, entitled to vote with respect to the Plan, to vote to accept the Plan.

CrossAmerica Partners, LP Plan of Liquidation

CrossAmerica Partners, LP ("CAP") filed a Plan of Liquidation (the "Competing Plan")and Disclosure Statement. The liquidation vehicle CAP has chosen to complete and fulfill its stated corporate objective *vis a vis* the elimination of dealers or multiple service operators such as IYS Ventures, LLC is to close the business operations of the Debtor, liquidate its assets through the Plan of Liquidation, and convert the Debtor's remaining marketing premises to CAP employee operated marketing premises.

The Debtor believes that CAP's Competing Plan cannot be confirmed and is not in the best interest of creditors for reasons including but not limited to the following: (**i**) the Plan of Liquidation was not proposed in good faith as required by 11 U.S.C. Section 1129(a)(3), (**ii**) the Plan of Liquidation cannot be confirmed pursuant to 11 U.S.C. Section 1129(a) (9), and (12) because it fails to provide for payment on or before the effective date of claims pursuant to 11 U.S.C. Section 507 aggregating in excess of $1,272,151.03 and is not feasible, (**iii**) the Plan of Liquidation incorrectly and improperly classifies claims, (**iv**) the Plan of Liquidation impermissibly seeks to gerrymander voting classes as non-impaired when clearly impaired, (**v**) the Plan of Liquidation contains false and incorrect information and assumptions relating to the Debtor's assets and operations, and (**vi**) the Plan of Liquidation would release the Debtor's claims for refund of security deposits and other damages relating to adversary proceedings filed by the Debtor against CAP seeking damages in excess of one million dollars ($1,000,000.00) through improper and impermissible releases in favor of CAP as the Plan of Liquidation proponent for no consideration whatsoever.

The Debtor's belief that the CAP Competing Plan is not in the best interest of creditors is clearly evidenced by the disparate treatment of unsecured creditors in the competing plans. Whereas CAP's Plan of Liquidation proposes distributions to unsecured creditors in the total amount of $100,000.00, IYS Ventures, LLC's Second Amended Plan of Reorganization proposes and pledges distributions by the IYS Ventures, LLC Creditors Trust, to be administered by Matthew Brash as Trustee, to unsecured creditors of $800,000.00 plus all Net Litigation Proceeds resulting from recovery of Litigation Claims which are reasonably estimated to be in excess of $1,000,000.00, and which CAP proposes to be released for absolutely no consideration whatsoever.

**$100,000.00 proposed by CAP's Plan of Liquidation compared to $800,000.00 proposed by IYS Ventures, LLC's Second Amended Plan of Reorganization, the first $400,000.00 on the Effective Date and the second $400,000.00 six (6) months following the Effective Date. The choice of which of the competing plans is in the best interest of creditors is obvious and not open or subject to reasonable disagreement or dispute. Clearly the Debtor's Second Amended Plan of Reorganization is in the best interests of creditors.**

Procedure for Voting to Accept or Reject the Plan - To be counted, a ballot containing your acceptance or rejection of the Plan must be filed with the Bankruptcy Court no later than the balloting deadlines provided in the ballot. **The balloting deadline is to be determined and will be reflected in the Ballot.** To be considered, all ballots must be received by the Clerk of the Bankruptcy Court, 219 South Dearborn, 7th Floor, Chicago, Illinois 60604, on or before on the date to be set forth in the Ballot. Ballots received after the balloting deadline will not be counted or otherwise considered.

**THIS DISCLOSURE STATEMENT IS PROVIDED TO ALL OF THE KNOWN HOLDERS OF CLAIMS AGAINST THE DEBTOR WHO ARE ENTITLED TO VOTE THEIR ACCEPTANCE OR REJECTION OF THIS PLAN. ACCORDINGLY, THIS DISCLOSURE STATEMENT IS DISSEMINATED IN FURTHERANCE OF THE DEBTOR'S SOLICITATION OF ACCEPTANCES OF THE PLAN. THE PURPOSE OF THIS DISCLOSURE STATEMENT IS TO PROVIDE SUCH INFORMATION AS WOULD ENABLE A HYPOTHETICAL, REASONABLE INVESTOR, TYPICAL OF THE HOLDERS OF CLAIMS THAT ARE IMPAIRED UNDER THE PLAN, TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN. THIS DISCLOSURE STATEMENT IS DESIGNED AND INTENDED TO ASSIST THOSE HOLDERS OF CLAIMS ENTITLED TO VOTE**

**IN DECIDING WHETHER TO ACCEPT THE PLAN. AFTER NOTICE AND A HEARING, THE BANKRUPTCY COURT WILL HAVE THE OPPORTUNITY TO APPROVE THIS DISCLOSURE STATEMENT SHOULD IT FIND THAT IT CONTAINS INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE A HYPOTHETICAL, REASONABLE INVESTOR, TYPICAL OF THE CLASSES BEING SOLICITED TO VOTE ON THE PLAN, AND TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PREPARED AND SUBMITTED BY THE DEBTOR UNLESS SPECIFICALLY STATED TO BE FROM OTHER SOURCES. NO REPRESENTATIONS CONCERNING THE DEBTOR, OTHER THAN THOSE SET FORTH IN THE DISCLOSURE STATEMENT, HAVE BEEN AUTHORIZED BY THE DEBTOR. THE DEBTOR BELIEVES THAT ALL OF THE INFORMATION CONTAINED HEREIN IS ACCURATE AND IS BASED UPON INFORMATION THAT THE DEBTOR HAS PROVIDED TO ITS COUNSEL. THE INFORMATION AND STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT AT ANY TIME AFTER THE DATE HEREOF SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN ANY CHANGE IN THE INFORMATION STATED HEREIN.**

**NO PERSON IS AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS AND SCHEDULES ATTACHED HERETO.**

**NO REPRESENTATIONS ARE BEING MADE AS TO TAX CONSEQUENCES, IF ANY, RESULTING FROM CREDITOR TREATMENT UNDER THE PLAN AND CREDITORS ARE URGED TO STUDY THE PLAN IN FULL AND TO CONSULT WITH AN ACCOUNTANT REGARDING TAX CONSEQUENCES, IF ANY, ARISING UNDER THE PLAN.**

**INTRODUCTION**

<u>Commencement of Case</u> - On March 23, 2023, the Debtor filed a Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court, Northern District of Illinois (the "Chapter 11 Case"). The bankruptcy filing was necessary to allow the Debtor to continue its business operations after The Huntington National Bank obtained without notice a pre-judgment attachment order on the Debtor's assets and to avert entry of a judgment in favor of Eby-Brown Company, LLC. Therefore, with the desire to continue its business operations uninterrupted; to assure that all creditors were treated fairly and equitably; to save the jobs of the more than four hundred (400) individuals employed in the operations of the Debtor's business; and to reorganize and restructure its operations and debts, the Debtor sought bankruptcy relief in the form of a business reorganization by commencing this Chapter 11 Case. The Debtor's efforts in its Chapter 11 Case have been directed, *inter alia*, towards *i*) stabilizing the business operations of the Debtor, *ii*) struggling with and combatting the interference and related actions of its principal partner CrossAmerica Partners, LP and it related affiliates (the "CAP Entities" "CAP" or "CrossAmerica") with its business operations and the personnel employed in the operations of its business, *iii*) normalizing its relations with suppliers, vendors, and licensing and other regulating authorities, an *iv*) managing and restructuring its financial affairs, operations and debt.

Purpose of Chapter 11 Case - Chapter 11 is designed to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets in a reorganization setting. The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the Debtor as of the filing date. The Bankruptcy Code contemplates that debtors remain in possession of their property during the case and while they seek to either implement a reorganization plan or orderly liquidate their assets under a liquidating plan. The bankruptcy court must approve any activities that are not within the ordinary course of the Debtor's business and financial affairs.

Confirmation of Plan and its Binding Nature - The consummation of a plan of reorganization or liquidation is the principal objective of a Chapter 11 case. A plan sets forth the means for satisfying claims against and equity interests in a debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon all parties including the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of or equity interest holder in, the Debtor, whether or not such creditor or equity security holder (*i*) is impaired under, or has accepted, the plan or (*ii*) receives or retains any property under the plan.

Objective of Plan - The primary objective of the Plan is to settle compromise or otherwise dispose of certain claims and interests on terms that the Debtor believes to be fair and responsible and in the best interests of its estate and creditors. The Debtor believes that the Plan it has proposed provides the best and most prompt possible recovery to the Debtor's claim holders. Under the Plan, claims against and interests in the Debtor are divided into different classes set forth in the Summary of Plan section below. The Plan contemplates the reorganization of the Debtor business operations, the restructuring of its debts and the distribution of payments to holders of the various Allowed Claims.

Deadline for Filing Proofs of Claim - The Claims Bar Date was set for September 1, 2023. Creditors which have failed to file their claim or interests on or before the Claims Bar Date, or unless otherwise allowed by order of Court, are forever barred from asserting a claim against or interests in the Debtor unless the Debtor's schedules reflect an allowed claim[1] or interest for such creditor.

## LIQUIDATION ANALYSIS

Under the provisions of the United States Bankruptcy Code, the Plan must be in the best interest of creditors by providing a return on allowed claims in an amount of not less than the amount they would receive in Chapter 7 liquidation. The distribution scheme proposed by the Debtor in the Plan reflects that all claimants will be receiving distributions in excess of any amounts that they would have received had the Debtor had been liquidated in a case under Chapter 7 of the Bankruptcy Code.

Assuming an order for relief under Chapter 7 were to be entered, the full amount of all allowed Administrative Claims, Priority Claims and Secured Claims would have to be paid prior to any distribution is made to the holders of claims of unsecured, non-priority creditors, the latter being classified in the Plan as Class 5 Claims. In the event of a Chapter 7 case, a trustee would be appointed to administer and liquidate the assets of the Debtor, with this trustee being entitled to payment of compensation, as approved by the Court, prior to the payment to any unsecured, non-priority creditors. In the performance of the Trustee's duties and if a Trustee has assets to administer, the Trustee would retain professionals such as counsel, accountants and

---

[1] Such a scheduled claim in order to be deemed to be the claim of the creditor in the absence of the creditor filing a claim, must be scheduled as (i) undisputed, (ii) liquidate and (iii) non-contingent. See Rule 3003(b)(1) of the Federal Rules of Bankruptcy Procedure ("F.R.BkryP")

auctioneers to assist him in the liquidation of the Debtor's assets. The expenses of the Chapter 7 trustee include the expenses of the afore-mentioned professionals, asset sale expenses, and all other expenses incurred until the liquidation has been completed are estimated to constitute at least ten percent (10%) of gross liquidation proceeds. See, Liquidation Analysis attached hereto as Exhibit A and made a part hereof as prepared by Management of the Debtor.

## PLAN IS IN THE BEST INTEREST OF CREDITORS

As stated above, in the event of a Chapter 7 liquidation of the Debtor, there would be fewer funds available to make a distribution to Class 5 Claimants than the proposed distribution of $800,000.00 to general unsecured non-priority claims under the Plan plus the net proceeds of Litigation Claims including the PMPA Adversary and CAP Adversary and the monetization and sale of the Reorganized Debtor's equity membership interests upon completion of all plan payments.

Under the Plan, the Debtor is proposing to repay general non-priority unsecured creditors holding Class 5 Claims from sources, being (i) $800,000.00 from a Post Confirmation New Credit Facility loan to the Reorganized Debtor and IYS Ventures LLC Creditors Trust in two (2) payments of $400,000.00 each. The first $400,000.00 to be paid on the Effective Date and the second $400,000.00 to be paid six (6) months following the Effective Date. Additionally general non-priority unsecured creditors holding Class 5 Claims shall receive pro-rata distributions of the Net Proceeds of Litigation Claims, including the PMPA Adversary and CAP Adversary, and the monetization and sale of the Reorganized Debtor's equity membership interests upon completion of all plan payments.

Accordingly, the Debtor believes that the Plan meets the "best interests of creditors" test of § 1129(a)(7) of the Bankruptcy Code; and, that the members of each impaired class will receive greater value under the Plan than they would in a Chapter 7 case. Based on the Liquidation Analysis, the Plan meets the "best interests" test by the plan payments paying more to all creditors that creditors would receive in a Chapter 7 liquidation case.

## HISTORICAL AND FINANCIAL BACKGROUND

The Debtor, IYS Ventures, LLC, is an Illinois limited liability company that operated forty-nine (49) gas stations in ten (10) states including Illinois, Indiana, Ohio, South Dakota, Louisiana, Michigan, Mississippi, Minnesota, Wisconsin and Virginia. IYS Ventures, LLC was expanded by Muwafak Rizek ("Rizek") out of a business owned by his father-in-law Isam Y. Samara ("IYS") that leased and operated a limited number of individual gas stations. These early stations were owned by Circle K and managed by one of the entities owned or acquired by CrossAmerica Partners, LP ("CAP"). Rizek expanded the number of stations leased from Circle K and organized IYS Ventures, LLC in October of 2018, to facilitate the operation of the gas stations. By 2019, Rizek contracted with Circle K to operate seven (7) additional gas stations in Ohio that Circle K operated through a system of dealer-operated stations, as opposed to other distributors which utilized either distributor-operated stations or hybrid dealer commission stations. Prior to 2021, IYS operated dealer gas stations under individualized separate leases, fuel supply agreements and franchise agreements with CAP and, or its one of the CAP affiliates.[2]

IYS continued its business and expansion plan by leasing gas stations from CAP (the "Leased Stations"). Many of the additional gas stations were rundown or closed due to poor condition or other factors

---

[2] The CrossAmerica Partners LP's affiliates are LGP Realty Holdings LP, Erikson Oil Products, Inc., CAP Operations, Inc., Lehigh Gas Wholesale Services, Inc. and Lehigh Gas Wholesale LLC.

and IYS was required to expend its funds to make necessary improvements at the Leased Stations.  IYS began to implement the second phase of its business and expansion plan in 2021, when it commenced the second part of its business and expansion plan purchasing gas stations from CAP.  A program of purchasing gas stations leased from CAP was intended to give IYS greater control over the gas stations and reduce the monthly costs of operating those stations including but not limited to amounts paid for rent.  By May of 2023, IYS had purchased ten (10) stations (the "Owned Stations") and had contracted to purchase an additional two stations in South Dakota. (the "Leased Stations" and "Owned Stations" also referred to collectively as the "Marketing Premises")

The income realized from the operations of the Marketing Premises is derived from two (2) sources.  The first source of income is from the sale of gas and motor fuels to retail customers, and the second source of income is from the sale of convenience stores food products, such as candy, alcohol products, convenience food items and in some instances prepared foods (the "Convenience Store Products") to retail customers inside the Marketing Premises.  Gas and Convenience Store Products Sales for 2022 and 2023 through month ending May 31[3] are attached hereto as Exhibit B and made a part hereof.

Initially and prior to 2022, purchased Convenience Store Products primarily from Eby-Brown Company, LLC, ("Eby-Brown") a nationwide company that is a large seller and distributor of such items.  During the implementation of its business and expansion plan, IYS found itself needing funds to improve the Leased Stations, acquire and improve the Owned Stations and pay for its purchases of Convenience Store Products to stock the Marketing Premises.  IYS sought loans on terms from various sources including but not limited to family members and merchant cash advances to assist its funding needs.  At the same time IYS' purchases from Eby-Brown increased proportionally as did IYS' balance owed to Eby-Brown which disrupted its relationship with Eby-Brown and resulted in a lawsuit being filed by Eby-Brown.

New Agreements with CrossAmerica

CAP acquired the Circle K stations through an acquisition and in 2021, demanded that IYS execute new documentation for the lease of the stations and purchase of gas and motor fuel products from CAP and its affiliates.  The CAP documentation for the stations was structured as Unitary leases, fuel supply agreements and franchise and trademark agreements to which all of the stations operated by IYS were required to join.  The unitary nature of the CAP documentation increased CAP's bargaining leverage with IYS for the reason that a single dispute at any one station could conceivably allow CAP to declare a default of the unitary agreements and termination of IYS' operation at all of the Leased Stations. The effect of consolidating all of the gas stations' leases, fuel supply agreements and franchise and trademark agreements in one or two Unitary agreements was to impede the ability of IYS to dispose of unprofitable stations and required IYS to suffer losses from unprofitable stations. The Debtor contends that the unitary nature of the CAP agreements constitutes an adhesion contract that cannot be enforced according to its terms by this Court as such action would work an injustice on the Estate of the Debtor and its creditors.  Faced with a take it or leave it proposal, without being able to consult with counsel and being unable to decline CAP's demand, IYS executed the new documents.  CAP also required IYS to pay a security deposit related to the two Unitary Leases and PMPA Franchise Agreements in the total amount of $995,000.00.  CAP continues to hold the security deposits to indemnify CAP from any monetary defaults by or claims against IYS.  Notwithstanding, the Unitary nature of the CAP agreements many amendments have been made to the documents to reflect the addition or deletion of individual stations and different operating conditions for those stations.

---

[3] Sales reflected in Exhibit B are limited to sixteen (16) Leased Stations (not including LA0054 managed by M&A 200, Inc. and LA0058 managed by 7 Mart, Inc.) retained by the Debtor after downsizing its operations through pushback and surrender of twenty-two (22) Leased Stations during the Debtor's Chapter 11

In addition, CAP required IYS to use the CAP point-of-sale system (the "POS System"). This POS System processes and deposits all credit and debit card purchases of the Debtor's retail customers to bank accounts owned and controlled by CAP. CAP not only charges fees to the Debtor for processing the credit and debit card purchases of the Debtor's retail customers but also deducts sums due to CAP for the sale of gas and motor fuels to IYS and in some instances for other amounts claimed due from IYS. The balance of the collected funds is then periodically transferred to IYS's bank account (the "Sweeps"). The Sweeps were delivered on inconsistent dates with little regularity and subject to the manipulation and whim of CAP, thereby disturbing and interrupting the cashflow available to IYS to pay bills owed to suppliers and vendors for Convenience Store Products. IYS' efforts to bring regularity to the Sweeps fell on deaf ears at CAP. As IYS' number of Marketing Premises stations increased, its difficulties with its suppliers and vendors likewise increased due to CAP's interference and manipulation with IYS' income and cashflow.

### Loan from Marks Supermarket NC, Inc.

The first loan obtained by IYS to fund its business and expansion plan originated in the Rizek family in 2021. Mr. Rizek's brother, Munadel Rizek, caused his business Marks Supermarket NC, Inc., to lend $5,200,000.00 to IYS (the "Marks Supermarket Loan"). As security for repayment of the Marks Supermarket loan, IYS executed and delivered mortgages on the stations owned by IYS to Marks Supermarket NC, Inc. However, the mortgages securing the Marks Supermarket Loan were not recorded contemporaneous with their execution and only some mortgages were ever recorded.

### Merchant Cash Advances

IYS needed further financing to pay for the improvements to the stations as more stations were leased from CAP and in certain cases, purchased from CAP. IYS obtain Merchant Cash Advances ("MCA"), initially from Itria Ventures, LLC ("Itria"). A MCA is generally structured as a purchase of a defined percentage of the accounts receivable of the merchant at high rates of return and requiring regular daily, weekly and, or monthly payments initiated through ACH drafts on the merchants bank account. In addition to the purchase, the seller, being IYS, would also grant a security interest in its assets to the MCA lender to secure IYS' performance in accordance with the terms of the MCA, especially in facilitating the sale of receivables and allowing ACH draws from its bank account. Due to all of IYS' receivables being controlled by CAP, IYS considered the MCA(s) to be loans secured by its assets. Additional MCAs arrangements were obtained from 2021 through 2022 from Itria. Thereafter, IYS obtained similar MCA loans from Fox Capital Group, Inc., Byzfunder NY, LLC, and lastly, Samson Funding although Samson Funding conducted its transaction without requiring a grant of security from IYS.

### Vendor Relationship with Eby-Brown Company:

Prior to the filing of the Chapter 11 Case, the amounts IYS owed Eby-Brown Company ("Eby-Brown"), its principal pre-petition vendor of convenience store goods prior to 2022, continued to increase as IYS added more Marketing Premises to its operations. IYS was attempting to negotiate the repayment of its debt owed to Eby-Brown over a term of years when a change of ownership installed a new management team at Eby-Brown. Thereafter, negotiations and relations deteriorated quickly when the new management team insisted on large paydowns of the amounts owed to Eby-Brown beyond IYS' financial abilities. The result was that Eby-Brown stopped doing business with IYS and referred the IYS account and balance owed to outside counsel for collection.

On March 4, 2022, Eby-Brown filed a Complaint in the Circuit Court for the 18th Judicial Circuit, Illinois, DuPage County commonly known as *Eby-Brown v. IYS Ventures, LLC, Imart Stores, LLC, Muwafak S. Rizek and Isam Samara*, case number 2022LA00021 (the "Circuit Court Lawsuit"). The Eby-Brown Complaint contained seven (7) counts: Breach of Contract (Counts I and II), Breach of Personal Guaranty (Counts III and IV), Account Stated (Count V), Unjust Enrichment (Count VI), and Illinois Consumer Fraud and Deceptive Business Practices Act (Count VII), seeking, *inter alia*, compensatory and punitive damages in an unspecified amount. The Circuit Court Lawsuit named Muwafak S. Rizek and Isam Samara as party defendants based upon their guaranties of the Eby-Brown obligations. IYS attempted to settle the Circuit Court Lawsuit but its efforts were unsuccessful and rebuffed by Eby-Brown. On July 26, 2022, during the pendency of the Circuit Court Lawsuit Eby-Brown obtained a pre-judgment Action Order that, *inter alia*, enjoined the Defendants from transferring and/or disposing of any assets until further order of court. The United States Trustee has suggested that IYS' agreements with its Management Companies may have violated this order as constituting a transfer of assets. IYS contests this contention on, *inter alia*, the factual basis that no assets were transferred and IYS only instituted its use of the Management Companies to geographically consolidate and restructure the operations of its fifty (50) Marketing Premises under specified Management Companies without any effect on the assets of IYS. Prior to entry of judgment, IYS filed its Chapter 11 Petition on May 23, 2023, staying the Circuit Court Lawsuit.

<u>Simplification of Management System</u>

Ultimately, the number of Marketing Premises operated by IYS grew to fifty (50) Marketing Premises, (40) Leased Stations and ten (10) Owned Stations, located in ten (10) states. In the implementation of its business and expansion plan and as the number of Marketing Premises grew so did the number of employees needed to operate the Marketing Premises (approximately 400). It became increasingly challenging to manage the Marketing Stations geographically by IYS' office staff of four (4) people at its headquarters in Orland Park, Illinois. Consequently, in late 2022 IYS sought to simplify its management system by entering into substantially similar Management and Operations Agreements (the "Management Agreements") pursuant to which the counterparties to the Management Agreements have several enumerated duties set forth therein. The counterparties (the "Management Companies") include 7 Mart Inc.; Ameer Investment Inc.; Areej Investment Inc.; F&M Stop Market LLC; Kareem Inc.; Kenan Ventures LLC; Leanne Investment LLC; Leanne Ventures LLC; and M&A 200 Inc. some of which were organized and are owned by Mr. Rizek's brother, Munadel Rizek.

Some parties have criticized the agreements between IYS and the Management Companies. CrossAmerica, the lessor of the Leased Stations and vendor of gasoline to IYS alleged that the agreements broke the contractual relationship between IYS and CrossAmerica and therefore constitute a breach of the various agreements between CrossAmerica and IYS. CrossAmerica filed a motion to force IYS to reject all of its agreements with CrossAmerica based on these contentions. IYS denied that any breach occurred as IYS continued to maintain its contractual privity with CrossAmerica and that the Management Companies occupied a position away from CrossAmerica as follows: Management Companies + IYS + CrossAmerica. Therefore, CrossAmerica continued to hold all of the same rights vis-à-vis IYS as it always had. Further. Muwafak Rizek performed the management functions for the Management Companies in operating the business of IYS, with no change in the qualitative nature of the management function.

It has been alleged by the United States Trustee that the execution of the agreements with the Management Companies may constitute a fraudulent conveyance that IYS as Debtor in Possession should prosecute to avoid and recover for the benefit of all creditors. IYS believes this contention is erroneous and without merit.

## Huntington Bank Accounts

IYS' use of its bank accounts and in particular operating accounts at JP Morgan Chase Bank were impaired after the filing of the Circuit Court Lawsuit by Eby-Brown leading IYS to establish a new banking relationship with The Huntington National Bank (the "Huntington Bank"). It is alleged by Huntington Bank that some of IYS's deposits into the new accounts at Huntington Bank made *via* wire transfer or ACH transfer were dishonored. The dishonored deposits allegedly grew in amount causing Huntington Bank to close IYS' accounts. Huntington Bank then filed a ten (10) count Complaint in the United States District Court, Northern District of Illinois (the "District Court") known as *The Huntington National Bank v. IYS Ventures, LLC, Muwafak Rizek, Leanne Holdings LLC and Kenan Enterprises, Inc.*, case number 23 cv 01368 (the "District Court Lawsuit"), seeking to recover for breach allegedly contract (Counts I and II), fraud(Count III), wire fraud (Count IV), conspiracy to commit wire fraud (Count V), bank fraud (Count VI), conspiracy to commit bank fraud (Count VII), civil conspiracy (Count VIII), conversion (Count IX), unjust enrichment (Count X). Before the Complaint had been served, Huntington Bank filed an *ex parte* (without notice) motion for the issuance of a pre-judgment writ of attachment. On March 16, 2023, the District Court entered an *ex parte* Order On Motion For Prejudgment Attachment under Seal (the "Attachment Order") and thereupon the Huntington Bank sought to seize assets of IYS and the other party defendants. The Attachment Order once discovered by IYS was another motivating factor for the filing of the Bankruptcy Case.

The Bankruptcy Court has avoided the Huntington Bank attachment order as to IYS, upon certain terms and conditions. Huntington Bank obtained a default judgment against the defendants, other than IYS, in the District Court Lawsuit, totaling $5.6 million dollars, including punitive damages of $3.8 million dollars. The Huntington Bank has filed its proof of claim in the Chapter 11 Case in the same sum of $5.6 million dollars including $3.8 million dollars of punitive damages which are disputed by IYS.

## Circumstances Leading to Filing for Chapter 11 Reorganization

The combination of the scheduled trial in the Eby-Brown suit and the pre-judgment attachment action of Huntington Bank left IYS with no alternative but to seek relief under Chapter 11 of the United States Bankruptcy Court, including the imposition of the automatic stay provisions of 11 U.S.C. Section 362 to stop all creditors' actions against IYS and thereby protect its assets. A Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code was filed on May 23, 2023, with the United States Bankruptcy Court for the Northern District of Illinois located in Chicago, Illinois, and the Chapter 11 Case, Case Number 23 - 06782, assigned to the Honorable David D. Cleary, United States Bankruptcy Judge.

## Post-Petition Chapter 11 Case History

On May 23, 2023, the date of the filing of the Debtor's Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code, the Debtor scheduled assets totaling $2,911,856.55 and liabilities totaling $22,947,818.98, including scheduled secured claims aggregating $11,695,013.74 and scheduled priority and general non-priority unsecured claims aggregating $11,252,805.24. The totals reflected herein include claims disputed by the Debtor.

The Debtor's assets on the Petition Date consisted of the following assets: (a) Cash, Cash Equivalents and Financial Accounts, (b) Ten (10) owned gas station marketing premises, (c) Leasehold interests in Forty (40) gas station marketing premises and improvements, (d) Seven (7) motor vehicles, (e) motor fuel, (f) Convenience Store Inventory and Products, (g) Miscellaneous office furniture and equipment, (h) Licenses and goodwill, (i) A possible interest in the financial account of the Management Companies, as defined herein; and, (j) Claims and causes of action against CAP.

Since the Chapter 11 filing, the Debtor has been actively engaged in ongoing efforts to normalize relationships with CAP, the Management Companies and critical vendors. The personal property assets of the Debtor are subject to the security interests and liens of creditors including but not limited to Itria Ventures, LLC and other lien creditors. Upon motion of Debtor, the Court has entered interim orders, from time to time, authorizing the Debtor's use of cash collateral for satisfaction of its ordinary course business and operating expenses and to provide adequate protection to Itria Ventures, LLC and other lien creditors in consideration for the use of the cash collateral, which protections include but are not limited to granting a post-petition replacement liens on new cash generated after the Petition Date and periodic adequate protection payments. For the precise terms of the Debtor's use of cash collateral reference is made to the monthly order authorizing the interim use of cash collateral entered by the Court from time to time (collectively, the "Cash Collateral Orders"). Pursuant to the Cash Collateral Orders, the Debtor made payments pursuant to cash collateral budgets of debtor in possession operating costs and expenses, including but not limited to rent, real estate and sales taxes and miscellaneous expenses for the Leased Stations, gas and motor fuel, convenience inventory and products, insurance, utilities, Management Company employees, suppliers and vendors. See, further disclosures below relating to Debtor's use of cash collateral.

Actions in Chapter 11 Case Number 23 - 06782

At the time of the Chapter 11 filing, the day-to-day business of IYS was conducted by the Management Companies which bought and sold Convenience Store Products, gas and motor fuel. For purchase and payment of gas and motor fuels and Convenience Store Products, the CAP point-of-sale system was and has been utilized for all credit and debit card transactions, other than a limited number of transactions processed through the goebt credit card processing system. However, at the request of the United States Trustee's office that supervises Chapter 11 reorganization cases, prompted principally by CAP's complaints and communications, IYS modified its accounting system and court filings to consolidate all sale and purchase transactions as its own account regardless that the Sweeps had been and processed and credit to accounts in the names of one of the Management Companies. Accordingly, IYS sought approval of the Court for the use of case collateral as if all purchase and sale transactions were conducted and processed by IYS instead of the Management Companies.

IYS received upon filing the Chapter 11 Case, the powers and obligations of a Debtor in Possession, including the avoidance powers of a trustee in bankruptcy. Soon after filing the Chapter 11 Case and in the performance its duties and fulfillment of its fiduciary obligations as Debtor In Possession IYS filed two (2) adversary complaints seeking to avoid preferential transfers.

Adversary Proceeding 23 - 00167 against Marks Supermarket NC, Inc.

The first adversary complaint was filed against Marks Supermarket NC, Inc. to avoid under Section 547 of the Bankruptcy Code the mortgages securing the Marks Supermarket Loans as preferential transfers. IYS and Marks Supermarket NC, Inc. entered into a Consent Judgment avoiding those mortgages that was entered by the Bankruptcy Court. Marks Supermarket NC, Inc., filed a general non-priority claim in the sum of $5,200,000.00.

Adversary Proceeding 23 – 00168 against The Huntington National Bank

The second adversary proceeding was filed against Huntington Bank to avoid its attachment order as a preferential transfer under Section 547 of the Bankruptcy Code. IYS and Huntington Bank entered into a consent judgment to avoid the attachment order as to IYS for the purpose of facilitating a Chapter 11 Plan of

Reorganization. The Consent Judgment was finalized and entered by the Bankruptcy Court on January 18, 2024 (Adv. Docket No. 18).

<u>Use of Cash Collateral and Objection of CAP</u>

IYS sought the authorization of the Bankruptcy Court to use cash collateral in which its secured creditors held an interest. Those secured creditors include Itria, Eby-Brown, Fox Capital Group, Inc. and Byzfunder NY, LLC. Notwithstanding that it was not a secured creditor and in the absence of any financial default, CrossAmerica Partners, LP objected to the Debtor's use of cash collateral, despite the fact that it held no cognizable interest in cash collateral.

IYS' use of cash collateral post-petition was critical and necessary to pay its operating expenses in the normal course of business in the Chapter 11 Case. These operating expenses include, but are not limited to, rent, purchase of gas and motor fuel, purchase of Convenient Store Products, payroll, taxes, utilities and insurance. CAP began its relentless attack on IYS and sought to prevent IYS from spending any of its cash collateral which would have resulted in the closure of IYS' business operations. Indeed, that result appeared to be just the action that CAP desired. Unknown to IYS at the time was CAP's decision to take actions to terminate the rights of its dealers and take over and operate dealer operated stations as company-operated stations. IYS appeared to be among the first of CAP's multiple site dealers ("MSO") to be the target of this agenda. The objection of CAP to the use of cash collateral was one of CAP's first, of many, objections that CAP has interposed in opposition to almost every action taken by IYS in the Chapter 11 Case. CAP's seized upon IYS' Chapter 11 filing and vulnerability to opportunistically advance its agenda to convert IYS' Leased Stations from dealer operated to company-operated stations. Ultimately CAP's agenda was discovered and is memorialized and transcribed in a CrossAmerica Partners LP (CAPL) Q2 2023 Earning Call Transcript with CAP's CEO Charles M. Nifong and CAP's CFO Maura Topper on August 8, 2023.

The first contested evidentiary hearing held in the Chapter 11 Case was conducted by the Bankruptcy Court on CAP's objection to the interim use of cash collateral and to modify the automatic stay. IYS prevailed at the contested evidentiary hearing and an order authorizing the interim use of cash collateral was entered and has been entered from time to time thereafter.

<u>Post-Petition Loans from Freedom Medical, Inc.</u>

IYS negotiated two (2) post-petition loans from Freedom Medical, Inc. ("Freedom Med") located in Scottsbluff, Nebraska and owned by an acquaintance of the Rizek family. Two (2) loans of $500,000.00 each, totaling $1,000.000.00 were authorized by the Bankruptcy Court and funded. The purpose of the loans has been to provide additional working capital to enable IYS to pay its normal business operating expenses and administrative expenses, including those of its professionals and United States Trustee quarterly fees. The Freedom Med loans were credited against Freedom Med's purchase of the Debtor's nine (9) Owned Stations referenced in the Sale of Owned Stations discussion *infra*.

<u>Engagement of Matthew Brash as Chief Restructuring Officer</u>

IYS required accounting services and assistance managing its cash management system to deal with the complaints and demands of CAP and assuage the concerns of the Debtor's creditors and the United States Trustee. Consequently, Matthew Brash and Newpoint Advisors Corporations were engaged with the authorization of the Bankruptcy Court as the Chief Restructuring Officer ("CRO") of IYS. Mr. Brash and his team have streamlined the accounting and management systems of IYS to improve their accuracy and operational efficiency. Additionally, Mr. Brash has explored different financial and operational transactions

intended to maintain profitability and has assisted in its dealings and negotiation with CAP and the reorganization of IYS's business and restructuring of its debt.

<u>United States Trustee's Motion for the Appointment of a Chapter 11 Trustee</u>

Patrick Layng, the United States Trustee for the Northern District of Illinois (the "US Trustee" or "UST") oversees the administration of bankruptcy proceedings in the Northern District of Illinois including Chapter 11 proceedings. On or about July 19, 2023, the US Trustee presented a Motion to Appoint Chapter 11 Trustee and to Shorten Notice (the "Motion to Appoint Chapter 11 Trustee" or "Motion") to the Bankruptcy Court. The Motion sought entry of an order of the Bankruptcy Court for the appointment of a Chapter 11 Trustee. The Motion to Appoint Chapter 11 Trustee alleged, *inter alia*, and was critical of *i*) "The Debtor's Interactions including Eby-Brown" *ii*) "The Management Agreements" *iii*) "The Debtor's Bankruptcy Case" as it relates to the Bank Account Motion, Cash Collateral Motion, the MOR, and CrossAmerica Partners, LP's Adequate Protection Motion and Motion to Reject. If appointed, a Chapter 11 Trustee would have replaced the Debtor as Debtor In Possession controlling the business operations of IYS. Due to the complexity of the Debtor's day to day business operations and the special skills required of management in the operations of the Debtor's Leased Stations and Owned Stations the Debtor believed that the appointment of a Chapter 11 would result in the cessation of business operations and liquidation of the assets of the Debtor's Estate without realizing the true value of the assets of the Estate and would be exceptionally harmful to the prospect of any meaningful recovery by the Debtor's unsecured creditors.

The Debtor opposed the UST's Motion contending, *inter alia*, that the arguments advanced by the US Trustee were erroneous, were wholly unsupported by the facts and did not constitute cause requiring the appointment of a Chapter 11 Trustee under § 1104(a)(1) or (a)(2). The UST's Motion was set for evidentiary hearing scheduled to commence on November 29, 2023. Ultimately, the Debtor and the US Trustee were able to negotiate a compromise resolving the Motion wherein IYS and the US Trustee agreed to specific time periods for IYS to file its plan of reorganization and achieve Bankruptcy Court approval of its Disclosure Statement and confirmation of its Plan of Reorganization. IYS is complying with the terms of the agreement as evidenced by the filing of this Disclosure Statement and its Plan of Reorganization on January 12, 2024, and subsequent amendments thereto.

<u>CAP Motion for Rejection of its Unitary Agreements and Leases</u>

Throughout the pendency of the Debtor's Chapter 11 Case, CAP has been the Debtor's most vociferous opponent interposing obstacles to Debtor In Possession operations and objections to almost every substantive motion filed by the Debtor. In addition and as part of CAP's interference with Sweeps were unilateral actions undertaken by CAP including but not limited to altering and changing credit terms without notice to IYS, charging and drafting payment for unnecessary miscellaneous expenses relating to the Leased Stations which it fails to timely reverse and credit to IYS, stuffing motor fuel tanks at the Marketing Premises with unscheduled motor fuel and charging and drafting payment for the motor fuel not needed and scheduled, and ignoring its obligations under the CAP Agreements to its share of the obligations to maintain and repair the Leased Stations as required by the Unitary Leases. Moreover, CAP started altering the regularity and amounts of the Sweeps that IYS depends upon to ensure payment by IYS for motor fuel, rent, real estate taxes and miscellaneous expenses. While CAP's control of its point of sale system allowed it to manipulate IYS's revenues for its own benefit, it has come at the expense of IYS' other operating obligations including suppliers and vendors.

In furtherance of its announced agenda, CAP filed *CrossAmerica Partners LP's Motion for Entry of an Order Compelling Rejection of Agreements for Leased Stations or, Alternatively, Granting Relief from the*

*Automatic Stay* [Docket No. 74] (the "Rejection Motion") requesting entry of an order compelling the rejection of the Unitary Leases and other agreements pursuant to sections 365(a), 365(b), and 105(a) of the Bankruptcy Code. The Debtor opposed the Rejection Motion by challenging the existence of the type of relief sought by CAP on the basis that only the Debtor in Possession has the statutory power to reject an executory contract or unexpired lease, with the authorization of the Court. The Debtor filed its *Motion to Approve Assumption of CrossAmerica Partners LP, CAP Operations, Inc., Lehigh Gas Wholesale, LLC, LGP Realty Holdings, LP, Lehigh Gas Wholesale Services, Inc., and Erickson Oil Products, Inc. Agreements* [Docket No. 206] (the "Assumption Motion"), seeking authority to assume the Unitary Leases and Franchise Agreements pursuant to section 365(a) of the Bankruptcy Code.

On November 15, 16 and 17, 2023, the Bankruptcy Court conducted a contested evidentiary hearing on the Rejection Motion of CAP and the Assumption Motion of IYS (collectively, the "CAP Agreement Motions"). The CAP Agreement Motions were fully briefed and taken under advisement and consideration by the Court for ruling (the "Court's Ruling"). The Court's Ruling was issued on April 4, 2024, in an Opinion denying the Rejection Motion and approving the Assumption Motion (Docket No. 553). Contemporaneously, the Court entered an Order Granting Debtor's Motion To Approve Assumption of CrossAmerica Partners, LP, CAP Operations, Inc., Lehigh Gas Wholesale LLC, LGP Realty Holdings, LP, Lehigh Gas Wholesale Servies, Inc. and Erickson Oil Products, Inc., Agreements (EOD206) (Docket No. 554), and an Order Denying CrossAmerica Partners, LP's Motion For Entry Of An Order Compelling Rejection Of Agreements For Leased Stations Or, Alternatively, Granting Relief From The Automatic Stay (EOD74) (Docket No. 555). The Court's ruling granting the Debtor's Assumption Motion allows IYS to continue operations of the Leased Stations and monetize the value of its improvements to the Leased Stations and create cash flow to fund payments to creditors under its Plan of Reorganization.

Notwithstanding CAP's interference with IYS' cash flow and business operations, the Debtor's business operations are continuing and ongoing. Mr. Brash, as Chief Restructuring Officer has conducted many negotiating sessions with business representatives of CAP in an effort to stop CAP's interference with the business operations of IYS and also to seek alternatives and modifications of the business relationship between the parties.

<u>PMPA Counsel Engaged and PMPA Complaint filed against CAP</u>

The federal statutes (15 U.S.C. Sec. 2801, et seq.) known as the Petroleum Marketing Practices Act or PMPA was enacted to protect dealers operating gas stations from predatory practices of distributors against their dealers. Termination or non-renewal of a dealer's franchise, *i.e.*, its lease and fuel agreement with the distributor, cannot be denied, absent very limited conditions. Detailed procedures exist in the PMPA statutes protecting the dealer's rights to receive notice of any alleged wrongdoings, an opportunity to cure those alleged wrongdoings, and obtain injunctive relief from a United States District Court. IYS' relationships with CAP constitute a franchise under PMPA and it enjoys the protections of this statute, which CAP has attempted to violate including by prosecuting the Rejection Motion. John Morgan is one of the leading practitioners in the PMPA field has been retained by IYS with the approval of the Bankruptcy Court to protect its rights under the PMPA statutes.

On November 14, 2023, IYS filed an Adversary Complaint against CrossAmerica Partners, LP and its affiliates that was assigned Adversary Case Number 23 A 00352. The Adversary Complaint seeks relief and damages for, *inter alia*, violations of the Petroleum Protection Practices Act ("PMPA") and breach of contract (the "PMPA Adversary"). On January 12, 2024, CAP filed a motion to dismiss the PMPA Adversary, and on September 26, 2024, the Court granted CAP's motion to dismiss without prejudice and granted the Debtor

leave to file an amended complaint on or before November 8, 2024. IYS believes the PMPA Adversary will be amended but vigorously contested and defended by CAP over an extended and unknown period of time.

CAP Adversary Complaint

On April 3, 2024, IYS filed a multi-count Adversary Complaint against the CAP Entities, CAPL Retail, LLC, Robert Brecker, Amy Shupp and Steven Lattig seeking injunctive relief and monetary damages for, *inter alia*, violations of the Automatic Stay Provisions of 11 U.S.C. §362, Breach of Contract, Tortious Interference with Business and Business Relationships, and Injunctive and Other Relief and assigned adversary case number 24 – 00088 (the "CAP Adversary").

**Count I** seeks damages of $1,000,000.00 for intentional and repeated actions taken in violation of the Automatic Stay imposed by Section 362 of the Bankruptcy Code for actions seeking to obtain possession and control over the business operations and physical assets of the Debtor's Owned and Leased Stations; **Count II** seeks damages of at least $422,875.00 for breach of contract in the unilateral change of credit terms for the sale of gasoline and motor fuel products, refusal to return any portion of the Debtor's Security Deposit of $995,000.00 posted with CAP to secure Debtor's obligations relating to its stations, notwithstanding Debtor's return of twenty-two (22) leased stations and sale of all ten (10) of its Owned Stations and other wrongful actions; **Count III** seeks damages in the sum of $10,000,000.00 and punitive damages in the further sum of $5,000,000.00 for the tortious interference with the operation of the Debtor's business operations and physical assets in (i) the unilateral changing of credit terms that threatens the Debtor's cash flow to be adequate to pay its ordinary bills and obligations, (ii) delaying payment to IYS of its cash via sweeps to build up more funds to pay bills to CAP but impairing the ability of the Debtor to pay other bills, (iii) stuffing Debtor's gas tanks with gas that was neither needed nor ordered, scheduled to shift the expected change in price away from CAP and to the Debtor and high octane gas that is slower to sell, (iv) conducting an abnormally large number of inspections of the stations, including private areas, for the purpose of antagonizing and interfering with the personnel operating the stations, (v) interrogating the stations' personnel about confidential information of the Debtor and slandering the Debtor during such interrogations, (vi) requesting vendors and licensing authorities to close the Debtor's accounts on the premise of the Debtor's imminent business failure allowing CAP's proposed takeover of the stations, and (vii) filing motions with the Bankruptcy Court including the motion to compel the Debtor to reject the CAP leases, fuel agreements and other agreements as a means to circumvent the protective provisions of the Petroleum Marketing Practices Act ("PMPA"); and **Count IV** seeking a preliminary and permanent injunction against CAP's wrongful actions interfering with the Debtor and its business operations.

CAP filed an Answer and Affirmative Defenses to Complaint and Counterclaim asserting that the Debtor has been using unauthorized point-of-sale equipment in breach of the CAP agreements. On July 11, 2024, the Debtor filed a motion to dismiss the Counterclaim, and on August 16, 2024, an order was entered denying the Debtor's motion to dismiss CAP's Counterclaim. IYS has answered the Counterclaim.

The Debtor believes the wrongful actions of CAPS are intended to cause the business failure of the Debtor and result in CAP forfeiting IYS's security deposits aggregating $995,000.00 and the improvements that the Debtor has made to the stations that it operates. IYS believes the CAP Adversary will be vigorously contested and defended by the CAP Defendants over an extended and unknown period of time. The Debtor is confident and hopeful of a significant award of damages against CAP in the Adversary, the net proceeds of which will be used to fund payments to general non-priority unsecured Class 5 Claimants under the Plan.

CAP Motion to Allow and Compel Payment of Administrative Expense by Applying Debtor's Security Deposit to Satisfy Debtor's Obligations Under Assumed Agreements

CAP contends that it has or will incur repair costs for the IYS pushback stations returned to CAP and Leased Stations remaining with IYS. First, CAP filed a Motion to Allow and Compel Payment of Administrative Expense by Applying Debtor's Security Deposit to Satisfy Debtor's Obligations Under Assumed Agreements (the "Administrative Claim Motion") seeking allowance of an administrative expense for alleged expenses of repairs made to the pushback stations.[4] The first request was then duplicated by CAP including the same or similarly identical requests as reflected in the CAP Disclosure Statement and Plan of Liquidation, wherein CAP seeks reimbursement and offset of additional repair expenses. CAP proposes in its Administrative Claim Motion and Plan of Liquidation, to pay these repair costs and expenses by offsetting those amounts against the Debtor's Security Deposit totaling of $995,000.00 and held by CAP.

IYS disputes its liability for the alleged repair costs and expenses for reasons, including but not limited to (*i*) the alleged repairs appear to be upgrades of the pushback stations for which IYS does not have any financial responsibility for and/or (*ii*) replacing equipment that was fully functional. IYS is not responsible for upgrading or improving the condition of the stations or replacing equipment that had reached the end of its usable life, which has always remained CAP's responsibility. IYS denies any obligation to pay any of the repair cost and expenses as they would constitute a change of the allocation of the responsibility of those items as set forth in the parties' agreements. IYS has served discovery upon CAP to obtain documentation and evidence of the repairs and costs and awaits CAP's compliance with IYS's outstanding discovery. IYS believes that discovery of the repairs asserted in CAP's Administrative Claim Motion and Plan of Liquidation are directly related to the wrongful actions alleged in the CAP Adversary case number 24 – 00088. Count II of the CAP Adversary seeks damages of at least $422,875.00 for breach of contract and refusal to refund and return any portion of the Debtor's Security Deposit of $995,000.00. IYS believes that discovery and adjudication of the Administrative Claim Motion should be consolidated with ongoing discovery in the the CAP Adversary and the adjudication of the CAP Adversary on the merits.

<u>CAP Motion to Compel Debtor to Provide Information or, in the Alternative, for Relief from the Automatic Stay to Allow CrossAmerica Partners LP to Declare a Default</u>

On September 25, 2024, CAP filed a Motion to Compel Debtor to Provide Information or, in the Alternative, for Relief from the Automatic Stay to Allow CrossAmerica Partners LP to Declare a Default (the "Insurance Information Motion") to compel IYS to provide information regarding IYS' insurance policies and the Management Companies. IYS has maintained insurance required by its agreements with CAP and CAP has always been aware of IYS' insurance coverage and policies as it is a named insured on the policies. IYS views the Insurance Information Motion as yet another an effort by CAP to not only distract the Debtor from its reorganizational efforts but to also unreasonably increase IYS' costs and expenses in defending yet another unfounded motion meant to interfere with its Debtor In Possession operations. IYS' attorneys and Chief Restructuring Officer working have provided proof of current insurance coverage of IYS and the Management Companies including but not limited to insurance policies, endorsements, additional insured provisions and waivers consisting of over 2,000 pages. CAP has asked additional questions concerning all of these matters which either IYS and/or the Management Companies will attempt to respond to in the ordinary course.

<u>Sale of Owned Stations</u>

---

[4] The Administrative Claim Motion seeks recovery and offset of the sum of $692,081.21, CAP's Disclosure Statement and Plan of Liquidation seeks recovery and offset of the higher amount of $696,898.88 wherein CAP has asserted a new obligation of IYS for repairs to the Leased Stations of $398,600.00, which it has by $102,797.00 as an erroneous charge to IYS.

Prior to the Petition Date, IYS purchased ten (10) stations from the CAP Entities. The Owned Stations are as follows:

i. 3748 N. High School Rd., Indianapolis, IN
ii. 8598 Michigan Rd., Indianapolis, IN
iii. 1001 W. Irving Park Rd., Streamwood, IL
iv. 10843 Montgomery Rd., Cincinnati, OH
v. 830 E. Cherry St., Vermillion, SD
vi. 304 E. College Dr., Marshall, MN
vii. 1903 Dakota Avenue, Huron, SD
viii. 727 Main St., Red Wing, MN
ix. 615 9th Street, S.E., Watertown, South Dakota
x. 314 E. Badger St., Waupaca, WI.

IYS received an offer to purchase its station located in Watertown, South Dakota, from the owner of an adjoining property. The station had never pumped motor fuel since being purchased from CAP due to issues with underground tanks. The purchase price was $350,000.00, and the Bankruptcy Court approved the sale transaction over the objection of CAP which sought to enforce its fuel supply agreement as to the purchaser (who did not intend to operate a gas station), notwithstanding that CAP had waived the fuel supply agreement as to this station. The Court granted IYS's motion to sell the Watertown, South Dakota station to Mr. Anderson by order entered on December 6, 2023 (Docket No. 365). The sale transaction closed in December 2023.

Pursuant to an agreement between Freedom Medical, Inc., and IYS, the Court granted IYS' motion to sell the remaining nine (9) Owned Stations to Freedom Medical, Inc., by order entered on February 21, 2024 (Docket No. 498). The nine (9) Owned Stations were sold "as is" for $2,450,000.00, subject to a credit to Freedom Medical repaying its two (2) post-petition loans.

<u>Pushback and Surrender of Leased Stations</u>

During the Chapter 11 Case, the CAP Entities and IYS reached agreements to pushback and surrender twenty-two (22) of the Leased Stations (the "**Marketing Premises**" or "**Pushback Stations**") to the CAP Entities. The agreements relating to the pushback and surrender of the Marketing Premises were documented in substantially similar Mutual Franchise Termination Agreements (**PMPA**) ("**MTA**" or the "**MTA(s)**") that were approved by the Court. The CAP and IYS' agreement and the MTA(s) obligated the CAP Entities to, *inter alia*, pay IYS for the gasoline and motor fuel products at the Pushback Stations, pay IYS for the inventory of convenience store products at the Pushback Stations and to refund Security Deposits.

The marketing premises comprising the Pushback Stations were as follows:

3321 West Algonquin Road, Rolling Meadows, Illinois (IL0097)
12567 Florida Boulevard, Baton Rouge, Louisiana (LA0054)
1648 Pitkin Road, Leesville, Louisiana (LA0057)
1764 North Parkerson Avenue, Crowley, Louisiana (LA0060)
501 W Washington Street, Marquette, Michigan (MI0001)
405 N Stephenson Avenue, Iron Mountain, Michigan (MI0002)
202 Eighth Street S, Virginia, Minnesota (MN0010)
920 Mankato Avenue, Winona, Minnesota (MMN00018)
301 Fourth Street, International Falls, Minnesota (MN0025)
1709 Second Avenue, International Falls, Minnesota (MN0026)
5995 Hodgson Road, Shoreview, Minnesota (MN0039)

221 Haines Road, Hermantown, Minnesota (MN0045)
8200 Columbia Road, Olmsted Falls, Ohio (OH0077)
10300 Brookpark Road, Brooklyn, Ohio (OH0088)
223-225 West Kemp Avenue, Watertown, South Dakota (SD0002)
512 South Sanborn Boulevard, Mitchell South Dakota (SD0004)
237 Keller Avenue, Amery, Wisconsin (WI0003)
1040 Bergslien Street, Baldwin, Wisconsin (WI0005)
1 Hewett Street, Neilsville, Wisconsin (WI0054)
706 N 4th Street, Tomahawk, Wisconsin (WI0057)
100 Second Street, Hudson, Wisconsin (WI0062)
406 Belknap Street, Superior, Wisconsin (WI0063)

The Security Deposits secured IYS's performance under the Leases and Fuel Service Agreement for the Stations including the surrendered Pushback Stations. Upon surrender of the Marketing Premises, all of IYS' obligations under the Leases and relating to the Pushback Stations have been terminated. When the Marketing Premises were surrendered to the CAP Entities, the portion of the Security Deposits relating to the Pushback Stations were no longer required. IYS has repeatedly requested that the CAP Entities provide it with "Landlord's procedures then in effect" pursuant to Article II, **Rent** Section 2.3 of the Leases, and "Landlord's post-termination procedures as furnished in writing to Tenant from time to time" pursuant to Article IX **Events Of Default** Section 9.1 of the Leases. The CAP Entities failed to establish "Landlord's procedures then in effect" pursuant to Article II, **Rent,** Section 2.3 of the Leases. The CAP Entities failed to establish and publish "Landlord's post-termination procedures as furnished in writing to Tenant from time to time" pursuant to Article IX **Events Of Default**, Section 9.1 of the Leases. The CAP Entities have not provided IYS with "Landlord's procedures then in effect" pursuant to Article II, **Rent**, Section 2.3 of the Leases. The CAP Entities have not provided IYS with "Landlord's post-termination procedures as furnished in writing to Tenant from time to time" pursuant to Article IX **Events Of Default**, Section 9.1 of the Leases. The CAP Entities maintain that its procedures relating to the Security Deposits is as follows:

> CAP has been unable to locate a specific written document; however, the usual procedure with security is to hold the security for a time to account for any bounced drafts, late billed fuel loads, credit card chargebacks or other expenses that are the dealer's responsibility but unbilled at the transition. In addition, CAP inspects the stations and the security is used to address any damage, deferred maintenance or other expenses that the dealer is responsible for paying. Finally, CAP evaluates the security on hand against the dealer's other remaining obligations— here, vis-à-vis the relationship at the remaining locations and IYS's other contractual obligations including with regard to CAP's legal expenses.

IYS has repeatedly demanded that the CAP Entities refund the proportionate amount of the Security Deposits relating to the Pushback Stations. The CAP Entities have failed and refused to refund any portion of the Security Deposits relating to the Pushback Stations to IYS. The Security Deposits relating to the Pushback Stations constitute property of the Estate. Because of the CAP Entities refusal to refund the Security Deposits and its post-petition interference with its business operations, IYS filed the multi-count Adversary Complaint against the CAP Entities, CAPL Retail, LLC, Robert Brecker, Amy Shupp and Steven Lattig seeking relief and damages in the CAP Adversary discussed above (24-00088). IYS believes the CAP Adversary will be vigorously contested and defended by CAP over an extended and unknown period of time. The Debtor is confident and hopeful of a significant award of damages in the CAP Adversary, the net proceeds of which will be used to fund payments to general non-priority unsecured Class 5 Claimants under the Plan.

## POST CONFIRMATION MANAGEMENT AND COMPENSATION

The Reorganized Debtor shall be managed in the future by Muwafak Rizek under the supervision of the IYS Ventures, LLC Creditor Trust Trustee. Mr. Rizek's duties are extensive and hands on management of all business affairs and operations of the Leased Stations and Owned Stations operated by the Debtor. The Reorganized Debtor's post confirmation management shall be compensated, and Mr. Rizek's annual compensation shall not exceed $130,000.00 until calendar year 2026, and only after distribution of the $800,000.00 to allowed Class 5 general non-priority unsecured claims pursuant to the terms of the Plan, not including bonuses, if any. Matthew Brash and Newpoint Advisors Corporation, who shall serve as the Disbursing Agent and now Trustee of the IYS Ventures LLC Creditors Trust shall oversee and assist Mr. Rizek in the management of the Reorganized Debtor's business operations and cash management system. Mr. Brash shall be compensated pursuant to his hourly fee schedule in effect from time to time and as more fully set forth in the IYS Ventures LLC Creditors Trust Agreement.

## FINANCIAL INFORMATION REGARDING THE PLAN

The Debtor has projected that its sources of funding will generate sufficient funds to make the disbursements and payments required under the Plan. Debtor's Projected Statement of Cash Flow is attached hereto as Exhibit C and made a part hereof. Copies of the Debtor's Statements of Revenue and Expenses for calendar years 2022 and 2023 and Income Statement/Statement of Operations for current calendar year through September 30, 2024, are attached hereto as Exhibit D and made a part hereof. The Debtor's summary of post-petition financial history through September 30, 2024, is attached hereto as Exhibit E and made a part hereof.

## SUMMARY OF OTHER PROVISIONS OF THE PLAN

**Disbursing Agent** – Matthew Brash and Newpoint Advisors Corporation through the IYS Ventures, LLC Creditors Trust shall serve as the Disbursing Agent for all payments under the Plan to Class 5 Claimants, and shall otherwise oversee and assist the Reorganized Debtor in payment of all other distributions and payments required by the Plan.

**Method of Distribution under the Plan:**

1. **Sources of Cash for Plan Distribution -** Except as otherwise provided in the Plan or the Confirmation Order, all cash necessary for the Debtor to make payments pursuant to the Plan to Allowed Administrative Claims, Priority Claims, Priority Tax Claims, Secured Claims and General Unsecured Non-Priority Claims will be from *i*) the continued operations of the Leased Stations, *ii*) New Credit Facility loan of $800,000.00 to the Reorganized Debtor and IYS Ventures, LLC Creditors Trust to fund distributions to allowed Class 5 general unsecured non-priority claims, *iii*) the Net Proceeds of Litigation Claims including the PMPA Adversary and CAP Adversary, and *iv*) the monetization and sale of the Reorganized Debtor's equity membership interests upon completion of all plan payments. See Projected Statement of Cash Flow attached hereto as Exhibit C.

2. **Distributions for Claims or Interest Allowed as of the Effective Date -** Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Class 5 Claims that are Allowed Claims as of the Effective Date shall be made for four years on the anniversary of the Effective Date. Net proceeds from the prosecution of the Litigation Claims shall be made annually upon collection of any judgment or settlement in favor of Debtor. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

3.     **Interest on Claims** - Unless otherwise specifically provided for in the Plan or Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, and no Holder of any other Claim shall be entitled to receive interest accruing on or after the Petition Date on any such Claim.

4.     **Distributions** - Matthew Brash and Newpoint Advisors Corporation through the IYS Ventures, LLC Creditors Trust shall serve as "Disbursing Agent" for all Distributions required by the Plan to allowed Class 5 Claims.

**Provisions Governing Distributions:**

A.     **Delivery of Distributions in General** - Distributions to holders of allowed claims shall be delivered to the addresses set forth in the Debtor's records unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001.

B.     **Undeliverable and Unclaimed Distributions** - Any funds distributed to the Holders of Allowed Claims that remain unclaimed by such claimants for three (3) months after disbursement will become property of the Debtor. Any claimant failing to claim property distributed pursuant to the Plan will not be able to recoup such property in subsequent distributions and will be deemed barred from any future claim in law or equity. If the distribution to any Holder of an Allowed Claim is returned as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Debtor is notified in writing of such Holder's then current address.

5.     **Means of Cash Payment** - Payments of distributions proposed under this Plan shall be made in lawful currency of the United States and shall be made, at the option and in the sole discretion of the Debtor, by (a) checks drawn on or (b) wire transfer from a domestic bank selected by the Debtor. Cash payments to foreign creditors may be made, at the option of the Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

6.     **Withholding and Reporting Requirements** - In connection with the Plan and all distributions thereunder, the Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Debtor will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. Notwithstanding any other provision of the Plan, each holder of an Allowed Claim or Interest entitled to receive a distribution of cash pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.

7.     **Setoffs** - The Debtor may, pursuant to § 553 of the Bankruptcy Code or applicable non-bankruptcy laws, but shall not be required to, set off against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, any Litigation Claim that the Debtor may have against the Holder of such Claim, provided however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such Litigation Claim that it may have against such Holder.

8.     **Resolution of Disputed, Contingent and Unliquidated Claims** - The Claim Objection Deadline for filing objections to Claims or Interests will be sixty (60) days after the Effective Date as to both

non-governmental and non-foreign claims, governmental claims and foreign claims. Any properly filed claim or interest to which no objection is filed by the Debtor by the applicable deadline is deemed to be allowed.

If any Allowed Claim contains a contingent and unliquidated amount, then no distribution shall be made to such claimant subject to the following: If any such claim exists on any Distribution Date, the Debtor shall continue to hold, for the claimants asserting such contingent and unliquidated claim, the entire amount of the liquidated, contingent and unliquidated claim that would be required to be disbursed thereto within the provisions of this Plan, as if each contingent and unliquidated claim were to be allowed in full and until a "Final Claim" is filed. The Debtor shall disburse not more than thirty (30) days following the filing of such "Final Claim" to the holder of such allowed claim the appropriate pro rata dividend. Any "Final Claim" shall be filed no later than one (1) year from the Effective Date of the Plan or such contingent and unliquidated amounts of a claim shall be disallowed and forever barred.

**9.    Amendment or Modification of the Plan -** Subject to § 1127 of the Bankruptcy Code and, to the extent applicable, §§ 1122, 1123 and 1125 of the Bankruptcy Code, the Debtor reserves the right to alter, amend or modify the Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan. A holder of a claim or interest that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified, if the proposed alteration, amendment or modification does not materially or adversely change the treatment of the claim or interest of such holder.

**AGAIN, THE READER OF THIS DISCLOSURE STATEMENT IS DIRECTED TO THE APPLICABLE SECTIONS OF THE PLAN FOR A MORE COMPLETE DISCUSSION OF THE VARIOUS OTHER PROVISIONS OF THE PLAN.**

**CONFIRMATION PROCESS**

**10. Confirmation of Plan:** The Debtor's implementation of its Plan depends on whether creditors vote to accept the Plan and, thereafter, whether the Court confirms or approves the Plan. The Bankruptcy Code provides that only creditors whose claims are impaired within the meaning of § 1124 of the Bankruptcy Code are entitled to vote on the Plan. Essentially, the Plan impairs a creditor's claim if it alters that creditor's legal or equitable rights. Creditors whose claims are not impaired (i.e. who will receive everything to which they are legally entitled) are deemed to have accepted the Plan and need not vote their acceptance. Likewise, creditors who receive nothing under the Plan are deemed to have rejected the Plan.

In calculating the votes that are cast under a particular Plan, under the Bankruptcy Code, a class of claims is considered to have accepted the Plan if both a majority in number and two thirds (2/3) of the dollar amount of those claims actually voting do vote to accept the Plan. The claims of those who do not vote are not counted in determining whether the requisite statutory majority in number and dollar amount have voted for acceptance. Acceptance by this statutory majority will bind the minority who dissent.

**11. Cram Down of Plan**: In the event the requisite acceptances are not obtained from classes of creditors and interest holders, the Debtors may, and does intend to, request that the Court confirm the Plan pursuant to the cram down provisions, or § 1129(b), of the Bankruptcy Code. Under this provision of bankruptcy law, the Court may confirm the Plan if the Court finds that the Plan provides fair and equitable treatment to the class rejecting it. In other words, if one or more classes rejects, or is deemed to have rejected, the Plan, the Court may nevertheless confirm the Plan if it finds that (*i*) at least one class of impaired non-insider creditors has approved the Plan; (*ii*) the rejecting class of creditors would not have received more under Chapter 7 of the Code than under the Plan; and, (*iii*) the Plan is fair and equitable. For the Plan to be fair and equitable, it must not unfairly discriminate against one class of creditors, and creditors of junior

priority cannot receive any distribution if creditors holding a superior priority are either not paid in full or do not consent to the distribution. If the Plan meets these standards, then the Court may confirm the Plan over the objections of the class of dissenting creditors.

**12. Effect of Confirmed Plan:** The provisions of a confirmed plan bind all parties, including the Debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and all creditors, equity security holders, or general partners in the debtor, whether or not the claim or interest of such creditors, equity security holders, or general partners are impaired under the plan and whether or not such creditors, equity security holders, or general partners have accepted the plan. Except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that from and after the Confirmation Date all persons who have held, hold or may hold claims against or interests in the Debtor are (i) permanently enjoined from taking any of the following actions against the estate, or any of its property on account of any such claims or interests and (ii) permanently enjoined from taking any of the following actions against the Debtor or its property on account of such claims or interests: (A) commencing or continuing, in any manner or in any place, any action or other proceeding on their claims; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting or enforcing any lien or encumbrance; (D) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor; and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such persons from exercising its rights pursuant to and consistent with the terms of the Plan.

<u>Plan Injunction</u> – The Plan and the Confirmation Order shall include, among other things, for a Plan Injunction that provides that from and after the Confirmation Date all entities and persons who have held, hold or may hold Claims against or Interests in the Debtor who had or were sent notice of these confirmation proceedings, their respective successors or assigns thereto, or anyone claiming under or through such holders are (i) **permanently enjoined from taking any of the following actions against the estate, property of the estate or the Debtor on account of any such claims or interests and (ii) preliminarily enjoined from taking any of the following actions against the estate, property of the estate or the Debtor on account of such claims or interests: (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting or enforcing any lien or encumbrance; (D) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor; (E) filing, serving or asserting any notice of termination, nonrenewal or other cessation of any contract, lease, franchise or other agreement based on any act, occurrence, event or combination thereof occurring in whole or part prior to the Effective Date; and (F) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such entities and persons from exercising their rights pursuant to and consistent with the terms of the Plan**. **The Plan Injunction in this paragraph is a §1141 discharge.** The Court shall have jurisdiction to determine and award damages to the Reorganized Debtor for any violation of such injunction including compensatory damages, professional fees and expenses and exemplary damages for any willful violation of said injunction, provided a copy of this injunction has been served on any party sought to be held in contempt of it.

**13. Voting Procedures:** If you are entitled to vote to accept or reject the Plan, a Ballot will be provided to you. Please carefully follow the instructions set forth in the Ballot and vote and file your Ballot with the Bankruptcy Court on or prior to on the Voting Deadline so that it is received by the Court by that date and time at:

The Clerk of Court
United States Bankruptcy Court
219 South Dearborn Street
Seventh Floor
Chicago, Illinois 60604

With a copy mailed to Debtor's Counsel:

Gregory K. Stern, Esq.
53 West Jackson Boulevard
Suite 1442
Chicago, Illinois 60604

Authorized ECF filers shall file electronically at the Court's website, www.ilnb.uscourts.gov

**TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE BANKRUPTCY COURT NO LATER THAN THE VOTING DEADLINE SPECIFIED IN THE BALLOT (THE "VOTING DEADLINE").**

**ANY BALLOT THAT IS EXECUTED BUT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN AND ANY BALLOT THAT IS NOT EXECUTED OR IN WHICH BOTH THE ACCEPTANCE AND REJECTION BOX IS CHECKED WILL BE CONSIDERED NULL AND WILL NOT BE COUNTED.**

**ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR ENTITLED TO VOTE ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, AND TO CONSULT WITH AN ATTORNEY OR OTHER PROFESSIONAL BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE AND BANKRUPTY RULE 3019, AND IN THE PLAN. THE DEBTOR RESERVES THE RIGHT TO MODIFY THE PLAN, OR ANY PART THEREOF, PRIOR TO OR AFTER ENTRY OF THE CONFIRMATION ORDER, PROVIDED THAT THE PLAN, AS MODIFIED, MEETS APPLICABLE BANKRUPTCY CODE REQUIREMENTS AND DOES NOT MATERIALLY AND ADVERSELY AFFECT THE INTERESTS, RIGHTS, TREATMENT OR DISTRIBUTIONS OF ANY CLASS OF ALLOWED CLAIMS OR INTERSTS UNDER THE PLAN.**

If you are a Holder of a Claim entitled to vote on the Plan and do not receive a ballot, receive a damaged ballot, lose your ballot, or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Debtor's counsel, Gregory K. Stern at (312) 427-1558.

## RISK FACTORS TO BE CONSIDERED

Because the Debtor is reorganizing the ordinary risk factors inherent in reorganization are present, and as such are dependent upon a number of factors.

The following specific risks exist in connection with confirmation of the Plan:

1. Any objection to the Plan filed by a member of a Class could either prevent or delay confirmation of the Plan.
2. In the event that certain Classes fail to meet the minimum Class vote requirements, as described above, the Debtor may request a cramdown of such non-accepting Classes. Failure to secure a cramdown confirmation or to suitably amend the Plan, if required, will in all likelihood prevent confirmation of the Plan.
3. Adverse economic conditions could possibly impair the future profitability of the Reorganized Debtor to the extent of precluding its ability to make the payments to creditors from its cash resources.
4. An adverse order entered in the CAP Agreement Motions Litigation.
5. The loss of Leased Stations.

## CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan is preferable to the alternatives described above because it will result in the greatest recoveries to holders of claims and interests. Accordingly, the Debtor strongly urges acceptance of the Plan.

This Disclosure Statement has been submitted on this 14th day of November 2024, by the Debtor.

IYS Ventures, LLC

By:   /s/ Muwafak Rizek
     Managing Member


    /s/ Gregory K. Stern
    Gregory K. Stern, Attorney for Debtor and
    Debtor In Possession




Gregory K. Stern (Atty. ID #6183380)
Monica C. O'Brien (Atty. ID #6216626)
Dennis E. Quaid (Atty ID #02267012)
Rachel S. Sandler (Atty. ID #6310248)
53 West Jackson Boulevard
Suite 1442
Chicago, Illinois 60604
(312) 427-1558